IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 21-cr-10158-7-MLW |
| | ) | |
| (7) THIAGO DE SOUZA PRADO | ) | |
| | ) | |
| Defendant | ) | |

**EMERGENCY MOTION FOR STAY**
**AND REVOCATION OF RELEASE ORDER**

The United States respectfully requests the Court revoke the May 21, 2021 Order of Magistrate Judge Bruce E. Reinhart (the "magistrate judge"), presiding in the Southern District of Florida, releasing defendant Thiago de Souza Prado on conditions, including GPS location monitoring. Under 18 U.S.C. § 3145(a)(1), this Court has jurisdiction over any government motion to revoke an order of pretrial release issued by a magistrate judge in the district where the defendant was arrested, which in this case is the Southern District of Florida. For the reasons set forth below, Prado presents a substantial risk of flight under the factors set forth in 18 U.S.C. § 3142(g), even with the conditions imposed by the magistrate judge, particularly given his use of GPS "spoofing" technology in the course of the charged offense. Because there are no conditions or combination thereof that can eliminate those risks, the government requests that this Court stay the release order until a hearing on this motion can be held by this Court, revoke the magistrate judge's order of release, and order Prado held pending trial.

1

## PROCEDURAL BACKGROUND

On May 6, 20201, Prado and 17 co-conspirators were charged via Complaint (No. 21-mj-5202-JGD) with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.[1] The Complaint alleges that the defendants conspired with each other and others known and unknown to create fraudulent driver accounts with multiple rideshare and delivery companies (the "Rideshare/Delivery Companies"), and to rent or sell the accounts to individuals who might not otherwise qualify to drive for those services.  A federal arrest warrant for Prado was issued the same day.

On May 12, 2021, Prado was arrested in Florida.  That same day, Prado appeared before the magistrate judge in the Southern District of Florida for an initial appearance and removal to this District, pursuant to Rule 5 of the Federal Rules of Criminal Procedure.  The government moved for detention based on a risk of flight under 18 U.S.C. § 3142(f)(2)(A).  Meanwhile, on May 17, 2021, a federal grand jury sitting in Boston returned a one-count Indictment charging Prado and 17 co-defendants on one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.

The magistrate judge held a hearing on the government's motion for detention of Prado on May 21, 2021.  At the conclusion of that hearing, at which the parties proceeded mainly by proffer, although defense counsel also cross-examined a government witness, Prado was ordered released on conditions, including posting a $100,000 unsecured personal surety bond, GPS location monitoring, travel restricted to the Southern District of Florida and the District of Massachusetts

---

[1] An additional co-conspirator was charged via Complaint (No. 21-mj-5196-JGD) with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 following a warrantless arrest on May 5, 2021.  This defendant was arrested at O'Hare Chicago Airport as he was preparing to board a flight to Mexico, from where he planned to return to Brazil.

for legal proceedings, and that Prado and his wife surrender their passports and any other travel documents. A copy of that Order is attached hereto as Exhibit A. The government notified the magistrate judge that it intended to seek review of the release order, and he stayed the release order pending further order of this Court.

**THE GOVERNMENT'S CASE AGAINST PRADO**

The Indictment alleges that, beginning by at least January 2019 and continuing through at least April 2021, in the District of Massachusetts and elsewhere, the defendants—Brazilian nationals living in the United States—conspired with each other and others to create fraudulent driver accounts from multiple rideshare and delivery companies, and to rent or sell the accounts to individuals who would not otherwise qualify to drive for those services. They engaged in the scheme by:

a. Obtaining images of victims' driver's licenses, or the information on victims' driver's licenses, and Social Security Numbers, from various sources including the DarkNet;

b. Editing images of driver's licenses, insurance documents, and other materials to submit to the Rideshare/Delivery Companies to create fraudulent accounts;

c. Creating accounts to drive for the Rideshare/Delivery Companies using those stolen identifiers;

d. Renting or selling those accounts, including to people who might not otherwise qualify to drive for the Rideshare/Delivery Companies;

e. Coordinating on prices charged to rent and sell accounts so as not to undercut each other's business;

f. Sharing tips about how to circumvent the Rideshare/Delivery Companies' fraud detection systems;

g. Causing the Rideshare/Delivery Companies to generate Internal Revenue Service Forms 1099 in the names of the identity theft victims for income they never earned, and attempting to divert those Forms 1099 from being sent to the victims;

