UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(7) THIAGO DE SOUZA PRADO,<br><br>Defendant. | Docket No. 21-cr-10158-7-MLW |

### DEFENDANT THIAGO DE SOUZA PRADO'S MOTION FOR RELEASE FROM CUSTODY

### INTRODUCTION

Defendant Thiago de Souza Prado, by and through his counsel, respectfully submits this Motion for Release from Custody. For the reasons set forth below, Mr. Prado—who is presently detained at the Wyatt Detention Facility in Rhode Island—requests that the Court order his release from custody during the pendency of this matter. Mr. Prado further requests that this Court hold a hearing on his Motion at its earliest convenience.

### STATEMENT OF FACTS

**Mr. Prado**

Thiago de Souza Prado is a Brazilian national who has lived in the United States for nearly 20 years. Mr. Prado and his wife of nearly five years, who is also a Brazilian national, have an infant son.[1]

Mr. Prado has limited ties to Brazil and substantial ties to the United States. Before his arrest, Mr. Prado lived with his wife, infant son, and 14-year-old stepson in Boca Raton, Florida.

---
[1] Mr. Prado also has a 14 year-old son from a previous relationship who resides in Massachusetts.

Previously, Mr. Prado resided in Massachusetts from January 2003 until early 2021. Mr. Prado's immediate family also resides in the United States. Mr. Prado's mother lives in Massachusetts. In addition, Mr. Prado has two sisters who live in Massachusetts.[2]

Prior to moving to Florida, Mr. Prado owned and operated a successful painting business—Prado Painting Corporation—out of Framingham, Massachusetts, for nearly a decade.[3] Mr. Prado's business shut down due to issues caused by the COVID-19 pandemic, and his move to Florida was motivated by his efforts to obtain gainful employment. Mr. Prado intends to use his skills as a painter to secure work in Florida should the Court release him from custody. *See infra* at 13.

Both Mr. Prado and his wife entered the United States legally but have overstayed their authorized entry. They have both filed asylum claims based on their fear of facing physical violence upon returning to Brazil.

**The Complaint & Mr. Prado's Arrest**

On May 6, 2021, Mr. Prado was charged by Complaint with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. *See* ECF No. 22 (docketed May 12, 2021).[4] The Affidavit in Support of the Complaint alleged that Mr. Prado acted in furtherance of a conspiracy to "create fraudulent driver accounts" with rideshare and delivery companies and "to

---

[2] Mr. Prado only has limited extended family in Brazil.

[3] *See Business Entity Summary for Prado Painting Corp.*, SECRETARY OF THE COMMONWEALTH OF MASSACHUSETTS, CORPORATIONS DIVISION (last accessed on May 26, 2021), *available at* https://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?sysvalue=U.xOQsW5Jhj YKm2.zIH7o2OcNnUVfmVmYLCMODi5HiA-.

[4] Unless specifically noted otherwise, citations to "ECF No." refer to the docket for this action, *United States v. Prado*, No. 21-cr-10158-7 (D. Mass.).

rent or sell the accounts to individuals who might not otherwise qualify to drive for those services."

ECF No. 22-1, at ¶ 6. Specifically, the Affidavit alleges that:

> Prado prepared and submitted applications using fraudulent identifiers; rented and sold fraudulent driver accounts; purchased and traded driver's licenses and Social Security numbers; sold GPS "spoofing" technology to drivers; and exchanged information with other conspirators about how to circumvent the Rideshare/Delivery Companies' fraud detection systems.

*See id.* at ¶ 77.

Mr. Prado was arrested in Florida on May 12, 2021. *See id.* The same day, Mr. Prado appeared before Magistrate Judge Reinhart of the United States District Court for the Southern District of Florida for his initial appearance, where Magistrate Judge Reinhart (1) removed the case to this District pursuant to Federal Rule of Criminal Procedure 5, and (2) scheduled a detention hearing for May 19, 2021, after the Government moved for pretrial detention based on a risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A). *See United States v. Prado*, ECF Nos. 1, 2, No. 21-mj-08175-BER (S.D. Fla. May 12, 2021). Magistrate Judge Reinhart later adjourned the hearing until May 21, 2021. *Id.*, ECF No. 4.

