1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3    _____

     UNITED STATES OF AMERICA,
4
                          Plaintiff,          Criminal Action
5                                             No. 21-10158-DJC
     V.
6                                             September 28, 2021
     THIAGO DE SOUZA PRADO,                   11:05 a.m.
7
                          Defendant.
8    _____

9

10

11        TRANSCRIPT OF DETENTION HEARING VIA VIDEOCONFERENCE

12            BEFORE MAGISTRATE JUDGE JUDITH M. DEIN

13               UNITED STATES DISTRICT COURT

14            JOHN J. MOAKLEY U.S. COURTHOUSE

15                    1 COURTHOUSE WAY

16                  BOSTON, MA  02210

17

18

19

20

21            DEBRA M. JOYCE, RMR, CRR, FCRR
                 Official Court Reporter
22           John J. Moakley U.S. Courthouse
              1 Courthouse Way, Room 5204
23                 Boston, MA  02210
                 joycedebra@gmail.com
24

25

1    APPEARANCES:

2    FOR THE GOVERNMENT:

3    DAVID M. HOLCOMB, ESQ.
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-756-9043
6    David.Holcomb@usdoj.gov

7    FOR THE DEFENDANT:

8    JOHN F. PALMER, ESQ.
     Law Office of John F. Palmer, P.C.
9    18 Main Street Extension
     Suite 201B
10   Plymouth, MA 02360
     617-943-2602
11   jpalmer@socialaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (The following proceedings were held via |
| 3 | videoconference before Magistrate Judge Judith M. Dein, United |
| 4 | States District Court, District of Massachusetts, at the John |
| 5 | J. Moakley United States Courthouse, 1 Courthouse Way, Boston, |
| 6 | Massachusetts, on September 28, 2021. |
| 7 | The defendant, Thiago De Souza Prado, is present with |
| 8 | counsel.  The Assistant U.S. Attorney is present.) |
| 9 | THE CLERK:  The United States District Court for the |
| 11:06 10 | District of Massachusetts is now in session on September 28, |
| 11 | the year 2021, in the matter of the United States of America v. |
| 12 | Thingo de Souza Prado, criminal case number 21-10158. |
| 13 | This is a general reminder that all persons granted |
| 14 | remote access to today's proceedings are reminded of the |
| 15 | general prohibition against photographing, recording and/or |
| 16 | rebroadcasting of today's court proceedings, and that's |
| 17 | pursuant to Local Rule 83.3. |
| 18 | Would counsel and Probation, please identify |
| 19 | themselves for the record. |
| 11:07 20 | MR. HOLCOMB:  Good morning, your Honor.  David Holcomb |
| 21 | for the United States. |
| 22 | THE COURT:  Good morning. |
| 23 | MR. PALMER:  John F. Palmer for Mr. Prado.  Good |
| 24 | morning, your Honor. |
| 25 | THE COURT:  Good morning. |

```
 1                Mr. Quinn, swear in the interpreter, please.

 2                THE CLERK:  Certainly.

 3                (Interpreter sworn in by the clerk.)

 4                THE CLERK:  Your Honor, I believe Mr. Palmer and

 5      defendant would like to have Claudia Azoff as standby and not

 6      interpreting this whole hearing.

 7                THE COURT:  Is that right?

 8                MR. PALMER:  That's correct, your Honor.

 9                THE COURT:  Okay.

11:07 10                Mr. Prado, are you okay with that?

11                THE DEFENDANT:  Yes, your Honor.

12                THE COURT:  All right.  And if at any point you need

13      interpretation, please just raise your hand and I'll know,

14      okay?

15                THE DEFENDANT:  Okay, your Honor.

16                THE COURT:  All right.  Mr. Palmer, let's start with

17      what's the status of the motion for Mr. Prado to proceed *pro

18      se*?

19                MR. PALMER:  I've had discussions with Mr. Prado and

11:08 20      he wishes to withdraw that motion.

21                THE COURT:  Is that correct, Mr. Prado?

22                THE DEFENDANT:  At the beginning, I spoke with

23      Mr. Palmer to withdraw the motion, but I'd like to have the

24      right to file my motions and if it's possible for me to have

25      him as standby counsel.  That's the way that I would like to
```

```
 1    proceed.
 2            We didn't have a chance to talk about the case, so I'm
 3    not -- still not sure if me and him -- we are on the same page
 4    for the rest of the case.  So I would like to stay with the
 5    motion to proceed pro se with standby counsel.
 6            THE COURT:  Are you changing your mind then with what
 7    you told Mr. Palmer?
 8            Let me suggest this.  It goes of smoother if
 9    Mr. Palmer can represent you.  You can filter your motions
10    through him.  Is that okay?
11            If there's a problem, you can always file a motion and
12    we can address it.
13            THE DEFENDANT:  Okay.
14            THE COURT:  But if things are going smoothly now,
15    let's have Mr. Palmer represent you.
16            THE DEFENDANT:  Okay.
17            THE COURT:  Okay?
18            THE DEFENDANT:  Yes, that's fine with me, Judge.  I'm
19    sorry.
20            THE COURT:  And if you want him to file a motion, you
21    just send it to him and he can --
22            THE DEFENDANT:  Okay.
23            THE COURT:  Okay.  Mr. Palmer, are you okay with that?
24            MR. PALMER:  I'm okay with that, sure.
25            THE COURT:  All right.
```

