```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   UNITED STATES OF AMERICA,            )
                                          )
 5            Plaintiff,                   )
                                          )
 6        v.                              )   Criminal Action No.
                                          )   1:21-cr-10158-MLW-7
 7   THIAGO DE SOUZA PRADO,               )
                                          )
 8            Defendant.                   )
                                          )
 9   _____

10

11        BEFORE THE HONORABLE MARK L. WOLF, DISTRICT JUDGE

12

              MOTION HEARING BY VIDEOCONFERENCE
13

14

                   Monday, November 22, 2021
15                        10:46 a.m.

16

17

18

19

20

21   John J. Moakley United States Courthouse
     One Courthouse Way
22   Boston, Massachusetts

23

     Robert W. Paschal, RMR, CRR
24   Official Court Reporter
     rwp.reporter@gmail.com
25
```

**A P P E A R A N C E S**

On behalf of the Government:

    UNITED STATES ATTORNEY'S OFFICE
    BY:  DAVID M. HOLCOMB
    One Courthouse Way
    Suite 9200
    Boston, MA  02210
    (617) 756-9043
    david.holcomb@usdoj.gov


On behalf of the Defendant:

    LAW OFFICE OF JOHN F. PALMER, PC
    BY:  JOHN F. PALMER
    18 Main Street Extension
    Suite 201B
    Plymouth, MA  02360
    (617) 943-2602
    jpalmer@socialaw.com

**P R O C E E D I N G S**

1

2              (In open court at 10:46 a.m.)

3              THE DEPUTY CLERK:  This is Criminal Matter

4    Number 21-10158, United States versus Thiago de Souza Prado

5    and others.

6              THE COURT:  Good morning.  Would counsel please

7    identify themselves for the Court and for the Court Reporter.

8              MR. HOLCOMB:  Good morning, Your Honor.

9    David Holcomb for the United States.

10             MR. PALMER:  John F. Palmer for Mr. Prado.  Good

11   morning, Your Honor.

12             THE COURT:  Good morning.

13             And Mr. Prado is present.  I'll question him about

14   this video proceeding in a moment.

15             Is there also a probation officer on the

16   conference?

17             PROBATION OFFICER:  Good morning, Your Honor.

18   Jennifer Dailey for Probation.

19             THE COURT:  Okay.  We're here in connection with

20   the defendant's motion to have me review and reverse the

21   Magistrate Judge Dein's order that he be detained.  I'm

22   conducting this hearing by videoconference, as permitted by

23   the CARES Act, by the Judicial Conference of the

24   United States, by the Chief Judge in the United States

25   District Court, District of Massachusetts, because we're in

1   the midst of resurgence of the pandemic, and it has hit Wyatt

2   where the defendant is detained, among other places.

3          It's imprudent to conduct proceedings such as this

4   in the courtroom if it's not necessary; and, therefore, if

5   Mr. Prado has spoken to Mr. Palmer and wishes to consent to

6   proceed by video today, we will.

7          Have you discussed that with him, Mr. Palmer?

8          MR. PALMER:  Yes, Your Honor.

9          THE COURT:  And does Mr. Prado wish to proceed by

10  video?

11         MR. PALMER:  Yes, he does.

12         THE COURT:  And is it correct -- or most correct to

13  call him Mr. Prado or Mr. Souza or Mr. Souza Prado?

14         THE DEFENDANT:  Mr. Prado is fine.

15         MR. PALMER:  Mr. Prado.

16         THE COURT:  Okay.  He said in English, "Mr. Prado

17  is fine."

18         Mr. Prado, I have an interpreter here for you.  And

19  if there's anything that I or anybody says that you have

20  difficulty understanding, you can ask the interpreter to

21  repeat it.  But have you understood me in English so far?

22         THE DEFENDANT:  Yes, Your Honor.  I do understand

23  you.

24         THE COURT:  All right.  And have you talked with

25  Mr. Palmer about whether you want to have this hearing by

1    video today, rather than a courtroom at some point probably

2    soon?

3            THE DEFENDANT:  Yes, Your Honor.  We do -- spoke

4    about it, and I'm totally fine with the Zoom video call.

5            THE COURT:  Okay.  Then we will proceed by video.

6    And let me -- okay.  The -- I apologize for starting late.  I

7    wanted to make sure that I had read everything carefully, and

8    it took me longer than I had hoped.  But I have, I believe,

9    read everything going back to the original Probation/Pretrial

10   Services report in Florida.

11           As I understand it, the Government moved for

12   detention based solely on the risk of flight and not on

13   danger to the community.  Magistrate Judge Dein ordered

14   detention because she found the Government proved by a

15   preponderance of the evidence that no combination of

16   conditions will reasonably assure the defendant's appearance

17   in the future, as required.

18           As I understand it, the Government still relies

19   solely on risk of flight and doesn't argue that the defendant

20   will be a danger to the community if released.  Therefore, I

21   must decide de novo if there are conditions of release that

22   will reasonably assure, not guarantee, that the defendant

23   will appear as required in the future.  And the Government

24   must prove by preponderance of the evidence that there are

25   not such conditions.

1              Do the parties agree that that's essentially the

2    history and legal framework for the proceeding today?

3              MR. HOLCOMB:  I agree, Your Honor.

4              MR. PALMER:  Yes, Your Honor.

5              THE COURT:  Mr. Palmer?

6              MR. PALMER:  Yes, Your Honor.  There are a few

7    additional background facts that I will cite, but --

8              THE COURT:  Oh, no.  But, I mean, is everything I

9    said correct so far?

10             MR. PALMER:  Yes, that's right.

11             THE COURT:  All right.  Then I have preliminary

12   questions.  What conditions do you propose would

13   reasonably -- should be imposed and would reasonably assure

14   the defendant's appearance, as required, in the future?

15             MR. PALMER:  I had -- this is in reference to the

16   Magistrate's order in Florida.  The conditions that have been

17   proposed to be implemented included surrendering all of his

18   travel documents that he may have -- he has a Brazilian

19   passport -- electronic monitoring with curfews; we would also

20   suggest that, in light of the concerns that the Government

21   may have, that he be monitored by the

22   Probation/Pretrial Services officer in Florida on a regular

23   basis, that he --

24             THE COURT:  What does that mean?

25             MR. PALMER:  Well, that they check up on him.  I

1  mean, I've had clients where, even on a -- certainly on a

2  weekly basis, but it could be more often.

3            I think what the Court -- not to jump ahead, but --

4  well, let me finish -- finish --

5            THE COURT:  No.  Just tell me all the conditions

6  because I have to decide whether they'll -- you know, the

7  Government's proven that they won't reasonably assure the

8  defendant will appear in the future.  So I want to know

9  exactly what they are.

10            MR. PALMER:  Okay.  Well, and the other

11  requirement, that he check in, he himself could check in with

12  Probation on a daily basis to assure that he is where he says

13  he is; that he -- that he obtain work.  I think he was trying

14  to obtain work.  He's a -- practiced in the construction

15  painting area, that he attempt to obtain work in that area.

16  Those are some of the conditions that were proposed --

17            THE COURT:  Well, I want to know all the

18  conditions.  I think there was a $100,000 personal

19  recognizance bond.  He didn't have to provide any surety.

20            MR. PALMER:  That's true.  So it would be an

21  unsecured bond in the amount of $100,000.

22            THE COURT:  Okay.

23            MR. PALMER:  So those were the conditions that the

24  Magistrate imposed.

25            THE COURT:  And those are the conditions you're

1    advocating today?

2              MR. PALMER:  Yes, Your Honor.

3              THE COURT:  Okay.  And then I'd like to make sure

4    we have a clear and common sense of the evidence on which I

5    should rely.  As you know, the Federal Rules of Evidence,

6    pursuant to Rule 1101(d), don't apply in detention hearings

7    or revocation -- detention proceedings like this.  It's

8    permissible to use hearsay, as I understand it.  It's

9    permissible to rely generally on a proffer from each side.

