UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**United States of America**

v.

**Wemerson Dutra Aguiar, et al.**

No. 21-CR-10158-MLW

### DEFENDANTS' FIRST MEMORANDUM RE COMMON ISSUES

The defendants respectfully submit this memorandum addressing common sentencing issues in response to the Court's Order of January 27, 2023. This memorandum addresses the following issues:

- The defendants did not cause economic loss;

- The Zelle inflows and Company deposits are inadequate to calculate loss or gain;

- § 2B1.1 cmt.n.3(B) may not be applied to use gain as an alternative measure of loss; and

- § 2B1.1(b)(10) enhancements for foreign involvement or sophistication do not apply.

Attorney Barron has filed a second memorandum addressing additional common issues raised by Probation in its memorandum of January 11, 2023.

I.    **The loss amount should be less than $6,500 because there was no loss.**

The defendants received money in two ways. Sometimes the driver's compensation was deposited by the rideshare and delivery services companies (the "Companies/Company") into bank accounts controlled by a defendant, and the

defendant was responsible for paying the driver. Sometimes the Company paid the compensation into a driver's bank account, and the driver was responsible for sending a rental fee through Zelle to a defendant. There were several reasons for the different methods, though these were not applied consistently.

Some drivers that rented an account were known to the defendant and were trusted to send the rental fee. In this situation, a defendant might agree to have the driver provide their own bank information to the Company, the Company paid the driver, and the driver would pay the rental fee through Zelle. If the defendant did not know the driver or did not trust that the rent would be paid, the defendant was more likely to retain control over the account by having the Company deposit the compensation into a bank account controlled by the defendant, and the defendant would then subtract the rental fee and send the driver the rest of the money.

When an account was sold outright, it was more likely that the defendant would have the driver give their own bank information to the Company because the defendant was not concerned about receiving additional payments after the purchase. In addition, this spared the defendant from having to send the driver the money being paid by the Company in situations when the defendant was not keeping any of the money because no rent was being subtracted.

This was not always the case. Some drivers preferred not to have their own bank accounts known to the Company, including both those who rented and those who purchased outright. They wanted the Company to pay a defendant, and then have the defendant send them their money. When this involved a driver who had

made an outright purchase, the defendant would not keep any of the money deposited into their bank account and transferred all of it to the driver.

Regardless of whose bank account the Company was depositing the driver's compensation into, the Company made the same profits that they made from the fares of properly documented drivers.

At Attachment 1 is a section from Uber's website,"Tracking Your Earnings," concerning drivers' compensation. www.uber.com/gh/en/drive/basics/tracking-your-earnings. Drivers are referred to as "partners," in furtherance of Uber's efforts to treat them as independent contractors and avoid paying employment-related benefits and *respondeat superior* liability.[1] Uber states that it "charges partners 25% fee on all fares." *Id*. There is

---

[1]   This included a Massachusetts ballot initiative, blocked by the Supreme Judicial Court due to a provision that sought to shield the companies from liability for accidents or crimes, that Uber and Lyft spent nearly $18 million to pursue. Kellen Browning, *Massachusetts Court Throws Out Gig Worker Ballot Measure*, NEW YORK TIMES, June 14, 2022, https://www.nytimes.com/2022/06/14/technology/massachusetts-gig-workers.html#, Attachment 2.

In California, a court found that Uber's treatment of drivers as independent contractors was unconstitutional.  *The People v. Uber Technologies*, Sup. Ct., San Francisco County, CGC-20-584402, Schulman, J., 2020 WL 5440308; *affirmed* 56 Cal.App.5th 266, 270 Cal.Rptr.3d 290 (Cal. Ct. App., 1st District, Division 4, CA 2020). The Companies responded, spending over $224 million on a successful ballot initiative, Prop. 22, like the initiative foreclosed in Massachusetts. Caroline O'Donovan, *Uber and Lyft Spent Hundreds of Millions to Win Their Fight Over Workers' Rights. It Worked.*, BUZZFEED NEWS, November 21, 2020, https://www.buzzfeednews.com/article/carolineodonovan/uber-lyft-proposition-22-workers-rights, Attachment 3; George Skelton, *It's No Wonder Hundreds of Millions Have Been Spent on Prop. 22. A Lot is as Stake*," LA TIMES, October 16, 2020, https://www.latimes.com/california/story/2020-10-16/skelton-proposition-22-uber-lyft-independent-contractors, Attachment 4. The matter is in litigation.

