UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| | ) |
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Criminal No. 21-CR-10158-MLW |
| | ) |
| WEMERSON DUTRA AGUIAR, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**GOVERNMENT'S MEMORANDUM
REGARDING COMMON SENTENCING ISSUES**

The government respectfully submits this memorandum in advance of the February 13, 2023 hearing on common sentencing issues, including the methodology for calculating the enhancement for loss under the applicable Sentencing Guidelines and the applicability of certain additional enhancements.

**INTRODUCTION**

The primary victims of defendants' conduct in this case were national rideshare and delivery services companies (the "Companies"), their customers, and the individuals whose identities were stolen to create fake driver accounts with the Companies. The Companies generally operated as follows:  Individuals applied to be approved "drivers" with the Companies and, once approved, completed "trips" by driving customers from one location to another or completing deliveries of items like groceries, takeout, or alcohol. The Companies' customers paid the Companies for trips or deliveries, and the Companies paid out a majority of those revenues to the drivers who completed the trips or deliveries.

For this arrangement to work, the Companies took precautions to ensure the safety of the customers who entrusted unknown drivers with their persons and their consumables. Potential

dangers to customers were not theoretical.[1]  Rather, safety concerns led numerous state and local regulatory authorities to require that Companies conduct background checks of potential drivers and, in some cases, subject potential drivers to additional, state background checks.[2]  Thus, to continue operating, Companies were required to partner only with properly vetted drivers.

Background checks were of no use, however, if the person whose background was vetted was not the person ultimately driving for the Company—*i.e.*, if the driver used another person's

---

[1] *See*, *e.g.*, Sara Ashley O'Brien, *Uber releases safety data: 998 sexual assault incidents including 141 rape reports in 2020*, CNN BUSINESS June 30, 2022, https://www.cnn.com/2022/06/30/tech/uber-safety-report/index.html ("[Uber's] 78-page report, which covers 2019 and 2020, is the second-ever Uber has released regarding safety incidents following a CNN investigation into sexual assault and abuse on the ride-hailing platform four years ago."); Wilson Wong, *Uber driver in Massachusetts arrested, accused of trapping woman inside car*, NBC News, March 23, 2021, https://www.nbcnews.com/news/us-news/uber-driver-massachusetts-arrested-accused-trapping-woman-inside-car-n1261819; Spencer Buell, *The Uber driver accused of Esplanade assault has appeared in court,* BOSTON MAGAZINE, April 1, 2019, https://www.bostonmagazine.com/news/2019/04/01/uber-assault-esplanade-mayanja-daudah/; Mariya Manzhos, *Winchester man held in ICE custody, facing deportation*, THE WINCHESTER STAR, Feb. 22, 2019, https://www.wickedlocal.com/story/the-winchester-star/2019/02/22/winchester-man-held-in-ice/5844374007/ (reporting the arrest, on child pornography charges, of YouTuber who coached Brazilians about settling in the U.S. and who maintained 14 vehicles used to drive for Uber and Lyft); Don Reisinger, *Boston Uber driver charged with sexual assault*, CNET, Dec. 18, 2014, https://www.cnet.com/tech/mobile/boston-uber-driver-charged-with-sexual-assault/ ("This is the fourth time an Uber customer in the Boston area has reported an assault or inappropriate touching within the last month, according to *The Boston Globe*, which earlier reported on the alleged assault[.]").

[2] *See* Harriet Taylor, *Uber and Lyft are getting pushback from municipalities all over the US*, CNBC, Sept. 2, 2016, https://www.cnbc.com/2016/09/02/uber-and-lyft-are-getting-pushback-from-municipalities-all-over-the-us.html (surveying state enactments); Dara Kerr, *California tightens background checks on Uber, Lyft drivers*, CNET, Sept. 29, 2016, https://www.cnet.com/tech/tech-industry/california-law-tightens-background-checks-on-uber-lyft-drivers ("[I]f someone with a criminal history is found to be driving for Uber or Lyft, the companies could now face fines of up to $5,000 per driver."); *Massachusetts adopts strict background check rules for Uber, Lyft drivers*, CNBC, Nov. 29, 2016, https://www.cnbc.com/2016/11/29/massachusetts-adopts-strict-background-check-rules-for-uber-lyft-drivers.html ("The new rules would require the companies ensure that the independent drivers who provide taxi-like services pass state background checks, including their criminal records, and require that they not be registered sex offenders.").

identity.[3]   The defendants in this case have pleaded guilty to participating in a nationwide conspiracy that circumvented background checks in this way, on a massive scale.  The defendants created accounts with the Companies under stolen identities, for the benefit of individuals who were not eligible to drive for the Companies under those individuals' real identities.  As a result of the defendants' conduct, the Companies issued millions of dollars in payments to thousands of drivers who were not the individuals that the Companies had permitted to drive on their platforms and, in most cases, who were not eligible to drive for the Companies.

Five of these defendants now argue that their conduct caused no real loss to the Companies, because the drivers who used fraudulent accounts completed trips and deliveries and, consequently, the Companies received payments.  But regardless of any money the Companies made, the Companies and their customers paid for something they did not get: the services of individuals who could lawfully drive for the Companies.  What they received instead—the services of individuals who could not lawfully drive for them—was worthless, and it "should not acquire an increased value merely because the defendant[s'] scheme was successful[.]"  *United States v. Gonzalez-Alvarez*, 277 F.3d 73, 78 (1st Cir. 2002).  The Companies and their customers therefore suffered a loss, the full value of which was the amount that they paid for services they never received.[4]

---

[3] *See* Sam Smink, *7Investigates: Is your ride share driver using someone else's identity to pass background checks?*, WHDH 7NEWS BOSTON, May 18, 2020, https://whdh.com/news/7investigates-is-your-ride-share-driver-using-someone-elses-identity-to-pass-background-checks/.

[4] The defendants open their first memorandum with thinly veiled criticism of the Companies for treating drivers as independent contractors.  Dkt. 707 at 3, n. 1.  This discussion lacks any relevance to the loss determination and merely represents an attempt to deflect blame onto the victim Companies.

