IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 21-cr-10158-7-MLW |
| ) | |
| (7) THIAGO DE SOUZA PRADO ) | |
| ) | |
| Defendant ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT THIAGO DE SOUZA PRADO'S RENEWED MOTION FOR REVOCATION OF ORDER OF DETENTION**

The government respectfully opposes defendant Thiago De Souza Prado's renewed motion for revocation of order of detention (Dkt. 705). Prado's risk of flight has not changed, and in fact the government has developed evidence further supporting a risk of flight as well as a risk to the safety of another person: a co-conspirator who has agreed to cooperate and testify at Prado's trial. Defendant's motion presents no new argument beyond the length of his pretrial detention—a situation defendant caused. Accordingly, defendant's renewed motion should be denied.

## BACKGROUND

The government incorporates by reference the background information provided in:

1. the government's Emergency Motion for Stay and Revocation of Release Order (Dkt. 69);

2. the transcript of the detention hearing held before Magistrate Judge Dein on September 28, 2021 (Dkt. 217);

3. the Order of Detention Pending Trial (Dkt. 200);

4. the government's Opposition to Defendant Thiago Prado's Motion for Revocation of Order of Detention (Dkt. 216);

1

5. the transcript of the motion hearing held before this Court on November 22, 2021 (Dkt. 263); and

6. the government's opposition to defendant Thiago Prado's motion for pretrial release (Dkt. 547).

Within days of the Court's denial of his motion for revocation of order of detention on November 22, 2021, Dkt. 263 at 45, defendant Prado moved to proceed *pro se*, Dkt. 236, which the Court allowed on December 17, 2021. Dkt. 257. Thereafter, between December 23, 2021 and December 30, 2022, defendant filed nearly 20 *pro se* motions challenging the indictment, his pretrial detention, and the Court's ability to preside over the case. *See* Dkts. 262, 265, 270, 279, 303, 304, 322, 339, 358, 386, 461, 467, 515, 542, 546, 552, 605, 625. The Court held hearings on these motions on March 4, 2022 and January 17, 2023.[1]

Meanwhile, 14 of Prado's co-defendants entered guilty pleas to the charges.[2] On December 22, 2022, the Court set a trial for Prado to begin March 6, 2023. Dkt. 621. However, during the January 17, 2023 hearing, Prado expressed a desire to have counsel re-appointed. Dkt. 720 at 27, 39-40, 57, 68-72. The Court thereafter re-appointed Mr. Palmer as counsel, and, at Mr. Palmer's request *and with defendant Prado's assent*, rescheduled the trial for September 11, 2023, to give Mr. Palmer time to prepare for trial. *Id.* at 68-72; *see also id.* at 39-40, 57, 59-60, 66.

---

[1] The Court set a hearing for August 24, 2022, *see* Dkt. 464, but continued that hearing after defendant filed an additional *pro se* motion on the eve of the hearing. Dkt. 532. Defendant proceeded to file additional *pro se* motions over the fall of 2022.

[2] Two co-defendants remain at large after fleeing to Brazil, and a third co-defendant was arrested in Colombia and extradition proceedings are pending.

In preparation for the March 6, 2023 trial date, the government recently disclosed to Prado that one of his co-conspirators had agreed to cooperate and would be a witness for the government at trial. *See* Affidavit of Kristen Kearney (Feb. 10, 2023) ¶ 1. During an interview with the government, this co-conspirator told investigators that Prado had told him that he (Prado) had a suitcase with $250,000 inside that he was storing with a friend in Parkland, Florida, and that the suitcase also held a firearm. *Id.*, Ex. A at 4. In a WhatsApp chat between Prado and this co-conspirator, Prado sent an image of what appears to be a firearm and a machete lying on Prado's computer. *Id.* ¶ 3 & Ex. B. The government also recently became aware that a video of Prado shooting what appears to be the same firearm out of the driver's side window of the vehicle he was driving has been widely distributed among individuals in the Brazilian community in Massachusetts. *Id.*, Ex. C. In the video, Prado shoots into what appears to be woods, without any regard for who or what he is aiming at. FBI translators have interpreted Prado's statements in the video to mean either, "This is how I handle it – if the guy goes wrong, I'll spray him with bullets" or "This is how it is with me, if a guy makes a mistake, I put a bullet in him." *Id.* ¶ 4. While the government has received information from Prado's estranged wife, Amarilda Ferreira, that this firearm may be a gun designed to shoot blanks, *id.* ¶ 5, the government notes that the firearm in the pictures and video does not have an orange-colored marking on the barrel that would indicate it fires blanks. *See* 15 C.F.R. §§ 1150.2-1150.3. Nor is the government aware whether Prado has taken any other steps to modify the firearm to shoot actual bullets. *See, e.g.*, Gokhan I. Ogunc *et al.*, *Modified blank ammunition injuries*, 193 FORENSIC SCI. INT'L 112 (Dec. 15, 2009) ("Blank firing weapons are easily modified by owners, making them suitable for discharging live firearm ammunition or modified blank ammunitions."), *abstract available at*

