UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,      )
                              )          Criminal Action
          Plaintiff,           )          No. 21-10158-MLW
                              )
v.                             )
                              )
THIAGO DE SOUZA PRADO,         )
                              )
          Defendant.           )
                              )
```

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

MOTION
VIDEOCONFERENCE

February 23, 2023
9:46 a.m.

John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      Kristen A. Kearney
 3    David M. Holcomb
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3204
 6    Kristen.kearney@usdoj.gov
      David.Holcomb@usdoj.gov
 7
      On Behalf of the Defendant:
 8    John F. Palmer
      Law Office of John F. Palmer, P.C.
 9    18 Main Street Extension
      Suite 201B
10    Plymouth, MA 02360
      617-943-2602
11    Jpalmer@socialaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE COURT:  Good morning.  Would the clerk please call the case.

THE CLERK:  Yes, Your Honor.  This is the criminal matter of 21-CV-10158, *United States v. Thiago de Souza Prado*.

THE COURT:  And would you please administer the oath to the interpreter.

THE CLERK:  Yes, Your Honor.

(Interpreter duly sworn.)

THE COURT:  I'm sorry, I'm not seeing the interpretation.

THE CLERK:  The counsel said that his client doesn't need an interpreter but only for standby.

THE COURT:  Okay.  Would counsel please identify themselves for the record.

MS. KEARNEY:  Good morning, Your Honor.  Kristen Kearney for the United States.

MR. HOLCOMB:  Good morning, Your Honor.  David Holcomb also for the United States.

MR. PALMER:  John F. Palmer for Mr. Prado.  And following up on the clerk's statement, Your Honor, Mr. Prado and I have been able to communicate in English.  And the way we've handled it in the past in court is that the interpreter will simply stand by in the event that there's something that Mr. Prado doesn't understand, but I'm confident that he

1    understands English.

2         THE COURT:  Thank you.  And we'll proceed in that way.

3    So it's not necessary for the interpreter to do simultaneous

4    interpretation, but if something requires interpretation, I'll

5    call on you.

6         As I said in my February 16 order, number 738, we were

7    unable to obtain a Portuguese interpreter to come to the

8    courthouse for the hearing this morning, and I offered the

9    defendant the option of proceeding by video or by having the

10:01 10   hearing in the courtroom at a later date, I'm not sure what

11   date.  And I received a submission from Mr. Palmer that he had

12   consulted Mr. Prado and that he waived any right that he might

13   have to have this hearing in the courtroom.  As I pointed out

14   in my order, it's not clear under the applicable rule that any

15   such right exists.

16        But, Mr. Palmer, can you confirm that you've talked

17   with Mr. Prado and that he does wish to proceed by video today

18   rather than at some later date in the courtroom?

19        MR. PALMER:  Yes.  I have discussed that with him,

10:01 20   Your Honor, and he does waive any right to be present.

21        THE COURT:  And Mr. Prado, did you discuss that with

22   Mr. Palmer?

23        THE DEFENDANT:  Yes, I did, Your Honor.

24        THE COURT:  And do you waive any rights you may have

25   to have this proceeding in the courtroom and to go ahead by

1   video today?

2          THE DEFENDANT:  Yes, Your Honor, I do waive, and I'm

3   okay with video court today.

4          THE COURT:  All right.

5          So at the January 17, 2023 hearing, at which I decided

6   Mr. Prado's many pro se motions, I decided and described in

7   detail the reasons that his continued detention does not

8   violate his rights to a speedy trial statute, Fifth or Sixth

9   Amendment or under Rule 48(b).  But I did agree to consider a

10:03 10  renewed motion for his release to determine whether there are

11  reasonable conditions on which he should be released pending

12  his September 11, 2023 trial.

13         The defendant has filed a motion, docket 705.  The

14  government's filed an opposition, which is docket number 723,

15  which provides additional evidence, which I'm now making part

16  of the record.  It's docket numbers 723-1, -2, which is under

17  seal, -3 and -4, which is a video.  The sealed document

18  includes the name of the cooperating individual.  The

19  government's memo references a cooperating individual.  There's

10:04 20  a name.  The name should not be used in this proceeding which

21  is open to the public.

22         The government requests the defendant's continued

23  detention because of risk of flight and, as I read it, also

24  because of danger to another person, the cooperating witness,

25  and to the community.

1          Could the government clarify, please, whether it's

2     seeking continued detention just on risk of flight or on both

3     grounds?

4          MS. KEARNEY:  Both grounds, Your Honor.

5          THE COURT:  Thank you.  That's what I understood.  At

6     the November 21 hearing on the original motion to revoke

7     detention, the parties agreed that the standards in determining

8     whether the defendant should be detained are set forth in my

9     decisions from long ago.  *Digiacomo*, 776 F. Supp. 593 at 597,

10:05 10    *Patriarca*, 776 F. Supp. 593 at 597, which was remanded on other

11    grounds.

12          As I wrote then, under Sections 3142(f)(1)(A) and (C),

13    the government must prove by a preponderance of the evidence

14    that no combination of conditions will reasonably assure the

15    defendant's appearance at future court proceedings.  And with

16    regard to dangerousness, the government must prove by clear and

17    convincing evidence that no combination of conditions will

18    reasonably assure the safety of any person or of the community.

19    And "reasonably assure" doesn't mean guarantee.  It's something

10:06 20    less.  Do the parties agree those are still the standards?

21          MS. KEARNEY:  Yes, Your Honor.

22          MR. PALMER:  Yes, Your Honor.

23          THE COURT:  Okay.  And then we'll go on to assure we

24    have a clear and common understanding of the conditions.  The

25    defendant poses -- the renewed motion referenced the prior

1    filings and adds that the defendant would now reside with his

2    mother in Framingham, Massachusetts, and reiterates that he

3    would abide by a curfew and electronic monitoring.

4         When I considered the original motion to revoke in

5    November 22, 2021, the conditions that I was analyzing included

6    that the defendant would surrender his passport, submit to

7    electronic monitoring, a curfew that would require him to be

8    home in the evening and allow him to go out to work and that he

9    would check in daily with probation, which was then in Florida,

10:07 10   now it would be Massachusetts.  He would have no internet

11   access or the probation department would monitor his internet

12   usage, and there would be $100,000 unsecured bond.

13        Are those all the conditions I should consider now,

14   Mr. Palmer?

15        MR. PALMER:  Yes, Your Honor.  On the issue of curfew,

16   curfew versus home detention, whether he would be permitted to

17   go out to work, he doesn't presently have a job lined up.  But

18   if the court wants to impose additional conditions that he

19   would essentially be in home confinement without being able to

10:08 20   leave the residence at all, that would also be acceptable to

21   the defendant.