3

h. Using fake driver accounts for the purpose of referring other drivers to the Rideshare/Delivery Companies, and then collecting referral bonuses from the companies for additional fake accounts that the conspirators created;

i. Utilizing GPS "spoofing" applications to "cut the line" for rides or deliveries, or to make it appear that trips were longer than they actually were, in order to obtain increased fares from the Rideshare/Delivery Companies, and selling this technology to drivers; and

j. Utilizing "bots" and other applications to grab more batches from the Delivery Companies and selling this technology to drivers.

The government's case against Prado shows that Prado prepared and submitted applications using fraudulent identifiers; rented and sold fraudulent driver accounts; purchased and traded driver's licenses and Social Security numbers; sold GPS "spoofing" technology to drivers; and exchanged information with other conspirators about how to circumvent the Rideshare/Delivery Companies' fraud detection systems.

In WhatsApp chats between Prado and co-defendant Wemerson Dutra Aguiar, which were obtained pursuant to a Court-authorized search warrant, for which draft summary translations have been prepared, Prado exchanged driver's licenses, Social Security numbers, and information about how to get accounts approved.  For example, on or about July 28, 2020, Prado and Aguiar discussed creating accounts, and Prado explained that he installed a software program to re-set his cell phones and clear his phone's cache to prevent the devices from being detected by the rideshare company identified in the Indictment as "Rideshare Company A."  On or about August 9, 2020, Prado informed Aguiar that he (Prado) was acquiring one to two accounts with Rideshare Company C per week, and advised Aguiar not to change the driver's photo on his accounts with Rideshare Company C, because it would cause the account to be shut down.  Instead, Prado advised Aguiar to have the driver wear a hat if the driver did not resemble the photo associated with the fraudulent account.  On or about August 12, 2020, Prado notified Aguiar that he had purchased a laser printer

for $650 on Amazon.  Prado explained that he printed victims' driver's licenses that had been edited with the driver's photo on photo quality paper to get past the Rideshare/Delivery Companies' software that detects edited images.

Prado also told Aguiar that he had obtained a GPS "spoofing" application.  On or about February 23, 2020, Prado explained to Aguiar how the GPS "spoofing" app worked and that the Rideshare Companies cannot detect that the app was used.  Prado told Aguiar he was selling the "spoofing" app to drivers for $500.  Prado also told Aguiar that he knew a lot about using the GPS "spoofing" app to cheat by putting the car in front of the line or turning a 10-mile trip into a 20-mile trip, and that Prado had been using the app for six months in his rides.  Prado explained that he used separate phones with the GPS "spoofing" app for Rideshare Company A and Rideshare Company C, because Rideshare Company A's geolocation tracking caused conflict.  On or about February 25, 2020, Prado told Aguiar that he was able to manipulate "surge" fares through his use of the GPS "spoofing" application.

Data obtained from the Rideshare/Delivery Companies corroborates these chats.  Fore example, Rideshare Company A collected metadata on driver accounts, including the location where the account was created.  This metadata shows that a number of fraudulent accounts were created in the vicinity of Overlook Ridge in Revere, Massachusetts, where Prado previously resided.  For example, on or about March 5, 2020, an account with Rideshare Company A in the name of a victim was created in the vicinity of Overlook Ridge.  The driver's license image associated with this account reflected the victim's personal identifying information, but Prado's photo.  GPS data placed the driver using the account in the area of Overlook Ridge at times when the driver was not completing trips.  This account is associated with telephone number 508-308-9803 (the "Prado Telephone"), which is the same telephone number associated with an iCloud

account subscribed to Prado and with WhatsApp chats between Aguiar and the individual believed to be Prado, who is identified in Aguiar's contacts as "Thiago N."