**The First Indictment**

On May 17, 2021, a grand jury in Boston returned a one-count indictment charging Mr. Prado with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. *See* First Indictment, ECF No. 41. Similar to the Complaint, the initial indictment alleges that Mr. Prado and other Brazilian nationals participated in a scheme to create fraudulent driver accounts with certain rideshare and delivery companies, and to make money by renting or selling those accounts to individuals who might not otherwise qualify to drive for those services. Although there are a number of allegations in the indictment about Mr. Prado's participation in this scheme, the first

indictment did not allege that Mr. Prado is capable of producing hard copies of driver's licenses, passports, or other identification documents.

**The Detention Hearing & Release Order**

Magistrate Judge Reinhart held a detention hearing on May 21, 2021, at which he considered the Government's request for pretrial detention of Mr. Prado based on his risk of nonappearance. *See United States v. Prado*, ECF No. 6, No. 21-mj-08175-BER (S.D. Fla. May 24, 2021) (the "Release Order").[5] At the hearing, the Government proffered, among other things, the following information as demonstrative of Mr. Prado's flight risk:

- That several of Mr. Prado's co-conspirators had fled or attempted to flee the United States;
- That Mr. Prado's family ties to the United States were limited and that Mr. Prado has "significant ties" to Brazil;
- That Mr. Prado did not have any legitimate employment prospects;
- Mr. Prado's alleged procurement of victims' personal identifying information from the DarkNet and other conspirators; and
- Mr. Prado's alleged use and sale of GPS "spoofing" technology.

*See* Government's Emergency Motion for Revocation of Release Order at 7–8, ECF No. 69 (the "Emergency Motion").

At the detention hearing, Magistrate Judge Reinhart issued an oral ruling rejecting the Government's request and releasing Mr. Prado on conditions. Those conditions included posting a $100,000 unsecured personal surety bond, GPS location monitoring, restricting Mr. Prado's travel to the Southern District of Florida and the District of Massachusetts, and requiring that Mr. Prado and his wife surrender their passports and other travel documents. *See id.* at 2–3. Mr. Prado is willing to abide by all these conditions.

---

[5] Magistrate Judge Reinhart issued a separate order summarizing the detention hearing and his oral ruling rejecting the Government's request for pretrial detention. Citations to the "Release Order" shall refer to this summary, unless noted otherwise.

On May 24, 2021, Magistrate Judge Reinhart issued the Release Order "summariz[ing] and further explain[ing] [his] conclusion that pretrial detention is not justified." *See* Release Order at 1. In the Release Order, Magistrate Judge Reinhart explained why the Government's proffered evidence was not sufficient to demonstrate by a preponderance of the evidence that Mr. Prado is a flight risk. In particular, Magistrate Judge Reinhart emphasized that the Government could not rely on the flight (or attempted flight) of Mr. Prado's alleged co-conspirators as evidence that Mr. Prado himself was a flight risk. *See id.* at 7. Magistrate Judge Reinhart further emphasized that the Government had not provided any evidence that the technology used to "spoof" GPS locations could override or otherwise interfere with the Court's ankle monitors. *Id.* at 8. Finally, Magistrate Judge Reinhart specifically emphasized the extent of Mr. Prado's family ties in the United States. *Id.*

Magistrate Judge Reinhart granted the Government's request to stay his release order pending further order from this Court.

**Government's Emergency Motion & Consent to Detention**

On May 24, 2021, the Government filed with this Court the Emergency Motion seeking to revoke Magistrate Judge Reinhart's May 21, 2021 Release Order on the sole ground that Mr. Prado is a flight risk. *See* ECF No. 69. In relevant part, the Government's Emergency Motion argued that Mr. Prado was a flight risk primarily because of (1) his use of others' identities in the alleged criminal enterprise, (2) his alleged access to (and understanding of) GPS "spoofing" technology, and (3) the perceived strength of his ties to Brazil relative to the United States. *See* ECF No. 69 at 13.

On May 25, 2021, this Court issued an order staying Mr. Prado's release from custody. *See* ECF No. 71. After conferring with defense counsel, Mr. Prado elected to consent to detention

without prejudice to his right to renew his motion for release at a later date. *See* ECF No. 83. The Court issued an order of detention as to Mr. Prado on June 2, 2021. *See* ECF No. 85. That order noted (1) that Mr. Prado could renew his release request at a later date, and (2) that any such motion would be decided by this Court rather than by the Magistrate Judge. *Id.* Mr. Prado has remained detained since that date.

**Superseding Indictment**

On June 14, 2021, a grand jury in Boston returned a superseding indictment which added charges for Aggravated Identity Theft under 18 U.S.C. § 1028A(a)(1) against defendants Itallo Felipe Pereira De Sousa Correa and Julio Vieira Braga. *See* Superseding Indictment, ECF No. 102.