1          So I'm going to have -- the pending motion will be

2     withdrawn without prejudice.

3          THE DEFENDANT:  Thanks, your Honor.

4          THE COURT:  Now, with respect to the arraignment on

5     the superseding indictment, Mr. Prado, have you had an

6     opportunity to review the charges in the superseding

7     indictment?

8          THE DEFENDANT:  No, I didn't have the new indictment

9     yet.  I just find out last week I was getting a superseding

11:10 10   indictment.

11          THE COURT:  All right.  I'm going to ask the

12     government to review what's new, if you can, and review the

13     maximum penalties; and then, if you need some time to talk to

14     Mr. Palmer, we'll go into a breakout room, okay?

15          MR. HOLCOMB:  Thank you, your Honor.

16          What's new in the superseding, the second superseding

17     indictment, it maintains Count One, which was originally

18     charged against defendant Prado, which is the conspiracy to

19     commit wire fraud charge; and adds a new count -- forgive me

11:10 20   while I find the number -- but it's a new count of aggravated

21     identity theft in violation of Title 18, United States Code,

22     Section 1028A.  This would be with respect to defendant Prado,

23     this is Count Nine of the indictment.

24          THE COURT:  And what's the maximum potential penalties

25     on both those counts?

1          MR. HOLCOMB:  With respect to Count One, the wire

2     fraud conspiracy, Mr. Prado faces the following maximum

3     penalties: incarceration for 20 years, supervised release for

4     three years, a fine of $250,000 or twice the gross gain or loss

5     from the scheme, whichever is greater, a mandatory special

6     assessment of $100, restitution and forfeiture.

7          And with respect to the new count in the indictment,

8     Count Nine, aggravated identity theft, Mr. Prado faces the

9     following mandatory minimum and maximum penalties: a mandatory

11:11 10     sentence of two years' incarceration consecutive to any other

11     sentence imposed, a term of supervised release of one year, a

12     fine of $250,000, a mandatory special assessment of $100, and

13     restitution.

14          THE COURT:  All right.

15          So, Mr. Prado, I'm going to ask you if you are

16     prepared to enter a plea of not guilty on these changes.

17          Do you want to do that now or do you want to -- and I

18     will give you a chance to talk to Mr. Palmer after or do you

19     want to talk to him before?

11:12 20          THE DEFENDANT:  I want to say not guilty.

21          THE COURT:  So I think, Mr. Quinn, I think that's

22     sufficient.  We'll have a plea of not guilty.

23          Is there additional discovery that's being produced?

24          MR. HOLCOMB:  Yes, your Honor.  Any additional

25     discovery with respect to the new count will be produced within

```
 1    21 days, which I believe is October 19th.
 2              THE COURT:  19th.
 3              And, I'm sorry, do we have another date for the next
 4    status conference?
 5              MR. HOLCOMB:  We do.  It is scheduled for Thursday,
 6    November 25th -- no, I apologize.  It's scheduled for Monday,
 7    November 29th.
 8              THE COURT:  Is that all right with you, Mr. Palmer,
 9    November 29th, what, at 10:00?
10              MR. PALMER:  Yes, that's fine.
11              THE COURT:  And I'll exclude through then.
12              And are we proceeding on the issue of detention?
13              MR. PALMER:  Yes, your Honor.
14              THE COURT:  All right.  How are we proceeding?
15              MR. HOLCOMB:  By proffer, your Honor.
16              THE COURT:  I'll hear from the government first.
17              MR. HOLCOMB:  Thank you, your Honor.
18              We oppose Mr. Prado's motion for release based on the
19    serious risk of flight that he presents.
20              I'll briefly describe Mr. Prado's conduct with respect
21    to the conspiracy and the identity theft, and then I'll speak
22    to the risk of flight and our specific concerns.
23              At a high level, Prado's role in the ride share fraud
24    conspiracy was extensive.  First, Prado purchased and sold
25    stolen victim identifiers, including driver licenses and Social
```