10   But I have to be comfortable with the reliability of the

11   information or evidence I'm being provided.

12              So what evidence does the Government rely on?  And

13   just to compound the question, Mr. Holcomb, is there any

14   evidence you want to -- what evidence is essentially in the

15   record before me?  And is there any additional evidence you

16   want to present?  I've read, for example, the transcript of

17   the proceeding before Magistrate Judge Dein.  But anyway, go

18   ahead.

19              MR. HOLCOMB:  Yes, Your Honor.

20              Mr. Palmer and I discussed, prior to the hearing,

21   and I believe that we're in agreement that we would propose

22   to rely on the same evidence proffered to Judge Dein at the

23   detention hearing in September as well as the other evidence

24   in the record that was before her.  Her order notes that she

25   considered the evidence that was before the Magistrate Judge

1    in the Southern District of Florida, and so I would

2    understand the record that she considered to include that

3    record as well.

4            And to your second question, Are there any facts or

5    any additional evidence that we would propose to present

6    today?  My understanding from discussion with Mr. Palmer is

7    that the answer to that is no.

8            THE COURT:  All right.  And, Mr. Palmer, do you

9    agree with Mr. Holcomb?

10           MR. PALMER:  I do, Your Honor.

11           THE COURT:  So essentially, then, as I understand

12   it, the evidence on which I should make the decision I need

13   to make is the Probation -- the Pretrial Services report that

14   was presented to the Magistrate Judge in Florida, what -- the

15   Magistrate Judge, I think, was relying on proffers, as far as

16   I can tell, in Florida, and I read his decision ordering

17   release.  And then I read Magistrate Judge Dein's decision

18   and the transcript of your argument before her.

19           I've read the pertinent parts of the complaint that

20   led to the original arrest warrant, the parts being -- the

21   most pertinent parts being those that reference Mr. Prado.

22   I've read the superseding indictment, which the Grand Jury

23   found there was probable cause to make the allegations and

24   charges that it includes.

25           Is there anything else?

1          MR. HOLCOMB:  Your Honor, that sounds
2     comprehensive.
3          MR. PALMER:  I believe that's complete, Your Honor.
4          THE COURT:  All right.  And, Mr. Holcomb, when you
5     make your argument, I'm interested in knowing -- I will be
6     interested in knowing more about the nature of the evidence.
7     I've seen references to WhatsApp chats, the bank records,
8     Bitcoins, but some more specificity at the appropriate time
9     because I have to, you know, consider the weight of the
10    evidence, among other things.
11         I'm going to be interested in knowing whether the
12    defendant has failed to appear in the past.  I saw some
13    references to that, but I want to have a better understanding
14    of it.  But I think the Pretrial Services report in Vermont
15    starts with the defendant being stopped at the Vermont
16    border, but it's not clear to me if he was ordered to appear
17    and didn't as a result of that, for example.
18         And then there were references in the arguments, at
19    least the Government's, to the defendant facing a lengthy
20    sentence.  But I didn't see anything that told me what the
21    Government or the parties believe the guideline range is, his
22    sentence before the -- his potential sentence before the
23    two-year mandatory consecutive sentence that would be
24    required if he's convicted of aggravated identity theft.
25         Do you know what the guideline range, as calculated

1   by the Government, is, Mr. Holcomb?

2           MR. HOLCOMB:  I do, Your Honor.  For just the wire

3   fraud conspiracy count, the guidelines range that the

4   Government has preliminarily calculated for each defendant in

5   this case is defendant by defendant, but -- apologies.  Just

6   one moment.

7           So for -- with respect to Mr. Prado, based on

8   losses resulting from the wire fraud conspiracy attributable

9   to Mr. Prado himself, the Government conservatively estimates

10  those losses at at least 150 to 200,000, based on bank

11  records showing rideshare deposits to his accounts and Zelle

12  transfers, which I'll be happy to explain at length further,

13  what those are further, but Zelle transfers that we attribute

14  to the fraud.

15          With respect to the larger relevant conduct number,

16  we would anticipate including losses that resulted from the

17  actions of several of the co-conspirators that we have linked

18  through evidence to Mr. Prado.  And I believe that that would

19  result in a loss amount that would result in the 550 to

20  $1.5 million range.

21          Additional enhancements would likely apply, in the

22  Government's view, for the number of victims that result --

23  there were ten or more victims, so that's a two-point

24  enhancement.  There's another two-point enhancement related

25  to the use or possession of unauthorized control devices or

1    access devices, and that relates to the fake drivers'

2    licenses and Social Security -- the use of fake licenses in

3    the scheme.

4           And then there would be another two-point

5    enhancement, in the Government's view, for use of

6    sophisticated means, as well as a substantial portion of the

7    scheme occurring or being committed outside of the U.S.

8           THE COURT:  And so what would the guideline range,

9    as you calculate it, be after trial?

10          MR. HOLCOMB:  After trial, for -- and apologies

11   because I've looked at this with respect to the number of

12   loss ranges; but after trial, I would calculate the

13   guidelines range, as offense level 26, 63 to 78 months.

14          THE COURT:  And that's before the two-year

15   consecutive sentence?

16          MR. HOLCOMB:  That's correct, Your Honor.

17          THE COURT:  So that would be 87 to 104 months.  And

18   if there were to be acceptance of responsibility, what would

19   the guideline range be?

20          MR. HOLCOMB:  That would, I believe, be 46 to

21   57 months prior to the two-year mandatory minimum sentence.

22          THE COURT:  So that would be, by my calculation,

23   70 -- I have a low end of 70 months.

24          And, Mr. Palmer, does that appear to be the correct

25   guideline calculation to you, should the defendant be

1    convicted after trial?

2              MR. PALMER:  I have not calculated the guidelines,

3    Your Honor.  I accept, you know, the Government's version of

4    how they view the guidelines, but I haven't reviewed enough

5    of the discovery to be able to corroborate that or not.

6              THE COURT:  All right.  Well, as I said, the

7    transcripts make reference to a lengthy sentence of -- this

8    makes it more concrete.  Of course, I'm not ruling now on

9    what the guidelines are, but the potential sentence is a

10   factor to be considered under Section 3142(g).

11             Okay.  Is there anything further before I hear the

12   Government's argument?

13             MR. PALMER:  Well, not on this issue, Your Honor,

14   but --

15             THE COURT:  Well, the Government has the burden of

16   proof.

17             MR. PALMER:  Okay.

18             THE COURT:  So the Government would argue first,

19   and then you would go second.

20             MR. PALMER:  Okay.  Thank you.  I got it.

21             THE COURT:  All right.  Mr. Holcomb?

22             MR. HOLCOMB:  Thank you, Your Honor.

23             Pretrial release is appropriate with respect to

24   Mr. Prado and should continue.  As Your Honor has noted,

25   following the detention hearing in September, Magistrate

1    Judge Dein found that the Government met its burden of

2    showing that no combination of conditions would reasonably

3    assure Mr. Prado's appearance in this case, based on

4    Mr. Prado's risk of flight under 18 USC, 3142(f).

5            In reaching that determination, Judge Dein

6    considered the applicable factors from Section 3142(g),

7    including the nature and circumstances of the rideshare fraud

8    conspiracy that the Government charged, weight of the

9    evidence against Mr. Prado specifically, and Mr. Prado's

10   history and characteristics.

11           And while Your Honor's review is de novo, I will

12   suggest that Judge Dein properly weighed the 3142(g) factors

13   with respect to Mr. Prado, in light of the facts proffered by

14   counsel at the detention hearing, in light of the opinion of

15   the initial Magistrate Judge in the Southern District of

16   Florida, and in light of Judge Dein's own more extensive

17   understanding of the case as a whole.