substantial information available on-line indicating that Uber and Lyft take far more than 25% from fares. At Attachment 5 is an article from Mission Local, a well-regarded San Francisco news site. David M. Horowitz, *As Rideshare Prices Skyrocket, Uber and Lyft Take a Bigger Piece of Riders' Payments*, MISSION LOCAL, July 15, 2021, https://missionlocal.org/2021/07/as-rideshare-prices-skyrocket-uber-and-lyft-take-a-bigger-bite-of-the-pie. Evaluating ten rides from each company, the reporter found that "drivers pocketed an average of 52 percent of our fares." *Id*. Whatever the percentage of the fares of the undocumented drivers that the Companies kept, that amount was no different than the amounts made from other drivers. The Companies made money from the scheme.

The Companies also received a financial benefit from ambitious drivers that the defendants did not. The defendants were paid the same amount of money, whether as a flat fee or as rent, regardless of how much driving was done. The Companies, on the other hand, made more money when the driver made more money because they were taking a continuing percentage of the fares.

When asked how exactly the Companies lost money, the government has repeatedly described how the Companies were prevented from hiring drivers that satisfied their employment/partnership criteria. This impairment does not translate to financial loss and is very similar to the circumstances of mortgage fraud.

In *United States v. Jimenez*, 964 F.3d 8 (1st Cir. 2019), the First Circuit reviewed this Court's method for determining loss in a real estate fraud case. The fraud involved the homes of the defendant's family, friends, and clients. The

market values had fallen below the outstanding mortgage debt. The defendant real estate broker fraudulently induced banks to agree to twelve short sales of the homes even though the financial conditions they required were not actually met.

Both this Court and the First Circuit endeavored to determine how to calculate loss. Most critical is the fact that this required an assessment of the real economic consequences, rather than a simplistic finding that the fraud proximately caused the short sales, so the loss should be the total amount of the sales, regardless of whether the sales caused a loss. The First Circuit noted that it was entirely possible that the fraud could have caused no loss if the banks had been left in the same situation with the underwater homes as they would have been absent the fraud: "So if, but for the fraudulent short sales or forced foreclosures for roughly the same or lower prices, the scheme might well have caused no loss." *Id*. at 13. This Court's conclusion that there were actual losses was based on a finding that it was likely that the homeowners would have continued to pay their mortgages absent the fraud, so that the banks lost the difference between what they would have realized on their loans and the amounts received from the short sales. *Id*. at 11 ("If the conditions are not met, a bank can refuse to approve the short sale and might well opt to see if the borrower's desire to avoid foreclosure and stay in the home causes the borrower to continue making payments."). The fact that the banks were denied their ability to approve short sales only when their underwriting criteria were met caused no loss in and of itself. What matters is what results. "Actual loss is 'the reasonably foreseeable pecuniary harm that resulted

from the offense.'" *Id*. at 12 (citing U.S.S.G. § 2B1.1 cmt.n.3(A)).

The same is true in routine mortgage fraud. The buyer exaggerates his assets. The bank relies on the fraud and lends money to someone who did not qualify for a loan. If the fraudster makes his mortgage payments, the bank suffers no loss. *See United States v. Appolon*, 695 F.3d 44, 68 (1ˢᵗ Cir. 2012) ("… the court should have calculated actual loss by subtracting from the outstanding balance on the mortgage loan either the sum recouped via foreclosure or, if there was no foreclosure, the property's fair market value at the time of sentencing.").

With respect to the compensation paid for the drivers' work, which represents the bulk of the monies paid by the Companies, the government cannot establish that any money was lost. With respect to all the other fraudulent conduct, the government either cannot establish loss, or has failed to do so.

Bonuses were paid by some Companies for the referral of new drivers. Through the pandemic, the Companies never stopped offering bonuses and retaining drivers, needing people willing to risk COVID and meet the skyrocketing demand for food delivery. *See* Kimiko de Fraytas-Tamura, *Food Delivery Apps are Booming, While Their Workers Often Struggle*, NY TIMES, November 30, 2020, updated October 12, 2021, https://www.nytimes.com/2020/11/30/world/food-delivery-apps-are-booming-while-their-workers-often-struggle.html; https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html, Attachment 6; ("Undocumented immigrants, who are not eligible for unemployment or federal coronavirus assistance, make up the bulk of the work

force in New York."). The Companies paid bonuses to get new drivers, and they got new drivers. It's no different than their paying compensation to these same drivers for their work. The Companies profited from the work of these drivers, and the bonuses helped them retain additional drivers from whom they could profit. No money was lost.