For the reasons provided herein, the Court should reject these defendants' arguments regarding loss and the applicability of certain other enhancements at their sentencing hearings.

## LOSS AMOUNT

In their plea agreements, nine of the defendants stipulated that, pursuant to Section 2B1.1(b) of the Sentencing Guidelines (the "Guidelines"), their offense levels should be enhanced based on an estimate of amounts paid out by the Companies for fraudulent accounts that were attributable to the defendant directly and through a relevant conduct analysis under Section 1B1.3. Such stipulations "will generally govern the resolution of that issue," *see United States v. Granik*, 386 F.3d 404, 411 (2d Cir. 2004), and courts are permitted to rely on the parties' stipulations in finding facts relevant to sentencing. *See id.* at 412; *United States v. Berndt*, 127 F.3d 251, 253-55, 258 (2d Cir. 1997) (affirming sentencing enhancement based on factual stipulations contained in state court plea agreement); *United States v. Bilal*, 941 F. Supp. 2d 397, 404 (S.D.N.Y. 2013) (denying motion to vacate restitution order where defendant "stipulated that the loss amount attributable to his conduct was greater than $1 million but less than $2.5 million").

The remaining five defendants, who have not stipulated to loss enhancements, contend that their fraudulent conduct caused no cognizable pecuniary harm whatsoever. They insist that, because the Companies received payments for trips and deliveries completed under fraudulent accounts, there is no loss for the Court to measure.

Separately, the draft Presentence Investigation Reports ("PSRs")[5] take the position that (i) defendants are responsible for losses in the form of "deposits directly from the Companies,

---

[5] The government acknowledges that final PSRs will not be available to the Court before the hearing on common issues on February 13. When citing to draft PSRs in this filing, the government has noted where factual bases may be disputed based on objections submitted by defendants.

representing payments for trips/deliveries completed or referral bonuses[,]" but (ii) loss from Zelle transfers[6] the defendants received, representing sale or rental payments for fraudulent accounts, "is too speculative and cannot be determined."  Dkt. 693-1 at 3 (Probation Office's memorandum to the Court).

The government respectfully submits that each of these positions is mistaken.  First, in similar circumstances, courts have recognized that, for purposes of calculating a loss-based enhancement under the Guidelines, a defendant causes a loss equal to the full amount a victim paid when the victim in turn received something that purported to be, but was not, the benefit of the victim's bargain.  Here, the Companies and their customers bargained for the services of fully vetted, lawfully permitted drivers, and the fraud denied them of that benefit.

Second, the most reliable estimate of that loss, based on available information, is the amount that the Companies unwittingly paid unvetted drivers as a result of the fraud.  This amount included not only payments that the Companies made directly to defendants, but also amounts that the Companies paid to other drivers who rented or purchased fraudulent accounts from the defendants.  Even with incomplete or imperfect information about these latter amounts, for reasons described below, the Court may still "make a reasonable estimate of the loss" from this category of payments under the Guidelines.  U.S.S.G. § 2B1.1 cmt. n.3(C).

## I.      Defendants Caused Pecuniary Harm and Actual Loss

The defendants' conduct caused demonstrable pecuniary harm because, when the Companies and their customers unknowingly paid drivers who fraudulently used other persons'

---

[6] Zelle is a digital payment network owned by a group of banks, including Bank of America and Wells Fargo, among others.  Zelle allows users to send and receive money, typically over a mobile device, directly from their bank accounts at participating banks.

identities, neither the Companies nor their customers received the benefit of their bargain—the services of vetted drivers.[7]

Contrary to the defendants' suggestion, the harm in this case extended beyond a Company's mere inability to satisfy its own "employment/partnership criteria" or other criteria, Dkt. 707 at 4, or a customer's mere preference of driver.  The Companies operate within a regulated industry and must comply with applicable regulatory requirements to continue operating within various jurisdictions.   These requirements include public safety measures—most commonly, background checks for drivers.  For example, Massachusetts requires a two-part background check for all rideshare drivers, including one check conducted by the rideshare company (meeting minimum specifications prescribed by regulation) and one check conducted by the regulatory authority.  *See* 220 Mass. Reg. 274.06.  Massachusetts also requires rideshare companies to submit

---

[7] The application notes to Section 2B1.1 of the Guidelines define "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," and provide that, in determining "loss" for purposes of the enhancement in Section 2B1.1(b), "loss is the greater of actual loss or intended loss."  *See* U.S.S.G. §  2B1.1 cmt. n.3(A).  Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.* n.3(A)(i).  The application note sets forth several factors to consider in estimating loss, including (1) the fair market value or replacement cost of the property unlawfully taken; (2) the cost of developing proprietary information; (3) the cost of repairs; and (4) more general factors, such as the scope and duration of the offense and revenues generated by similar operations.  *Id.* n.3(C)(i)-(iii) & (vi).  The Guidelines provide that the Court "need only make a reasonable estimate of loss."  *Id*. n.3(C).

In *United States v. Brill*, this Court concluded that "it must follow First Circuit precedent concerning the meaning of 'loss' under Guideline § 2B1.1" following the Supreme Court's holding in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) (declaring that courts may refer to the Commentary Application Notes only if a term is ambiguous).  *United States v. Brill*, No. CR 20-10125-MLW, 2021 WL 4148215, at *2 (D. Mass. Sept. 13, 2021).  Defendants' first memorandum argues that Application Note 3(B), regarding the use of defendants' gain as an "alternative measure of loss," is invalid in light of *Kisor*.  Dkt. 707 at 14-19.  As explained below, the government does not ask the Court to rely on Application Note 3(B).  The defendants' memorandum notes that the Third Circuit has invalidated the "intended loss" commentary of Application Note 3(A) under *Kisor*.  *Id.* at 17 (citing *United States v. Banks*, 55 F.4th 246 (3rd Cir. 2022)).  However, the defendants do not otherwise challenge the foregoing commentary on loss in Application Note 3(A).