https://pubmed.ncbi.nlm.nih.gov/19879076/#:~:text=Blank%20firing%20weapons%20are%20easily,can%20discharge%20the%20live%20ammunition.

Additionally, as the Court is aware, Prado previously engaged in harassment of the cooperating co-conspirator while both were detained at the same facility by informing others, including individuals in the co-conspirator's cellblock and as well as co-defendants, of the co-conspirator's cooperation.  Dkt. 426 at 2 (under seal).

## STANDARD

Under 18 U.S.C. § 3142(g), "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," the Court shall consider: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  The preponderance standard governs the flight risk determination, while clear and convincing evidence is required under the safety risk determination.  *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Digiacomo*, 746 F. Supp. 1176, 1180-81 (D. Mass. 1990) (Wolf, J.) (citations omitted).

Where, as here, a defendant asserts that his continued detention raises due process concerns, the First Circuit instructs the Court to also consider (1) the seriousness of the charges, (2) the strength of the government's proof that defendant poses a risk of flight or a danger to the community, (3) the strength of the government's case on the merits, (4) the length of the detention that has in fact occurred, (5) the complexity of the case, and (6) whether the strategy of one side or the other has added needlessly to that complexity.  *United States v. Zannino*, 798 F.2d 544, 547 (1st Cir. 1986).

**ARGUMENT**

In his renewed motion, defendant cites no change in circumstances besides the length of his detention, and he offers no different proposed conditions other than that he would live with his mother in Massachusetts, rather than his wife and child in Florida.  *Compare* Dkt. 705 at 1-2 *and* Dkt. 263 at 46-47.  Because Prado's risk of flight has not changed, and because the government has developed evidence further supporting a risk of flight as well as a risk to the safety of another person, his renewed motion should be denied.

      I.      **No Combination of Conditions Will Reasonably Assure Prado's Appearance**

As previously laid out in detail in the government's prior submissions and at hearings, and as the Court has previously found, "there is a real risk that the defendant will flee and that the proposed conditions and any other feasible conditions will not reasonably assure that the defendant will not flee."  Dkt. 263 at 47; *see also* Dkt. 69 at 2-14 & 11-13; Dkt. 216 at 2-3; Dkt. 217 at 8-15; Dkt. 263 at 13-31, 42-44; Dkt. 547 at 1-5.  In reaching this conclusion, the Court considered conditions including that Prado surrender his passport, be subject to electronic monitoring, check in daily with Pretrial Services, be prohibited from having Internet access or have that access monitored by Pretrial Services, and post a $100,000 unsecured bond, as well as any other feasible conditions.  Dkt. 263 at 46-47.

In weighing the factors under § 3142(g), the Court previously found that the "formidable evidence against the defendant and the advisory guideline range suggesting he will receive a lengthy sentence, if convicted, and the fact that . . . [there is] at least a good chance he'll be deported, despite his asylum application, together create a substantial incentive for the defendant to flee."  Dkt. 263 at 49.  While the Court also considered the presence of the defendant's family in Massachusetts and that he lived in Massachusetts for many years, *id.*, this was not enough to

5

overcome the evidence of his risk of flight. Similarly, that defendant may not want to return to Brazil because of a pending asylum application did not dissuade the Court that he "could flee to other parts of the United States or to Mexico." *Id.* at 50. The Court also relied on evidence the government presented that the defendant "knows how to make and obtain false identification, including false Social Security cards [and] fraudulent drivers' licenses." *Id.* Given this evidence, the Court noted that, "even if [Prado] could not spoof Probation's electronic monitoring devices," he could just as easily "cut off the electronic monitoring device and flee," and "[w]ith the false identification, [Prado] could go anywhere in the United States." *Id.* at 51. The Court further found that "there's no security the defendant can post to discourage flight." *Id.*