22        THE COURT:  Okay.  Well, I'll consider that as a

23   potential condition.  Do the parties have any additional

24   evidence they want to submit at this hearing, particularly any

25   testimony?

|   | |
|---|---|
| 1 | MS. KEARNEY:  No, Your Honor.  The government is |
| 2 | prepared to proceed based on what we've previously submitted. |
| 3 | MR. PALMER:  No, Your Honor.  I have no further |
| 4 | testimony. |
| 5 | THE COURT:  And does Mr. Prado want to testify? |
| 6 | MR. PALMER:  No, Your Honor. |
| 7 | THE COURT:  Mr. Prado, is that correct?  I can't hear |
| 8 | you. |
| 9 | THE DEFENDANT:  I said I don't want to testify. |
| 10:09 10 | THE COURT:  You do not want to testify? |
| 11 | THE DEFENDANT:  I do not. |
| 12 | THE COURT:  Okay.  As I noted November 20, '21, the |
| 13 | Federal Rules of Evidence don't apply in this proceeding as |
| 14 | provided in Rule of Evidence 1101(d).  So I've read or looked |
| 15 | at the attachments to the government's position memo, and I've |
| 16 | watched the video that's docket number 723-4. |
| 17 | The burden remains on the government.  And while I |
| 18 | stated the general standard, I'm reconsidering this de novo in |
| 19 | part because of the passage of time.  I've closely analyzed |
| 10:10 20 | speedy trial considerations and decided there were no |
| 21 | constitutional or statutory federal rule to speedy trial |
| 22 | violations in January and wouldn't be for trial in September, |
| 23 | but it is a factor that can be taken into account at this time. |
| 24 | So I think if the parties want to argue the speedy trial |
| 25 | implications, you may do that, too. |

1          Ms. Kearney, are you going to argue this for the

2    government?

3          MS. KEARNEY:  Yes, Your Honor.

4          THE COURT:  All right.  Why don't you go ahead,

5    please.

6          MS. KEARNEY:  Okay.  So starting with the nature and

7    circumstances of the offense charged, by now the court has

8    heard 14 guilty pleas and what the government would prove at

9    trial, so I don't want to belabor the point.  But I do want to

10:11 10   point out just the seriousness of the offense here.

11         As you know, this was a nationwide scheme that

12   targeted thousands of individuals whose identities were stolen

13   in order to create accounts with rideshare delivery companies

14   for people who would otherwise not qualify to drive for these

15   companies.  It involved use of the dark net, obtaining driver's

16   license images, social security numbers, and, you know,

17   millions of dollars in losses for the customers who rode with

18   the rideshare companies or obtained deliveries from the

19   delivery companies and that the companies then passed on to the

10:12 20   defendant and his co-conspirators.  So this is a serious

21   offense, and also it involves identity theft, which is a factor

22   that the government believes plays into the risk of flight.

23         And the weight of the evidence here, the government

24   has thousands of pages of the defendant's own chats.  We

25   previously had addressed the chats with co-defendant Wemerson

1    Aguiar.  We also have obtained an additional chat with the

2    cooperating co-defendant, and those show the defendant

3    discussing the scheme, engaging in the scheme, purchasing

4    social security numbers from co-defendants, obtaining driver's

5    licenses on his own.  And so they show that he was personally

6    involved in the scheme.

7         On top of that, there's bank records that show he was

8    getting paid for his participation in the scheme as well as

9    records from the rideshare and delivery companies that show his

10:13 10    face on, you know, more than a dozen accounts, plus metadata

11   that shows the accounts were created from his IP address,

12   associated with his IP address where he was residing at the

13   time.

14        So the evidence here is substantial, and it's

15   overwhelming.  And in fact, 14 of his co-defendants are facing

16   similar evidence and chose to plead guilty.  So I think that --

17   obviously this defendant is an individualized determination,

18   but the fact that 14 other co-defendants saw the weight of the

19   evidence against them, which is identical to the evidence

10:14 20   against this defendant, and chose to plead guilty, we think

21   that demonstrates the weight of the evidence.

22        Additionally, as we've now disclosed, there is a

23   cooperating co-defendant who would testify about the

24   defendant's role in the scheme, including that the defendant

25   personally was using the dark net to obtain social security

numbers, that he was involved in the creation of a BOT to get

deliveries ahead of other people on one of the delivery

companies' apps, and he was selling this BOT for $600 to $800,

and also that he was involved in printing driver's licenses for

another co-defendant.  So given that, the weight of the

evidence is just very strong.

And then we look to the history and characteristics of

this defendant.  He is a Brazilian national.  He is likely

facing deportation after he serves any sentence should he be

convicted in this case.  There is an ICE detainer.  Notably

Brazil does not deport its own citizens, so if he flees to

Brazil, he won't face any consequences as long as he stays in

Brazil.  So he has every incentive to return to Brazil before

serving any further time in the United States rather than

serving, you know, a sentence should he be convicted and then

having to go to Brazil anyway.

Previously it was a factor that his wife and child

were here.  The government notes that he is now separated from

his wife, has not had contact with her, and so it's all the

more reason to flee.  There's nothing, even his wife and child,

first of all -- well, his child does but his wife does not have

status here.  But even her presence here while she's here is

not going to keep him here.  It's also easier to flee, whether

to Brazil or another part of the United States or to Mexico

without a wife and child in tow.

1          His mother and sister are here.  Otherwise the

2     defendant does not have ties to the United States.  He doesn't

3     own property here.  He has no financial ties.  He doesn't have

4     work lined up; nor can he work.  My understanding is he does

5     not have a work authorization permit at this time.  So he has

6     no prospects to stay, if he were to stay in the United States,

7     given his immigration issues.

8          We've noted before that several co-defendants in this

9     case have fled.  And again, it's an individualized

10:17 10    determination, but it shows what individuals facing identical

11    circumstances have chosen to do.  They've chosen to flee to

12    Brazil.

13          THE COURT:  Excuse me.  To Brazil or to Mexico?

14          MS. KEARNEY:  So they went to Mexico and then

15    proceeded to Brazil.  But it's a good point you raise.  The

16    defendant doesn't have to flee all the way to Brazil.  He can

17    go somewhere else in the United States.  He can get to Mexico.

18    You only need a driver's license to get to Mexico if you cross

19    at a land border.

10:17 20          So here is someone who knows how to obtain people's

21    driver's license images, how to get his face on the driver's

22    license and who knows how to print driver's licenses.  So the

23    risk of flight here is huge.  You know, he also apparently,

24    according to the cooperator, has cash available in order to

25    flee.

1          THE COURT:  Well, just to try to assure I understand
2    this accurately, the cooperator has told the government Mr.
3    Prado claims to have $250,000 in cash in a suitcase in a
4    particular place with a gun in the suitcase, too?