Rideshare Company A identified approximately ten other fraudulent accounts with driver's license images bearing Prado's photo (the "Prado Accounts").  Many of the Prado Accounts were linked to a vehicle registered to Prado's wife, whose account was also used to refer some of the Prado Accounts to Rideshare Company A.[1]  The WhatsApp messages between Prado and Aguiar reflect that five accounts identified by Rideshare Company A as linked to Prado's wife's account were created for Prado by Aguiar.  Those messages indicate, in substance, that Prado sent Aguiar driver's license images for these five accounts; that Aguiar obtained the corresponding Social Security numbers to be used with these five accounts; and that Prado sent $1,000 via Zelle to Aguiar with the note "SS," which is believed to be a reference to "Social Security."  Specifically, the $1,000 transfer came from an account in the name of a female individual ("Subject 1").  Prado sent Aguiar a photo of the confirmation that he had sent the $1,000 payment on or about February 23, 2020.  The only payment for $1,000 to Aguiar on that date was from Subject 1.  Other payments from Prado to Aguiar were also sent from Subject 1's account.  In WhatsApp chats, Prado also told Aguiar that he used his girlfriend's account to send payments.

In or about October 2020, ten accounts with the delivery company identified in the Complaint and Indictment as "Delivery Company B" were created in the names of ten different victims from the Comcast IP Address 73.123.253.111.  The profile photographs and driver's license images uploaded for these accounts bear the image of Prado or co-defendant Luiz Nascimento Alves Neto.  IP Address 73.123.253.111 is a Comcast IP address subscribed to Prado

---

[1] During a WhatsApp chat with Aguiar on or about February 23, 2020, Prado said he was filling his wife's account with referral bonus money.

at 19 Overlook Ridge Terrace, Apartment 204, in Revere, Massachusetts and is associated with the Prado Telephone.  Delivery Company B has identified additional fraudulent accounts that were created from this same IP address.  According to the GPS data collected by Delivery Company B, one of these accounts was active in the vicinity of Overlook Ridge.

Additionally, in or about March 2020, Prado referred another co-conspirator to AGUIAR as someone who could edit driver's licenses.

## THE DETENTION HEARING

At the detention hearing, the magistrate judge took judicial notice of the Pretrial Services Report, the Complaint, and the Indictment.  The government proffered that, in furtherance of the offense, Prado purchased victims' personal identifying information from other co-conspirators and from the DarkNet to create fake identification documents, which he then used to open fraudulent driver accounts with the Rideshare/Delivery Companies.  He also used and sold GPS "spoofing" technology to mask drivers' true locations to "cut the line" for deliveries and to make trips seem longer than they were to increase the fare.  The government also proffered that Prado had only recently moved to Florida approximately three months earlier and did not own any property there or in Massachusetts, where he had previously resided.

The government further proffered that several co-conspirators had already fled or attempted to flee the United States.  Namely, co-defendants Itallo Felipe Pereira de Sousa Correa and Julio Vieira Braga fled from California to Cancun, Mexico shortly after co-defendants began being arrested on May 7, 2021.  Sousa Correa and Braga attempted to fly from Cancun to São Paolo, Brazil, but were detained when they landed for a connecting flight in Panama City, Panama, and are currently in extradition proceedings.  Two other co-defendants, identified in the Indictment as "Defendant D" and "Defendant Q," also fled by driving to Mexico, but took direct flights from

Mexico City to São Paolo, thereby evading capture.  An additional suspected co-conspirator, the wife of defendant Guilherme da Silveira, booked a flight to Brazil the day her husband was arrested, and left with their infant son the next day, despite that she had not even been charged yet.

The government also proffered that Prado's family ties to the United States were limited. The government further proffered that Prado did not have any legitimate employment, and his only income was from the unlawful activities charged in this case.  The government proffered that Prado had significant ties overseas, particularly to Brazil.

The defense proffered that Prado was residing with his wife and young child.  The defense also proffered that Prado's current wife and son, who are also from Brazil, have no intention of returning to Brazil because of threats of violence against her and her son and they have a pending asylum claim.  Prado has joined this claim.  The defense further proffered that Prado's immediate family is located in Massachusetts and that his extended family is located in Brazil.  The defense also cross-examined a government witness regarding how many of the 2,000 victims are attributable to Prado, the timing of Prado's travel to Florida prior to the issuance of the charges in this case, and whether there was corroborating evidence that Prado actually used the GPS "spoofing" technology or if it actually worked.