Like the initial Indictment, the superseding indictment does not allege that Mr. Prado was capable of producing hard copies of driver's licenses, passports, or other identification documents.[6]

### STANDARD OF REVIEW

As reflected in its previous submissions to this Court, the Government believes that pretrial detention of Mr. Prado is necessary solely because he presents a "serious risk" of flight. *See* 18 U.S.C. § 3142(f)(2)(A); Emergency Motion at 1. The Government accordingly "must prove by a preponderance of the evidence that no combination of conditions will *reasonably* assure [Mr. Prado's] appearance at future court proceedings." *United States v. Digiacomo*, 746 F. Supp. 1176, 1180–81 (D. Mass. 1990) (citations omitted) (emphasis added); *see also United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *see also* 18 U.S.C. § 3142(e) (providing that the Court may detain Mr. Prado pending trial only if it determines that "no condition or combination of conditions

---

[6] All citations and references to "Indictment," *infra*, refer to this Superseding Indictment.

[set forth under 18 U.S.C. § 3142(b) or (c)] will reasonably assure the appearance of [Mr. Prado] as required."). Similarly, recognizing that "[i]n our society, liberty is the norm, and detention prior to trial . . . is the carefully limited exception," *United States v. Salerno*, 481 U.S. 739, 755 (1987), the Court is statutorily required to impose "the least restrictive [] condition, or combination of conditions, that [it] determines will reasonably assure the appearance of [Mr. Prado] as required and the safety of any other person and the community," 18 U.S.C. § 3142(c)(1)(B).

In considering whether Mr. Prado presents a flight risk, the Court shall consider: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

## ARGUMENT

### I. The Court Should Release Mr. Prado to the Southern District of Florida with Conditions

#### A. The Government Has Not Established that Mr. Prado is a Flight Risk by a Preponderance of the Evidence

As discussed in its previous submissions to this Court, the Government believes Mr. Prado to be a flight risk primarily because of (1) his use of others' identities in the alleged criminal enterprise, (2) his alleged access to (and understanding of) GPS "spoofing" technology, and (3) the perceived strength of his ties to Brazil relative to the United States. *See* Emergency Motion at 13. The Government, however, has failed to demonstrate by a preponderance of the evidence that any of these factors render Mr. Prado a "serious" flight risk as required by statute.

Mr. Prado expects that the Government will argue that he is a flight risk because several of his co-defendants have fled (or attempted to flee) the United States. *See* Emergency Motion at 12. For example, in its Emergency Motion, the Government contended that the flight of Mr. Prado's

co-defendants "demonstrates the ease with which Prado could flee and how appealing it is to flee rather than face a lengthy prison sentence." *Id.*  But the Government cannot brand Mr. Prado a flight risk by association because this Court's decision to detain or release Mr. Prado must be an "individualized" one. *See Patriarca*, 948 F.2d at 794; *see also United States v. Parsons*, 2013 WL 12309385, at *1 (D. Mass. June 6, 2012). As Magistrate Judge Reinhart correctly recognized in his Release Order, at issue is "whether *Mr. Prado* presents a serious risk of flight that cannot be mitigated by conditions of release, not whether other people pose such a risk," meaning any Government request to keep Mr. Prado detained must be "assessed solely based on [Mr. Prado's] own conduct and situation." *See* Release Order at 7 (emphasis in original). Notably, the Government has not demonstrated that that Mr. Prado was even aware that his co-defendants had attempted to flee, let alone provided evidence that Mr. Prado himself has a propensity to flee or has otherwise taken steps to flee the United States.

First Circuit precedent cited in the Government's original Emergency Motion illustrates that the Government's attempt to impute the attempted flight of Mr. Prado's co-defendants to Mr. Prado is insufficient to establish that he is a flight risk. In *United States v. Patriarca*, the Court of Appeals reviewed this Court's decision allowing the pretrial release of Raymond Patriarca, Jr. In relevant part, this Court found that, while (1) Defendants similarly situated to Patriarca had fled or attempted to flee, and (2) the Mafia had "resources to facilitate flight," the Government had failed to provide evidence that Patriarca "personally" had been involved in any plans to flee. *See United States v. Patriarca*, 776 F. Supp. 593, 603–04 (D. Mass. 1991) (Wolf, J.). The Court of Appeals agreed with this finding, specifically emphasizing that, while the Mafia was capable of aiding Patriarca's evasion of law enforcement, the Government had failed to provide "evidence of *this Mafia member's* propensity to flee." 948 F.2d at 793 (emphasis in original). The same is true

-8-

here. While the Government in its Emergency Motion explained the steps that several of Mr. Prado's co-defendants took to attempt to evade capture by law enforcement, Emergency Motion at 12, it has provided no reason for the Court to find that Mr. Prado *himself* is likely to take similar steps. Simply asserting that Mr. Prado "could . . . easily flee," *id.*, just because his co-defendants did is insufficient to establish a serious flight risk by a preponderance of the evidence.[7] The presence of Mr. Prado's infant son and wife in the United States, as well as his stepson and other child, further undermines the notion that he is likely to flee.