1    Security Numbers.

2         Second, he used stolen identifiers to create dozens of

3    fraudulent driver accounts with several of the ride share

4    delivery companies.

5         Third, he managed those accounts and used them to

6    receive income, including referral bonuses from the companies,

7    in some cases in excess of $1,000 for each referral bonus.

8         And fourth, he also used and enabled others to use GPS

9    spoofing technology and other technology that allowed the user

11:15 10   to project the false location or otherwise fraudulently

11   override the company's applications and systems.

12        The evidence of Mr. Prado's conduct here is strong.

13   The government obtained voluminous WhatsApp messages between

14   Prado and co-defendant Wemerson Dutra Aguiar, which showed that

15   the two coordinated to create and manage fraudulent driver

16   accounts and to avoid detection by the ride sharing delivery

17   companies.

18        These show that Prado sent driver's licenses to Aguiar

19   and bought Social Security Numbers from Aguiar.  They also show

11:15 20   that Aguiar, in some instances, created accounts for Mr. Prado.

21        The messages also show that Mr. Prado used a fake GPS

22   application that overrode a user's true location on the ride

23   share company's applications.

24        Mr. Prado used and distributed another application

25   that allowed app users to cut the line to get additional

1    pickups from the ride share companies in batches from the

2    delivery companies.

3           But more concerning to the government, Mr. Prado

4    distributed GPS spoofing technology that allowed the user to

5    project a false location and fool the systems into thinking

6    that the user was in a different place than where they really

7    were in order to profit from that.

8           Additionally, the messages show that Mr. Prado had

9    access to the dark net and used the dark net in a number of

11:16 10    ways.  He obtain victim's Social Security Numbers to use in

11    creating fraudulent accounts, and he paid for these with

12    Bitcoin.  He also used the dark net to resell Social Security

13    Numbers that he had obtained.

14           Records and witness testimony will show that in

15    addition to defendant Aguiar, Mr. Prado partnered with several

16    other co-defendants, including Luiz Neto, as well as several

17    uncharged co-conspirators who are now in Brazil.

18           For example, Mr. Prado worked with others to have

19    driver's licenses photographs edited to show either his own or

11:17 20    the ultimate driver's face rather than the image of the victim

21    whose identity or whose driver's license image was stolen.

22           Mr. Prado also referred other co-conspirators to

23    individuals who did that driver's license image editing for

24    many other co-conspirators.

25           Ride share company records reveal dozens of accounts

1    attributable to Mr. Prado based on a combination of IP address,

2    registration information that was used, and the use of

3    Mr. Prado's own image edited onto photos of victim's driver's

4    licenses.

5         And bank records for accounts that are known to have

6    been used by Prado show that Prado received deposits from the

7    ride share companies, as well as Zelle transfers from

8    individuals who rented or purchased the fraudulent accounts

9    that Prado offered or that GPS spoofing technology or the other

11:18 10   bots that I've mentioned.

11        In sum, Mr. Prado's conduct is at the center of this

12   scheme, both in terms of the scope of his activities, profiting

13   from fraudulent driver accounts, as well as in terms of his

14   work with other conspirators.

15        As to flight risk, Mr. Prado has strong incentives to

16   return to Brazil and avoid prosecution in this case.  He faces

17   a potentially lengthy sentence.  On the conspiracy count alone,

18   his sentence is likely, based on the losses attributable to

19   him, as well as those that would have been reasonably

11:18 20   foreseeable to him based on the network that he was working

21   with, as well as several enhancements that apply based on the

22   specific nature of the conduct, including the involved identity

23   theft in the production of counterfeit or unauthorized

24   identification devices.

25        The grand jury also returned a superseding indictment

1   earlier this month charging him with an additional aggravated

2   identity theft count based on his use of victim's identifiers

3   in this scheme.  The aggravated identity theft carries a

4   two-year mandatory minimum sentence consecutive to the sentence

5   that will be imposed on the conspiracy count.