18           I will also address the specific challenges to

19   Judge Dein's order that Mr. Prado raises in the present

20   motion, and I will highlight first that these challenges

21   should not being credited; and, second, that even if these

22   challenges are credited, they do not alter the fundamental

23   finding that no set of conditions can reasonably address

24   Mr. Prado's flight risk.

25           Your Honor, I'll briefly address the 3142(g)

factors, since I know that you've read the record below.
First, with respect to the nature and circumstances of the
offense, the Government presented evidence that Mr. Prado was
involved in an extensive scheme to use stolen personally
identifiable information of individual victims to create
fraudulent accounts with rideshare and delivery companies.

The scheme played out against both the companies
and the individual victims.  Defendants stole the identities
of real victims by using their driver's license images and
information and Social Security numbers.

Defendants defrauded the rideshare and delivery
companies by using those stolen identities to open fraudulent
accounts for ineligible individuals to drive with, and
individual customers of the rideshare and delivery companies
paid for rides and deliveries from people using those
fraudulent accounts who were not who they presented
themselves to be and who were not properly vetted under
public safety regulations and the company's own internal
regulations -- or internal requirements.  Pardon me.

With respect to Mr. Prado specifically, the
Government presented evidence that Mr. Prado personally
engaged in identity theft and fraud against the rideshare and
delivery companies in --

THE COURT:  In what -- oh, I'm sorry.  Go ahead.

MR. HOLCOMB:  Mr. Prado sourced certain personally

identifiable information and obtained other information, such as driver's license images and Social Security numbers, in order to create the fraudulent accounts with the companies. And he also created those accounts and then rented and sold those accounts to ineligible drivers for a rental fee or a price, as well as to generate referral bonuses that these companies occasionally offered.

THE COURT:  And what is the underlying evidence that he did these things?

MR. HOLCOMB:  The primary evidence against Mr. Prado consists of WhatsApp chat messages between Mr. Prado and another co-defendant in this case, Wemerson Dutra Aguiar.  These are chats that were obtained pursuant to a court-authorized search of Aguiar's iCloud account.

The chats between Aguiar and Mr. Prado demonstrate that Prado and Aguiar discussed creating and managing fraudulent accounts, as well as ways to avoid detection of those fraudulent accounts by the rideshare company -- rideshare and delivery companies.  Those companies had fraud-detection systems and frequently attempted to shut down accounts that they deemed fraudulent.  And so Prado and Aguiar discussed ways of avoiding those accounts being shut down.

The messages between Prado and Aguiar also show Prado sending driver's license images to Aguiar and buying

1    Social Security numbers from Aguiar typically in batches of

2    five to ten numbers -- or numbers corresponding to five to

3    ten individuals at a time.

4         And Prado also had Aguiar create fraudulent

5    accounts for him.  These messages were for a period of

6    between February to October, 2020; and there were over 4,100

7    of those messages that were exchanged between the two,

8    sometimes in stretches of messages occurring at a frequency

9    of every day.

10        That's -- Your Honor, that's one set of evidence

11   that the Government is relying on.  Another is -- are bank

12   records, which Your Honor has already noted.  There is one

13   particular quirk with the bank records for Mr. Prado, which

14   is that we do have bank statements for Mr. Prado specifically

15   for an account in his name, but we also have chats showing

16   that Mr. Prado directed payments to other bank accounts.  And

17   so it appears to the Government that Mr. Prado used other

18   individuals' bank accounts at times, and he would not be

19   alone in this case in doing so.

20        But I flag that for Your Honor just to highlight

21   that the numbers that I'll highlight to you now may be -- in

22   the Government's view, are an incomplete picture of the

23   inflows that Mr. Prado enjoyed from the scheme.

24        But Mr. Prado's individual bank records in his own

25   name show rideshare deposits, but that is deposits from the

1    rideshare companies directly into the account totalling over

2    $30,000 and Zelle transfers of over $110,000.

3            Now, Zelle is -- Zelle was the typical method that

4    renters' or buyers' accounts used to pay the sources of the

5    fraudulent accounts, either when the drivers under those

6    accounts purchased the accounts outright, typically for a fee

7    of, for instance, around $1,000, or for periodic rental

8    payments in amounts between 150 and $350 typically.

9            THE COURT:  And you were going to tell me, I think,

10   what a Zelle payment is.

11           MR. HOLCOMB:  Zelle, as I understand it,

12   Your Honor, is a money-transfer system done through -- it's a

13   mobile money-transfer system.  It's a mobile application that

14   allows users to transfer funds directly from their own bank

15   accounts into another individual's and then, you know, vice

16   versa.

17           THE COURT:  Okay.

18           MR. HOLCOMB:  Your Honor, with respect to

19   additional evidence, the Government would rely on evidence

20   from the rideshare and delivery companies themselves.  These

21   would be account registration data and other records that

22   would show that a number of accounts, at least a dozen

23   accounts, were created using Mr. Prado's face edited on to a

24   real person's -- a real victim's driver's license, so with

25   the victim's name, date of birth, driver's license number and

1    other information, but showing the face of Mr. Prado.

2              THE COURT:  So --

3              MR. HOLCOMB:  And --

4              THE COURT:  And when we're talking about drivers'

5    licenses, are you saying these are stolen identities?

6              MR. HOLCOMB:  Yes, Your Honor.  We're talking about

7    accounts, like a driver account created with a rideshare

8    company that were created by uploading a driver's license

9    image that showed the information of another person, but the

10   face of Mr. Prado.  And I would note that this is not the

11   only way that these fraudulent accounts were created.

12   Sometimes the driver's licenses were edited, the images were

13   edited, but other times they weren't and other -- especially

14   if they were not going to be used by the person whose face or

15   the -- sorry -- the person who was creating the account.

16              For instance, if Mr. Prado created the account for

17   somebody else, he might edit -- have somebody else's face

18   edited on to the driver's license because somebody else would

19   be driving under that fraudulent account.  And so the

20   rideshare companies have identified a number of other

21   fraudulent accounts that they have attributed to Mr. Prado

22   based on metadata such as IP address, e-mail address, and

23   telephone number.

24              And, finally, just in terms of big-picture

25   categories of evidence that the Government would rely on, the

1     Government would expect to have witness testimony from

2     co-conspirators who worked with Mr. Prado and had an

3     awareness of Mr. Prado's activity with respect to the

4     rideshare fraud.

5             THE COURT:  So there are cooperating witnesses in

6     the case?

7             MR. HOLCOMB:  That is -- that is correct,

8     Your Honor.  The Government anticipates there being

9     cooperating witnesses.

10            THE COURT:  Okay.  So I think that relates to the

11    nature and circumstance of the offenses charged and the

12    weight of the evidence against Mr. Prado.

13            What about the other Section 3142(g) factors; and

14    then the adequacy or, from your perspective, inadequacy of

15    the proposed conditions?

16            MR. HOLCOMB:  Yes, Your Honor.  If -- before I move

17    on to Mr. Prado's history and characteristics, though, if I

18    may just kind of add two points about the nature of the

19    offense?

20            THE COURT:  Yes.

21            MR. HOLCOMB:  There's evidence that defendants,

22    including Mr. Prado, used what's called GPS spoofing in order

23    to manipulate location data that was projected through the

24    rideshare -- through the rideshare and delivery companies'

25    applications.  This was a way that the defendants were able

1  to generate higher fees or fares for rides completed or

2  delivery trips completed.

3          And so defendants, including Mr. Prado, used, in

4  some cases sold, GPS-spoofing technology to other individuals

5  who operated in this space, often with fraudulent rideshare

6  accounts in order to generate higher amounts of money from

7  the delivery activities.

8          THE COURT:  Is there evidence -- will there be

9  evidence of how Mr. Prado allegedly got this spoofing

10  technology?

11          MR. HOLCOMB:  The Government anticipates that the

12  WhatsApp messages between Mr. Prado and Mr. Aguiar will be

13  instructive as to his use of GPS-spoofing technology.