Further, the government has not established what payments from the Companies were bonuses. It has provided nothing to distinguish bonus payments from any other payment.

The government has never produced records from any of the Companies. These records might identify bonus payments. They may have allowed the government to identify which Zelle inflows came from drivers, by comparing the names of the Zelle senders with the names of wage recipients. It wasn't done.

The government asserts that software bots were sold or used by some of the defendants to do one of two things: cut the line so that they could get customers faster or exaggerate trip mileage. The use of these types of bots is common. *See* Annie Palmer, *Amazon Flex Drivers are Using Bots to Cheat Their Way to Getting More*, CNBC.COM, February 9, 2020, [https://www.cnbc.com/2020/02/09/amazon-flex-drivers-use-bots-to-get-more-work.html](https://www.cnbc.com/2020/02/09/amazon-flex-drivers-use-bots-to-get-more-work.html), Attachment 7. There is no evidence that the undocumented drivers used them any more often than other drivers. Nor is there any evidence of how often they were used or how much money they generated.

The "cut the line" bot did not cause any loss of money. If the undocumented drivers had not picked up the customers, someone else would have. For the Companies, it was a wash. They made their percentage on the fares, no differently than they would have kept their cut from any other driver. There's no evidence that any other driver lost money from the scheme or suffered any harm, beyond possibly having to wait longer for their next fare. This was a minimal part of the scheme and involved a small number of the defendants.

The "mileage exaggeration" bot might have, in theory, resulted in some minimal loss, but not to the Companies. The Companies made more money from the scam. The government and the Companies have no idea which rides, how many rides, or how much extra fare money, resulted from the bots. Suppose a customer paid Uber $12 for what should have been a $10 fare: Uber kept its share of the extra $2.00; it did not reimburse the customer because it did not know which fares were exaggerated. The only loss was to the customer, and the loss would have been small enough to avoid having the customer ask why the fare was higher than anticipated. And this is all theoretical. The government has no idea how often this happened, how much money was involved, or whether it happened more often with the undocumented drivers than with others.

Even if the mileage bots were deemed to have caused some financial loss, that loss should not be used as a hook to substitute defendants' gains as an alternative measure of loss. Not only is any bot-related loss unquantifiable, it also should not be considered under § 2B1.1(b) as a specific offense characteristic. The

purpose of the conspiracy was to "create fraudulent driver accounts … and to rent or sell the accounts to individuals who might not otherwise qualify to drive …" Second Superseding Indictment, ¶ 32. The bots had nothing to do with this, and most of the defendants had nothing to do with the bots. The government does not know where they were made or shipped, or whether there were interstate wire communications concerning them. If a cab driver installed a bot to increase his fares, it would be hard to imagine this larceny being treated as federal wire fraud. The fact that this happened in conjunction with the fraudulent account scheme does not convert this independent crime into part of the wire fraud.

The government also has claimed that the Companies lost money due to fraud protection expenses. There is no evidence that any of these defendants caused the Companies to spend any money that they would not have otherwise spent. The Companies were required to meet regulatory requirements that predated this conspiracy. Did the Companies reduce their fraud detection spending after the arrests of the defendants? There's no such evidence.

Just as there was no actual loss, there was no intended loss. The scheme worked the way that the defendants anticipated: undocumented aliens got jobs and the Companies paid them the same money that they would have paid anyone else and made the same profits from their work. The defendants did not intend to inflict any pecuniary harm. They intended to make money by helping undocumented aliens get work.

Because there was no loss, any consideration of the Zelle inflows or the deposits from the Companies to calculate a loss amount is unwarranted. Further, even if the Court finds that U.S.S.G. § 2B1.1 cmt.n.3(B) remains viable as a basis for using gain as an alternative measure of loss, it cannot be done in this case: "The court shall use the gain that resulted from the offense as an alternative measure of loss **only if there is a loss** but it reasonably cannot be determined." *Id*. (emphasis added).