a roster of drivers to the regulatory authority, including the drivers' names, former names, addresses, dates of birth, driver's license numbers, and last six digits of Social Security numbers, among other information.  220 Mass. Reg. 274.06(1)(c).  California similarly requires rideshare companies to conduct national and local criminal background checks of their drivers.  *See* CA Pub. Util. § 5445.2.[8]

When an account applicant provides a Company and a regulatory authority with a false identity for the purpose of circumventing a legally required background check, that applicant thwarts the Company's ability to comply with public safety regulations and customers' ability to obtain lawfully provided rides.  The risks of this type of fraud to the Companies stretch beyond regulatory fines or sanctions.[9]  The upshot is that properly identified and vetted drivers were not a mere corporate or consumer preference, substitutable for unknown and unvetted drivers, as defendants appear to suggest.  *See*, *e.g.*, Dkt. 707 at 9 ("[U]ndocumented aliens got jobs and the Companies paid them the same money that they would have paid anyone else and made the same profits from their work.").  Rather, verified and vetted drivers were the *only* drivers with whom

---

[8] The government focuses on Massachusetts and California, as these are the locations where defendants created the majority of the fraudulent accounts.

[9] The Companies face potential civil liability for misconduct committed by drivers.  *See*, *e.g.*, Wheeler Cowperthwaite, *Sexual assault victim sues Uber*, The Patriot Ledger, July 2, 2020, https://www.patriotledger.com/story/news/courts/2020/07/02/ sexual-assault-victim-sues-uber-over-predatory-driver/113897092; Maria Cramer, *Two women just wanted to get home; instead, they say, their Lyft drivers raped them*, The Boston Globe, Oct. 9, 2019, https://www.bostonglobe.com/metro/2019/10/09/two-women-just-wanted-get-home-instead-they-say-their-lyft-drivers-raped-them/JWkh0FBOVg4Uq nmBLXpCJP/story.html; Jared Weber, *Uber sued over 550 sexual assault claims, alleging assault, attacks by drivers, law firm says*, USA Today, July 15, 2022, https://www.usatoday.com/story/money/2022/07/14/uber-sexual-assault-lawsuit-550-passengers-attack/10062393002/.  The companies also historically faced regulatory suits over background check practices and disclosures.  *See*, *e.g.*, Dara Kerr, *California DAs sue ride-sharing app Uber, settle with rival Lyft*, CNET, Dec. 9, 2014, https://www.cnet.com/tech/tech-industry/california-sues-ride-sharing-service-uber-settles-with-rival-lyft/.

the Companies were permitted to partner.  By creating and distributing fraudulent accounts for unapproved drivers, the defendants deprived the Companies and their customers of the services of vetted drivers, even where trips or deliveries were still completed.

The First Circuit has recognized that defendants cause losses when they pass unlawfully provided goods or services off as lawful ones.  For instance, in *U.S. v. Ihenacho*, the defendant, who operated an Internet pharmacy, claimed that the government failed to show that customer-victims suffered any loss, because the drugs that he dispensed under fake prescriptions were not counterfeit.  *U.S. v. Ihenacho*, 716 F.3d 266, 276-80 (1st Cir. 2013).  The First Circuit disagreed, noting that customers had received the drugs in vials bearing the names of a licensed pharmacy and the purported prescribing physician.  "From the face of it, the consumers had received entirely legally prescribed drugs.  But in fact, they had not."  *Id.* at 277; *see also United States v. Bhutani*, 266 F.3d 661, 670 (7th Cir. 2001) ("[T]here was indeed loss to consumers because consumers bought drugs under the false belief that they were in full compliance with the law.").

Just as the customer-victims in *Ihenacho* suffered loss from receiving drugs falsely packaged as lawfully prescribed (despite that the drugs were exactly what the customers had ordered), the Companies and their customers suffered loss when they paid individuals who bore a false veneer of regulatory approval, even when those individuals completed trips and deliveries as a lawfully approved driver would have.  Notably, in *Ihenacho*, the court found that the customer-victims had suffered a loss even though they had intended to sidestep the valid prescription requirement and to receive real drugs dispensed under fake prescriptions.  By contrast, the Companies maintained procedures to detect identity fraud on their platforms and actively closed

accounts that they identified as fraudulent.[10]   Moreover, in finding a loss, the *Ihenacho* court observed that "many of [the] transactions would never have taken place in the absence of the fraud because the patients could not and would not have received a prescription had they seen a legitimate physician."   *Ihenacho*, 716 F.3d at 277.   The same is true for the rides and deliveries completed by fraudulent drivers, who generally were not eligible to drive for the Companies under their true identities and who consequently used the stolen identities of others.

Another parallel is self-evident: in *Ihenacho*, the court highlighted the PSR's position that "[Internet] pharmacies lack quality assurance and accountability[,] and their products pose a serious danger to the buyers/customers, who are often addicted to the medications they seek and for which they could not obtain a valid prescription."   *Id.*   Public safety concerns also motivated the enactment of background check requirements for drivers, the circumvention of which was at the heart of defendants' conduct in this case.

The defendants' second memorandum, Dkt. 706, attempts but fails to distinguish *Ihenacho*. The defendants offer no answer to the *Ihenacho* court's first-order conclusion that the provision of an unlawful substitute causes a loss.   Instead, the defendants focus only on the second-order question of whether and how that loss should be offset (discussed below).   Both memoranda from the defendants ignore *Ihenacho* altogether in denying the presence of a loss in this case.

The draft PSRs highlight other types of losses caused by the defendants' conduct, including resources expended by the Companies to combat the use of stolen identities on their platforms and certain costs to identity theft victims.   These, too, are real losses.   However, the government

---

[10] The Companies also advertise that their drivers have passed background checks.   For example, when booking an Uber in Massachusetts, a message pops up on the Uber app informing the customer that the assigned driver has passed a two-part background check.

focuses herein on the amounts paid by the Companies and their customers for fraudulent drivers' services, because those losses are the greatest in magnitude and, in the case of amounts paid by the Companies, the most readily measurable.