The same factors the Court previously considered and found persuasive as to the defendant's risk of flight still apply. Further, the government now has evidence that, in addition to a substantial incentive to flee, Prado also has the means to flee—$250,000 in a suitcase stored with a friend. Further, Prado indicated at the January 17, 2023 hearing that he and his wife are no longer together, making it even easier for him to flee on his own, rather than with a wife and young child in tow. The denial of his various motions challenging the charges against him, as well as the fact that 14 of his co-defendants have now pleaded guilty to identical charges, creates an additional incentive to flee. There is no longer a hope that the charges could be dismissed prior to trial, and 14 similarly situated defendants and their counsel have by now determined the chance of acquittal at trial is minimal. In other words, since the Court considered these issues in November 2021, Prado's incentive to stay and fight the charges has diminished greatly, and his incentive to flee has correspondingly increased.

What is more, no additional conditions exist that would reasonably assure the defendant's appearance. Indeed, the only change he proposes is to live with his mother in Massachusetts rather

than his (now estranged) wife and child in Florida.  The shortcomings of electronic monitoring and limitations on his computer access remain.

      **II.**      **No Combination of Conditions Will Reasonably Assure the Safety of the Co-Conspirator**

The government has not previously raised concerns about the risk of safety to any person or the community.  However, mounting evidence suggests that this factor also weighs against Prado's pretrial release.  The evidence shows not only that Prado has access to weapons—namely a firearm in the same suitcase as the $250,000, as well as a machete pictured in his chat with a co-conspirator—but also that he has threatened to "spray bullets" or "put a bullet in" anyone who "goes wrong" or "makes a mistake."  The co-conspirator who agreed to cooperate and would be called to testify at Prado's trial likely now falls in this camp.  Further, Prado took steps to intimidate the co-conspirator—even before it was confirmed to him that the co-conspirator was a cooperator—by outing him as a cooperator to co-defendants and others in the co-conspirator's cell block.  Now that the co-conspirator's cooperation has been confirmed and a summary of his statements to investigators provided to Prado's counsel, should Prado be released, there is a substantial possibility that Prado will carry out the threat from his video against the co-conspirator, who has also been released (in part because of the danger posed by Prado in the facility).  That the firearm pictured may be designed to shoot blanks does not change the analysis, where there is no way to tell if Prado has modified the gun to shoot live rounds, and where even blank guns can injuries, including fatal ones.  *See, e.g.*, Rebecca Pircher *et al.*, *Wound morphology in contact shots from blank cartridge handguns: a study on composite models*, 131 INT'L J. OF LEGAL MEDICINE 1333 (2017) ("It is a well-known fact that blank cartridge guns can cause penetrating and even fatal injuries when discharged in contact or at very close ranges."), *abstract available at*

https://pubmed.ncbi.nlm.nih.gov/28717964/#:~:text=It%20is%20a%20well%2Dknown,that%20from%20a%20conventional%20gun.

Further, the limitations of conditions such as electronic monitoring apply equally to the safety determination as they do the risk of flight determination.  As with the risk of flight, Prado could simply cut off an electronic monitoring bracelet and, instead of (or before) fleeing, he could further harass, threaten, or commit violence against the co-conspirator.  Even without cutting off a bracelet, Prado could take a detour on his way to or from an approved trip (such as to his attorney's office or a medical appointment) to harass the co-conspirator or worse.