5          MS. KEARNEY:  Yes, Your Honor.  That is what the
6    cooperator has told the government and was included in the
7    under-seal submission.  And, you know, I note that that was
8    very specific information about where the suitcase is located
9    and with whom.  It wasn't just a general, you know, "Oh, yeah,
10:18 10   I have money stored somewhere," that maybe has less weight.

11         And so going back to the history and characteristics
12   of the defendant, in addition to those factors that support the
13   risk of flight, there's also now a concern about the risk of
14   safety of this cooperating co-defendant.  The defendant appears
15   to have access to firearms.  There was the firearm in the video
16   that the government submitted and also the photo of the firearm
17   and a machete that the defendant sent to the cooperating
18   co-defendant.

19         THE COURT:  Let me, I may not have appreciated that.
10:19 20   The picture of the firearm and the machete, which is docket
21   number -- well, it's Exhibit B to your memorandum.

22         MS. KEARNEY:  Yes, Your Honor.

23         THE COURT:  With the firearm and you say it's a
24   machete, kind of a long knife, that picture was sent by
25   Mr. Prado to the cooperating witness?

1          MS. KEARNEY:  Yes, Your Honor, prior to the arrest in

2     this case.  So just during the course of the scheme, they would

3     regularly communicate via WhatsApp, and this was a picture sent

4     to the now cooperating defendant during that chat period.  I

5     believe this was sent in March of 2021, and I want to be clear

6     that the firearm, the government understands it may actually be

7     designed to shoot blanks, not actual bullets, but it's not

8     clear to the government whether it's been altered.  It doesn't

9     have the orange cap that normally a weapon designed to shoot

10:21 10    blanks would have.  And if it's designed to shoot blanks, it

11    can still cause harm if it's shot at close range.

12         THE COURT:  Does this appear to be the firearm that

13    the defendant is shooting out the window in the video?

14         MS. KEARNEY:  It does, Your Honor.  The color of the

15    firearm appears to be slightly different but the handle looks

16    the same.  I admit I'm not an expert on firearms, but it does

17    appear to be the same.  So we don't want to overstate what the

18    firearm is.  But also in that video it's notable that the

19    defendant is sending the message that this is what happens to

10:21 20    those who make a mistake or who go wrong, and this was just

21    something that doesn't appear to be targeted towards the

22    cooperating co-defendant because it was made before the

23    defendant was in custody, but it shows just generally he is

24    trying to threaten individuals who might cross him.

25         And then with respect to the cooperating co-defendant

1    specifically, the defendant has already attempted to out the

2    cooperating co-defendant before it was even confirmed that he's

3    cooperating.  And now that the cooperation has been confirmed,

4    the government has provided the cooperating co-defendant's 302

5    report to the defendant through his counsel, there's even more

6    of an incentive to threaten or try to intimidate this

7    co-defendant.

8         And I also want to point out, you know, with the video

9    and also the defendant's history of restraining orders, that he

10:23 10    appears to have a history of violence, shooting blindly out of

11    a car window without regard to what may have been in the woods

12    behind him and then laughing about it.  And then three

13    restraining orders, including one that was extended for 18

14    months, just demonstrates that there is a history of violence

15    here.

16         THE COURT:  Let me ask you this.  One, is it your

17    contention that no reasonable -- no combination of conditions

18    will reasonably assure the safety of the cooperating witness or

19    the cooperating witness and also the general community?

10:23 20         MS. KEARNEY:  I think our concern is primarily for the

21    cooperating witness here, you know, given the defendant's

22    general threats to anyone who crosses him, to the extent there

23    are other witnesses against him, they may be also at risk, but

24    I think primarily the concern is for the cooperating

25    co-defendant.

```
 1              THE COURT:  Is that considered an automatic weapon
 2    that he was firing out the window?  Because it fired many --
 3              MS. KEARNEY:  Well --
 4              THE COURT:  -- in rapid success.
 5              MS. KEARNEY:  Yes, Your Honor.  I believe that would
 6    be considered either -- again, I admit I am not an expert on
 7    firearms, so I don't want to overstate whether it's a
 8    semiautomatic versus automatic.  But yes, the idea that you can
 9    just keep firing as opposed to stopping to reload every time.
10:24 10              THE COURT:  And if a firearm fires blanks, does it
11    eject something?
12              MS. KEARNEY:  Yes, Your Honor, it does.  And that's
13    the issue.  It has to be at close range in order to hurt
14    someone, but that is the factor that, because it does eject
15    something, you know, a blank essentially, that can cause damage
16    if used at close range.  Additionally, it's very easy to modify
17    a firearm designed to shoot blanks, to shoot actual bullets.
18              THE COURT:  Okay.
19              MS. KEARNEY:  I'm sorry, Your Honor.
10:25 20              THE COURT:  No.  You should continue.  Those were my
21    two questions.
22              MS. KEARNEY:  So I did want to address the conditions
23    issue.  And it's the government's position that there's no
24    combination of conditions that could both prevent the defendant
25    from fleeing and protect the safety of the co-defendant.  The
```

1   same concerns in terms of the risk of flight were present

2   earlier where in November 2021, when we talked about how the

3   location monitoring really just gives the government a heads-up

4   after the defendant has already fled, I mean, if he were to cut

5   off his bracelet, he could get a head start, maybe he has a

6   little bit of a head start, but where he's someone who can use

7   a different identification and has access to cash, that's going

8   to make it very difficult for the government to track him down

9   should he flee.

10:26 10     I note that he does have a history of access to GPS

11   spoofing technology.  And even if he couldn't tap into the

12   location monitoring of the bracelet, again, he can cut it off,

13   and also, just given his incentive to flee, it's outweighed,

14   that incentive to flee outweighs any protection that monitoring

15   might provide.

16     And I also note even his own sister made it clear

17   she's not going to be able to assume responsibility for his

18   appearance based on what was submitted in probation's memo.  So

19   the fact that he's residing with his mom, you know, his mom is

10:27 20   older, she's not going to stop him from fleeing, I would

21   presume.

22     Home confinement, again, if he cuts off that bracelet,

23   he can easily get to another part of the United States, get to

24   Mexico, from Mexico get to Brazil, given his ability to access

25   identifiers and create licenses.

1          And even if his internet usage is monitored or

2     limited, that doesn't stop him from using his mom's phone, his

3     mom's computer.  So daily check-ins, again, that's just going

4     to give a briefer window for him to flee, but it's not going to

5     stop him from fleeing.

6          Similarly, with the co-defendant and threats to the

7     co-defendant, you know, if he's on home confinement, he still

8     would presumably be permitted to leave the apartment in order

9     to meet with his attorney, to go to medical appointments, and

10:28 10   it would be easy for him to take advantage of that opportunity

11    to try to track down the co-defendant and potentially

12    intimidate him.  And again, it's just as easy to cut off the

13    bracelet and go after a co-defendant as it is to cut off a

14    bracelet and flee.  So, you know, the government doesn't

15    believe that these conditions will prevent the defendant from

16    fleeing or from posing risk of safety to the co-defendant.