## ADDITIONAL BACKGROUND RELEVANT TO DETENTION

In addition to the information the government proffered at the detention hearing, it is also notable that Prado received significant proceeds from the alleged scheme and has the financial ability to flee.  In the span of less than six months, between September 22, 2020 and March 1, 2021, Prado received approximately $133,430.69 in his Citizens Bank accounts ending in x9018 and x7233.  More than half of those funds, approximately $79,089.45, were from Zelle and Cash App transfers.  These mobile payment applications were the primary way conspirators paid each

8

other for victims' personal identifying information and for renting or buying fraudulent driver accounts or GPS "spoofing" technology.  None of the deposits appear to be payroll.  From these funds, Prado sent approximately $5,813.80 via Transferwise, a mobile application for sending money overseas.

Prado also had access to a Bank of America account ending in x7850 in the name of another person.  Specifically, Prado sent several payment confirmations to co-defendant Aguiar, which corresponded to transfers from this individual's account.  This account received approximately $118,689.29 in deposits between June 2019 and March 2021, including approximately $29,592.34 from Rideshare/Delivery Companies and approximately $53,389.58 in Zelle deposits.  During that same period, approximately $15,858.50 was transferred out of the account via Transferwise.

Prado's wife obtained civil restraining orders against him in August 2018, January 2019, and February 2019.  The last of these expired in November 2020.  The January 2019 restraining order also prevented Prado from having contact with his teenage son.  Prado has been cited for failure to pay child support on several occasions in 2018 and 2020.

Prado also has a history of defaults in at least four prior Massachusetts state court proceedings, including as recently as 2019.

## **LEGAL STANDARD**

"If a person is ordered released by a magistrate judge . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release. . . . The motion shall be determined promptly."  18 U.S.C. § 3145(a).  As Prado is charged in the District of Massachusetts, this Court has original jurisdiction over the offense and is the proper forum to hear the Government's Emergency Motion for Stay and Revocation of a Release Order.

The district court reviews a release order *de novo*. *See United States v. Tortora*, 922 F.2d 880, 884 n.4 (1st Cir. 1990) (with respect to pretrial detention or release orders, the proper approach is for the district court to engage in *de novo* review of the contested order). *Tortora* mandates that the district court must make an independent determination of the detention decision, unconstrained by the limits of the magistrate's conclusions or the record established in the original detention hearing. *See also United States v. Leon*, 766 F.2d 77, 80 (2nd Cir. 1985) ("In our view a district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion."). Accordingly, in its discretion, this Court may proceed to rehear the evidence to support detention by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not raised previously. In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required.

Pursuant to 18 U.S.C. § 3142(g) the Court shall consider: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. The preponderance standard governs the flight risk determination. *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991). That is, a detention order should issue if the judicial officer should determine that it is more likely than not that no condition or combination of conditions will reasonably assure the accused's appearance. *United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985) (distinguishing this standard

governing the flight risk determination with the higher clear and convincing burden of proof that governs detention based on danger to the community).

## **ARGUMENT**

Prado's use of others' identities, access to the DarkNet and GPS "spoofing" technology, potentially lengthy sentence, and ties to Brazil demonstrate that he poses a risk of flight that cannot be mitigated by conditions of release.

Prado is a Brazilian national, and Brazil does not extradite its own citizens. If Prado can get to Brazil—as two of his co-defendants already have—he can escape any punishment for the charged offense or any likely forthcoming charges. As alleged in the charging documents, the government has identified more than 2,000 fraudulent accounts created using victims' personal identifying information, including their Social Security numbers, across the entire conspiracy. Under USSG § 2B1.1, App. Note 3(f)(i), each Social Security number is an "access device," to which $500 of loss is attributed. At 2,000 fraudulent accounts—and 2,000 Social Security numbers—the estimated loss is $1 million. Coupled with additional enhancements given the number of victims; that a substantial part of scheme was committed from outside U.S. and the offense involved sophisticated means; and that the offense involved the possession and use of device-making equipment, the production and trafficking in unauthorized access devices, and the possession of 5 or more means of identification unlawfully produced from another means of identification, defendants are looking at sentencing guidelines of 70 to 87 months. Even if Prado can show that the entire loss was not reasonably foreseeable to him, he is still facing potential aggravated identity theft charges, which carries a two-year mandatory sentence consecutive to any sentence he receives on the conspiracy to commit wire fraud charge. Further, after serving his sentence, Prado will likely be deported to Brazil.