Similarly, Mr. Prado anticipates that the Government will assert that Mr. Prado's ties to Brazil make him a flight risk. ***First***, to the extent that the Government believes Mr. Prado to be a flight risk solely because he is a Brazilian national or because of his immigration status, that argument is unavailing. Alienage is not "inherently probative of a serious risk of flight nor is it a factor that 'tip[s] the balance either for or against detention.'" *United States v. Lidinilah*, 2020 WL 6542005, at *5 (D.P.R. Nov. 6, 2020) (quoting *United States v. Pimentel-Ramirez*, 2019 WL 6879332, at *3 (D.P.R. 2019)). ***Second***, despite previously emphasizing in its Emergency Motion Mr. Prado's "financial ties overseas," Emergency Motion at 13, Mr. Prado is not aware of any evidence that there are actually individuals in Brazil (or elsewhere) who would provide him financial assistance to evade capture. *Cf. United States v. Merrill*, 2014 WL 2769148, at *6 (D. Mass. June 17, 2014) (revoking pretrial detention order where "government point[ed] to [defendant's] international network of supporters," but failed to offer "proof that there are any individuals … who would actually help [defendant] flee."). ***Third***, the Government previously claimed that Mr. Prado "lack[s] … legitimate ties to Massachusetts or Florida." Emergency

---

[7] The Government also believes that Mr. Prado is a flight risk because "Brazil does not extradite its own citizens." Emergency Motion at 11. However, there is no evidence in the record that Mr. Prado is even aware of that fact such that it could influence any decision to flee.

Motion at 13. But (1) Mr. Prado has not returned to Brazil for nearly two decades and has expressed no desire to return to Brazil, (2) Mr. Prado's wife and infant son live in Florida and the rest of his immediate family, including his mother and sisters, live in Massachusetts, and have no intention of returning to Brazil, and (3) Mr. Prado operated a successful painting business out of Massachusetts for nearly a decade.

Mr. Prado further expects that the Government will argue that Mr. Prado's "access to other identification documents" could facilitate his flight (or make him difficult to trace). *See, e.g.*, Emergency Motion at 12. Absent from the record, however, is any allegation (or any evidence) that Mr. Prado (or any of the members of the alleged conspiracy) were engaged in the printing of *hard copy* false identification documents that could actually facilitate their ability to travel or to evade capture. Rather, the Indictment merely alleges that certain of Mr. Prado's alleged co-conspirators *digitally* altered illegally obtained drivers licenses for use in online applications submitted to certain rideshare and delivery companies. *See* Indictment ¶¶ 34(a)–(b). The Government's previous Emergency Motion did allege that Mr. Prado purchased a laser printer to print high-quality photos of driver's licenses, but only alleged that Mr. Prado did so in order "to get past the [companies'] software that detects edited images" in those online applications. Emergency Motion at 5. The Government has not explained how Mr. Prado could use that printer or other means to create believable forgeries of identification documents that would be needed in any escape attempt. More importantly, the Government cannot demonstrate that Mr. Prado could forge a passport—a high-tech document with embedded microprocessor chips and biometric information—that would give him the ability to abscond overseas.[8] It is thus, at best, unclear from

---

[8] Notably, as of 2012, Brazil's passport complied with or exceeded the International Civil Aviation Organization's (a United Nations agency) standards for biometric passports, which include a requirement that such passports "contain[] a contactless integrated circuit chip that stores biometric

-10-

the record how Mr. Prado's alleged access to driver's licenses, Social Security Numbers, or any other personal information could facilitate his flight from law enforcement.