6       Moreover, after serving a sentence, if convicted, it

7   is likely that Mr. Prado will be deported.

8       It's my understanding that an ICE detainer was lodged

9   on Mr. Prado in May of this year.  So if Mr. Prado is released

11:19 10   prior to -- prior to further proceedings in this case, ICE

11   could pick him up and deport him before further proceedings in

12   this case which would also -- which also adds to the

13   government's concerns here.

14       Mr. Prado is a citizen of Brazil, and Brazil does not

15   extradite its own citizens.  The upshot of that is Mr. Prado

16   has every incentive to return to Brazil before serving any

17   sentence in the United States rather than eventually returning

18   to Brazil after serving his sentence in the United States.

19       In addition to the weight of the evidence and the

11:20 20   nature of the offenses charged, as well as Mr. Prado's

21   Brazilian citizenship, Mr. Prado's history and other

22   characteristics caution that he is a flight risk here.

23       Despite having moved to Florida for potential work

24   opportunities, according to counsel in the filings in this

25   case, Mr. Prado and his wife are currently not authorized to

1    stay here.  They overstayed their authorized entry, and

2    Mr. Prado is not authorized to work here.  The government's

3    understanding is his last work authorization expired in June of

4    2021.

5            I understand from his prior filing that he and his

6    wife filed asylum claims, but I'm not aware of any work

7    authorization that currently permits him to work at this time.

8            And while your Honor must make an individualized

9    determination about Mr. Prado's risk of flight, I think it's

11:20 10  instructive to look at the similarly situated defendants in

11   this case who face similar incentives and choice sets here.

12           At least five of the defendants in the case fled or

13   attempted to flee.

14           THE COURT:  Sorry, I just lost your mic.

15           MR. HOLCOMB:  Apologies, your Honor.

16           I was speaking to the other defendants in this case

17   who have fled or attempted to flee.

18           As I believe your Honor knows, five of the defendants

19   fled or attempted to flee to Brazil, which was in each of their

11:21 20  case their home country, and for each of them would not

21   extradite them to the U.S. in this case.

22           Two of the co-defendants crossed the border in New

23   Mexico without detection and were arrested in Panama en route

24   to Brazil.  Two other co-defendants crossed in Mexico and

25   evaded arrest by flying directly to Brazil.

1          These co-defendants were all citizens of Brazil, had

2    similarly weak ties to the United States and were all facing

3    the same potential charges in this case and they demonstrate

4    the ease and appeal of fleeing rather than facing prosecution

5    in this case.

6          I understand that Mr. Prado points to the presence of

7    his wife and young child in the U.S., but I'm afraid that

8    experience in this case so far suggests that even having a

9    young child in the U.S. does not ensure or does not assure the

11:22 10   defendant's appearance.  For instance, following defendant

11   Guilherme da Silveira's arrest, his wife and infant child fled

12   to Brazil the very next day.  It's the government's concern

13   here that Mr. Prado's wife, who is also a Brazilian national,

14   can return to Brazil with Mr. Prado, and Mr. Prado might in

15   that case be able to remain with his family and also avoid

16   prosecution in this case.

17         Although he's been in the U.S. since 2003, I think his

18   weak work prospects here and the potential prison sentence

19   coupled with the available option of Brazil outweigh his ties

11:23 20   to the U.S. in terms of assessing the risk of flight.

21         And finally, I would just add that Mr. Prado has

22   demonstrated proficiency with obtaining and using false

23   identities and an ability to access the dark net and, you know,

24   were he to use false identifications or were he to use

25   information or resources available to him on the dark net in an

1    attempt to flee, it would make him very difficult to trace.

2         His prior use of GPS spoofing technology and his use

3    -- his access to technology and information underscore that

4    location monitoring is not a viable alternative to detention

5    here.

6         Finally, your Honor, continued detention would be

7    consistent with your Honor's prior order with respect to

8    co-defendants Edvaldo Cabral, Bruno Abreu, and Priscila

9    Barbosa, for whom the Court also found that the risk of flight

11:23 10    was too high to justify release.

11         THE COURT:  Thank you.

12         Mr. Palmer.

13         MR. PALMER:  Thank you, your Honor.

14         First of all, I want to make sure the Court has

15    reviewed the Pretrial Services Report from Florida, as well as

16    the magistrate's decision on detention that was reached in

17    Florida upon Mr. Prado's arrest.

18         THE COURT:  I have seen it, but feel free to highlight

19    what you want me to focus on.