14          THE COURT:  Is there any contention or evidence

15  that he created that technology, or is essentially the claim

16  that he acquired it?

17          MR. HOLCOMB:  I believe, Your Honor, that the

18  latter is more accurate, that he and co-conspirators he

19  worked with acquired the -- acquired the technology, which

20  relates to the second additional point I wanted to raise,

21  which is that the Government has extensive evidence through

22  sub chats between Mr. Prado and Mr. Aguiar, as well as

23  between Mr. Aguiar and others or between other defendants,

24  that defendants in this case used the dark net in order to,

25  on the one hand, obtain driver's license images and numbers

1   and Social Security numbers; so, for instance, several of the

2   co-conspirators purchased Social Security numbers on the dark

3   web.

4            The Government has evidence suggesting that the

5   dark net was also used to acquire the GPS-spoofing technology

6   that was used.

7            THE COURT:  And what is the dark net in this

8   concept, in this context?

9            MR. HOLCOMB:  Your Honor, as I understand it, the

10   dark net is an overlay on the Internet that is accessible

11   only using specialty software, and it is not in a searchable,

12   indexed form, format.  So if you are -- if you were to try to

13   access a dark net site, you would need to know where you were

14   going.  But the dark net, for these reasons, is often used in

15   connection with criminal activity, especially sales of items

16   like Social Security numbers, and often those sales involve

17   the exchange of cryptocurrency like Bitcoin.

18            And if I may just put a -- one more note on your

19   question about Mr. Prado's acquisition of GPS-spoofing

20   technology.  The evidence shows that Mr. Prado not only

21   acquired the spoofing technology, but he also helped install

22   that technology for other people, other individuals, to use

23   it on their own phones, other devices, and that he helped

24   troubleshoot certain issues that arose with that technology

25   with some of those individuals.

1          THE COURT:  And then you referenced cryptocurrency

2     and Bitcoin.  What's the relevance of that?

3          MR. HOLCOMB:  The relevance there, Your Honor, is

4     that WhatsApp messages also demonstrate that Prado discussed

5     obtaining and using Bitcoin.  And the Government's

6     understanding is that, that likely was used in connection

7     with purchases on the dark net of personally identifiable

8     information and GPS-spoofing technology.

9          THE COURT:  Okay.  Go ahead.

10          MR. HOLCOMB:  Okay.  I'll move on to the next

11     factor now, if that's okay.

12          THE COURT:  Yes.

13          MR. HOLCOMB:  So, third, with respect to

14     Mr. Prado's history and characteristics, Mr. Prado is a

15     Brazilian national.  He's been in the United States since

16     2003.  It's the Government's understanding that he overstayed

17     his visa and that, pending resolution of an asylum claim that

18     the defense has made the Court aware of, Mr. Prado would be

19     subject to removal proceedings.

20          Mr. Prado faces poor work prospects here.  Counsel

21     proffered that Mr. Prado was painting and had a painting

22     business before the pandemic but that the pandemic caused

23     that business to fail.

24          I would note one thing about Judge Dein's order is

25     that it suggests that Mr. Prado is presently authorized to

1   work in the U.S., and I reviewed a transcript from the

2   detention hearing, and I do not know that, that conclusion is

3   supported by the facts that were proffered, and perhaps

4   Mr. Palmer can update us.  But at the hearing, the Government

5   proffered that Mr. Prado's last work authorization expired in

6   June of 2021.

7          And I don't believe Mr. Palmer addressed whether

8   Prado has official work authorization in place at this point,

9   rather than just that Mr. Prado is prepared to work as a

10  painter.  And I note that just to highlight that the

11  Government's view is that Mr. Prado's work prospects in the

12  United States at this point are very weak.

13         Mr. Prado previously lived in Massachusetts but

14  moved to Florida.  He has family in the U.S., including his

15  spouse, their young child, and his spouse's minor child from

16  another relationship.

17         However, his spouse is also a Brazilian national

18  who has also overstayed her visa in the United States.  I

19  don't believe that there has been evidence presented that she

20  has ties to the United States that are particularly strong,

21  especially since she has not been living in the United States

22  for as long of a period.  My understanding is that she has

23  been in the United States since around 2017.

24         Mr. Prado owns no property in the United States,

25  and no evidence has been presented that his prior business

1    serves as a meaningful tie; and no evidence has been

2    presented that he or his family could post meaningful

3    security in connection with a combination of conditions in

4    this case that might have, you know, reasonably assured his

5    appearance.

6            So, in sum, Mr. Prado has weak work prospects here,

7    few ties, and the Government would submit that those ties are

8    really just a family that could relocate with him back to

9    Brazil.

10           And, Your Honor, I believe the fourth factor is

11   only relevant in the context of danger to the community, so I

12   will move on to why Mr. Prado presents a risk of flight,

13   unless you have any questions at this point?

14           THE COURT:  No.  I think you've covered most of

15   them.

16           MR. HOLCOMB:  So the 3142(g) factors here point to

17   strong incentives that Mr. Prado has to return to Brazil and

18   avoid prosecution in this case altogether.  As I've --

19           THE COURT:  I wondered if you framed your argument

20   too broadly.  He may have strong -- and I'm saying this in

21   part so Mr. Palmer can address it.

22           The risk of flight doesn't relate exclusively to

23   the risk that he would flee the United States.  It may be

24   difficult to fabricate a passport; however, I thought you

25   would argue perhaps that Defendant has a demonstrated

1   capacity to fabricate a Social Security card and a driver's

2   license.

3         He could cut off the GPS, even if he can't spoof

4   it, which is part of their argument, that people -- I've had

5   cases where people have cut off GPSes, and then probation and

6   the marshals are alerted that somebody's gone, but it doesn't

7   keep them from going; and he would have false identification

8   and could live in other parts of this big country and, if he

9   wanted to go to Brazil or some place else, maybe go into

10  Mexico because Mr. Palmer of course is right, and I wrote

11  about this in *Patriarca* 30 years ago.

12        I have to decide, you know, whether this particular

13  defendant poses so great a risk of flight that there are no

14  reasonable conditions that will reasonably assure, not

15  guarantee, that he'll appear in Court here in the future.

16        But the fact you argue, and it makes some sense to

17  me, that it's feasible for people who want to, you know,

18  leave the U.S. and go to Mexico and then wherever they want

19  to go, to do that, maybe particularly if they have what

20  appear to be authentic U.S. identification documents.

21        MR. HOLCOMB:  Well, Your Honor, I will argue those

22  points that you just raised.  I think, as I understand your

23  question, though, at the moment, it seems to be, Why --

24  What's the significance of him fleeing to Brazil?  And as --

25  as I think the Government has highlighted since the outset,

1    at the first detention hearings, the significance there is

2    that he has the -- he has Brazilian citizenship, he has a

3    past there, and then he has the ability to return there and

4    not face any consequences here because Brazil does not

5    extradite its own citizens for offenses such as those charged

6    in this case.

7              And to jump ahead a bit to the relevance of the

8    flight of others, I agree, this is an individualized

9    determination that Your Honor must make; but it's instructive

10   to observe that others who faced a similar -- or who were

11   involved in an offense of a similar nature, identical really,

12   identical nature of the offense, nearly identical weight of

13   the evidence, and substantially similar personal history and

14   characteristics with respect to past in Brazil and

15   nationality and having that option available as a safe haven,

16   that similarly situated individuals were able to cross into

17   Mexico undetected and fly from Mexico to Brazil and avoid

18   prosecution in this case altogether.

19             THE COURT:  And the similarly situated individuals,

20   are they indicted co-defendants in this case?

21             MR. HOLCOMB:  Three of them are, Your Honor.

22             THE COURT:  Okay.

23             MR. HOLCOMB:  I would also -- I would note that two

24   additional individuals -- let me revise that, Your Honor.  I

25   believe only two of the three, the Government has -- has been

1    notified, left the country and flew from Mexico to Brazil.  I

2    believe that the third one is still unaccounted for.