II.     **The Zelle inflows are inadequate to calculate loss or gain.**

As detailed above, the Zelle inflows include payments from drivers to purchase or rent accounts. So, admittedly, there are gains to the defendants that are included somewhere in the Zelle inflows. But the Zelle inflows cannot be used to calculate loss, or to calculate gain as an alternative measure of loss, because there was no loss. So, while the defendants agree with Probation's concerns about use of the Zelle inflows being speculative and problematic, these impediments are not the reason that the Zelle inflows should not be used to calculate loss or gain - - the reason is that there was no loss to begin with.

Nonetheless, it is useful to recognize how deficient the Zelle inflows are in determining how much money the defendants received from the drivers. Examination of the Zelle inflows establishes that the government's allegations regarding how often and how much the drivers paid for accounts, and the assertion that all the Zelle inflows are related to the conspiracy, are unfounded.

If the allegations were accurate, the Zelle records would be filled with the

names of the same drivers sending similar weekly rental payments in the range of $100-$400, and other drivers sending single purchase payments of $1,000. Finding these patterns would be a simple exercise, involving nothing more than searching the records for all transactions involving a particular name. This is precisely what the government has done to determine the inflows of each defendant. There is little doubt that the government has searched the Zelle records for the names of people sending money to the defendants. The reason that the government has made no mention of this is because the results do not support the allegations. Instead, the records are filled with the names of senders appearing just once, sending amounts that are wildly variable, including many transfers under $100. Even when a sender's name appears more than once, the timing and amounts of the transfers are routinely variable, and do not support the allegations.

At Attachment 8 is a record of Saulo Aguiar Ponciano's Zelle inflows for July – September 2019. Only three sender's names appear more than once. Dos Santos sent payments of $300 and $90; Da Silva sent payments of $33 and $76.73; De Castro sent payments of $193.34 and $520. There are six payments from different senders for less than $100. There are no $1,000 payments. There are three payments from different senders of approximately $500, which do not square with rental fees maxing out at $300 and a purchase fee of $1,000. The government cannot establish what these payments were for, and guideline calculations require more than speculation. *See United States v. Figueroa*, 105 F.Supp.3d 152, 155 (D. Mass. 2015) ("… care must be taken to ensure that particularized drug-type

quantity findings are predicated on reliable information and, where significant uncertainty exists, that those findings error on the side of caution.") (quoting *United States v. Candelaria-Silva*, 714 F.3d 651, 657 (1st Cir. 2013)).

The government's allegations regarding the costs of account rentals and purchases are suspect. According to the government, the mean cost of an Uber or Lyft account rental was $325/week. If true, and if the allegation that accounts were sold outright for $1,000 is accurate, a driver could cover the cost of an outright purchase from three rent payments, in under a month. Even if a driver could not afford an outright purchase from the start, you'd think that after briefly working they could afford a purchase. Ongoing rental would make no sense.

As Probation recognizes, the defendants constantly used Zelle for reasons unrelated to the conspiracy. They sent things to Brazil and were paid back through Zelle. They did work, like painting and construction, and were paid through Zelle. Some had family members and friends receiving money through Zelle. Some received rent shares from roommates. They split restaurant bills and party expenses. They received money from people using their cars. Many used Zelle to receive any money that was coming their way for any reason. The government has no idea which Zelle inflows represent account rentals or purchases.

III.   **The Company deposits are inadequate to calculate loss or gain.**

Like the Zelle inflows, there are gains to the defendants somewhere in the Company deposits. And similarly, these deposits cannot be used to calculate loss, or to calculate gain as an alternative, because there was no loss. As with the Zelle

inflows, it is impossible to determine the amounts of gain from the records.

The government says that it made a typo in its offense conduct statement, and that rent was paid weekly, not monthly. The truth is that the government has not produced evidence establishing any routine rental period, and the Zelle inflows, which would contain the rent payments, indicate that there were no consistent rental periods. But however much the rental payments were, they were the only money that the defendants kept from the Company deposits compensating the drivers. The rest was sent to the drivers. The total deposits do not represent gain. *See United States v. Abbott*, 19-cr-10117-IT, 2019 WL 4394934, at *3 (D. Mass. Sept. 13, 2019) ("… the Defendants … did not 'gain' these amounts, but instead paid them to a co-conspirator. Nor did the conspiracy as a whole gain these moneys. Instead, the amounts were passed between the co-conspirators, and cannot stand in as an alternative measure for any loss …").