## II.     The Loss Is the Full Amount Paid in Connection with Fraudulent Accounts

The Companies and their customers paid users of fraudulent accounts for trips and deliveries that the users of those accounts were not lawfully permitted to complete.  The services of those users were valueless and do not offset the loss to the Companies and customers under First Circuit precedent and the Guidelines.  The loss is therefore the full amount paid in connection with the trips and deliveries completed with fraudulent accounts.

*Ihenacho* again offers the rationale for finding a total loss in all amounts paid for the fraudulently provided trips or deliveries.  In *Ihenacho*, the First Circuit affirmed the district court's determination that the appropriate loss amount comprised the payments from customer-victims to the defendants, through the Internet pharmacy, for the drugs that the pharmacy represented were lawfully distributed.  The court observed: "We have endorsed a pragmatic, fact-specific approach, stating that 'loss should be calculated using the entire price paid for the product, unreduced by any offsetting value,' if 'the product misrepresented by the defendant is worthless.'"  *Ihenacho*, 716 F.3d at 278 (citing *United States v. Gonzalez–Alvarez*, 277 F.3d 73, 77 (1st Cir. 2002)).  Even acknowledging that the drugs had not been worthless to the customer-victims, who had intentionally purchased the drugs, the court agreed that the drugs had no offsetting value.  *Id.* at 279.  First, the court observed that, because of "the dangerous and harmful nature of medications dispensed without valid prescriptions[,]" "[t]here is no reason to think these vials of drugs with labels had an after-sale retail value."  *Id.*  Second, the court again noted that, but for the fraud, "these payments (or most of them) would not have been made at all."  *Id.*

The First Circuit has followed this principle in other contexts, as well.  For example, in *United States v. Gonzalez-Alvarez*, the court declined to offset consumers' losses from purchasing adulterated milk by any measure of value of the tainted milk.  *United States v. Gonzalez-Alvarez*, 277 F.3d 73, 78 (1st Cir. 2002).  The court accepted the government's argument that, "because the adulterated milk could not lawfully be distributed in interstate commerce … the value of the milk in the silos was zero as a matter of law." *Id.*  "Because the milk would have been worthless had the scheme been terminated before the adulterated product was sold, it should not acquire an increased value merely because the defendant's scheme was successful and the tainted milk reached the consumers." *Id.*  The court therefore held that "where a product cannot be sold lawfully it has a value of zero for the purpose of calculating loss under [the predecessor to U.S.S.G. § 2B1.1(b)(1)]." *Id.*  *C.f. United States v. Cadden*, 965 F.3d 1, 32–33 (1st Cir. 2020) (acknowledging that, "[i]nsofar as NECC sold a product using a fraudulent representation, there is a strong argument that the entire value of the product constituted a 'loss' for Guidelines purposes," but finding that, with respect to non-fraudulent products produced in areas separate from NECC's sterile compounding facilities, a customer suffered no loss even if "he might have reconsidered the choice to become a customer at all if he had been aware of the seller's other fraudulent sales.").

Like the fraudulently represented drugs in *Ihenacho* and *Cadden* and the tainted milk in *Gonzalez-Alvarez*, the trips and deliveries completed under fraudulent accounts in this case were valueless.  There is no lawful market for rides or deliveries from unauthorized drivers, and there consequently is no market value for those services.  And even absent legal impediments, it would be purely speculative to imagine a market for rides or deliveries from strangers outside of the context of one of the Companies, a taxi medallion holder, or another established, legally authorized service.

Here, too, the defendants fail to distinguish this case from *Ihenacho* or similar cases. They claim that Application Note 3(F)(v) to USSG § 2B1.1 prevented the *Ihenacho* court from applying an offset for the value of the drugs.[11]   However, the *Ihenacho* court expressly noted that its analysis did not rely on that application note.  *Ihenacho*, 716 F.3d at 278 n. 10 ("The government refers to this [application note] but does not argue to us, and did not argue before the district court, that Baldwin's offenses involved any of [the schemes described in the application note].  We do not reach the issue of whether this application note applies to these facts.").  The defendants also attempt to distinguish *Ihenacho* on the grounds that the drugs in that case, "consumed without physician oversight," "could have serious health consequences or lead to addiction[.]"  Dkt. 706 at 9.  They ignore altogether the public safety concerns behind the background checks that they deliberately ducked.[12]   Defendants acknowledge that the illegally distributed drugs in *Ihenacho*

---

[11]  Application Note 3(F)(v) to U.S.S.G. § 2B1.1 provides: "Certain Other Unlawful Misrepresentation Schemes.—In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services."  Regardless of whether this application note applies to services, as opposed to goods, that were falsely represented as approved by a governmental regulatory agency, the application note offers further, persuasive support for not attempting to offset loss by any market value that might be divined for the fraudulent drivers' unlawful services.

[12]  Certain claims in the defendants' memoranda are entirely unsupported and impossible to credit, such as the suggestion that defendants intended for the Companies to profit from defendants' activity and the claim that defendants and co-conspirators did not attempt to conceal their activity, despite opening and using accounts in other individuals' names.  Dkt. 706 at 4, 6. Regardless of how "eagerly" the fraudulent drivers completed trips to earn money for themselves, they acted no more altruistically than—in defendants' telling—the Companies did in attempting to keep fraudulent drivers off of the Companies' platforms.  Defendants' attempt to ascribe benevolent motives for their deception—*e.g.*, that they "intended to make money by helping undocumented aliens get work," Dkt. 707 at 9—is belied by their actual conduct of stealing

and the out-of-specification concrete in *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), were worthless as a matter of law.  Yet, they insist that the illegal services of unauthorized drivers in this case were not valueless.  Their only rationale appears to be that nothing bad happened to the Companies' customers in this case, despite the similar absence of evidence of specific harm to the drug purchasers in *Ihenacho* or members of the public in *Prosperi*.