### III.     The Length of Prado's Detention Does Not Change the Analysis

As discussed above and in the government's prior submissions on Prado's detention, the first three *Zannino* factors weigh in favor of Prado's continued detention.  With respect to the length of his detention, courts in this circuit have not adopted a bright-line rule regarding what period of detention violates due process.  Rather, they make a case-by-case analysis.  *See, e.g.*, *United States v. Tortora*, 922 F.2d 880, 889 (1st Cir. 1990) ("At this stage of the proceedings, Tortora's pretrial incarceration" of more than a year and a half "has not been so protracted as to support a due process claim."); *United States v. Carrozza*, 807 F. Supp. 156, 157 (D. Mass. 1992), *aff'd*, 4 F.3d 70 (1st Cir. 1993) ("All five defendants were detained pending trial, some for more than two years. After taking testimony and receiving other evidence, the court in December 1991 denied their motions to be released on Due Process and Sixth Amendment grounds.") (citing *Zannino*); *United States v. Montrond*, No. 09-cr-10278-NMG, 2011 WL 1560932, at *3 (D. Mass. Apr. 25, 2011) ("While [sixteen months is] a significant period of time, I do not feel that his length of incarceration standing alone, is violated of due process, given that he faces a mandatory minimum sentence of five years if convicted of the offenses charged, *i.e.*, substantially longer than

8

sixteen months."); *cf. United States v. Cardona*, No. 17-cr-30072-TSH, 2020 WL 1905308, at *2 (D. Mass. Apr. 17, 2020) (finding that a 32-month period of pretrial detention would "cross the threshold from permissible regulation into impermissible punishment" under the circumstances of the case where record indicated defendant played lesser role in conspiracy and did not cause any of the delay in his trial); *United States v. Daniels*, No. 98-cr-30040-MAP, 2000 WL 1611124, at *6 (D. Mass. Oct. 5, 2000) (ordering release of defendant who had been detained for two years under the presumption pursuant to 18 U.S.C. § 3142(e), where "resolution of [a significant pretrial] matter, conservatively speaking, is several months off and trial, if called for, even later" and after finding defendant was not "palpably dangerous" and defendant's proposed conditions of release would reasonably assure his appearance).  Here, the length of Prado's pretrial detention does not support a due process claim where he faces a sentence substantially longer than the 23 months he will have been detained, was not a minor player in the conspiracy, is the primary cause of the delay in his trial, presents a risk of safety to the co-conspirator, and no conditions of release will reasonably assure his appearance.

As the Court noted at the January 17, 2023 hearing, the length of Prado's pretrial detention has been driven by the complexity of this 18-defendant case, and even more so *by Prado's own conduct*. Dkt. 720 at 51-55, 59-60, 66. Despite warnings from the Court, Prado chose to proceed *pro se*, and thereafter filed nearly 20 substantive motions, including on the eve of the August 2022 hearing on several of his motions, which caused a delay in that hearing until January 2023, as Prado continued to file motions challenging the indictment through December 2022. Despite that these motions were outstanding, the Court nevertheless attempted to move the case along by setting a trial for March 6, 2023. Yet Prado then changed course and requested counsel be re-appointed, and further agreed to postpone his trial to September 2023 so that his counsel would have time to

9

prepare for trial. Each of these decisions and actions by Prado contributed to the time it has taken to resolve his motions and schedule the trial.

What is more, the government has not pursued a strategy that needlessly added to the complexity of the case. Rather, the government timely completed discovery, with the last production on November 15, 2021. Dkt. 406 (Final Status Report). The government also timely responded to each of Prado's *pro se* motions, and (unlike Prado) complied with the Court's deadlines for the March 6, 2023 trial until the Court suspended those deadlines in light of the new trial date. At every turn, the government has sought to move this case along, while Prado has contributed to the length of his pretrial detention. *See also* Dkt. 720 at 55 (finding the "government has done nothing to contribute to the delay.").

Prado should not be permitted to use the delay caused by his own conduct to now justify his release from detention, particularly where the risk of flight and safety concerns outlined above weigh so heavily in favor of his continued detention. *United States v. Beverly*, No. 87-cr-00521, 1988 WL 36988, at *2 (N.D. Ill. April 8, 1988) ("As a general rule, the stronger the justification for keeping a defendant in detention, the longer he or she can be detained without violating the due process clause.").

## CONCLUSION

For these reasons and those outlined in the government's prior submissions concerning Prado's pretrial detention, the Court should deny Prado's renewed motion for revocation of his detention.

        Respectfully Submitted,

        RACHAEL S. ROLLINS
        United States Attorney

By:   */s/ Kristen A. Kearney*
      KRISTEN A. KEARNEY
      DAVID M. HOLCOMB
      Assistant U.S. Attorneys

Dated: February 10, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: February 10, 2023

        */s/ Kristen A. Kearney*
        KRISTEN A. KEARNEY
        Assistant U.S. Attorney