17         So the only other factor I was going to address, Your

18    Honor, is the length of the defendant's pretrial detention at

19    this point.  That's really the only thing that has changed in

10:29 20   terms of the assessment of the defendant's detention.  Beyond,

21    the government has -- I guess I should clarify.  The government

22    has now developed additional evidence of the risk of flight and

23    the risk to the safety of the cooperating co-defendant, and the

24    only factor that weighs for release at this point is the length

25    of detention.  And, you know, here the length of the detention

1    though was driven by the defendant's own conduct.

2            The court went through these factors at the January

3    17, 2023 hearing where you noted that the defendant chose to

4    proceed pro se.  He then filed approximately 20 substantive

5    motions.  The court tried to hold a hearing in August of 2022

6    on those motions, but the defendant kept filing motions,

7    including one on the eve of that hearing, continued to file

8    motions through the fall of 2022 through the end of December in

9    fact.

10:30 10          And the court was finally able to hold a hearing in

11   January of 2023.  And as the court noted at that hearing, that

12   hearing was necessary because the defendant was filing pro se

13   motions.  The hearing gave you the opportunity to really fully

14   understand what he was asking for and what he was arguing.  And

15   so it wasn't a matter of being able to simply decide all his

16   motions on the papers.  A hearing was necessary.

17          THE COURT:  I'll confirm what you just said, which I

18   believe I said in January.  I have to liberally, judges have to

19   liberally construe pro se motions.  If there was something of

10:30 20   merit in any of them, I didn't want to miss it.  And Mr. Prado

21   explained his motions much differently, some of the them, at

22   the January hearing than he did on paper.  The hearings were

23   definitely necessary.

24          MS. KEARNEY:  Exactly, Your Honor.  And even with the

25   delayed hearing, Your Honor tried to move the case along by

1    setting the March 6 trial date back in December of 2022.  And

2    it was the defendant who then in January said, "Actually, I do

3    want counsel," which, you know, is his right, but that then

4    required the trial to get pushed back so that his counsel could

5    prepare for trial.

6         And all of this is driven by the defendant's own

7    conduct.  In contrast, here the government has not engaged in

8    any strategies to try to delay any hearings, any trials.  We've

9    timely responded to all of the defendant's motions.  Discovery

10:32 10   has been produced for well over a year.  In fact, the bulk of

11   it was even earlier than that.  The government was prepared to

12   proceed with the March 6 trial date and had complied with the

13   pretrial deadlines that the court had set up until the point

14   that court continued them.

15        So given the risk of flight, the safety concerns, they

16   outweigh any due process concerns, particularly where, here,

17   the defendant is the one who drove the delay in the trial.  And

18   I note in the *Zannino* case that the First Circuit decided,

19   there the defendant had claimed a heart condition which delayed

10:32 20   the trial, and the First Circuit noted that allowing the

21   defendant's delay to then get him released would defeat the

22   purpose of the Bail Reform Act.

23        And just one final note is that at this point the

24   defendant is not going to be held indefinitely.  We have a

25   trial date set for September.  This is not going to be an

1    indefinite detention.

2            So for all of these reasons, the government believes

3    that continued detention is appropriate here.

4            THE COURT:  Thank you.  Mr. Palmer.

5            MR. PALMER:  Thank you, Your Honor.

6            With respect to, let me start with the last point, the

7    court's order and statement at the January hearing to indicate

8    that you would revisit the question of detention.  You had

9    already ruled that the defendant's speedy trial rights had not

10:33 10   been violated, and you stated that you will revisit the

11   question of detention.  So I think I'll address my remarks,

12   some of which will overlap arguments, as has the government's,

13   that were previously made to the court.

14           THE COURT:  And it's necessary to do it because, while

15   there is some additional evidence, there has been the passage

16   of time as I've prepared for this, and of course I've prepared

17   for this.  I read what was argued and what I said in November

18   2021.  It's necessary to do that.  So you don't have to

19   apologize for repeating, if that's where you were going.

10:34 20   MR. PALMER:  I'm not going to unnecessarily repeat.

21   Let me put it that way.  But I do want to just quickly take

22   issue with one comment that the government made at the end.

23   The only changed -- the length of the detention is not the only

24   changed circumstance.

25           We're proposing -- the government has said that the

defendant's wife is estranged from him, the wife that lives in
Florida.  That was the previous recommendation, that he live
with the wife in Florida.  That's no longer possible.  And the
residence that we're posing in Massachusetts should be more
than satisfactory to the court because the defendant would be
here in Massachusetts, supervised by Massachusetts probation,
monitored by Massachusetts electronic monitoring.  And so I
think that's a changed circumstance that the court can take
into consideration as well.

10:35    The third issue, aside from the change in residence,
the length of detention, the government cites new evidence that
it now claims supports detention based on dangerousness.  And I
would just point out at the outset, Your Honor, that much of
this evidence, this new evidence, is coming from a cooperator
whom I've not had the benefit of cross-examining, who I have
not been provided, I would contend, the full degree of
exculpatory information concerning.  He's not being -- he
hasn't been cross-examined.  Even at a trial --

    THE COURT:  Well, let's refine that then.  One of the
10:36 pieces, additional pieces of evidence is the video of the
defendant shooting the firearm out of the car.  And apparently
the government has two translations of what he's saying, you
know, "This is what I do to people who wrong me," or, "This is
what I do to people who make a mistake."  It suggests that even
before he was charged in this case he tried to demonstrate what

1    he would do to anybody who crossed him, who he felt had harmed

2    him.  And so there is that.

3         MR. PALMER:  Well, I mean, it is what it is.  But all

4    I can say to the court is, from the information I've been

5    provided, the degree -- the government is expressing concern

6    for this cooperator.  They apparently were incarcerated

7    together and the full degree of so-called threats that my

8    client allegedly made against this -- well, he didn't make any

9    threats.  He simply said that he's a cooperator.

10:38 10        THE COURT:  Go ahead.  I mean, that, A, is

11   speculation, and B, I think I can take judicial notice based on

12   my 38 years as a judge that frequently, more than rarely,

13   cooperators in prison are harmed by other prisoners, even if

14   not by Mr. de Souza themselves, are regarded as rats.  It

15   happens.  What's the reason to broadcast that, "I suspect that

16   X is cooperating in a case against me and others," if not to

17   intimidate that person and possibly prompt somebody to harm

18   him?

19        MR. PALMER:  With all due respect, I think that

10:38 20   requires a little bit of speculation.  I think that we don't

21   know the circumstances.  This fellow hasn't been

22   cross-examined.  So I'll leave it at that.  I think that the

23   court, even when you instruct juries at a trial, they're

24   instructed to accept, even after the cross-examination, the

25   testimony of these witnesses with great caution.