11

That five co-conspirators already fled or attempted to flee demonstrates the ease with which Prado could flee and how appealing it is to flee rather than face a potential lengthy prison sentence followed by deportation.  Co-defendants Sousa Correa and Braga were able to cross the border to Mexico without detection and fly from Cancun before being detained in Panama City.  Defendant D and Defendant Q likewise fled by crossing into Mexico by land to avoid detection, and flew direct to Brazil to avoid apprehension.  Defendant D in particular left her car behind in Massachusetts and appears to have driven in another vehicle to Laredo, Texas where she crossed the border.  Even defendant Da Silveira's wife, who had not yet been charged and whose child was born in the United States, left behind her husband and fled with their infant to Brazil the day after Da Silveira was arrested.  Should Prado cut off his GPS bracelet, he could likewise easily flee to Mexico and fly from there to Brazil before authorities could notify the Mexican authorities to stop him, as both Defendant D and Defendant Q successfully did.  Prado's access to other's identification documents makes it all the more difficult to trace him should he use fake identifications in an attempt to flee.

What is more, Prado does not even need to cut off his GPS bracelet to escape.  The government's investigation has shown that Prado has access to the DarkNet, and specifically to GPS "spoofing" technology.  Prado discussed this technology at length with Aguiar over WhatsApp.  He not only sold the technology to drivers and taught them how to use it, but he also used it himself and provided troubleshooting to drivers who experienced issues with the app.  GPS monitoring transmits location data via cell phone frequencies, similar to how the cell phones the drivers to whom Prado sold and taught to use the technology transmit location data, and it is not a leap for Prado to trick a GPS bracelet with the use of GPS "spoofing" technology.

Prado has resided in the United States since 2003, with almost all of that time in Massachusetts.  Prado moved to Florida only approximately three months ago.  He is staying with his wife, who has had several restraining orders against him, and who herself may be involved in the scheme.  In any event, the flight of defendant Da Silveira's wife demonstrates that having a wife and child in the United States is no guarantee that the wife and child will not return to Brazil.[1]

Prado has no legitimate employment as he is not authorized to work in the United States. He owns no property here.  Nevertheless, Prado has the resources to flee and financial ties overseas. He has received more than $250,000 in deposits into his accounts and an account in the name of another individual that he controlled.  These accounts combined have sent more than $20,000 overseas via Transferwise, evidencing Prado's ties abroad.

Finally, Immigration and Customs Enforcement has lodged an immigration detainer against Prado.  Should he be released, ICE may detain him and possibly deport him, which would also allow him to escape the potential punishment he faces here.

Given Prado's access to the DarkNet, victims' personal identifying information, and GPS "spoofing" technology, his lack of legitimate ties to Massachusetts or Florida, his ties overseas, the strength of the government's case, the amount of time he is facing upon conviction, and the likelihood that he will be deported at the end of his sentence, the government submits there are no conditions or combination of conditions that can assure his appearance in court.

---

[1] The government understands Prado's wife has an asylum claim pending, but is unaware of the basis for this claim.

## CONCLUSION

Prado is a flight risk and there are no conditions that can reasonably assure his appearance at trial.  Accordingly, this Court should revoke the order of release and detain Prado pending his transportation to the District of Massachusetts.

Respectfully Submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:    */s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
DAVID M. HOLCOMB
Assistant U.S. Attorneys


Dated: May 24, 2021


## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of this motion to be sent to counsel for defendant in the Southern District of Florida by transmitting a copy of it by e-mail to Assistant Federal Public Defender M. Caroline McCrae on May 24, 2021.

*/s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant U.S. Attorney

14