Mr. Prado also expects that the Government will rely on Mr. Prado's alleged understanding of GPS "spoofing" applications to argue that he is a flight risk. Emergency Motion at 12. Specifically, the Indictment alleges that Mr. Prado obtained "applications" (presumably used on a mobile phone or similar device) that could manipulate GPS trackers on rideshare and delivery programs and showed others how to use those applications. Indictment, ¶ 55. Based on this, the Government has previously represented that because "GPS monitoring transmits location data via cell phone frequencies," that "it is not a leap" for Mr. Prado to use those applications to outwit an ankle monitor. Emergency Motion at 12. But, as Magistrate Judge Reinhart previously recognized, it is unclear how Mr. Prado's alleged understanding of GPS "spoofing" *software* that is used on a mobile phone (through a touchscreen mobile interface) would allow him to employ the same knowhow to trick the Court's tracking *hardware* (which defense counsel understands contains no user interface like a mobile phone does). *See* Release Order at 8 ("[T]here is no evidence in the record that the technology used to manipulate the ride-sharing GPS system could defeat the Court's location monitoring technology."). In light of this, the Government cannot establish by a preponderance of the evidence that Mr. Prado is capable of using GPS "spoofing" applications to facilitate an escape attempt.

Finally, the Government has previously noted that Mr. Prado "has a history of defaults in at least four prior Massachusetts state court proceedings, including as recently as 2019." Emergency Motion at 9. Defense counsel understands based on conversations with Mr. Prado that

---

data … of the passport holder as well as other encrypted identification data." Ryan Clary, *E-Passports Spread to Half the Globe*, SECUREIDNEWS (Feb. 28, 2012, https://www.secureidnews.com/news-item/e-passports-spread-to-half-the-globe/.

he recently missed a court date because he never received information about the court date in the mail.  Mr. Prado also explained to defense counsel that he missed court dates many years ago when he first arrived in the United States because he feared that he would be deported if he appeared.  Mr. Prado has represented to defense counsel in no uncertain terms that he will appear as required before this Court if released from custody.

For the foregoing reasons, Mr. Prado respectfully submits that the Government cannot demonstrate by a preponderance of the evidence that he is a serious flight risk as required by 18 U.S.C. § 3142(f)(2)(A).

### B. Releasing Mr. Prado on Conditions Similar to those Imposed by Magistrate Judge Reinhart (or Additional Conditions) Would Reasonably Assure Mr. Prado's Appearance Before the Court

Because the Government has not established that Mr. Prado is a serious flight risk by a preponderance of the evidence, "the adequacy of the conditions to assure [Mr. Prado's] presence at trial becomes relevant." *See Patriarca*, 948 F.2d at 793.  Critically, those conditions need only provide a "reasonable assurance" that Mr. Prado will appear, and do not need to ensure Mr. Prado's appearance with "absolute certainty."  *See United States v. Paulino*, 335 F. Supp.3d 600, 618 (S.D.N.Y. 2018).

Previously, Magistrate Judge Reinhart imposed as conditions of release: (1) posting a $100,000 unsecured personal surety bond; (2) GPS location monitoring; (3) restricting Mr. Prado's travel to the Southern District of Florida and the District of Massachusetts; and (4) requiring that Mr. Prado and his wife surrender their passports and other travel documents.  *See* Release Order at 2–3. Mr. Prado is prepared to submit to the conditions similar to those imposed by Magistrate Judge Reinhart in the Release Order—and to any additional restrictions that this Court would

impose—and respectfully submits that such conditions would adequately ensure that he will appear at any required appearances before this Court. *See* Sec. I.A., *supra*.

Should the Court elect to release him from custody, Mr. Prado respectfully requests that the Court permit him to live in Florida at his family's residence while permitting him to (1) travel to Massachusetts for Court appearances (or to appear for Court appearances via video), and (2) leave the residence only for (a) employment purposes and (b) family or personal medical attention. *See* 18 U.S.C. § 3142(g)(3)(A) (emphasizing importance of "family ties" in flight risk analysis); *Merrill*, 2014 WL 2769148, at *6 (same). Critically, Mr. Prado's wife, infant son, and stepson all live in Florida, rely heavily on Mr. Prado to pay for their basic living expenses, and are struggling mightily to make ends meet while Mr. Prado remains detained. With the Court's permission, Mr. Prado hopes to use his experience running a painting business in Massachusetts to find similar work in Florida so that he might help to provide for his family while he awaits trial.