11:24 20         MR. PALMER:  All right, thank you.

21         THE COURT:  I do have it in front of me.

22         MR. PALMER:  Okay.  Well, I think -- let me address

23    what the magistrate also addressed in Florida, and I want to

24    emphasize, first of all, to the Court that you have a situation

25    here where both Pretrial Services in Florida, who interviewed

1    the defendant upon his arrest, as well as the magistrate judge

2    in Florida, who had a full detention hearing and heard these

3    arguments in Florida, issued an order calling for the release

4    of my client with certain conditions, and he addressed some of

5    the very arguments that are being presented to this Court

6    again, apparently in an effort to persuade you to rule

7    otherwise.

8         But let me address this issue of Brazilian nationality

9    first.

11:25 10        Well, two issues, one is, the magistrate found with

11   respect to co-defendants, what other people do or don't do in

12   this case has very little relevance to what this defendant and

13   his individual circumstances might do or not do.  And I think

14   the magistrate highlighted that.  In our system of justice we

15   treat each person that appears before the court based upon his

16   individual characteristics and the likelihood that he would

17   present a risk of flight.  So the magistrate dismissed that

18   argument.

19        I also want to point out, and I think the magistrate

11:26 20   addressed this as well, that, yes, Mr. Prado is a Brazilian

21   national, but he's lived in the United States since 2003.  He's

22   worked in the United States in Massachusetts up until 2021 when

23   COVID was largely responsible for having his business fail.  He

24   was involved as a painter, painting business in Massachusetts

25   for 17 years.

1        He has two sisters, a mother in Massachusetts.  This

2   issue about whether or not he has ties in Brazil, he has no

3   ties in Brazil.  I don't know where that's coming from, except

4   for the fact that he's a Brazilian national.  As a matter of

5   fact, he and his wife have both presented applications for

6   asylum in the United States because they're fearful of

7   returning to Brazil.  So the magistrate was correct in finding

8   that his ties are to the United States, not to Brazil.

9        So I would ask the Court to adopt or follow the

11:27 10   recommendations of Florida with that respect and find that,

11   actually, he's got ties here that greatly exceed the ties that

12   he had to Brazil.

13        So, you know, in terms of his incentives to flee to

14   Brazil, the government in its submission to the Court has

15   raised the question, well, he has all these resources, he can

16   use these resources that they found by tracing his bank

17   accounts to assist in his fleeing to Brazil.  But he has no

18   resources now.  He was assigned a lawyer.  I'm an appointed

19   lawyer in this case.  The government hasn't indicated that he

11:28 20   has any access now to any funds.  So he has no resources to

21   flee.

22        All the incentives -- in terms of whether he's a

23   national in Brazil or has ties to the United States, all the

24   incentives are for him to stay in the United States.  He has a

25   stepchild that's living with him.  He has an infant who's

```
 1    living with him.  He's been married for four years.  He has a
 2    son by a prior relationship in Massachusetts.  He has a mother
 3    in Massachusetts.  He has two sisters in Massachusetts.  His
 4    father, unfortunately, passed away in 2019, but he has no
 5    family that he would flee to in Brazil.
 6              So --
 7              THE COURT:  What do I do about the false
 8    identification?
 9              MR. PALMER:  Well, I think that prior counsel -- first
10    of all, as a general proposition, your Honor, because somebody
11    has -- because somebody has committed, allegedly committed a
12    crime in the past doesn't mean that there can't be
13    conditions -- doesn't mean it's going to be a continuing
14    enterprise to commit the crime in the future.  And that's what
15    the government is essentially asserting here, that because
16    he -- the allegations here imply or suggest falsification of
17    documents, therefore, he's going to do it in the future.
18    That's just not a valid basis for denying somebody release.
19    That's like saying if somebody was involved in a conspiracy to
20    distribute drugs, they're going to continue to be a danger to
21    the community because they're going to continue to distribute
22    drugs.  There has to be some additional showing that the
23    conditions that the Court imposes won't be sufficient to
24    control or monitor any possible future violations.
25              And I think it's also -- it's also pertinent that --
```

1    and I think this is in the submission that was made by prior

2    counsel, that the government hasn't shown that whatever --

3    whatever the allegations are about Mr. Prado's past conduct,

4    whether that applies, would even apply to an ability to

5    circumvent protections that this Court would impose, for

6    example, electronic monitoring.