3         Now, two additional co-defendants, charged

4    co-defendants in this case, did the same thing.  They drove

5    into Mexico or crossed into Mexico undetected and attempted

6    to fly from Mexico to Brazil; however, unknowingly, they

7    touched down in Panama for a connecting flight and were

8    apprehended there, and they were extradited to the

9    United States.

10        But those are two additional co-defendants in this

11   case, same charges, same -- substantially similar evidence,

12   same general characteristics that attempted to flee.  Those

13   two just weren't able to do so.

14        But, Your Honor, I think the more important point

15   as to others' risk or others' -- evidence of others' flight

16   in this case is that it's instructive with respect to

17   somebody in Mr. Prado's shoes, but the facts with respect to

18   Mr. Prado, in the Government's view, are enough.

19        The safe haven available to him in Brazil to avoid

20   prosecution in this case altogether is a very compelling

21   interest for Mr. Prado, especially since he faces a lengthy

22   sentence, as I've outlined.  And just one point on that.

23   It's a lengthy -- it's not so much the absolute length of the

24   sentence here as much as it's the sentence compared to the

25   alternative, which is, if he gets back to Brazil, he faces no

1    sentence.

2            Part of the reasonableness and part of the analysis

3    of what's sufficient to deter flight here is what's the

4    likelihood that Mr. Prado is going to be caught if he

5    violates his conditions of release?  And here, the likelihood

6    that he cuts an ankle bracelet -- the likelihood of him

7    getting caught, I should say, if he cuts an ankle bracelet

8    and attempts to make it back to Brazil are very low,

9    especially as more time elapses and if he's able to use false

10   identifiers, like he has in the past, in order to return to

11   Brazil.  And so the length of the sentence here is

12   significant when the alternative is zero consequences if he

13   makes it back to Brazil.

14           That's underscored by the fact that, if Mr. Prado

15   is convicted, he's liable to be deported after he serves a

16   sentence here.  An immigration detainer was lodged in May

17   concurrent with his arrest.  I understand that there may be

18   certain considerations because of the asylum claim that the

19   defense has flagged for the Court; but I think that, you

20   know, if Mr. Prado is convicted and serves a sentence, it's

21   highly likely that he will be deported after he serves that

22   sentence.  And so the upshot is that Mr. Prado has every

23   incentive to return to Brazil now and avoid any sentence

24   whatever, rather than ultimately being returned to Brazil

25   after serving a sentence.

1          And just to highlight a couple of the points that

2    Your Honor already previewed that you expected the

3    Government -- Your Honor expected the Government to make, the

4    risk of flight is underscored by the nature of the offense,

5    which involved the use of fraudulent identifiers and passing

6    oneself off or other people off as people that they were not,

7    as well as the weight of the evidence and Prado's

8    insubstantial ties to the U.S. and his uncertain future

9    prospects in the United States.

10          Your Honor, I'll briefly address, I think, the

11    other challenge that Mr. Prado raises in his motion beside

12    the point about reference to others' flight, which I believe

13    is the location monitoring and the viability of location

14    monitoring; and I've already alluded to it, but the reason

15    the Government does not believe that location monitoring is

16    adequate in this case is because it really only minimally

17    guards against the risk of flight.

18          Location monitoring is effective in allow -- in

19    notifying Pretrial Services once a defendant has fled, but it

20    really just limits the defendant's head start here.  And so I

21    think other sessions of the Court have noted as much that

22    electronic monitoring is useful when the Court, you know, is

23    trying to make sure somebody stays within the home, for

24    instance, if it's -- if it's, like, radio-frequency

25    monitoring or, you know, if Pretrial Services is keeping tabs

1    on somebody closely.

2           But the moment the bracelet is cut, electronic

3    monitoring is really of no help.  It doesn't help Pretrial

4    Services or the Marshals locate the defendant.

5           In this case where there's such a clear safe haven,

6    the Government submits that location monitoring, regardless

7    of whether Mr. Prado could tamper with the bracelet in other

8    ways, location monitoring here isn't viable.  I think it's

9    appropriate that Judge Dein noted, however, that this

10   defendant demonstrates a willingness and ability to tamper

11   with location projecting -- location technology in the past,

12   and so that's, you know, one further reason why electronic

13   monitoring seems inappropriate in this case.

14           THE COURT:  Thank you.

15           All right.  Mr. Palmer?

16           MR. PALMER:  It's hard to know exactly where to

17   begin, but let me start with the issue of substantial ties to

18   the community.  The Assistant U.S. Attorney and, indeed

19   prior, I think Judge Dein referenced the fact that he has no

20   ties to the United States as compared to ties to Brazil.  In

21   fact, he has no ties to Brazil other than the fact that

22   that's his nationality.  There's nothing in the record,

23   either in the hearing before Judge Dein, Magistrate Judge

24   Dein, or proffered by the Government that would indicate that

25   he has family ties any place other than the United States.

1          He came to the United States in 2003 legally.  He's

2     not presently authorized to be in the United States because

3     he overstayed his visa, but he did file and has filed an

4     application for asylum.  It's a curious argument that he

5     wants to flee to Brazil when he's filed an application for

6     asylum fearing his safety if he were to return to Brazil.

7          THE COURT:  When did he file that application?

8          MR. PALMER:  I think it was at least five years

9     ago.

10          THE COURT:  And what's the basis of it?

11          MR. PALMER:  I haven't seen it, Your Honor, but it

12     usually would be based on -- well, I shouldn't speak.  I

13     don't know.  But it seems to be -- that seems to be the case,

14     that it's been filed.

15          He has -- as you can see from the record, the

16     Magistrate Judge who initially released him in Florida I

17     think addressed the fact that he had -- he's got a mother

18     that's living in Massachusetts.  He's got two sisters living

19     in Massachusetts.  He's got a son that he's provided for

20     child support.  That was not noted in the Government's

21     presentation, but he's under a child support order, which

22     he's paid up until at least the time of his incarceration for

23     the support of that child in Massachusetts.

24          He's been living with his wife of -- I think it's

25     four years now they've been married.  They live in

1    Boca Raton.  He's living with her and his one-year-old son,

2    as well as her child by a prior marriage.  So all of his

3    family connections are here in the United States, either in

4    Massachusetts or in Florida.

5          In addition, he has worked in -- the question about

6    his employment, he has worked since 19 -- since his coming to

7    the United States in 2003, he had his own

8    construction/painting company in Massachusetts up until 2017;

9    and then, as noted by the Government, he moved to Florida,

10   but it was primarily because he and others like him in the

11   contracting business had difficulties during COVID.

12         THE COURT:  Well, you said he had his own business

13   until 2017.  That was pre-COVID.

14         MR. PALMER:  That's correct.  But he had -- so he

15   had difficulties, and the business was -- you know, not doing

16   as well, but COVID accentuated that and I think was what

17   prompted him to move to Florida.

18         In terms of his work permit, I do understand that

19   he had a work permit up until at least the time of his

20   incarceration in this case, and he hasn't been able to

21   address that because he's been incarcerated since May.  It

22   would be his intention to renew that application for a work

23   permit, were he to be released, in Florida.  He was

24   working -- he was looking for and doing work in Florida at

25   the time of his arrest.

1            I wanted to address the question of -- so, the

2       issue -- it's a twofold -- and I know I'm not informing this

3       Court of anything that the Court doesn't know already.  But

4       in terms of the law, we're focusing more on whether there are

5       any conditions of release here that would mitigate possible

6       flight by Mr. Prado.  Nothing is guaranteed in life, and

7       nothing is required to be guaranteed, as the Court pointed

8       out, in terms of a defendant's likelihood of flight.