Based on monthly rent of $325, if a driver made $30,000/year, $2,500/month, the rent would take 13%. The claim that the mean weekly rent for an Uber or Lyft driver was $325 is refuted by the math. Monthly rent would be $1,300. A driver making $30,000/year would lose over half his compensation. With a Company fee of 25% plus the rent, a driver would need to take in fares of $40,000 to make $14,400/year. If the Company's fees took 50% of fares, a driver bringing in $40,000 would make $9,600/year. Either way, no one would do it.

Even if it was possible to determine an accurate rental fee percentage, multiplying that number against the total deposits would exaggerate the

defendants' gains. This is because the deposits included compensation for drivers who had made outright account purchases but preferred that their compensation funnel through the defendants. For those drivers, the defendants kept nothing.

Nor can gain be determined through calculation of the number of accounts. Many accounts were rejected outright, requiring the defendant to create another account to receive a rental or purchase fee. Accounts were often identified as questionable and closed quickly; most lasted no longer than one month. There is no way to tell how many different accounts were opened for a driver to get started, let alone continue driving for any length of time. It is impossible to attribute a particular rental income, purchase price or gain to an account.

The Company deposits also are a poor reflection of culpability. Whether a driver brought in fares of $5,000/month or $500/month, the rental fees were the same. The Company deposits were based on the fares earned. A defendant who rented an account to a driver who worked all the time was no more culpable than one who rented to a driver who drastically cut back his work from fear of COVID, but the Company deposits compensating the drivers would be vastly different.

**IV.     § 2B1.1 cmt.n.3(B) should not be applied to calculate gain.**

At the time counsel submitted a memorandum concerning loss calculation, urging the Court to follow *United States v. Banks*, 55 F.4th 246 (3rd Cir. 2022), he was not aware of this Court's decision in *Brill v. United States*, 20-cr-10125-MLW, 2021 WL 4148215 (D. Mass. Sept. 13, 2021). *Brill* does not support deference to § 2B1.1 cmt.n.3(B). The defendants' gain may not be used as an

alternative measure of loss.

To begin with, there was an actual loss in *Brill*; the quandary was how to calculate it. In this case, the Court should not even reach the issue of whether to rely upon Application Note 3(B) to calculate gain because there was no loss.

But assume that the Court disagrees and finds that there was a loss, that the amount of this loss cannot reasonably be determined, and that it is possible to reasonably determine the amount of gain. The Court still should conclude that Application Note 3(B) may not be applied.

In *Kisor v. Wilkie*, __ U.S. __, 139 S.Ct. 2400, 204 L.Ed.2d 841 (2019), the Court cut back the deference to be shown to agency interpretations of regulations, explaining that *Auer* deference only applies when a regulation is genuinely ambiguous. *Id*. at 2414-15; *see Auer v Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). The Court provided guidelines on how ambiguity should be assessed, instructing that before deciding that a regulation is "genuinely ambiguous, a court must exhaust all the traditional tools of construction." *Kisor* at 2415. Deference to an agency's interpretation of a regulation occurs only if genuine ambiguity remains after this assessment, and the interpretation falls within the "zone of ambiguity" the court has identified. *Id*. at 2416.

In *Brill*, applying the *Kisor* standards, this Court found that the term "loss" as used in § 2B1.1 is genuinely ambiguous in determining the time when loss should be counted, and held that the definition of loss provided in Application Note 3(E)(i), allowing a credit for repayments depending upon when they were

made, fell within the zone of ambiguity. The same is not true of Application Note 3(B). Whatever ambiguities the term "loss" may have, those ambiguities do not include "gain" being grafted to the definition of "loss." Application Note 3(B) does not fall within any zone of ambiguity; rather, it is an addition to the definition of "loss" that is not referenced in § 2B1.1 and does not address any uncertainty about what "loss" means or how to measure it.

This Court found that it was required to follow First Circuit precedent applying Application Note 3(E) unless one of two exceptions to the "law of the circuit doctrine" applied:

> … when: (1) 'an existing panel decision [is] undermined by controlling authority, subsequently announced,' or (2) 'authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind.' *United States v. Lewis*, 963 F. 3d 16, 23 (1st Cir. 2020).
> *Brill* at *2.