The First Circuit cases cited herein make clear that something valueless cannot attain value simply because a transaction has occurred.  Had a driver's fraud been revealed before any customer set foot in that driver's vehicle, neither that customer nor the Company would have, or lawfully could have, paid for that driver's services.  Had the fraud been revealed after that driver had completed a trip and after the customer had been charged, the Company would have been entitled to expel the fraudulent driver from the platform without paying the share that the driver otherwise might have received from that trip.[13]

False Claim Act ("FCA") cases, in which medical or similar health care services are provided by individuals who fraudulently misrepresent their qualifications to render those services, offer another useful analogy.  There, the loss to the government is the full amount billed to the government under those fraudulent representations, not offset by any value of the services rendered.  The individual is not a physician or other licensed professional; there is no market value

---

victims' identities on a large scale and enabling drivers who may not even have had a driver's license, let along a clean background check, to drive unsuspecting customers.

[13] In fact, the evidence in this case suggests that the Companies' fraud detection efforts resulted, with some frequency, in the termination of fraudulent accounts controlled by the defendants or co-conspirators before payment for certain trips or deliveries were completed.

to a procedure or treatment performed by one unqualified to perform it, no matter how well it was performed.[14]  The same is true here.

Based on the foregoing, all amounts paid by the Companies and their customers in connection with fraudulent accounts represent loss, without offset for the value of trips or deliveries under these fraudulent accounts, because they are valueless.  Reaching a reasonable estimate of this full loss should be the goal at defendants' sentencings.

### III.     The Most Reasonable Estimate of Loss Is the Amount the Companies Paid

A number of factors complicate the effort to calculate this full loss.  Foremost, because of the widespread nature of this conspiracy, the government does not have complete information about every one of the thousands of customers that paid for trips or deliveries completed with the fraudulent accounts.  However, even in the absence of complete information about amounts customers paid for these trips or deliveries, the Court may reach a reasonable estimate of the loss from available information on how much the Companies paid the users of the fraudulent accounts.

Defendants' first memorandum attempts to detail one or more of the Companies' fare structures.  Dkt. 707 at 3-4.  However, the Court need only consider these facts: (i) customers paid the Companies for completed trips or deliveries, (ii) the Companies retained a portion of those payments, and (iii) the Companies disbursed the remaining portion of those payments to drivers. The payments from customers for fraudulently provided trips or deliveries represent the total fraud

---

[14] *See*, *e.g.*, *United States v. Mackby*, 339 F.3d 1013, 1018-19 (9th Cir. 2003) ("The fact that Mackby's clinic actually performed the physical therapy for which he claimed reimbursement does not eliminate the government's injury.  Damages under the FCA flow from the false statement.  Ordinarily the measure of the government's damages [under the FCA] would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful.  The falsity here was not Mackby's representation that patients had received physical therapy, but the use of his father's PIN to obtain payments to which he was not entitled.  Had Mackby been truthful, the government would have known that he was entitled to nothing because he was neither a doctor nor a physical therapist in private practice.").

loss.  The portion of that amount that the Companies paid to drivers presents a conservative estimate of the overall loss.

This framing of the loss illustrates why the defendants' comparisons of their conduct to mortgage fraud are inapt.  The cases that the defendants cite stand for the proposition that, where the mortgage lender has been compensated in full or in part (from payments from the defendant or from short sale proceeds), the mortgage lender's losses should be offset by that amount.  The defendants insist that the Companies were compensated for the loss of authorized drivers' services through payments from their customers.  But defendants ignore altogether the fact that *the customers* received no compensation for their loss.  That the Companies received payments does nothing to negate the overall loss that defendants' conduct caused.

This framing also illustrates why the amounts the Companies paid to drivers are properly considered *loss*, and not merely the defendants' gains.  While estimating these amounts necessarily involves examining the defendants' receipts, this analysis does not rely on gains as an "alternative measure of loss," but rather as the best available estimate of the losses—the portion of the amounts customers paid on unvetted rides and deliveries that the Companies passed on to drivers.

## IV.   Zelle Receipts Should Be Included in the Loss Calculation

As defendants acknowledge in their memoranda, the defendants received payments from this scheme in a variety of ways.  *See* Dkt. 707 at 1-3.  When defendants completed trips or deliveries under fraudulent accounts themselves, or when others did so under fraudulent accounts linked to the defendants' bank accounts, the defendants received payments directly from the Companies.  When other individuals rented or purchased fraudulent accounts from defendants and those accounts were linked to the drivers, the drivers—not the defendants—received payments directly from the Companies, and the defendants received rental or purchase payments from the

drivers.  In some cases, drivers paid the defendants for GPS spoofing technology or "bots" to use

with fraudulent accounts to boost earnings from those accounts.[15]  In other instances, defendants

churned fraudulent accounts in order to generate referral bonuses and either received those bonuses

directly from the Company or received a share of the bonus from a co-conspirator.[16]  However, in

all of these cases, any amounts the Companies paid out in connection with fraudulent accounts

represent loss under the Guidelines.  And, where a driver paid a defendant in connection with

fraudulent account activity, the driver did so because a Company paid that driver as much or,

likelier, more.

> The Probation Office reached a different conclusion in its memorandum to the Court:
>
> The Probation Office has not included the Zelle inflows … from individual drivers
> renting/purchasing fraudulent accounts and/or bots or spoofing technology as part of the
> loss calculation because these figures represent monies exchanged between co-conspirators
> and gains to the defendants.  If the Probation Office knew how much money the Companies
> paid to individual drivers who bought and rented fraudulent accounts from the defendant,
> these amounts could potentially be considered additional loss.  However, without this
> information, loss from any of these sold/rented fraudulent accounts is too speculative and
> cannot be determined.

Dkt. 693-1 at 3.

However, these Zelle payments are not mere money transfers between co-conspirators.

Rather, the money that account renters or purchasers paid to defendants via Zelle in turn either

---

[15] Defendants claim that sales of the bots and GPS spoofing technology should not be included because, essentially, everyone does it.  Dkt. 707 at 7-9.  That others may have cheated the Companies and their customers does not negate the loss that the use of this technology *in connection with fraudulent accounts* caused the Companies and their customers.  Likewise, whether unauthorized drivers used these technologies more often than authorized drivers is irrelevant as, in all cases, the unauthorized drivers obtained their earnings through fraud in the first place.