1          THE COURT:  With care and --

2          MR. PALMER:  Yes, right.  So I urge the judge to view

3    this uncross-examined statement where the witness has every

4    motivation to help himself in the same light.

5          The other thing, Your Honor, is the conditions I

6    propose I would suggest mitigate against any harm that the

7    government might be legitimately concerned about.  The

8    government acts as if it's a routine matter for defendants to

9    cut off bracelets and flee.  Just anecdotally, I've been

10:40 10   practicing in the federal court quite some time now.  I

11   certainly never had a client who has done that, and I haven't

12   even heard about it.

13         THE COURT:  I've had cases in which it occurred.

14         MR. PALMER:  Well, you have more experience than I do.

15         THE COURT:  Including civil cases where people were in

16   removal proceedings.  It's happened.

17         MR. PALMER:  I would suggest it's rare.  But I think

18   that here, you know, this allegation, which I've heard about

19   for the first time with the government's submission that he's

10:41 20   got a suitcase somewhere with $250,000 and a gun in it, with

21   all due respect, Your Honor, that's just an unsubstantiated

22   statement from a questionable source, I would suggest.  But in

23   any event, in any event --

24         THE COURT:  I'll make the note here so the government

25   can -- if the defendant is convicted and the government has got

1       that $250,000, if it has seized it somehow, and it may not any

2       longer be where it was if it was there, I want that money

3       recovered.

4              The public is paying for Mr. Prado's representation on

5       the representation that he's indigent, that he has no money.

6       He filed an affidavit to that effect.  If he's got $250,000 in

7       a suitcase, A, he lied to get Mr. Palmer as his court-appointed

8       lawyer; and, B, there's the authority to recover Criminal

9       Justice Act payments if it's proved that the defendant was

10:42 10  capable of paying.  So we'll just make a note of that.

11             The longer this case goes on, the more the public will

12      pay Mr. Palmer.  And if and when Mr. de Souza is convicted,

13      they're going to want their $250,000.  Although I think there

14      are forfeiture allegations anyway.  This may be a specific

15      application of that money.  I've dealt with this before where

16      the defendant is suspected of having money and having

17      court-appointed lawyers.

18             I'm sorry, Mr. Palmer, go ahead.  But this is, there's

19      no testimony presented with regard to that.  It's a very

10:43 20  specific allegation, as Ms. Kearney said.  It says there's a

21      particular place where there's this suitcase.  Why should I not

22      credit the contention that the defendant told the cooperator

23      this when they were co-conspirators?

24             MR. PALMER:  That portion of the 302 report that I

25      have, Your Honor, seems to have that portion redacted.  I'm not

1    sure that --

2          THE COURT:  I think it's not, if you look at the

3    government's submission, in docket number 723-2 under seal,

4    that's not redacted.

5          MS. KEARNEY:  Your Honor, if I may jump in just to

6    clarify.  When the government initially produced the 302 to

7    defense counsel, we did redact the last paragraph out of

8    concerns for the safety of the cooperating co-defendant because

9    he had expressed concerns about the defendant knowing he had

10:44 10   shared that information with the government.  However, in

11   connection with our filing at docket 723, we did provide

12   defense counsel with an unredacted copy.

13         THE COURT:  It's there.

14         MR. PALMER:  I'll have to go back and look.

15         THE COURT:  It's there.

16         MR. PALMER:  So the unredacted copy is attached to the

17   motion.  But I think, so the government in terms of -- as the

18   court has noted, they have to show by clear and convincing

19   evidence that there aren't any conditions of release that would

10:45 20   prevent -- you know, safeguard the community and another

21   person.  I think that the conditions that I have proposed would

22   in fact safeguard the other person.

23         I mean, the government is somewhat arguing

24   inconsistent positions.  I mean, if the defendant were going to

25   cut off his bracelet, he wouldn't be going after the

co-conspirator.  He'd be leaving for Mexico.  That's their argument.  So I think there are conditions that protect the community and also ensure that he won't flee.

I just want to comment on what the judge, I think it was the magistrate in Florida noted about the defendant's alleged knowledge of technology to create, you know, to enable him to flee and create all sorts of documents.  He wouldn't be able to do that with the conditions, even if he were inclined to do it, he wouldn't be able to do with it the conditions that I proposed, which would include regular monitoring by the probation department, regular check-ins by him, and electronic monitoring.  I respect the court's experience, but I would suggest it is speculative that he would --

THE COURT:  Well, I mean, there's very substantial evidence that he created false driver's licenses and sometimes put his own picture on it.  He could do it himself and he knows people who know how to do it.  There are 18 defendants in this case, unindicted co-conspirators.  Apparently, somebody could do this for him.

MR. PALMER:  I was addressing the suggestion that he could somehow circumvent the GPS monitoring.  I guess I wasn't clear on that.

THE COURT:  I see.  I think, as I recall in November 2021, I said even if he couldn't spoof the GPS monitor, he could just cut it off.  And then if he had a driver's license

1     that he or somebody in his community made for him, he could

2     take off.  And he wouldn't have to leave the country.  He could

3     live under a different identity in someplace other than

4     Massachusetts presumably.  Anyway.  Thank you.

5                 MR. PALMER:  Thank you, Your Honor.

6                 THE COURT:  Okay.  Is there anything the government

7     would like to say in response?

8                 MS. KEARNEY:  No, Your Honor.  I think you actually

9     made the points already that I was going to respond; that, even

10:49 10    if the defendant doesn't have access to a computer, he

11    certainly knows people who could get him access and could make

12    driver's licenses for him.

13                THE COURT:  Well, I'd like the clerk to put me in the

14    breakout room with my staff, please.

15                (Recess 10:49 a.m. - 10:56 a.m.)

16                THE COURT:  I believe we have everybody back.  I've

17    studied this matter closely.  In advance of the argument, which

18    was helpful, and since I'm immersed in this and know how I will

19    decide it, I'm going to do it orally.  The transcript will be

10:56 20    the record of the decision.  Although it might at some point be

21    converted into a more formal memorandum, into a formal

22    memorandum and order.

23                With regard to the renewed motion to revoke the

24    defendant's detention, it is hereby denied.  The parties have

25    agreed that the standards that I described in determining

1   whether detention has been proven to be justified by the

2   government are as discussed in *Digiacomo*, 746 F. Supp. 1176 and

3   1180, and in *Patriarca*, 776 F. Supp. 593 at 597, a case that

4   was remanded but not with regard to the applicable standard.