Notably, this Court has already released several of Mr. Prado's similarly situated co-defendants to other jurisdictions on conditions similar to those originally imposed by Magistrate Judge Reinhart and those requested by Mr. Prado here. While the Court's decision must be individual to Mr. Prado's situation and circumstances, these releases provide helpful benchmarks and context for potential release conditions:

- **Altacyr Dias Guimaraes Neto:** Released to home detention in the Middle District of Florida (with travel permitted to this District) on $25,000 bond with location monitoring. Permitted to leave residence for, among other things, employment purposes. *See United States v. Neto*, ECF No. 22, No. 21-mj-01402-EJK (M.D. Fla. May 17, 2021); *see also* ECF No. 116 (adopting conditions of release imposed by Middle District of Florida).

- **Clovis Kardekis Placido:** Released with travel restricted to the Eastern District of California and to this District, among other standard conditions. *See United States v. Placido*, ECF No. 9, No. 21-mj-00074-DB (E.D. Cal. May 24, 2021); *see also* ECF No. 125 (adopting conditions of release imposed by Eastern District of California).

- **Luiz Narciso Alves Neto:** Released with travel restricted to the District of Minnesota and this District, among other standard conditions. *See United States v. Neto*, ECF No. 8, No. 21-mj-00387-JTH (D. Minn. May 20, 2021); *see also* ECF No. 126 (adopting conditions of release imposed by District of Minnesota).

- **Philipe do Amaral Pereira:** Released on $100,000 bond. *See United States v. Pereira*, ECF No. 6, No. 21-mj-70811-MAG-1 (N.D. Cal. May 19, 2021); *see also* ECF No. 114 (adopting conditions of release imposed by Northern District of California).

Mr. Prado respectfully submits that releasing him to the Southern District of Florida while imposing conditions similar to those imposed on his co-defendants would adequately ensure his appearance before the Court.

In light of the foregoing, Mr. Prado proposes the following Conditions of Release:

1) Mr. Prado shall execute a bond binding him to pay the United States the sum of $100,000 in the event of a failure to appear as required or to surrender as directed for service of any sentence imposed.

2) Mr. Prado will reside with his wife, Amarilda Ferreira Franca Prado at their home in Boca Raton, Florida.[9]

---

[9] For privacy reasons, defense counsel is not disclosing the address and phone number of Ms. Prado in this public filing. Should the Court elect to release Mr. Prado from custody, defense counsel will promptly provide the relevant address and phone number to the Court or to Pre-Trial Services.

3) Mr. Prado shall be subject to electronic location monitoring through an ankle monitor or similar device.

4) Mr. Prado shall be released to home detention, and will be restricted to his residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by Pre-Trial Services.

5) Mr. Prado and his wife surrender their passports or any travel documents, if they have them, to Pre-Trial Services on the next working day after Mr. Prado's release and shall not apply for a passport or any type of travel documents while on release.

6) Mr. Prado shall not possess any firearms, destructive devices or dangerous weapons while on release, and there shall be no such firearms, destructive devices or dangerous weapons in the residence.

7) Mr. Prado shall not use alcohol to excess and shall not use or possess any narcotic controlled substance except by prescription from a licensed medical practitioner.

8) Mr. Prado shall notify Pretrial Services within twenty-four (24) hours if he is arrested or has any contact with any law enforcement officials.

9) Mr. Prado shall not violate any Federal, state or local law while on release, including the provisions of 18 U.S.C. §§ 1503, 1512 and 1513.

10) Mr. Prado shall have no contact, either directly or indirectly, (except through his attorney) with any co-Defendant or alleged co-conspirators.

11) Mr. Prado shall not engage in any activities which would allow him access to third parties' identities or their personal identifying information.

12) Mr. Prado shall report to Pre-Trial Services whenever directed to do so.

## CONCLUSION

In light of the foregoing, the Government cannot meet its burden to establish that Mr. Prado is a serious flight risk by a preponderance of the evidence.  The Court should accordingly grant Mr. Prado's Motion and release Mr. Prado from custody to the Southern District of Florida with conditions in place while he awaits trial.  Mr. Prado further requests that this Court hold a hearing on his Motion at its earliest convenience.

                                        Respectfully submitted,

Date: July 13, 2021                    By: /s/ Joshua S. Levy
                                           Joshua S. Levy (BBO #: 563017)
                                           ROPES & GRAY LLP
                                           Prudential Tower
                                           800 Boylston Street
                                           Boston, MA   02199-3600
                                           Telephone:  (617) 951-7281
                                           Fax:  (617) 235-0441
                                           Joshua.Levy@ropesgray.com

**CERTIFICATE OF SERVICE**

  I, Joshua Levy, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on July 13, 2021.

                    /s/ Joshua S. Levy
                     Joshua S. Levy