7           So that's what -- there's a disconnect here.  There's

8    a failure of proof to show that Probation couldn't adequately

9    monitor Mr. Prado while he was on pretrial release.

11:31 10          So that's what I say about the allegation of

11   falsification of documents.  There's a disconnect here between

12   what's alleged in the crime and what he might or might not be

13   able to do while he's on pretrial release.

14          So I think, in response, we're not dealing with an

15   allegation of he presents a risk of danger to the community

16   because, well, that even hasn't been alleged by the government.

17   So it's solely on the basis of risk of flight.

18          The mention of the ICE detainer, I don't know that

19   there's an ICE detainer, but there hasn't been any kind of

11:32 20   removal order.  There hasn't been any determination of his

21   asylum claim.  So the mere fact that the government alleges

22   here that he stayed beyond his visa does not automatically

23   result in the removal or suggest that he's going to be removed,

24   particularly when he's got an asylum claim pending before ICE.

25   So there are other instances where the court, the District

1    Court, anyway, in Massachusetts has released people who may

2    have stayed beyond their visa.

3           I note the person that -- his wife is on the video

4    call this morning, and she is the one that -- with whom he

5    would be living and returning to live in Florida.  He could be

6    monitored out of the Florida Probation Office, which is what I

7    believe the judge, the magistrate judge in Florida had

8    recommended, and would be required to appear in Massachusetts

9    as required by the Court.  Most of the hearings are now -- or

11:34 10   the hearings now are conducted virtually anyway, so that

11    shouldn't be a problem until his case comes to trial.

12           Just to give you some -- this is in the pleadings, but

13    let me just recap briefly what Mr. Prado has been doing since

14    he came to the United States in 2003.

15           As indicated, or maybe it wasn't indicated, but I will

16    tell the Court that there was an incident in his home country

17    involving threats to his life and his security that prompted

18    his father to assist him in getting to the United States.  And

19    that's the reason he came to the United States, and that's why

11:35 20   he's actually making a claim of asylum that is pending before

21    ICE.

22           After he came to the United States, he -- after a

23    brief period of time, he went to -- or he went to Framingham,

24    he had a relative living in Framingham, and that's where he

25    went to live.  And he started working as a painter, a painting

company, and worked as a painter for the next 16 or 17 years,
living primarily in Framingham but briefly in Marlboro and
Revere.

And then he and his wife during -- during that time,
he had a prior relationship that resulted in the birth of a son
who's now, I think, 14 or 15 years living in Massachusetts with
his mother, and Mr. Prado keeps in touch with that child.

Mr. Prado also has a child by his present wife.  They
were married four years ago.  She also has a child by a prior
relationship who lives with Mr. and Mrs. Prado in Florida.  So
he does have family ties to Florida and Massachusetts.  And as
I said before, his ties are much more significant in the United
States than they are in Brazil, which are almost nonexistent.

I wanted to point out -- I mean, this is sort of an
additional fact that has come to light since I've been able to
talk to Mr. Prado.  He has -- he has -- he's had the COVID
while he's been -- strike that.

He's had the COVID vaccination, but he also suffers
from a breathing disorder which requires that he wear a CPAP
machine.  And to date, he has not been given that while he's
been detained at Wyatt.  And this is another concern that
exists, particularly in light of the widespread appearance of
COVID variants in the institutions and even in Wyatt.  Just
this past week, past two weeks, there has been an outbreak,
significant outbreak at Wyatt.  So I'm not saying that's

determinative, but I'm saying that having Mr. Prado remain at Wyatt presents some risk that would not otherwise be present were he released.

So that's all I have, your Honor, at the present time. But I would ask the Court, request that the Court reread the magistrate's decision down in Florida because I think it's well reasoned and appropriate in addressing some of the arguments that the government has made, and also would suggest that release is an appropriate course of action in this case.

Thank you.

THE COURT:  Thank you.

Mr. Holcomb.

MR. HOLCOMB:  Your Honor, if I may respond to just a few of the points that Mr. Palmer raised.

First, I want to address the idea that somehow Mr. Prado's prior use of stolen identifiers is not indicative at all of how he might conduct himself on pretrial release.

This is not a case of somebody who was arrested on drug offenses and the concern being that they'll commit further drug offenses and, therefore, be a risk of flight or a danger to the community.