9            There are -- one condition I didn't mention, but it

10      occurred to me in light of what the Government and the Court

11      seems to be concerned about, is that there can be

12      monitoring about -- monitoring of his -- his capabilities,

13      let me put it that way.  For example, in other types of

14      cases, people restrict access to an individual's computer,

15      other devices that can access the Internet.

16           These things are done to afford somebody who has

17      inappropriately been using the Internet and alleged to have

18      used the Internet in a crime -- the Court's concerned about

19      continued use of the Internet for nefarious purposes.  You

20      restrict or take away the opportunity to do that.  I mean,

21      that can be accomplished.

22           And there are all sorts of speculative things that

23      somebody might do to avoid the imposition of restrictions,

24      but I would suggest to the Court that these are mere -- these

25      are speculations, that there are conditions that can be put

1    into place that would mitigate the concerns that the Court

2    has.

3              If you think that he might -- and this issue of

4    spoofing technology, the Government -- you know, the

5    Magistrate, when he initially ordered release, made the point

6    that the Government has not shown or didn't indicate how

7    exactly this -- his access, the defendant's access, to

8    spoofing technology in the case, in the underlying case,

9    would affect his ability to access some kind of technology

10   that would defeat the application of --

11             THE COURT:  Well, this is necessarily preliminary,

12   but this is an unusual case.  According to the Government,

13   there's substantial evidence that the defendant, you know,

14   was able to manufacture -- you know, to obtain drivers'

15   licenses of other people, Social Security licenses of other

16   people, personally alter those licenses, and then acquire

17   technology -- it was helpful to me to have clarified that he

18   didn't engineer the technology -- but acquired technology

19   that would, you know, defraud ride-sharing services.  I

20   assume that's, like, Uber and Lyft and GrubHub, something

21   like that.

22             So it's some evidence of both a proclivity and a

23   capacity in other contexts to do it, you know, to interfere

24   with technology.  But in any event, go ahead.

25             MR. PALMER:  No.  My only point is that I suppose

1   it's some evidence, but it's not -- to me, it's not terribly

2   compelling, unless there's a connection made to his ability

3   to do one thing facilitates his ability to do something else.

4          The other -- but the more compelling point I would

5   like to make to the Court is that, in order to do that, you

6   have to have some Internet connection; you can't just do it

7   in a vacuum in your house.  And you can address that through

8   conditions.  You can take away his computer; you can take

9   away his ability, as a condition of his release, his ability

10  to access that alleged information on the computer, so --

11         THE COURT:  Did the -- okay.

12         MR. PALMER:  Yeah.  So, I mean --

13         THE COURT:  I'll consider that.

14         MR. PALMER:  Well, I'm just saying it's done in

15  cases of pornography, for example.  The fact that somebody

16  has a proclivity to do something, the access is taken away

17  from him, and people are still released on conditions that

18  take away that opportunity.

19         The -- so the other -- you know, the other factor

20  that the Magistrate cites and the Government continues to

21  emphasize is the fact that other people fled.  As the

22  Magistrate in Florida pointed out, this is of little

23  relevance to what this defendant would do and what this

24  defendant's particular circumstances are.

25         As the Court knows, it's this particular defendant

1    and whether this particular defendant has conditions -- or

2    there might be conditions imposed that would restrict him in

3    his opportunity to flee.  I know --

4            THE COURT:  I do know that.  I think you -- the

5    Government cited it in a higher profile file than this,

6    *United States v. Patriarca*, 776 F.Supp. 593, starting at 603.

7    I discussed extensively why I was persuaded there were

8    reasonable conditions that -- on which the boss, or deposed

9    boss, of the New England Mafia could be released, even though

10   other members of La Cosa Nostra, co-defendants of his, had

11   fled.

12           So it does not have to be an individualized

13   determination; however, the fact that some of his

14   co-defendants fled to Mexico indicates that that's something

15   that's possible to do.  And then, you know, the question, you

16   know, would be whether there's reasonable assurances of what

17   the defendant would do.  And each of them is unique.  And I

18   don't know what their circumstances are, and I don't know how

19   I would decide a detention matter before they fled,

20   concerning them.

21           But I -- no.  I take your point.  But, yeah, it's

22   not sort of an "all or nothing" thing; there is some limited

23   relevance, and it's the way -- I think Mr. Holcomb

24   articulated, today at least, to the fact that it's feasible

25   for people to do it if they want to do it.

1          MR. PALMER:  But my only point is that's of

2    extremely limited relevance in terms -- I don't know, for

3    example, what their conditions of release were or even if

4    they had conditions of release.  I just don't know.  And in

5    any case that appears before the Court, there's the potential

6    of flight, there's no question about that.

7          But the question is:  In this particular case, can

8    we fashion, can the Court fashion, can Probation fashion,

9    some conditions that will reasonably assure his presence?

10          And notwithstanding the strength of the

11    Government's case or the nature of the facts, I think, in

12    this case, there are factors that would militate against his

13    flight, and there are conditions that would assure his

14    presence.  And we presented most of them to the Magistrate.

15    One Magistrate in Florida ruled one way, and the Magistrate

16    here ruled the other way; but I think that, in ruling the

17    other way, that the Magistrate in Massachusetts relied

18    upon -- principally relied upon factors that I don't think

19    are valid.

20          One was the fact that he -- the spoofing technology

21    would allow him to circumvent any conditions of release.  I

22    think there's a condition that would address that concern.

23    And the second factor she cited was the fact that other

24    people fled, and I think that that's not a valid -- I concede

25    to the Court that there's some -- if it was at trial, there

1    would be some -- you know, might be some probative relevance,

2    but it's really quite limited.

3          So I would ask the Court to reinstate the

4    conditions, perhaps the conditions that were imposed in

5    Florida, with the additional condition that, if the Court has

6    concern about spoofing technology, take away his opportunity

7    to use any technology, just take away his computers.  And I

8    think that would address the concern about his continued

9    inappropriate use of -- or access to computer technology.

10         THE COURT:  There's a question I actually did mean

11   to ask Mr. Holcomb, and I foreshadowed it early on but didn't

12   reiterate it.  I have the Pretrial Services report from

13   Florida, which on Page 3 has his prior criminal record.  I

14   thought I read somewhere in the documents leading up to

15   today's hearing that four times Mr. Prado had failed to

16   appear as ordered for judicial proceedings.  First, is that

17   right?  And, second, what were the four times?

18         MR. HOLCOMB:  Your Honor, my understanding is that,

19   that is correct.  I apologize.  I do not have -- excuse me --

20   that specific information in front of me.  I'm happy to

21   submit it for you.

22         THE COURT:  Well, there's not going to be any

23   opportunity to submit it because it's always my goal to

24   decide matters orally, and that's my goal today.

25         So why do you think he failed to appear four times?

1          MR. HOLCOMB:  Your Honor, I can't speak to those

2    failures to appear and the specific circumstances of those.

3    I just would note that I don't believe that the parties

4    relied on that either -- or argued that either way before

5    Judge Dein in the detention hearing below.

6          THE COURT:  It's somewhere in the record.  I mean,

7    do you remember the same?  Do you have the Pretrial Services

8    report?

9          MR. HOLCOMB:  I do.

10          THE COURT:  All right.

11          MR. HOLCOMB:  That -- I know that it is based on

12    his BOP sheet.

13          THE COURT:  So the first entry -- this is the

14    report.  I don't think it's docketed, but it's dated May 18,

15    2021.  The first entry says "9/24/2004, when he was 20,

16    Department of Homeland Security's Customs Border Patrol

17    charged him with being a deportable alien," so they must have

18    stopped him.  And then it says, "Disposition:  Date unknown,

19    warrant of arrest/notice to appear."  So that looks like he

20    was encountered at the border in Vermont, released, ordered

21    to appear; and then, according to the records and the NCIC,

22    National Crime Information Center, system, the warrant's

23    still outstanding.