The Court found that *Kisor* did not undermine Application Note 3(E) or First Circuit precedent applying it, rejecting Brill's reliance on *United States v. Riccardi*, 989 F. 3d 476 (6th Cir. 2021). In *Riccardi*, the Sixth Circuit, relying on *Kisor*, found that Application Note 3(F)(i), was entitled to no deference because the commentary's $500 minimum loss amount did not fall within the zone of any ambiguity in the guideline. *Id*. at 486 ("No reasonable person would define the 'loss' from a stolen gift card as an automatic $500 … if the Commission seeks to keep individuals behind bars for longer periods of time based on this 'fictional' loss

amount, this substantive policy decision belongs in the guidelines, not in the commentary.") (citing *United States v. Lyles*, 506 Fed.Appx. 440, 445 (6th Cir. 2012)). Similarly, no reasonable person would define one man's "loss" to include another's "gain." While *Riccardi* may not anchor disregard for Application Note 3(E), it surely supports the refusal to treat gain as loss.

In *United States v. Kirilyuk*, 29 F.4th 1128, 1136-39 (9th Cir. 2022), the Court agreed with the Sixth Circuit's holding in *Riccardi*, finding that the $500-per-card multiplier in Application Note 3(F) was an expansion of the meaning of "loss," not clarification of an ambiguity.

In *United States v. Banks*, 55 F.4th 246 (3rd Cir. 2022), the Third Circuit held that *Kisor* bars consideration of the Commission's conjoining of "intended loss" with "loss" in Application Note 3(A). *Id.* at 258 ("…the ordinary meaning of the word 'loss' is the loss the victim actually suffered … Because the Commentary expands the definition of 'loss' by explaining that generally 'loss is the greater of actual loss or intended loss,' we accord the commentary no weight."). If "intended loss" is deemed an unwarranted expansion of the meaning of "loss," then "gain" is yet more obviously an addition rather than an elucidation.

*United States v. Lewis*, 963 F.3d 16 (1st Cir. 2020), does not support deference to Application Note 3(B). The crux of the *Lewis* decision is akin to this Court's analysis in *Brill*. The First Circuit considered whether *Kisor* would cause the Court to change its position on deferring to Application Note 1 of § 4B1.2, treating inchoate offenses as career-offender predicates. The Court concluded that

prior panels considering the issue had appropriately applied the "zone of ambiguity" in finding Application Note 1 consistent with § 4B1.2. *Id*. at 24. Essentially, the Court held that *Kisor* did not change the outcome because prior panels had complied with *Kisor*'s "legal toolkit" for assessment of ambiguity. *Id*. Other circuits have disagreed and found that there is not sufficient ambiguity in the terms "crime of violence" and "controlled substance offense" to invite inclusion of inchoate offenses in their definitions. *E.g., United States v. Dupree*, __ F.4th __, 2023 WL 22763 (11th Cir. 2023) (en banc). The circuit split on the issue reflects differences in the assessment of ambiguity. But there is no correlation between an assessment of whether a "crime of violence" and a "controlled substance offense" are sufficiently ambiguous to include inchoate offenses, and whether "loss" is sufficiently ambiguous to include "gain."

There is another significant difference between *Lewis* and this case. In *Lewis*, the Court considered the significance of First Circuit precedent, pre-*Kisor*, that had assessed the ambiguity issue in finding that inchoate offenses should be included in the predicate definitions. Counsel has not found any First Circuit case that similarly evaluates whether the term "loss" is elucidated by an Application Note concerning "gain." There are cases that describe the Application Note, which seem to assume its validity, usually in the process of explaining why it does not apply in the case at hand. *E.g., United States v. Ihenacho*, 716 F.3d 266, 277 (1st Cir. 2013) ("Application Note 3(B) to U.S.S.G. § 2B1.1 states that 'the court shall use the gain that resulted from the offense as an alternative measure of loss *only if*

18

*there is a loss but it reasonably cannot be determined*.'") (emphasis in original).
But counsel has not found a First Circuit case assessing the ambiguity issue. If there
is no such case, then there is no binding precedent.