[16] Defendants also argue that the Companies did not suffer a loss in paying out referral bonuses because they would have done so anyway.  Dkt. 707 at 6-7.  But this argument ignores both that the Companies would not have paid referral bonuses had they known the drivers were not who they claimed to be, and that, once a bonus target was hit, defendants instructed the driver to begin using a new account in order to collect an additional bonus.

came from or generated payments from the Companies to those drivers.[17]   Further, for this economic model to work for drivers purchasing or renting accounts, those drivers as a general matter needed to receive more in payments from the Companies than they paid to defendants. Consequently, Zelle payments to the defendants for account rentals or sales not only correspond to payments from the Companies on fraudulent accounts; they also represent only the most conservative estimate of those losses to the Companies.   In fact, the defendants appear to acknowledge that these Zelle transfers as a rule fell far short of the amounts the Companies paid out to the drivers who sent the Zelles.  Dkt. 707 at 4 ("The defendants were paid the same amount of money, whether as a flat fee or as rent, regardless of how much driving was done.  The Companies, on the other hand, made more money when the driver made more money because they were taking a continuing percentage of the fares.").  If anything, the Zelles undercount the loss, because they represent only a fraction of what the Companies paid to drivers, which itself is only a fraction of what customers paid for unvetted rides and deliveries.

Because of the widespread nature of this conspiracy, the government does not have bank records from every driver who rented or sold a fraudulent account from any of the 18 defendants who the government alleges were active in the market for fraudulent driver accounts.  Instead, the government has relied on records of Zelle and Venmo payments to defendants (which, in some

---

[17] Defendants misinterpret Judge Talwani's ruling in *United States v. Abbott*, 2019 WL 4394934 (D. Mass. Sept. 13, 2019), in which Judge Talwani found that payments from parent co-conspirators in the college admissions case to the ringleader, Rick Singer, did not result in gain to the conspiracy.  Here, the Zelle payments are not a measure of gain between co-conspirators, but rather a conservative estimate of the loss to the Companies and their customers.  Further, that defendants passed some of the money they received from the Companies on to drivers does not result in a reduction of their loss.  Under Section 1B1.3, these payments are part of jointly undertaken criminal activity within the scope of, in furtherance of, and reasonably foreseeable in connection with that activity.

instances, include as a description of the payment the word "Uber," "Lyft," etc., as well as "conta," the Portuguese word for "account") to estimate this portion of the losses.

Under the Guidelines, however, the Court need not reach a precise and full measure of the loss; the Court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). Where only a portion of a loss is measurable based on available information, the Court need not abandon an estimate of that portion entirely.

Because different defendants obtained money through the scheme in different ways, neglecting one or more ways entirely would result in the disparate sentencing of equally or near-equally culpable defendants. For example, if two defendants caused similar overall losses to the Companies and customers by causing payments of similar amounts on fraudulent accounts, their loss amounts for Guidelines purposes might diverge widely if the first defendant caused the Companies to pay a greater amount directly to that defendant, while the second defendant caused the Companies to pay a greater amount to co-conspirators who then paid that second defendant. If Zelle transfers are excluded from consideration, the first defendant appears to be more culpable and the second defendant appears to be less culpable, despite the defendants causing commensurate losses through fraudulent account activity. The table of estimates included in the Probation Office's memorandum to the Court, Dkt. 693-1 at 3-4, illustrates the variation in the composition of losses caused by the 18 defendants. *Compare* Edvaldo Rocha Cabral ($27,914 in deposits from Companies and $402,837 in Zelle inflows) *and* Clovis Placido ($248,416 in deposits from Companies and $80,936 in Zelle inflows). The resulting distinctions would be arbitrary; by their own telling, the defendants had different arrangements with fraudulent drivers depending on their degree of trust with the drivers, whether an account was rented or purchased, personal preferences with respect to using bank accounts, and other factors. Dkt. 707 at 2-3.

18

Additionally, excluding Zelle inflows would cause a defendant's loss amount to exclude entirely any proceeds from a defendant's sale of "bots" or GPS spoofing technology to users of fraudulent accounts.  Regardless of how widely these technologies were used by authorized drivers, their use by unauthorized drivers amplified the fraud loss caused with fraudulent accounts and is properly considered a significant part of the charged fraud conspiracy.  *See*, *e.g.*, Alves Neto PSR ¶ 39 (describing Alves Neto's sale of a "bot," sometimes sold pre-loaded on a used mobile phone, to renters of fraudulent accounts from co-defendant Thiago Prado).[18]

At sentencing, "[t]he government must prove the amount of loss by a preponderance of the evidence." *United States v. Flete-Garcia*, 925 F.3d 17, 28 (1st Cir. 2019) (citing *United States v. Curran*, 525 F.3d 74, 78 (1st Cir. 2008)).  "In arriving at a loss figure, a sentencing court is free to consider both losses stemming directly from the conduct underlying the offenses of conviction and losses stemming from any relevant conduct (including uncharged conduct)." *Id.* (citing *Curran*; *United States v. Ranney*, 298 F.3d 74, 80-81 (1st Cir. 2002); and *United States v. Sklar*, 920 F.2d 107, 110 (1st Cir. 1990)).[19]  Here, the government is prepared to establish that it is more likely than not that at least a portion of each defendant's Zelle receipts represent losses from the fraud

---

[18] In his objections to the draft PSR, defendant Alves Neto argues that his involvement with bots falls outside the scope of the conspiracy.  At sentencing, the government intends to establish that Alves Neto sold bots exclusively to users of fraudulent accounts and, in this way, fully participated in the conspiracy to obtain money from the Companies and customers through fraudulent accounts.