5          Although I did decide the motion to revoke detention

6   on November 22, 2021, I've considered the matter de novo

7   because of the passage of time and the evolution of the

8   evidence.  I'm going to explain, of course, the reasons for my

9   decision.  And in many respects, they're the same, the analysis

10:57 10   is the same as it was in November 2021 because certain relevant

11   circumstances have not changed.  As Mr. Palmer recognized,

12   certain repetition is necessary.

13          In November 2021, the government was relying solely on

14   risk of flight for the defendant to justify defendant's

15   detention.  It now also intends that no reasonable combination

16   of conditions will -- no combination of conditions will

17   reasonably assure the safety of the cooperating witness.

18          So the government must prove by a preponderance of the

19   evidence that no combination of conditions will reasonably

10:58 20   assure defendant's appearance as required at future court

21   proceedings.  And that doesn't mean that, as I said earlier,

22   that those conditions have to guarantee he won't appear.  They

23   have to provide reasonable assurance that he will.  I find the

24   government has satisfied its burden with regard to risk of

25   flight.

1          With regard to danger, the government must prove by

2     clear and convincing evidence that no combination of conditions

3     will reasonably assure in this case that the defendant will not

4     be a danger to the cooperating witness whose identity he knows.

5     And although not material to the outcome of the case, I find

6     that the government has satisfied its burden to that point,

7     too.

8          I have to consider the Section 3142(g) factors in

9     making this decision, including what the proposed conditions

10:59  10    are.  They include that the defendant would surrender his

11    passport, that he would be subject to electronic monitoring, if

12    necessary, he would be on home confinement, not curfew.  He

13    would be monitored by Pretrial Services in Massachusetts now

14    not Florida.  He would be prohibited from internet access or

15    alternatively would have his internet access monitored by

16    Pretrial Services, and there would be $100,000 unsecured bond.

17         I find that the government has proven by a

18    preponderance of the evidence that there is a high risk, real

19    risk that the defendant would flee and that the proposed

11:00  20    conditions or any other feasible conditions will not reasonably

21    assure the defendant will not flee and will appear in the

22    future.  As I'll explain, I also find to prove clear and

23    convincing evidence that no combination of conditions will

24    reasonably assure the safety of the cooperator.

25         With regard to the Section 3142(a) factors, the crime

1    charged is not a crime of violence or a drug charge.  There's

2    no presumption of detention, but there is a charge that he

3    conspired to commit wire fraud, and he did so in a very

4    substantial way and engaged in aggravated identity theft

5    repeatedly, which are both serious crimes.  I think it hasn't

6    been mentioned today, but previously I was told that the wire

7    fraud guidelines, the government expects, were about 46 to 78

8    months if the defendant goes to trial.  Well, I'm not sure

9    that's if he gets acceptance of responsibility which would

11:02 10    lower the guidelines, which are only advisory.  And the

11    aggravating identity theft requires a two-year, 24-month

12    consecutive sentence.  So as I understand it, the advisory

13    guideline range is 70 to 104 months in custody.

14         The weight of the evidence against the defendant is

15    very strong.  At the outset of this case and in the complaint,

16    docket number 1-1, which may still be under seal, it indicates

17    in paragraph 77, "The investigation has revealed that, as part

18    of the scheme, Prado prepared and submitted applications using

19    fraudulent identifiers, rented and sold fraudulent drivers'

11:03 20    accounts, purchased and traded driver's licenses and social

21    security numbers, sold GPS spoofing technology to drivers,

22    these are Uber and Lyft drivers, and exchanged information with

23    other co-conspirators on how to circumvent the rideshare

24    delivery companies' fraud detention systems.  There were also

25    delivery companies who were targeted in the scheme.

1        I have taken guilty pleas from 14 defendants, heard
2   the recitation of the government's evidence against them
3   specifically and of the general nature of the crime.  And my
4   understanding is that the evidence against Mr. Prado is strong
5   or stronger than the evidence against those individuals who did
6   not have confirmation there was a cooperating witness, for
7   example.  It is very strong.
8        Among other things, the government has evidence from
9   4100 WhatsApp chats with co-conspirators, with co-defendant
11:04 10   Aguiar.  There are bank records.  There are Zelle transfers of
11   funds into the defendant's accounts that evidently in some
12   manner relate to the scheme alleged.  There are records of the
13   rideshare and delivery companies.  And there's evidence that
14   the defendant altered at least 12 driver's licenses.
15       In addition, the cooperating witness will provide
16   detailed evidence of a time that he and Mr. Prado were friends
17   and co-conspirators.  The fact that 14 defendants have pled
18   guilty doesn't mean Mr. Prado is guilty.  It means, as the
19   government argued, 14 co-defendants looked at the evidence and
11:05 20   decided that they would be proven guilty if they went to trial
21   and preferred to plead guilty and hopefully get some benefit
22   from that in sentencing.
23       So the combination of formidable evidence against the
24   defendant and also the facts that the guidelines suggest there
25   should be a lengthy sentence -- although tomorrow I'll hear

argument from the other 14 defendants as to whether the
government's loss calculation or contentions concerning
enhancements are correct, the government's calculation of the
guideline range may not be correct -- what Mr. Prado has heard
so far is that he's facing 70 to 108 months in prison if they
give him a guideline sentence if he's convicted.  If he pleads
guilty, it could be less, but it could be more.  He's facing a
long sentence, and he is likely to be deported even though he
has an application for asylum.  And these facts create a
substantial incentive to flee.

I've considered his history and characteristics.  He
has family in Massachusetts.  He's lived in Massachusetts for
many years.  He's now, though, estranged from his wife and
children which were previously argued to be a reason that he
would not flee and in any event he could, as the government
explained, flee more easily alone than with his wife and
children.  He could try to get to Brazil, which does not have
an extradition treaty with the United States.  He may not have
strong ties there and he may even fear being in Brazil.

He could also flee to other parts of the United
States.  He has a proven ability to create false
identification, including false driver's licenses, and he could
use those to flee and live in the United States or to go to
Mexico, for example.  In addition, for present purposes, I
credit the evidence in the FBI report that he told the

1    cooperating witness before either were charged when they were

2    friends and co-conspirators that he has a suitcase with

3    $250,000 in it and a gun in a specific place with specific

4    people.  And this gives him the means to flee, to finance it.

5         The defendant is not authorized to work in the United

6    States.  He has no history of drug abuse.  He's got a minimal

7    criminal record, but he does have restraining orders indicative

8    of a violent streak.  It's not clear whether or not he's

9    appeared in the past as required, and I'm not finding that he

11:09 10   did not.  He wasn't on probation or release when he was charged

11    in this case.

12         As I said, the government has proven no proposed

13    conditions or any others will reasonably assure the defendant

14    will appear in the future as required.  As I said, he's got a

15    powerful incentive to flee.  He's facing a guideline range

16    which at the moment he's been told by the government at least

17    is 70 to 108 months.  His motions to dismiss have been denied.