I don't think it's at all a stretch to conclude from his willingness and his resourcefulness to have used stolen identifiers in the past in order to make a profit off of people renting these accounts or profit directly from the ride share

1   companies, I don't think it's a stretch at all to conclude that

2   he would also be willing and resourceful enough to do the same

3   in order to avoid prison time.  I think the incentives are much

4   higher for him to engage in this exact same conduct that would

5   allow him to do both.

6           Second, I want to address a point that I believe Judge

7   Reinhart's order in the Florida court discussed, and I want to

8   respectfully disagree with that, which I don't think you're

9   going to find a case where the government can offer some type

11:40 10   of direct proof that the defendant has in the past or can

11   thwart probation-specific location monitoring technology.  But

12   I want to put a finer point on the government's concern here,

13   which is that it's not just that Mr. Prado, you know -- that we

14   have any sort of direct evidence that he can spoof an ankle

15   monitor, but what we do have here, and what our concern arises

16   from, are a few things, one, Mr. Prado's past ability and

17   willingness to spoof location technology; two, his access to

18   technology and information on the dark net, especially for

19   unlawful purposes; three, his extensive use of stolen and

11:40 20   assumed identities and his ability to do so in the future; and

21   four, the considerable incentive that he has to thwart any

22   location monitoring the Court might impose here.

23           And, you know, let's also not forget that

24   technological, you know, backdoors are not the only way that he

25   might thwart location monitoring here.  The defendant need

only, you know, cut their ankle monitor, and I submit that
Mr. Prado has every incentive to do so in this case given the
availability of Brazil as an option.

Third, with respect to Mr. Prado's ties to Brazil, I
understand here that -- and I acknowledge that there are
strong -- that there are somewhat strong ties to the United
States and Mr. Prado has not lived in Brazil for some time, but
the fact is that several of the conspirators that Mr. Prado
works directly with are in Brazil, were in Brazil at the time
or were in the United States and have returned to Brazil.  I do
not think it's accurate to say he doesn't have contacts in
Brazil that are current based on the evidence that we have and
the messages that we have.

Fourth, as to the concern about generalizing from
others' attempted flight, I agree entirely that, you know,
other co-conspirators' attempt at flight alone is not
appropriately or sufficient to establish Mr. Prado's risk of
flight, but I would submit that these are important data points
because these co-defendants, to varying degrees, faced the same
pressures, faced the same potential sentences, the same
sentence that Mr. Prado here has.  I think it would be
imprudent to ignore these data points in this case when so many
have already shown the appeal to flight back to a country that
will not turn them over to the U.S.

And then, finally, your Honor, just with respect to

1   Pretrial Services recommendation, you know, giving that report

2   and acknowledging that report's recommendations, I just wanted

3   to acknowledge that my understanding is that that

4   recommendation is based on -- without certain factors that are

5   considered only for the Court's consideration, most

6   importantly, in our case here, the weight of the evidence,

7   which, as I've described, clearly demonstrates Mr. Prado's

8   major participation in the scheme, as well as potential

9   penalties which here include the two-year mandatory minimum on

11:43 10   the aggravated identity theft's charge.

11        Thank you.

12        THE COURT:  Anything there, Mr. Palmer?

13        MR. PALMER:  Only just to repeat that these arguments,

14   many of these arguments were addressed to the magistrate judge

15   in Florida and they were addressed in the opinion and they were

16   presented to him and he rejected them.  And I would ask this

17   Court to reject them as well because I don't think on balance

18   that they establish the government's burden to prove that

19   there's no condition of release that would ensure, reasonably

11:44 20   assure the presence of Mr. Prado at any future court

21   proceedings.  I think the evidence actually suggests otherwise.

22        Thank you.

23        THE COURT:  I'll take the matter under advisement.

24        I will review all of the information.

25        MR. PALMER:  Thank you.

1          MR. HOLCOMB:  Thank you, your Honor.

2          THE CLERK:  Court is in recess.

3          THE COURT:  Thank you.

4          (Court adjourned at 11:44 a.m.)

5                  - - - - - - - - - - - -

6                       CERTIFICATION

7          I certify that the foregoing is a correct transcript

8     of the record of proceedings in the above-entitled matter to

9     the best of my skill and ability.

10

11

12

13    /s/Debra M. Joyce                    November 5, 2021
      Debra M. Joyce, RMR, CRR, FCRR       Date
14    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25