24          Do you have anything to say on this, Mr. Palmer?

25          MR. PALMER:  All I have, Your Honor, is what you

1    have; and I would just say that these notations aren't

2    necessarily reliable, although I haven't looked into it.

3              THE COURT:  Okay.

4              MR. HOLCOMB:  Your Honor, if I may, I believe that

5    the -- I think you were referring to 2004 --

6              THE COURT:  Yes.

7              MR. HOLCOMB:  -- instance?  The Government can't

8    comment on, you know, an asylum claim that it doesn't know

9    more about, but my -- I believe that it's possible that, that

10   particular incident may have resulted in the asylum claim

11   being asserted, and that may be the lead-up to that.  But I

12   don't know --

13             THE COURT:  No.  That was 2004.  Mr. Palmer said he

14   thought the asylum petition was filed in 2017, 13 years

15   later.  That would be attenuated.

16             MR. HOLCOMB:  Your Honor, I -- I agree, and I'm

17   relying on information presented -- or the information about

18   the asylum claim shared by Mr. Palmer, so I'll rely on that.

19             My understanding of the others, the other defaults,

20   one was leaving the scene of property damages back in 2011;

21   one was a default for --

22             THE COURT:  Well, hold on a second.  2011?  There's

23   not -- there's no entry for 2011 in the Pretrial Services

24   report, which I'll make Exhibit 1 of today's date so the

25   record's clear on what we're discussing.

1          MR. HOLCOMB:  Okay.

2          THE COURT:  Go ahead.

3          MR. HOLCOMB:  Well, Your Honor, I'll just leave it

4    at that.  I don't have further information about those

5    defaults in the Pretrial Services report.

6          MR. PALMER:  Your Honor, I have a question of

7    clarification.  My -- I don't have -- I don't see where it

8    says "defaults."

9          THE COURT:  Yeah.  I -- I don't think I used the

10   term "default."  I had read -- I've read everything leading

11   up to this hearing today.  And somewhere -- although I can't

12   tell you right at the moment where I read that -- I thought I

13   read that four times he had failed to appear.  Maybe one of

14   them was after he was arrested in this case.  So I was just

15   trying to see if that was true and whether it was accurate.

16         I think the only reliable information I have, and

17   it's admittedly ambiguous, is that a warrant for his

18   arrest/notice to appear was issued in 2004.  And I infer that

19   he wasn't arrested and didn't appear.

20         All right.  Is there anything else?

21         MR. HOLCOMB:  Your Honor, may I make just three

22   brief points in response to Mr. Palmer?

23         THE COURT:  Yes.

24         MR. HOLCOMB:  I just want to make clear that

25   Mr. Palmer is pointing out these two -- the issue of the

1    location monitoring being not viable because of GPS spoofing

2    being a part of the offense and the issue of supposedly

3    imputing others' flight on Mr. Prado.  I just want to

4    highlight that Judge Dein's order by no means relies on those

5    two --

6              THE COURT:  It really doesn't -- it's potentially

7    confusing to rely on Judge Dein's order.  I have to review

8    this de novo.  That means -- although, actually, I think

9    there's some jurisprudence in the First Circuit that's

10   de novo review with some deference to the Magistrate Judge,

11   but I'm not deferring to the Magistrate Judge.

12             De novo, for these purposes, to me means I start as

13   if there are no prior decisions.  So I'm not deciding whether

14   she abused her discretion or whether -- or if she -- or

15   whatever; I'm deciding whether you've proved, representing

16   the United States, by a preponderance of the evidence that

17   there's no reasonable conditions that will reasonably assure

18   that Mr. Prado will be here for future proceedings in the

19   case if I release him on those conditions.

20             MR. HOLCOMB:  Of course.

21             The second point I wanted to make, Your Honor, is

22   just the problem with a proposed Internet access condition of

23   release is:  One, the obvious, which is that the concern here

24   is preventing flight, not preventing further offenses from

25   being committed over the Internet.  But I understand

Mr. Palmer's point that perhaps flight may be facilitated by use of the Internet, which is the second issue with Internet access monitoring as a condition of release is that it, of course, relies on Pretrial Services using a true representation of what devices the defendant has access to, who he's interacting with, in the Government's view, is just not viable.

And then the final point, you know, Mr. Palmer notes that nothing needs to be guaranteed with respect to Mr. Prado's appearance, but his appearance does need to be reasonably assured; and where Mr. Prado has a safe haven available like Brazil, like Mr. Prado has with Brazil, it would not be reasonable, in the Government's view, to trust location monitoring that can be easily defeated in a way that Mr. Prado wouldn't be able to be recovered after he has cut the bracelet or otherwise tampered with the location monitoring.

THE COURT:  Okay.  I'm going take a break of about 15 minutes, and if I've decided how to decide the motion, I'll tell you.  But until then, Court will be in recess.

In fact -- oh, I'm sorry.  Mr. Palmer, did you want to address me?

MR. PALMER:  No, no.  I was going to say --

THE COURT:  All right.  Then we'll go -- I'll ask the Clerk to put me in a breakout room, please.

1          THE DEPUTY CLERK:  Yes, Your Honor.

2          (Court in recess at 12:01 p.m.

3          and reconvened at 12:44 p.m.)

4          THE COURT:  Once again, that took me longer than I

5     thought to ponder the arguments today and organize my

6     thoughts.  However, since I'm immersed in this matter and

7     know how I'm going to decide it, I'll decide it orally.  The

8     transcript will be the record of the decision.  You're being

9     ordered to order the transcript.

10         For the reasons I'll describe in some detail, the

11    defendant's motion to have his pretrial detention revoked is

12    hereby denied.  In reaching this decision, I've employed the

13    standards that the parties agreed are applicable at the

14    outset of today's hearing.  They were summarized by me long

15    ago in *United States v. DiGiacomo*, 746 F.Supp. 1176, starting

16    at Page 1180; and also in *Patriarca*, 716 F.Supp. 593, at 597.

17    Those were 1990 and '91 cases, respectively.

18         The *Patriarca* case was remanded by the

19    First Circuit but not altered in a way that would benefit the

20    defendant in this case because he's not posting any --

21    proposing to post any security.

22         I have decided this matter de novo, as the

23    First Circuit said is required in *Tortora*, 922 F.2d 880, at

24    883, Note 4.  I have reviewed the evidence and arguments

25    independently, as I discussed in *DiGiacomo* at 1181.

1          The Government has relied here, as it has before

2     the Magistrate Judge, solely on risk of flight.  Therefore,

3     the Government must prove by -- has been required to prove by

4     a preponderance of the evidence that no combination of

5     conditions will reasonably assure the defendant's appearance,

6     as required, at future court proceedings.

7          As I said earlier today, I understand that the

8     question is not whether there is some combination of

9     conditions that will guarantee that the defendant will

10    appear, but whether there's a combination of conditions that

11    will reasonably assure that he will appear.  The Government

12    has proven, as I said, by a preponderance of the evidence

13    that there is not.

14         In reaching this the conclusion, I've considered

15    all of the Section 3142(g) factors, and I've considered the

16    conditions that the defendant proposes for his release.  As

17    it's evolved in the course of this hearing, those conditions

18    would require that Mr. Prado surrender his passport, be

19    subject to electronic monitoring with a curfew so he could go

20    to work.  But I realize -- recognize that I could require

21    that he be home all day without being permitted to leave to

22    go to work at least.

23         It's proposed that he be monitored by Pretrial

24    Services in Florida and that he check in daily with Pretrial

25    Services in Florida.  It's proposed that he be prohibited

1    from having Internet access or having -- or have his Internet

2    access monitored by Pretrial Services.

3              It's also suggested that he be required to post a

4    $100,000 unsecured bond.

5              The Government has proven, as I said, by a

6    preponderance of the evidence that there is real risk that

7    the defendant will flee and that the proposed conditions and

8    any other feasible conditions will not reasonably assure that

9    the defendant will not flee and will appear in Court in the

10   future, as required.