Even if there is such a case, it should not bind this Court. *Kiser* did change
things, and it would undermine any prior First Circuit decision that did not apply
the *Kiser* "tool-kit" to assess whether "loss" means "gain." Further, the many
circuit decisions applying *Kiser*, and particularly the Third Circuit's assessment of
"intended loss" in *Banks*, are "fresh developments" that offer sound reasons for
disregarding Application Note 3(B). *See Brill* at *2 (citing *Lewis*, 963 F.3d at 23).

## V.    There should be no § 2B1.1(b)(10) enhancements.

There is no evidence concerning any of the defendants establishing that "a
substantial part" of the scheme "was committed from outside of the United
States." *See* § 2B1.1(b)(10)(B). Probation states that it has applied the
enhancement when "the defendant specifically dealt with one of the Brazilian
unindicted co-conspirators." This does not satisfy the guideline. The enhancement
requires evidence establishing that "substantial" conduct in furtherance of the
conspiracy happened in Brazil. Specifics are necessary to weigh how substantial the
foreign activity was, not merely a vague description of the defendant doing
something, somewhere, with a co-conspirator who sometimes went to Brazil.

Take Saulo Aguiar Ponciano as an example. The only uncharged co-
conspirator mentioned in his offense conduct is Marcus Bastos. Ponciano
occasionally drove for Lyft, using an account that Bastos created. This was a

minimal part of his involvement. While stating that Bastos went back and forth between Brazil and the United States, there is no allegation that Bastos did anything for Ponciano while in Brazil, or that Ponciano worked with anyone else in Brazil to do anything.

The foreign involvement of Wemerson Dutra Aguiar also involved dealings with Bastos, from whom Aguiar bought personal identification information. There is no evidence that Bastos was in Brazil when this occurred.

The Second Superseding Indictment dates the conspiracy to "[b]eginning by at least in or about January 2019 and continuing through at least in or about April 2021." ¶ 32. In a recent email, the government advised Aguiar's counsel that "law enforcement records reflect that Bastos was in the U.S. between 4/2/18 and 12/2/20." Aguiar believes that Bastos was in the United States and left for Brazil around the time of his arrest in May 2021.

There is no evidence of Ponciano or Aguiar knowing where Bastos was located when dealing with him, nor would it matter. The conduct of Bastos concerned matters in the United States, not Brazil. He opened accounts here. He sold identification information of Americans. Whether or not he happened to be in Brazil had no bearing on anything related to the conspiracy. It would not have furthered the scheme or helped evade detection. There is no basis to use information like this, which fails to establish that a substantial portion of the scheme occurred in Brazil, to impose an enhancement.

Nor is there evidence establishing sophistication. Elementary school kids use Photoshop. Probation recognizes this in limiting the sophistication enhancement to defendants who used, sold, or purchased a GPS spoofing bot.

However, the use of software bots to provide exaggerated trip mileage or to "cut the line" was not sophisticated and was a minimal part of the scheme, with no evidence establishing how often the bots were used or with what impact. The defendants did not make the bots. They are not difficult to find for purchase. They are widely used by gig drivers. *See* Attachment 7. They are easy to install, typically no more complicated than downloading an application and typing a few words or making a few clicks; just do a Google or YouTube search for "how to install a bot." It's far less complicated than buying and installing a television.

The defendants' backgrounds belie some masterly enterprise. Ponciano, for example, left school in the 5th grade. The only work he had prior to this case was selling things on the street and light construction. His background is typical of the defendants. Figuring out where to buy a bot and reselling it to a driver who installed it in a minute or two did not turn them into criminal sophisticates.

### Conclusion

For these reasons, the Court should find that the defendants did not cause financial loss, that the Zelle inflows and Company deposits are inadequate to calculate loss or gain, that § 2B1.1 cmt.n.3(B) may not be applied to use gain as an alternative measure of loss, and that § 2B1.1(b)(10) enhancements for foreign involvement or sophistication do not apply.

Respectfully submitted,

SAULO AGUIAR PONCIANO
By his Attorney,

/s/ *Keith Halpern*
Keith Halpern, BBO # 545282
572 Washington Street, Suite 19
Wellesley, MA 02482
(617) 722-9952

CERTIFICATE OF SERVICE

    I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 6, 2023.

/s/ *Keith Halpern*