[19] Defendants' citation of cases involving drug quantity findings in poly-drug conspiracies are particularly irrelevant to the Court's reasonable determination of a monetary loss amount here, because drug quantity determinations in that context may trigger mandatory minimums, requiring drug quantities to be determined beyond a reasonable doubt, rather than by a mere preponderance of the evidence.  *See* Dkt. 707 at 11-12 (citing *United States v. Figueroa*, 105 F. Supp. 3d 152, 154 (D. Mass. 2015) and *United States v. Candelaria-Silva*, 714 F.3d 651, 658 (1st Cir. 2013)).  Rather, in fraud cases, "[t]he sentencing court has considerable discretion in determining what evidence should be regarded as reliable in making findings as to the amount of loss." *Flete-Garcia*, 925 F.3d at 28 (citing *Sklar*, 920 F.2d at 110).

conspiracy.  The government can establish this portion of the overall loss with evidence including, but not limited to, WhatsApp chats demonstrating that defendants distributed fraudulent accounts for co-conspirators to use or, conversely, rented or purchased fraudulent accounts from co-conspirators; WhatsApp chats demonstrating that defendants and co-conspirators transferred money via Zelle in connection with these account transfer or sales; examples of bank account statements demonstrating that fraudulent account renters or purchasers both received deposits from one of the Companies and transferred money via Zelle to a defendant, in each case in connection with a fraudulent account; and WhatsApp chats demonstrating common weekly rental rates; and additional evidence.[20]  Considering this information—as well as the fact that most defendants' lacked work authorization and relied on fraudulent rideshare activity as their primary source of income—the Court will be entitled to conclude that at least a portion of the Zelles that defendants received represented fraud losses from this scheme.

The government recognizes that at least some portion of the Zelles in each defendant's statements may not relate to this fraudulent scheme.  The government is prepared to take a more conservative approach in estimating total Zelles related to the fraud based on this reality.  But the defendants' alleged use of Zelle for unrelated receipts does not exclude this category from scrutiny. Rather than categorically exclude this type of payment, the Court should permit the government

---

[20] Defendants' first memorandum muses that, if the going rate for fraudulent account rentals was $325 per week, and the price for purchasing an account outright was $1,000, "[o]ngoing rental would make no sense."  Dkt. 707 at 12.  This conclusion ignores a critical consideration for the account renter or purchaser: the risk that the Company would detect and shut down the fraudulent account before the driver had an opportunity to break even.  Moreover, the memorandum cherry-picks examples of one-time, rather than recurring Zelle receipts.  Frequent account terminations also explain this pattern; when accounts were shut down, the users of those accounts found new fraudulent accounts from whomever was offering them, via Brazilian WhatsApp group chats or otherwise.  There is no reason to expect that one defendant's renter would remain that defendant's renter across multiple fraudulent accounts.

to demonstrate at sentencing why at least a portion of a defendant's Zelles more likely than not represent fraud losses.

## OTHER ENHANCEMENTS

The defendants additionally raise objections to three enhancements that the Probation Office has agreed apply to most or all defendants. These objections should be overruled.

### I.      A Substantial Part of the Scheme Was Committed from Outside the U.S.

Section 2B1.1(b)(10) of the Guidelines provides, in relevant part: "If … (B) a substantial part of a fraudulent scheme was committed from outside the United States … increase by 2 levels." Defendants contend that the evidence is insufficient to establish that "substantial" conduct occurred overseas.

Courts interpreting this enhancement have given the term "substantial" its ordinary meaning. *See*, *e.g.*, *United States v. Bagby*, 550 F. App'x 364, 365 (9th Cir. 2013) ("The district court reasonably concluded that 'substantial' has numerous meanings, including 'important, material, of considerable importance, and ample.'"). In this case, the number of fraudulent accounts that defendants created and distributed is high. However, with respect to any one fraudulent account, the sourcing of stolen identifiers or altered licenses for the account and the registering of the account were material and important to the scheme, because they were necessary acts for obtaining money through the use of fraudulent accounts.

The offense conduct in the draft PSRs establishes that both of those acts—sourcing identifiers to be used and creating the accounts—were performed in some instances by individuals outside the United States. For example, defendant Priscila Barbosa, who created fake accounts

and coordinated with several of the co-defendants,[21] obtained Social Security numbers and edited driver's licenses from individuals in Brazil.  *See* Barbosa Draft PSR ¶¶ 37-38.  Barbosa created and managed accounts with "CC-1," who relocated to Brazil.  *Id.* ¶¶ 16, 39.  Defendant Flavio Da Silva rented out accounts for CC-1 and received and transferred payments from drivers for CC-1. *See* Da Silva Draft PSR, ¶ 35.  Da Silva also obtained Social Security numbers and edited driver's licenses from individuals in Brazil.  *Id.*, ¶ 36.[22]  Defendant Wemerson Dutra Aguiar, who also created fraudulent accounts and coordinated with several co-defendants, exchanged driver's licenses and Social Security numbers with "CC-2," who also relocated to Brazil.  *See* Aguiar Draft PSR ¶ 36.  These are but a few examples of portions of the scheme occurring outside the United States.

The government respectfully disagrees with the Probation Office's position that the enhancement applies only when "the defendant specifically dealt with one of the Brazilian unindicted co-conspirators."  Dkt. 693-1 at 4.  The text of the enhancement imposes no such limit. Further, to the extent some courts have adopted a relevant conduct-like analysis and required that the parts of the scheme outside the United States be reasonably foreseeable to the defendants,[23] the

---

[21] *See*, *e.g.*, Edvaldo Cabral Draft PSR ¶¶ 38-39 (describing Cabral's purchase of driver's licenses from Barbosa and partnership with Barbosa in creating, and splitting proceeds from, fraudulent accounts); Alessandro Da Fonseca Draft PSR ¶ 39 (describing Da Fonseca's partnership with Barbosa in creating and distributing fraudulent accounts for generating referral bonuses) and ¶ 41 (describing Da Fonseca's purchase of fraudulent accounts from Barbosa); and Saulo Ponciano Draft PSR ¶ 38 (describing Ponciano's purchase of Social Security numbers from Barbosa).

[22] Co-defendant Luiz Narciso Alves Neto rented numerous accounts from Da Silva, who managed accounts with co-conspirators in the Untied States and Brazil.  *See* Alves Neto Draft PSR ¶ 37.

[23] *See*, *e.g.*, *United States v. Chukwu*, 842 F. App"x 314, 323 (11th Cir. 2021) ("Even if Chukwu did not commit any actions outside of the United States, the evidence below clearly establishes that many of the conspiracy's acts occurred outside of the United States, and those acts

widespread nature of the scheme and the interconnectedness of the co-defendants supports the conclusion that each defendant could reasonably foresee that some essential part of the fraudulent account infrastructure was supplied from outside the United States.

## II.    Defendants Engaged in or Caused the Use of Sophisticated Means

Section 2B1.1(b)(10) of the Guidelines further provides that, "[i]f … (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels."  Defendants argue that the technologies that the defendants used alongside fraudulent accounts were rudimentary and cannot be considered sophisticated for purposes of this enhancement.   As an initial matter, while elementary school kids may learn Photoshop, Dkt. 707 at 21, they are not editing driver's licenses in such a way as to circumvent the Companies' sophisticated facial recognition technology, dupe the Companies' advanced fraud detection systems into thinking a photo of a photo is a live "selfie," or confuse those systems into believing that a selfie was taken at one location when in fact it was taken at another location.  Nor are elementary school kids obtaining Social Security numbers off the Dark Net or data-mining to find out information on identity theft victims to get past identity verification questions.  Indeed, contrary to defendants' assertion, there is a reason many of them studied or worked in computers and information technology.  *See, e.g.*, Abreu Draft PSR ¶ 102 (college degree in Information Technology); Cabral Draft PSR ¶ 93 (work experience in website management and data management); Da Fonseca Draft PSR ¶ 91 (education in IT mechanics and engineering and work experience at website company); Alves Neto Draft PSR ¶ 93 (studied to be systems analyst and took additional computer classes, also worked as a technology network and

---

were both reasonably foreseeable and taken in furtherance of the conspiracy.") (citing *United States v. Singh*, 291 F.3d 756, 761-62 (11th Cir. 2002)).

infrastructure analyst at various data centers in Brazil, including handling the administration of data from servers and security networks).[24]

The government also respectfully disagrees with the Probation Office's view that this enhancement only applies where a defendant "used, sold, or purchased a GPS spoofing bot."  Dkt. 693-1 at 4.  In addition to the steps outlined above, the defendants used several other technologies involving greater sophistication and carrying greater capacity for harm.  For instance, certain defendants and co-conspirators accessed the Dark Net to obtain individuals' Social Security numbers, to be used in creating new fraudulent accounts.  Likewise, the use of virtual private networks ("VPN") enabled certain defendants to avoid detection by the Companies' anti-fraud systems.  These, too, should be considered sophisticated means.

Moreover, the enhancement should apply to all defendants.  If any one defendant did not personally engage in edit licenses, GPS spoofing, accessing the Dark Net, or using a VPN, he or she more likely than not intentionally caused another co-conspirator to employ one or more of these sophisticated means by obtaining identifiers or fraudulent accounts from them.  The sophisticated means prong of the enhancement under Section 2B1.1(b)(10) therefore applies to all defendants.

### III.    Defendants Used and Trafficked Authentication Features

Finally, Section 2B1.1(b)(11) of the Guidelines provides, in relevant part: "If the offense involved (A) the possession or use of any … (ii) authentication feature; (B) the production or trafficking of any … (ii) authentication feature … increase by 2 levels."  Under Title 18, United

---

[24] Further, while defendants cite cases affirming application of the enhancement where means of arguably greater sophistication were employed, Dkt. 706 at 17-18, they cite no authority suggesting that the means employed in this case were insufficiently sophisticated to merit the enhancement.

States Code 1028(d), "authentication features" include "any hologram, watermark, certification, symbol, … or other feature that either individually or in combination with another feature is used by an issuing authority on a … means of identification to determine if the document is counterfeit, altered, or otherwise falsified."

In this case, the driver's license images that the defendants and co-conspirators uploaded when registering for accounts with the Companies included authentication features that authentic driver's licenses bear—*e.g.*, holograms, watermarks, symbols, miniature photograph duplicates, etc.—depending on the state of issuance.  Where defendants or co-conspirators edited driver's license images for use in creating accounts, they preserved or replicated the licenses' authentication features.  Where an authentication feature on an uploaded license was distorted or omitted, the Companies, or their background check providers, rejected the license images.

Defendants' objection to this enhancement misses the mark, because, as the draft PSRs make clear, this enhancement applies based on the authentication features that were exchanged and used in this conspiracy, separate from the "means of identification" predicates for the aggravated identity theft counts.  *See*, *e.g.*, Aguiar Draft PSR, ¶ 61 ("[T]he offense involved the possession, use, production, and trafficking of authentication features with respect to the fraudulent driver's licenses used to open the fraudulent driver accounts with the Companies.").  Application Note 2 to Section 2B1.6, which the defendants claim precludes application of the Section 2B1.1(b)(11) enhancement to defendants also charged with identity theft, only pertains to the "transfer, possession, or use of a means of identification."  This application note is silent as to authentication features, and the defendants offer no other authority barring application of the Section 2B1.1(b)(11) enhancement based on the use or trafficking of authentication features.  This objection, too, should be overruled.

## **CONCLUSION**

For the reasons set forth above, the government respectfully submits that the Court should make a reasonable estimate of the loss caused by the defendants based on the payments that the Companies made directly to defendants, as well as Zelle transfers representing additional payments made by the Companies.  Further, the Court should find that enhancements for sophisticated means, substantial conduct outside the United States, and the use and trafficking of authentication features apply as to all defendants in this case.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney


By:    */s/ David M. Holcomb*
       KRISTEN A. KEARNEY
       DAVID M. HOLCOMB
       Assistant United States Attorneys

Date: February 9, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants.

Dated:  February 9, 2023

/s/ David M. Holcomb
DAVID M. HOLCOMB
Assistant U.S. Attorney