18         In contrast to November 2021, he now no longer has the

19    hope that the case will be dismissed, which may affect his

11:10 20   incentive to flee.  He knows how to make and obtain false

21    identification, including social security numbers and licenses.

22    Even if he could not use a computer himself, there is

23    substantial evidence that he has ready access to buying

24    fraudulent identifications on the dark web and could do it

25    again.  He could also have friends or others make false

1   identifications for him at his direction that know how to do

2   it.

3           Even if he couldn't spoof electronic monitoring, as he

4   spoofed the rideshare apps software, he could just cut off the

5   electric monitor and flee.  It's happened in my experience.

6   The electronic monitoring will inform probation and the

7   government that somebody has fled.  It doesn't prevent flight.

8   Nor would his mother or sister be possibly watching him or able

9   to prevent him from fleeing if he decided to flee.  And with

11:11 10   false identification, he could go anywhere in the United

11   States.  And, as I said, he has claimed to have $250,000 in

12   cash in a suitcase which would facilitate that flight.

13           The fact that several of his defendants, co-defendants

14   went to Mexico and then to Brazil is not evidence that the

15   defendant himself would flee to Mexico or to Brazil.  But it is

16   evidence that it can be done if he wanted to do it.  And

17   there's no security the defendant could post that would

18   discourage him from fleeing.  So for all of those reasons, I

19   find that the defendant's detention must continue because of

11:12 20   the risk of flight.

21           This isn't material to the decision that his detention

22   continue, but in the interest of completeness, I'll say the

23   government has also proved by clear and convincing evidence

24   that no combination of conditions will reasonably assure the

25   safety of the cooperating witness.  The evidence available,

1   some of this evidence was not available to me at the November

2   2021 hearing.  The new evidence includes the fact that --

3   evidence I find sufficiently proves the facts for present

4   purposes.  The defendant harassed a then suspected cooperating

5   witness while they were in jail together.  He told others that

6   the cooperating witness was a cooperator.  And it's an

7   unfortunate fact that cooperators are often -- in jail by

8   criminals who regard them as rats and sometimes harm them

9   physically.  So the defendant exposed the cooperating

11:14 10   individual to danger while they were in jail.  Now the

11   suspected cooperating witness has been confirmed for Mr. Prado,

12   and the person is on release somewhere.

13        There's a video of the defendant shooting out of a car

14   with an automatic weapon, which may or may not have been firing

15   blanks, but which could have harmed or possibly killed someone,

16   particularly if he wasn't firing blanks.  The video also

17   records the defendant saying before he was charged in this

18   case, in effect, that this is what I would do to someone who

19   makes a mistake of wronging me.  He's basically bragging that

11:15 20   he would shoot them.

21        As I said, he could remove the electronic monitor.  I

22   think Mr. Palmer is right that he might not want to spend much

23   time, if any, looking for the cooperating witness, but if he

24   thought he knew where the cooperating witness was and could

25   easily shoot him before taking off, there is a real risk that

1    he would do that.

2            So while I'm relying primarily on risk of flight in

3    ordering the continued detention, and the decision would be the

4    same regardless of my finding whether there's clear and

5    convincing evidence that the defendant would pose a danger if

6    released on conditions, I do find that the government has

7    proven by clear and convincing evidence that no combination of

8    conditions will reasonably assure the safety of this

9    cooperating witness if the defendant is released before his

11:16 10    September 11 trial.

11            And this conclusion is not altered by the length of

12    his pretrial detention, which I have seriously considered.

13    He's now been detained for about 21 months.  He will be

14    detained for about 28 months at the time of his trial in

15    September 2023.  I've analyzed the speedy trial issues, the

16    whole range of them carefully and explained my reasoning and

17    denying requests to be released on speedy trial grounds in my

18    January 17, 2023 oral decision.  The transcript is docket

19    number 720.  The decision is at pages 49 to 55 from the draft

11:17 20    transcript I have.

21            That analysis remains correct in my view.  I don't

22    intend to alter it by anything I say now.  But in many cases I

23    recognize that an 18-month detention might violate due process

24    according to the First Circuit *Zannino*, 797 F.2d 44-47.  That's

25    not true in every case.  An individual inquiry is required, as

1      the First Circuit said *Zannino*.  In some cases longer periods

2      of detention have been held to be lawful.  In *Carrozza*, a case

3      cited by the government, I held that defendants held more than

4      two years would properly and should have their detention

5      continue.

6             And as I explained in my decision last month and

7      today, with regard to the *Zannino* factors, there is no due

8      process violation.  The charges here are serious.  The

9      government has persuasive, compelling evidence of risk of

11:18 10  flight and dangerousness.  The government -- that the defendant

11     is guilty is substantial.  I'm just a judge, not a prophet, and

12     believe it's likely the defendant will be proven guilty beyond

13     a reasonable doubt after I give him a fair trial, which I will

14     strive to do.  But if I felt that there was a substantial risk

15     -- let me put it this way.  I don't feel there's a substantial

16     risk that the defendant is serving time now that he wouldn't be

17     required to serve after trial.  Sometimes there are surprising

18     results, and I will strongly repeatedly tell the jury the

19     defendant is presumed innocent; the government must prove his

11:19 20  guilt beyond a reasonable doubt.

21            I know now far more about this case than I know any

22     other case at this stage.  Guilty pleas from 14 defendants.

23     And the evidence the defendant is guilty is substantial.  This

24     18-defendant case is inherently complex to manage, but the

25     defendant for a long period of time exercised his right to

1   represent himself, filed many pro se motions, some on the eve

2   of hearings of those motions so the government didn't have time

3   to adequately respond.

4         And as I said earlier, those hearings were necessary.

5   I wanted to understand what Mr. Prado was arguing in his often

6   confusing motions.  And the hearing last month was very

7   helpful.  He clarified a lot.  It turned out to all be

8   unmeritorious motions.  And then he made the decision, which I

9   believe is very wise, to be represented by counsel again.  But

11:21 10   naturally, Mr. Palmer needs, as like any other lawyer, would

11   need time to prepare for the trial, study the voluminous

12   evidence.  And therefore I had to, because of the defendant's

13   decisions, postpone the March 6, 2023 trial date.

14         So I know that 21 to 28 months is an unusually long

15   time to be detained, but it doesn't violate the defendant's

16   right to due process.  And in view of all the other factors I

17   have to consider, it doesn't justify releasing him.

18         So I'm directing that the parties order at least the

19   transcript of my decision, actually, the whole transcript of

11:22 20   today's hearings when it's available.

21         And the clerk sent you earlier today a largely blank

22   pretrial order.  Is that correct?

23         MS. KEARNEY:  Yes, Your Honor.

24         THE COURT:  All right.  Well, here are the dates I

25   propose.  And if they cause anybody concern, you'll tell me.

1          So as previously ordered, the trial will begin on

2     September 11 at 9:00 a.m., September 11, 2023.  I am ordering

3     that you talk again about whether you can reach some agreement

4     to resolve this case.  Mr. Prado and Mr. Palmer now know

5     something they didn't know yesterday, and that is Mr. Prado is

6     not going to be released pending trial.  I wouldn't do it

7     gratuitously, I didn't do it gratuitously, but they now know my

8     current view of the strength of the evidence against Mr. Prado.

9          I'm ordering that you report by March 15, that you

11:23 10    confer and report whether you've reached an agreement to

11    resolve the case in some fashion.  And if not, I'm ordering

12    that that be done again, that you confer again and by August 1

13    report whether you've reached an agreement because there's a

14    lot of work to be done to prepare for a trial, particularly in

15    this case, and it shouldn't be done unnecessarily.

16          If the parties haven't reached an agreement to resolve

17    the case, the government shall by May 1, 2023 disclose to the

18    defendant exculpatory information identified in local rule

19    116.2 that's not previously been produced.  Does the government

11:24 20    have a problem with doing that?

21          MS. KEARNEY:  No, Your Honor.  And we had complied

22    with the prior deadline on that in January.  And so to the

23    extent any new information becomes available to the government,

24    we'll comply with that deadline.

25          THE COURT:  All right.  As we've discussed before,

1   you've told me before, you understand this is a continuing

2   obligation.  You have to go to every agency that participated

3   in the investigation and find out if there's oral or written

4   exculpatory evidence that hasn't been produced and produce it.

5   And then, you know, if as you're preparing witnesses, for

6   example, inconsistencies emerge and they're likely to be

7   material, you should disclose those.  Do you understand?

8           MS. KEARNEY:  Yes, Your Honor.

9           THE COURT:  All right.  And is the government

11:25 10  intending to introduce any 404(b) evidence?

11          MS. KEARNEY:  Your Honor, at this time we do not, and

12   that's what we indicated when we complied with the prior

13   deadline on this.  Should something new come to our attention,

14   we will of course comply with all deadlines, but at this time

15   the government is not introducing any 404(b) evidence.

16          THE COURT:  I'm making May 1 the deadline for that.

17   Mr. Palmer, if the government agrees to turn over witness

18   statements in advance of a witness's testimony, are you willing

19   to do the same?

11:26 20          MR. PALMER:  Yes, Your Honor.

21          THE COURT:  I'm ordering that that be done by July 14.

22   I'm ordering that by July 21 the parties file proposed voir

23   dire questions, jury instructions, any motions in limine with

24   supporting memoranda.  The government shall file a trial brief

25   and the defendant may.  I'm not ordering it.  If you're going

1      to file a trial brief, Mr. Palmer, it shall be filed the 21st,

2      and then responses to the motions in limine shall be filed by

3      August 4.

4             The government shall, by August 11, file the names and

5      addresses of its witnesses and give the defendant copies of the

6      exhibits it intends to use in its case-in-chief.  The defendant

7      shall do the same by August 18.  The parties shall by August 22

8      file any stipulations, and we'll have another pretrial

9      conference on September 6 at 10:00 a.m.  It's possible I'll

11:29 10   move that back to August.

11            And it was agreed at the January 17, 2023 pretrial

12     conference all time until trial on September 11 -- all time

13     until trial is excluded for Speedy Trial Act purposes.  It

14     continues to be in the interest of the administration of

15     justice, to give Mr. Palmer time to prepare, among other

16     things.

17            By August 22, though, the parties shall report whether

18     they object to any of their adversary's exhibits and just

19     briefly state the reasons, hearsay, relevance.  And I'm going

11:30 20   to need copies of exhibits and the *Jencks* material, two extra

21     copies of the exhibits, two copies of the *Jencks* material for

22     my own preparation, which should be submitted August 22.

23            Is there anything further in this matter for today?

24            MS. KEARNEY:  Your Honor, just one request, on the

25     objections to exhibits, under the current proposed schedule,

```
 1    the government would only have four days --
 2            THE COURT:  That's probably not enough.
 3            MS. KEARNEY:  If we could have until the 25th, that
 4    would be a full week.
 5            THE COURT:  That's fine, that's fine.
 6            MS. KEARNEY:  Thank you.
 7            THE COURT:  That's fine.
 8            MR. PALMER:  Your Honor, I think I missed, I didn't
 9    hear the second date we were supposed to report back to the
11:31 10  court for whether or not there's been a resolution.
 11           THE COURT:  The second date would be August 1.  We can
 12   do it earlier, as I moved some other things earlier.  In fact,
 13   I'm going to change that.  Make it July 14 because I'm trying
 14   to -- if having seen all the evidence and talked to your client
 15   there's some agreed resolution, then you don't have to file the
 16   motions in limine and the jury instructions.
 17           We're all very busy.  So I'm prepared to continue to
 18   invest substantial time in this case, but it's not the only
 19   case I have.  There are always hard decisions to be made, but
11:32 20  if the case is not going to go to trial, I think it's in
 21   everybody's interest to determine that sooner rather than
 22   later.  And if it's sufficiently far in -- if the defendant
 23   decides to plead guilty, and it's totally up to him, if it's
 24   early enough, he gets points off for acceptance of
 25   responsibility, so it's entirely up to him.
```

         1              MR. PALMER:  Your Honor, there was one other issue.

         2     In preparing for this hearing I reviewed the plea, the

         3     transcript of the plea colloquy between the cooperating witness

         4     and the court.  And part of that colloquy apparently was

         5     sealed, and I'm going to be requesting -- I don't know how I'll

         6     do it, but I wanted to request that that be unsealed, at least

         7     insofar as I would be given access to the cooperating --

         8              THE COURT:  You should -- I appreciate your raising

         9     it, but it can't be resolved in this hearing.  Discuss it with

11:34   10     the government.  I don't have a memory of what's under seal and

        11     whether recent disclosures alter the sealing calculation in the

        12     government's view or my view.  But talk to the government.  If

        13     you don't reach an agreed resolution of the issue, you should

        14     file a motion.  If necessary or appropriate, you can move to

        15     file it under seal and the government's response under seal.

        16     Hopefully you can work it out.

        17              MR. PALMER:  Okay.

        18              THE COURT:  All right.  I've ordered you to order the

        19     transcript of today's proceeding.  And I will see the probation

11:35   20     officer, I didn't have her identify herself, Martha Victoria,

        21     and my staff in the breakout room after everybody else is off

        22     this.  Okay.  Court is in recess.

        23              (Adjourned, 11:35 a.m.)

        24

        25

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 28th day of February, 2023.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RMR, CRR

Official Court Reporter