11             With regard to the Section 3142(a) factors, the

12   first is the nature and circumstances of the offense charged,

13   including whether the offense is a crime of violence, in

14   violation of Section 1591; a Federal crime of terrorism or

15   involves a minor victim; or controlled substance, firearm,

16   explosive, or destructive device.  This is not a crime of

17   violence or a drug crime or any of the other specified

18   crimes.

19             In this case, the defendant is charged with

20   conspiracy to commit wire fraud and also with aggravated

21   identity theft.

22             The Government estimates, without dispute at this

23   point, that basically the advisory guideline range for the

24   wire fraud charges, if proven, are about 46 to 78 months

25   depending on whether the defendant would get acceptance of

1    responsibility and a sentence at the low end of the guideline

2    range, that would be 46 months.

3            The aggravated identity theft charge, if proven,

4    would require a 24-month, two-year consecutive sentence.  So

5    as a practical matter, the advisory guideline range is about

6    70 to 104 months, with a minimum of two years required and

7    significant possibility of a sentence of more than two years,

8    although it's premature to make any informed decision --

9    well-informed decision on what the sentence might be.

10           The second factor to be considered is the weight of

11   the evidence against the person.  The weight of the evidence

12   against Mr. Prado is very strong, as it's been explained to

13   me.

14           Essentially, it appears that the Government is

15   likely to be able to prove that -- prove the alleged

16   conspiracy existed, that Mr. Prado was a member of the

17   conspiracy; and as part of the conspiracy, in furtherance of

18   it, he personally prepared and submitted applications,

19   usually using fraudulent identifiers -- these are

20   applications to rideshare companies -- rented and sold

21   fraudulent driver accounts, purchased and traded drivers'

22   licenses and Social Security numbers, sold GPS-spoofing

23   technology to rideshare drivers, and exchanged information

24   with other conspirators about how to circumvent rideshare

25   delivery companies' fraud-detection systems in order to make

1    his customers -- help his customers make more money.

2            The Government's evidence, as explained to me,

3    includes 4,100 WhatsApp chats between Prado and his

4    co-defendant Aguiar where they discussed the details of the

5    scheme; bank records; also so-called Zelle, Z-e-l-l-e,

6    transfers of about $110,000 to the defendant's accounts

7    through apps; rideshare records; evidence that the defendant

8    personally altered at least 12 drivers' licenses by putting

9    his own picture on them.

10           In addition, there are cooperating witnesses.

11           In essence, the combination of formidable evidence

12   against the defendant and the advisory guideline range

13   suggesting he will receive a lengthy sentence, if convicted,

14   and the fact that the defendant is likely to be deported,

15   despite the fact that he has an asylum application, or at

16   least a good chance he'll be deported, despite his asylum

17   application, together create a substantial incentive for the

18   defendant to flee.

19           I've also considered, as required, the defendant's

20   history and circumstances.  I recognize that he has family,

21   including his mother, in Massachusetts; that he lived in

22   Massachusetts for many years; he lived here recently with his

23   wife and their child and her child, other child, his stepson.

24   However, his wife is in the United States unlawfully.  She's

25   also subject to removal.  And this creates an incentive for

1   the family to leave the United States or at least to flee

2   pretrial detention so they can stay together in the

3   United States.

4          The defendant could try to get to Brazil, which

5   doesn't have an extradition treaty with the United States,

6   but he does not have strong ties to Brazil either.  And,

7   although the basis of the asylum application hasn't been

8   explained to me, may have a fear of returning to Brazil.

9   However, he could flee to other parts of the United States or

10  to Mexico.

11         The defendant is not authorized to work in the

12  United States.  He has no history of drug abuse.  He has a

13  minimal criminal record.  It's not clear if he's appeared, as

14  required, for court proceedings in the past.  I am not

15  finding that he has failed to appear in the past.

16         I also, as I said, find that the Government has

17  proven that neither -- proven by a preponderance of the

18  evidence that neither the proposed conditions of release or

19  any others will reasonably assure the defendant will appear

20  in the future, as required.  As I've said, the defendant has

21  a powerful incentive to flee.  The evidence indicates he

22  knows how to make and obtain false identification, including

23  false fraudulent Social Security cards, fraudulent drivers'

24  licenses.

25         Even if he could not use a computer himself,

1    there's substantial evidence that he's had easy access to buy

2    fraudulent identification of documents on the dark web.  I

3    believe he could do so again or have somebody obtain them for

4    him.  And even if he could not spoof Probation's electronic

5    monitoring devices the way he spoofed the rideshare software

6    of the rideshare companies, the defendant could do what some

7    other defendants have done, which is cut off the electronic

8    monitoring device and flee.  It happens.  Electronic

9    monitoring will inform Probation and ultimately the Marshals

10   if a person has fled, but it doesn't prevent flight.

11           With the false identification, the defendant could

12   go anywhere in the United States.  The fact that several of

13   the -- of Mr. Prado's co-defendants went to Mexico and then

14   to Brazil does -- is not evidence that the defendant would

15   flee and go to Mexico and then Brazil himself.  However, it

16   is evidence that he could do that if he wanted to; and

17   there's no security the defendant can post to discourage

18   flight.  There's nothing he would lose if he -- and he and

19   his wife and children fled.

20           So, in those circumstances, based on those

21   findings, as I said, the motion to revoke the pretrial

22   detention is denied.  I will issue a short order

23   memorializing that conclusion; but as I said, the transcript

24   will be the record of the decision, unless I decide to

25   convert it into a formal memorandum and order.

1           Is there anything further in this matter for today?

2           MR. HOLCOMB:  Nothing from the Government,

3  Your Honor.  Thank you.

4           MR. PALMER:  Your Honor, there were two short items

5  Mr. Prado wanted me to bring to the attention of the Court

6  that are probably not material to your decision, but --

7           THE COURT:  Well, I've made my decision.  If they

8  relate to my decision, it's too late.

9           MR. PALMER:  I understand.

10         THE COURT:  If you want to file a motion to

11  reconsider, you can file a motion to reconsider; but you have

12  to give me something that you couldn't have given me before.

13         I mean, it's 1:05.  I've got another matter at

14  1:30, and I was hoping to eat lunch.  But go ahead.

15         MR. PALMER:  This will take one minute.

16         First of all, the -- so, the Magistrate in Florida

17  had ordered his wife and any family that he's living with to

18  surrender their passports.  And the second matter, which I

19  can address in another forum at another time, if need be, is

20  he is not -- he has sleep apnea, a condition that's

21  documented in the medical records, and Wyatt has not given

22  him access to a CPAP machine, which is something that he's

23  had in the past.

24         THE COURT:  I -- and what you should do, before you

25  address that to me, is address it to the Marshals.

1    They're -- he's in their custody, and they have a

2    responsibility for assuring that he gets, in effect, adequate

3    medical care for a serious medical need.

4            I don't know why Wyatt won't let him have the CPAP.

5    I don't -- whatever it is.  But the Marshals should look into

6    it, and if that doesn't lead to a satisfactory resolution and

7    you think there's a proper basis for me to order the Marshals

8    to direct Wyatt to give him the CPAP, then you should come to

9    me.

10           You know, with regard to -- I know.  I didn't

11    mention -- I know his wife surrendered her passport, but

12    the -- you know, the capacity to get false identification for

13    himself would apply equally to his wife.

14           Look, this has been very well presented on both

15    sides, and this case has the prospect of going on for a while

16    because there are 18 defendants, so there might be fugitives.

17    So, as always, I've taken it seriously.  I've considered the

18    evidence and the arguments, and you have my decision.

19           Court is in recess.

20           (Court in recess at 1:02 p.m.)

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 22nd day of December, 2021.

/s/ Robert W. Paschal

_____

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter