UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                               )
                               )                Criminal Action
          Plaintiff,           )                No. 21-10158-MLW
                               )
v.                             )
                               )
WEMERSON DUTRA AGUIAR,         )
ET AL.                         )
                               )
          Defendants.          )
                               )


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


HEARING

February 24, 2023
11:19 a.m.


John J. Moakley United States Courthouse
Courtroom No. 2
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      David M. Holcomb
 3    United States Attorney's Office MA
      1 Courthouse Way
 4    Suite 9200
      Boston, MA 02210
 5    617-756-9043
      David.Holcomb@usdoj.gov
 6
      On Behalf of the Defendant Wemerson Dutra Aguiar:
 7    Kevin L. Barron
      Kevin L. Barron, Attorney at Law
 8    50 Congress Street, 6th Flr.
      Boston, MA 02109
 9    617-407-6837
      Kevinbarronesq@gmail.com
10
      On Behalf of the Defendant Edvaldo Rocha Cabral:
11    Daniel DeMaria
      Greco Neyland, P.C.
12    15 Cottage Avenue, 4th Flr.
      Quincy, MA 02169
13    617-658-5020
      Dan@greconeyland.com
14
      On Behalf of the Defendant Luiz Narciso Alves Neto:
15    Austin C. Tzeng
      Law Office of Austin C. Tzeng
16    Suite 501
      21 Mayor Thomas J. McGrath Hwy
17    Quincy, MA 02169
      781-929-4882
18    Tzengdefense@gmail.com

19    On Behalf of the Defendant Altacyr Dias Guimaraes Neto:
      Nathaniel H. Amendola
20    Amendola LLC
      738 Main Street
21    Hingham, MA 02043
      781-740-0800
22    Nate@amendolallc.com

23

24    (continued)

25
```

```
1   On Behalf of the Defendant Bruno Proencio Abreu:
    J. Thomas Kerner
2   Attorney at Law
    240 Commercial Street
3   Suite 5A
    Boston, MA 02109
4   617-720-5509
    Thomas.kerner@comcast.net
5
    On Behalf of the Defendant Alessandro Felix da Fonseca:
6   James E. Haynes
    Hedges & Tumposky, LLP
7   88 Broad Street
    Ste 101
8   Boston, MA 02110
    617-722-8220
9   Haynes@htlawyers.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Mark L. Wolf, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 2, Boston, Massachusetts, on
 7    February 24, 2023.)
 8    (Case called to order.)
 9              THE COURT:  Good morning.  Would the clerk please
11:19 10   administer the oath to the interpreter.
11              (Interpreter duly sworn.)
12              THE COURT:  Would counsel who are present in the
13    courtroom please identify themselves for the court and for the
14    record and state whether or not your client is one of the
15    defendants in the jury box.
16              MR. HOLCOMB:  Good morning, Your Honor.  David Holcomb
17    for the United States.
18              MR. BARRON:  Good morning, Your Honor.  Kevin Barron
19    for Wemerson Dutra Aguiar who sits in the center of the people
11:19 20   in the jury box.
21              MR. HAYNES:  Good morning, Your Honor.  James Haynes
22    on behalf of Alessandro da Fonseca, who is the gentlemen
23    raising his hand.
24              MR. AMENDOLA:  Good morning, Judge.  Nate Amendola on
25    behalf of Altacyr Neto, who has waived his appearance.
```

1          MR. TZENG:  Good morning, Your Honor.  Austin Tzeng
2     for Luiz Narciso Alves Neto.  He's waived his physical presence
3     for this hearing.
4          MR. DEMARIA:  Good morning, Your Honor.  Daniel
5     DeMaria for Edvaldo Cabral, who is in the gray, with his hand
6     raised there.
7          MR. HALPERN:  Good morning, Your Honor.  Saulo Aguiar
8     Ponciano, who is in the jury box.
9          MR. KERNER:  Thomas Kerner --
11:20 10          THE COURT:  I'm sorry, we don't have room for you.
11          MR. KERNER:  That's okay.  He's already pled pursuant
12     to a plea agreement.
13          THE COURT:  Okay.  And we have some counsel observing
14     on Zoom.  We have some of the defendants on Zoom as well.  We
15     have some counsel observing on Zoom as requested and authorized
16     by me.
17          We're here pursuant most recently to my February 7,
18     2023 order, docket number 708.  This is a presentencing
19     hearing.  I intend to hear argument on issues that are common
11:21 20     to all of the defendants.  I defined two of them in my January
21     13, 2023 order, docket number 648.  And a third issue regarding
22     an authentication feature has emerged.
23          I will eventually rule on the issues, the common
24     issues and the context of the objections to the Presentence
25     Reports of each defendant at their sentencing hearing.  The

1    defendants will be present here in the courtroom for that.

2    They don't have a right in my view to be present today pursuant

3    to Rule 43 since this is just a presentencing hearing that I'm

4    conducting, so I don't make decisions on issues, for example,

5    whether there's loss and how to calculate it with regard to the

6    first of the 14 defendants to be sentenced that the others

7    haven't had an opportunity to be heard on.  Nine of the

8    defendants in any event have waived any possible right they

9    might have to be present today, and I agreed, as requested, to

11:22 10   have five of the defendants present here today.

11               I hope to give you non-final views on how I expect to

12   rule on objections on common issues today.  And at the actual

13   -- well, at the sentencing hearings I'll make actual final

14   rulings in the context, as I said, of the objections to the

15   Presentence Reports.  I will have to make an individualized

16   determination of the amount of loss, if I determine that there

17   is loss, and other issues at sentencing, and the amount of any

18   loss attributable to each defendant may be different.  It may

19   require a relevant conduct analysis.  Well, it will require a

11:23 20   relevant conduct analysis, I expect, for at least some of the

21   defendants.  And at the appropriate time I'll apply the

22   relevant conduct principles as they are in Section 1B1.3 of the

23   guidelines.

24               The common issues to be addressed today are whether

25   the conspiracy to which each of the defendants has pled guilty

1    caused any loss; if so, how the loss should be calculated and,

2    if so, what was the amount of the total loss.

3         All of the defendants who pled guilty stipulated to

4    the amount of the loss and other contested common issues in

5    their plea agreements.  As I understand it, their counsel are

6    not arguing today.  However, Probation and the Court are not

7    required or not bound by the stipulation, although it may have

8    force.  And if I ultimately disagree with any of the stipulated

9    facts from the defendants who pled guilty, I expect that if

11:25 10   it's favorable to -- if it would be favorable to the other

11   defendants, they'll get the benefit of those rulings despite

12   the stipulations.

13        The second common issue is whether there should be an

14   enhancement in calculating the guidelines for sophisticated

15   means and/or for a substantial part of the scheme taking place

16   outside of the United States.  The third issue, common issue

17   that's emerged is whether there should be enhancement for an

18   authentication feature.

19        Do the parties agree those are the common issues?

11:25 20   MR. HOLCOMB:  Your Honor, I believe that covers it,

21   yes.

22        MR. BARRON:  Yes, Your Honor, and I take it by saying

23   "sophisticated means," you also mean substantially outside of

24   the United States.

25        THE COURT:  Right.  If I didn't say that, I did mean

1     to say it, exactly.  Okay.

2            And as I understand it, Mr. Barron, you and

3     Mr. Halpern on behalf of Mr. Aguiar and Mr. Ponciano are going

4     to argue the loss issues; is that correct?

5            MR. BARRON:  Yes, Your Honor.

6            THE COURT:  And which of you will go first?

7            MR. HALPERN:  I will, Your Honor.

8            THE COURT:  Mr. Halpern, okay.  And it's important,

9     I'm willing to hear from the two of you, but it's important

11:26 10    that you, Mr. Barron, supplement.

11           INTERPRETER:  Excuse me, Your Honor.  The interpreter

12    apologizes for the interruption.  Apparently one of the

13    receivers is not working.  The defendants are saying it's

14    failing.  It comes and goes, comes and goes.

15           THE COURT:  Maybe I ought to just have the marshals

16    take them out.  I've got to give undivided attention to this.

17    They don't have a right to be here at all, and this is not

18    really tenable.

19           MR. HALPERN:  Your Honor --

11:27 20    THE COURT:  I haven't decided to take them out.  I'll

21    take a brief break, but this is too consequential.

22           MR. HALPERN:  Speaking for Mr. Ponciano, Your Honor,

23    he understands some English, so even if he can't get it all,

24    I'd like him here.

25           THE COURT:  I'm finding that's the case.  For example,

1    Ms. Barbosa, who late yesterday afternoon said she'd like to

2    watch on Zoom, has previously asked for an interpreter and

3    yesterday represented to me that she understands English.  So

4    if they understand English, they can stay.  But if their

5    presence is going to injure the flow of this argument or my

6    ability to focus on what you're doing -- why don't each of you

7    go talk to your client, see if they understand sufficient

8    English, if their lawyers are here.

9             MR. HAYNES:  Mr. da Fonseca --

11:28 10             THE COURT:  What's that?

11             MR. HAYNES:  Mr. da Fonseca reports that he

12    understands what's going on and would like to remain.

13             THE COURT:  Fine.  Mr. da Fonseca can stay.

14             MR. KERNER:  Similar for Mr. Abreu, he has enough

15    understanding of English to stay for the hearing.

16             THE COURT:  Thank you, Mr. Kerner.

17             MR. DEMARIA:  Mr. Cabral as well, Your Honor.  He has

18    a sufficient understanding of English.

19             THE COURT:  All right.  He wants to stay.

11:29 20             MR. BARRON:  Mr. Aguiar would like to stay.  His

21    English is spotty, but he's learned a lot since his

22    incarceration and could get some meaningful information from

23    the proceeding.

24             THE COURT:  You're going to have to keep your voice

25    up.

```
 1              MR. BARRON:  Sorry, Your Honor.

 2              THE COURT:  Okay.  Does that cover all five, or is

 3    there somebody I haven't heard about?  They can stay, and the

 4    interpreter -- now they don't seem to have their headsets on,

 5    so I don't know why she's interpreting.

 6              INTERPRETER:  Now it's working.  The interference

 7    might be with the interpreter being too close to here.  The

 8    interpreter can move back.

 9              THE COURT:  You can move, but I may just not have you
11:29 10    do it because I've been working for several days to get ready

11    for this argument.  It's very important, and it's a courtesy

12    that they're here.  Is it working now?  Fine, you can even go

13    back in the gallery if you want because I'd prefer not to hear

14    you, too.

15              All right.  Just try it from right there.  That's

16    okay.  Try it from right there, if it works.  But if there's

17    another interruption, they may have to leave.  Okay?  Or at

18    least they won't get any interpretation.

19              All right.  And then I understand that with regard to
11:30 20    sophisticated means or substantial activity outside of the

21    U.S., Mr. Tzeng on behalf of Mr. Alves Neto is going to present

22    the argument; is that correct?

23              MR. TZENG:  I was not planning on doing so, Your

24    Honor, but I certainly can.

25              MR. HALPERN:  I am.
```

1          THE COURT:  All right.  I think we were informed

2     previously, but that's okay, and Mr. Barron is going to address

3     authentication, correct?

4          MR. BARRON:  Yes, Your Honor.

5          THE COURT:  All right.  So with regard to loss, for

6     reasons I can explain, it's my present view, having studied the

7     submissions, that there was loss as defined in the guidelines,

8     pecuniary harm, that it's most appropriately calculated by

9     using the payments that the rideshare and delivery companies

11:31 10    made to the defendants.  That would exclude Zelle payments,

11    Zelle payments from drivers who were not defendants, and some

12    of those payments I believe would represent loss, but it seems

13    not possible to determine which, as far as I know.

14          The government can address this, I may misunderstand

15    it.  And using Zelle payments, if I understand what the

16    government's proposing correctly from these defendants to --

17    well, Zelle payments by these defendants for things like BOTs

18    or for the driver's licenses would be gain rather than loss.

19    It's not a proper proxy.

11:33 20         And I guess I didn't say it, but when I say that there

21    was loss and it's most appropriately calculated by using

22    payments from the rideshare and delivery companies to the

23    defendants, to get the total loss, not all of which might be

24    attributable to each defendant, ultimately, I'm saying that as

25    in *Gonzalez-Alvarez*, for example, which I view as the most

1    analogous case at the moment, the value of the services

2    rendered was zero.

3           And I'll also say that if there is no loss, at the

4    moment, I would depart upward under Application Note 21 to

5    Section 2B1.1 which encourages departures in cases in which the

6    offense level substantially understates the seriousness of the

7    offense.  And then I would use the amount of the payments to

8    determine a reasonable range for the upward departure.  But

9    that's all tentative and hopefully will help.

11:34 10          The burden of proof with regard to the enhancements,

11   of course, is on the government.  And I'd like to break this

12   up.  First, hear argument on was there loss and how should it

13   be -- should any value be attributed to the services rendered

14   and then go on to discuss what should be included in the

15   calculation of loss.

16          So Mr. Holcomb, would you like to go first?

17          MR. HOLCOMB:  Yes, Your Honor.  Your Honor, on loss,

18   the loss really fundamentally stems from the fact that the

19   companies and the customers paid for one thing and they got

11:35 20   something totally different.  And not only that, the thing that

21   they received, the services of unvetted drivers, wasn't even

22   authorized under the law.

23          I think it's fairly remarkable to suggest there's no

24   pecuniary harm here.

25          THE COURT:  Why don't you pull the microphone, please,

1    just a little closer.

2            MR. HOLCOMB:  Yes, Your Honor.  I think it's fairly

3    remarkable to argue there's no pecuniary harm here on the basis

4    that customers still got from Point A to Point B or the company

5    still got paid or that no harm or the government hasn't shown

6    specific harm caused to customers as a result of any specific

7    fraudulent rides or that there hasn't been some other

8    consequence to the companies.  But all these arguments advanced

9    by the defendants tend to blend together into a suggestion that

11:36 10   the customers didn't know that they were being driven by

11   somebody --

12            THE COURT:  I see you're sort of looking down to read.

13   Would you rather speak from the podium?

14            MR. HOLCOMB:  Is the issue you can't hear me, Your

15   Honor?

16            THE COURT:  I can hear you.  All right.  Go ahead.

17            MR. HOLCOMB:  The suggestion seems to be that, because

18   customers did not realize that they were being driven by

19   somebody who wasn't who they said they were or somebody who

11:37 20   wasn't vetted properly, according to the law or according to

21   the state regulations, the suggestion seems to be that the

22   companies lost nothing and the customers lost nothing.

23            But that's the same situation as the customers in

24   *Gonzalez-Alvarez*.  They received -- excuse me -- they received

25   adulterated milk.  They didn't know any better.  But the First

1    Circuit still found not only a loss but that the loss was the

2    entire amounts paid for the adulterated milk.

3          Even if you assume that some customers would have

4    understood that undocumented workers were driving under other

5    people's identities and hadn't gone through background checks

6    and were ending up as their Uber drivers and that even if

7    assuming that some customers would have been okay with that,

8    First Circuit case law says there's still a loss, and that loss

9    is still the entire amount paid for that thing that was

11:38 10   represented as something that it wasn't, and that's the

11   *Ihenacho* case.

12          The customers of the online pharmacy there were

13   seeking the real prescription drugs under fake prescriptions.

14   Those were still being sold by the pharmacy as real

15   prescription drugs or duly prescribed drugs.  And even in that

16   case where the customers knew that they were getting something

17   that wasn't authorized, the First Circuit found that those

18   customers suffered a loss and that the amounts that they paid

19   were the loss.

11:38 20          THE COURT:  Hold on just one second.  Go ahead.

21          MR. HOLCOMB:  Your Honor, the defendants have

22   presented various arguments about the companies' business

23   practices, whether the companies profited from some of these

24   fraudulently granted -- given rides and whether the companies

25   truly tried to keep unvetted drivers off their platforms or

1    perhaps turned a blind eye to the fraudulent drivers.  None of

2    these is relevant to the question of loss.

3           The jurisdictions, Massachusetts and California

4    specifically, have been briefed, but jurisdictions elsewhere,

5    too, have been the ones to require the vetting of the drivers

6    and the background checks.

7           THE COURT:  Well, that's something that I didn't -- it

8    is in your briefing, but it wasn't in the detail that I thought

9    it should have been, so I read the California and Massachusetts

11:39 10   regulations.  They require, among other things, background

11   checks to determine if somebody is a licensed driver, if

12   somebody is a sex offender by virtue of criminal history, if

13   somebody has a criminal history that could disqualify them.

14          These are the major matters, and you're making your

15   argument, and I think it's accurate, that, even if you assume

16   that some people would take the rides, it's accurate in the

17   sense that the First Circuit says adulterated milk has no value

18   and drugs without a valid prescription have no value.  But I

19   actually don't assume that.  I think if almost anybody was

11:40 20   told, "You called for Uber, and you thought you were getting

21   somebody who had been vetted, he has no criminal history, he's

22   got a driver's license, he's not a sex offender," and then they

23   said, "But actually we're sending you somebody who hasn't been

24   vetted, he may not have a driver's license, he may have a

25   criminal history, he may be a sex offender," I think any

1    reasonable person would say, "I'll walk.  I'll take a taxi.

2    I'll take the subway.  I'll drive.  I'm not going to do

3    business with you."  So anyway, go ahead.

4              MR. HOLCOMB:  Your Honor --

5              THE COURT:  So you say there are other jurisdictions

6    that have regulations comparable to Massachusetts and

7    California?

8              MR. HOLCOMB:  Yes, Your Honor.  I have not summarized

9    them in the briefing because the conduct here that we've

11:41 10   focused on in this investigation occurred primarily in

11   Massachusetts and California.  I just wanted to mention it.

12             And Your Honor, I share Your Honor's view, and I don't

13   mean to minimize those aspects of this.  Certainly that is part

14   of the government's concern.  I mean to say only that we don't

15   even need to speculate what a reasonable person out there would

16   or wouldn't accept in a driver.  Whether they would in a pinch

17   pay somebody who they didn't even know and knew not to be

18   vetted $20 off the street to drive them to the airport, we

19   don't need to speculate that because it's not allowed under the

11:42 20   laws and regulations of Massachusetts and California.  Those

21   people cannot legally provide services through Uber or

22   otherwise.  And so for that reason alone, their services are

23   valueless, according to the First Circuit precedent.

24             But in addition to that, I believe Your Honor is

25   correct that the reasonable rider out there would not just

1    accept a ride from a stranger off the street, outside of the

2    understood checks that these companies perform.

3           So another reason I stress the jurisdictions is

4    because I anticipate that Your Honor will likely hear from the

5    defendants various criticisms of the companies.  And some may

6    be valid, some may not, but I don't think that we're here today

7    to decide those or to credit any of those.

8           THE COURT:  I view the primary victims as the riders,

9    not the companies.  And, you know, I think the companies in my

11:43 10   current conception are victimized to the extent they paid --

11   well, they may also be the victims of having been deceived, but

12   for calculating loss, it would be double-counting or something.

13   But if they paid referral fees and they could be quantified,

14   they would be victims of that element of the scheme of the

15   fraud.  If there were -- trying to think about what else would

16   be a monetary harm.

17          MR. HOLCOMB:  If I may, Your Honor?

18          THE COURT:  Anyway, go ahead.

19          MR. HOLCOMB:  The BOTs that extended or that made a

11:44 20   trip look longer than it really was and so they paid out more

21   for a ride than the company would have paid out.

22          THE COURT:  But did the rider have to pay more?

23          MR. HOLCOMB:  Yes, Your Honor.

24          THE COURT:  So if the rider paid Uber more --

25          MR. HOLCOMB:  My apologies.  Yes --

```
 1          THE COURT:  -- than he or she should have, then
 2    arguably the company profited from that.  They didn't lose
 3    money.
 4          MR. HOLCOMB:  I think Your Honor is correct.  It's
 5    primarily the referral bonuses that are loss to the company if
 6    we're trying to parse it.  But I agree with Your Honor the
 7    primary victim in terms of the overall loss is the amounts that
 8    the riders paid out.  And I think that segues really into the
 9    quantification of the loss.
11:44 10        THE COURT:  Why don't we pause right there before we
11    get to quantification.  You mean whether it should be just the
12    payments from the companies to the defendants or whether it
13    should also include the Zelle payments?
14          MR. HOLCOMB:  I do plan on addressing that in a
15    moment, Your Honor, or whenever Your Honor would like to
16    address that.  But primarily, even just looking at the amounts
17    paid out by the companies, we're underestimating then how much
18    was actually paid by the riders.  And so, you know, I think
19    that's a question of how much did the companies --
11:45 20        THE COURT:  Because, why?
21          MR. HOLCOMB:  Because the companies received payments
22    from the riders and the companies only sent a portion of that
23    payment on to the drivers.  So the amounts that the companies
24    paid out is in every case lower than the total loss to the
25    riders.  And it may create thorny questions for restitution,
```

```
 1    for instance, but as for measuring the total loss, I think that
 2    it's safe to conclude that, across the board, looking at the
 3    amounts paid out by the companies underestimates the total loss
 4    if we accept that the amounts paid by the riders was the loss.
 5              THE COURT:  Thank you.  That's helpful.  Mr. Halpern,
 6    or Mr. Barron?
 7              MR. BARRON:  Mr. Halpern said he wanted to go first.
 8              MR. HALPERN:  Let me start.  Give me a second.
 9              THE COURT:  Yes.
11:46 10          MR. HALPERN:  The purpose here --
11              THE COURT:  Hold on just one second, please.  Thank
12    you.
13              MR. HALPERN:  I think one of the things the guideline
14    asks is to assess what the purpose of the scheme was, and the
15    purpose here was not to steal money.
16              THE COURT:  Where does the guideline say that?
17              MR. HALPERN:  I think the guideline asks what the
18    intention -- the calculation of loss includes an analysis of
19    what the purpose and the intent is.
11:47 20          THE COURT:  Point me to the language.  There's actual
21    loss and intended loss when the amount intended isn't received.
22    I think, rightly, in the last memo, the defendants have filed
23    several, that Mr. Barron cited, there was close attention to
24    the text, and this is part of your argument.  There has to be
25    pecuniary harm.
```

1      And actually, I should have asked Mr. Holcomb about

2   (F)(iii), but we'll get back to that.  But go ahead, what are

3   you pointing to in the guideline?

4      MR. HALPERN:  The pecuniary harm that you looked at in

5   *Jimenez,* which involved a mortgage fraud, what you did in that

6   case was look at what was the situation for the lender if no

7   fraud had happened and how did that change as a result of the

8   fraud.  What you did not do is say, "Well, if there hadn't been

9   a fraud, these short sales would never have occurred, so I'm

11:49 10   going to take the total amount of the short sales because those

11   short sales were caused by the fraud and I'm going to count

12   that as loss."

13      Instead, what you did was say, "Let's look at the

14   realities of what actually happened to these banks."  What

15   happened to these banks was that lenders sold properties.  The

16   banks recovered the proceeds from the short sales.  And you

17   compared that number to what the banks would have received if

18   there had not been any fraud, and you concluded that it was

19   likely that, if there hadn't been any fraud, the mortgage

11:49 20   holders would have continued to pay on the loans.

21      And so you did the math.  You subtracted the

22   difference between what the banks would have made but for the

23   fraud, from what they did make as a result of the fraud, and

24   the difference was the loss.  What happens if you do that here,

25   right?  There's no loss by any mathematical calculation.

1          The companies made money.  They made anywhere from 25

2   percent to 40 percent.  They paid the drivers the same thing

3   that they would have paid legitimate drivers.  There was no

4   economic harm done to the companies, and there was no economic

5   harm done to the customers beyond the argument that the

6   government makes that they lost the benefit of their bargain;

7   that what they really wanted and were paying for weren't rides.

8   What they really wanted were rides from qualified drivers.  And

9   so because they didn't get qualified drivers, they got nothing.

11:51 10         THE COURT:  Well, I mean, I'd say two things.  One, I

11   am familiar with the mortgage fraud principles in that line of

12   cases.  However, as I said, it appears to me, as this is a

13   regulated industry that the cases like *Gonzalez-Alvarez* and

14   *Ihenacho* -- I'm going to spell it -- mispronounce it, and some

15   others are more analogous.  So why don't you --

16         MR. HALPERN:  Well, let me give two different examples

17   and contrast the outcomes.  If I hire somebody to paint my

18   house and I tell them that it's important to me that they're

19   here legally and they tell me they are and I give them $20,000,

11:52 20   they paint my house, they do a great job, but it turns out I

21   find out that they're undocumented aliens, have I suffered a

22   loss of $20,000?  Can I get my money back?  No.

23         Now, suppose I instead give the $20,000 to a lawyer

24   and I hire him and it turns out he's not really a lawyer, he's

25   not a legitimate lawyer, he never passed the bar, and I've been

1  victimized by fraud, but he did a great job, right?  Do I get

2  my money back?  Yes, I do.  And there's an application note

3  that applies because it's a business professional.

4          THE COURT:  You're talking about (F)(iii)?

5          MR. HALPERN:  Yes.  All right.  And the government's

6  argument essentially turns the painters and it turns everybody

7  into that application note.

8          THE COURT:  This is useful because I know that

9  (F)(iii) doesn't have a specific category that the Uber drivers

11:53 10  would fit into.  I thought that (F)(iii) was meaningful for two

11  reasons, we can look at it, for several reasons.  One, (F)(iii)

12  treats -- just a minute.  You're looking for it now.  I've got

13  to find it.  Sorry, it's not (F)(iii) though.  It's (F)(v).

14          MR. HALPERN:  In my book it's page 92.

15          THE COURT:  Exactly.  It's (F)(v), Roman Numeral V.

16          MR. HALPERN:  Right.

17          THE COURT:  This application note seemed to me to be

18  significant for certain purposes of analysis.  First of all, it

19  treats goods or services provided by, for example, an

11:54 20  unlicensed professional who represents that he or she has the

21  required license as a form of loss, which means the guidelines

22  treat it as a form of pecuniary harm.  I thought that was

23  significant.  And then it says with no credit provided for the

24  value of those items or services.

25          So as far as I know, the painter in your analogy

1   doesn't have to have a license from the state.  The lawyer

2   does.  But here, even though, as I read it, it didn't seem that

3   the Uber drivers and the government didn't argue that the Uber

4   drivers, you know, were falsely posing as licensed

5   professionals.

6          MR. HALPERN:  The Uber drivers are not licensed

7   professionals.

8          THE COURT:  Okay.  But here -- go ahead.

9          MR. HALPERN:  When you say that this provision is

11:55 10   significant because, "for example," right, it's not "for

11   example."

12          THE COURT:  No, it's not.  Okay.  You finish.  The

13   record will be clearer.

14          MR. HALPERN:  You used the term "for example," okay,

15   and it's not "for example."  It's this particular professional

16   licensees.  That's what this is about.

17          THE COURT:  I think I used "for example" to say, to

18   try to communicate that in certain circumstances goods or

19   services provided by somebody who is not qualified is a form of

11:56 20   pecuniary harm and therefore loss, and the guidelines indicate,

21   consistent with the case law, which is what in my current

22   conception I'd be primarily relying on if you don't change my

23   mind, and you might, consistent with the case law that the

24   value should be zero.  That was the limited reason I was

25   referring to it.

1           MR. HALPERN:  I understand.  My point is that this

2    application note becomes superfluous if you accept the

3    government's argument.  Because you don't have to create a

4    special circumstance for people who are pretending to have

5    professional licenses.

6           The government's argument is it doesn't matter if they

7    have a professional license if there's some regulatory scheme

8    at all, right?  They can be drivers.  It could be -- I mean, if

9    you take my example, instead of a painter, I mean, suppose the

11:57 10   painter had to get a building permit.  Now does the government

11   say, "Oh, well, there's a municipality regulation that was

12   involved here.  He may not be a professional licensee, but

13   there's something that involves some sort of governmental

14   oversight, therefore, the value is zero."

15          And the point I'm making is you've got an application

16   note here that only makes sense if this theory of attributing

17   no value to a product or a service of a professional licensee

18   is limited to a professional licensee.  If you expand it to

19   include everybody, regardless of what sort of regulatory scheme

11:58 20   they're under, then what's the purpose of the application note?

21          THE COURT:  Then let me ask you this.  How do you

22   reconcile that argument with, say, *Gonzalez-Alvarez* or

23   *Ihenacho*?

24          MR. HALPERN:  Mr. Barron is going to address *Ihenacho*,

25   but I'm going to address *Gonzalez-Alvarez*.  Nobody, nobody is

```
 1   going to pay money for a product that is half milk and half
 2   water.  And so to me, drawing an analogy between, Well, you
 3   know, maybe I'll take a ride with somebody who hasn't been
 4   totally vetted, suppose you get your ride and you find out that
 5   the guy wasn't vetted the way you thought, do you say, "This is
 6   ridiculous, my money has been stolen, I want my money back"?
 7   Is that person like remotely comparable to somebody who buys
 8   what they think is milk and it turns out that it's 50 percent
 9   milk and water and salt.  So I mean, I think that in
10   Gonzalez-Alvarez, you've got a product that is literally
11   worthless.  Nobody would pay for it.
12         THE COURT:  Well, first of all, I don't know that
13   that's what the First Circuit reasoned.  It says, "The milk
14   would have been worthless if the scheme had been terminated
15   before the adulterated product was sold.  It should not acquire
16   an increased value merely because the defendant's scheme was
17   successful."
18         As I said, and the government didn't emphasize this,
19   but I think there's a reason that there are regulations that
20   require vetting to determine whether somebody has a driver's
21   license, whether somebody has a criminal history that might
22   disqualify them, when somebody is a sex offender.  I don't know
23   who would get in the vehicle.
24         MR. HALPERN:  Who would get in the car?
25         THE COURT:  Yeah.  If they said, "We're sending you
```

somebody.  We don't know if he has a driver's license.  We
don't know if he's a sex offender.  We don't know if he's got a
criminal history because we didn't do what the law requires," I
don't think somebody would pay for a ride with that driver.

MR. HALPERN:  Let me address that.  And this relates
back to *Gonzalez-Alvarez* as well.  This conspiracy occurred
during COVID, and one of the reasons that the companies needed
these drivers was because of COVID.  As a result of COVID, the
market for these companies dramatically changed because people
were not going to work.  They weren't going places.  The
colleges were closed.  The students weren't here.  They weren't
taking Ubers.  The market for people getting in the cars to go
from Point A to Point B dropped dramatically.  And in place of
that, a different market developed, which was a market for food
delivery.

And if you look at what these defendants actually did,
what you will find is that overwhelmingly this case isn't about
customers going from Point A to Point B.  The government
produced -- and I think you'll hear reference to this with
respect to loss calculation.  They produced the records of six
of the drivers to show their Zelle transactions.  They wanted
to show the money that those drivers gave to the defendants.
And I suspect at some point the government will reference
those.  And I want to point out I didn't pick what I'm going to
show you.  I didn't cherry-pick anything.  These are the

1    records the government produced.

2              THE COURT:  Hold on just a second.  Are you going to

3    put something up?  Is this what you handed --

4              MR. HALPERN:  I premarked many exhibits that are

5    not -- I thought I was going to go first and go through a list.

6    This has been premarked as number 11.

7              THE COURT:  Here.  We don't have to -- don't premark

8    things when you appear before me in the future.  It confuses

9    the record.  We'll mark them when they come out.  It's not

12:03 10    premarked as anything.  This is Exhibit 1 for identification.

11              MR. HALPERN:  Thank you.

12              THE COURT:  Hold on a second.  So this is now Exhibit

13    1.

14              MR. HALPERN:  This will be Exhibit 1.  So these are

15    Zelle printouts from the government of the payments to various

16    drivers, six of them were provided, to the defendants.  And if

17    you go through them, this money shows both the Zelle transfers

18    that the drivers made to the defendants and it shows where the

19    drivers got the money from.

12:04 20              So if you look at the first one, the Dos Santos, Jr.,

21    he's working for Grubhub and DoorDash.  If you look at the

22    second guy, Santos, Jr., all Grubhub.  Next guy, Philip

23    Pereira, DoorDash.  All of it, DoorDash.  The third guy, da

24    Fonseca, all of it DoorDash and Grubhub.  The fourth guy,

25    Clovis Placido, all of it DoorDash.

1          And in fact, if you go through all of the records,

2     right, that's what the bulk of this case is about, Uber did not

3     distinguish between Uber Eats and Uber.

4          So if you look at the records, you can't tell for sure

5     whether the person was delivering food for Uber or whether they

6     were actually taking a ride.  Of all of the companies that were

7     involved in this case there's only one I believe where you can

8     look at the records and make a judgment that this was really

9     about taking a person, and that's Lyft, because Lyft did not

12:05 10    have a food delivery service.  Other than Lyft, every company

11    in this case was about food.

12          THE COURT:  Is any of this in your briefing?

13          MR. HALPERN:  Is this in my brief?

14          THE COURT:  Yeah, these arguments.

15          MR. HALPERN:  I don't think so.

16          THE COURT:  I don't think so either.  You filed three

17    briefs.  You know, I'm going to try to decide this matter

18    today.  I don't know why you don't put them in the briefs.  And

19    one of them was filed a couple of days ago.

12:06 20          MR. HALPERN:  To be honest I think I flashed on this

21    when the government produced the six records of Zelle and I

22    looked at them and appreciated --

23          THE COURT:  Well, the point is I let the defendants

24    file a brief late.  It was 12 days after the government's

25    brief, and they had to stay up late and file a reply.

```
 1              MR. HALPERN:  I don't think the point is any less

 2      relevant because I missed it before.  It is what it is.

 3              THE COURT:  Well, I'm not saying you can't make it.

 4      I'm saying if it's important, I don't think the nine of you

 5      would have missed it or should have missed it.  But anyway, go

 6      ahead.

 7              MR. HALPERN:  Fine.  Then I apologize for missing it,

 8      but it doesn't make it less important because I missed it.  And

 9      it's true --

12:07 10              THE COURT:  And are background checks not required for

 11      people who drive for Grubhub and DoorDash?

 12              MR. HALPERN:  The government asks --

 13              THE COURT:  I asked you a question.

 14              MR. HALPERN:  Of course it is.

 15              THE COURT:  Of course it is.  And I could have looked

 16      at those, but they're the same regulations, I expect.

 17              MR. HALPERN:  It's the same regulation, but the

 18      government essentially argues put yourself in the place of this

 19      customer who thinks that they're getting the benefit of their

12:07 20      bargain, and they want a vetted driver, and this is really

 21      important to them, and they don't get it, and so, you know,

 22      it's worthless.

 23              THE COURT:  But if you look at --

 24              MR. HALPERN:  Can I just finish my point?

 25              THE COURT:  Go ahead.
```

1          MR. HALPERN:  So suppose what we're really talking

2     about is a guy that orders a pizza, and he finds out that the

3     driver who delivered his pizza hasn't been vetted

4     appropriately.  Like, what exactly is his concern?  Oh, my --

5          THE COURT:  I'll tell you what my wife's concern was.

6     If she had a possible sex offender at the door, she would, to

7     be colloquial, freak out.  Look, I got your point.  Keep going

8     but you don't have to elaborate it so theatrically.  Go ahead.

9          MR. HALPERN:  I don't believe the people who are

12:08 10   getting food deliveries are seriously worried about whether or

11    not their drivers --

12         THE COURT:  All right.  But now, Mr. Barron, if

13    necessary, can pop up and answer this.  The people in *Thenacho*

14    who ordered drugs knowing they had no valid prescription and

15    therefore not entitled to get the drugs didn't care whether

16    there was a prescription or not.  And it sounds to me that

17    that's, even if I accept your premise, that's analogous.  Do

18    you want to address that, Mr. Barron?

19         MR. BARRON:  Yes, Your Honor.  Thank you.  Goods cases

12:09 20   are different, first of all.

21          THE COURT:  What?

22         MR. BARRON:  It's a goods case.  There's a big

23    distinction in the guidelines between goods and services.

24          THE COURT:  See, that's part of the reason -- I feel

25    like I'm in a tag-team wrestling match here.  That's part of

1  the reason I said that I think that, although guideline (F)(v)
2  doesn't apply, it's relevant because there the guidelines treat
3  goods and services by certain unlicensed people as equivalent
4  and a form of pecuniary harm.
5       MR. BARRON:  I think *Ihenacho* is the least persuasive
6  case the government could touch.
7       INTERPRETER:  I'm sorry, the interpreter cannot hear.
8       MR. BARRON:  Maybe I'll go up there.
9       INTERPRETER:  Thank you so much, and I apologize for
12:10 10  interrupting.
11       THE COURT:  That's okay.
12       MR. BARRON:  I think *Ihenacho* is a terrible case for
13  the government.  It's different in so many ways, and the first
14  of them being that some of the people who got those drugs died,
15  13 of them died, and I quote the section of the Appeals Court's
16  reasoning, and that was how harmful the drugs were.  So people
17  may have wanted it, but they were seriously harmed.  It's an
18  actual loss case that could have involved a much higher loss if
19  the court had taken things like deaths and addiction into
12:11 20  account.  It was a disastrous case.
21       Secondly, it's a Controlled Substances Act case.
22  Since when did anybody ever argue that the value of the
23  Percocets he sold are real drugs and the people who took them
24  wanted them and they maybe had a toothache, when have we ever
25  accepted such an argument?  We haven't.  We never will.

1          And that's what *Ihenacho* is, because Mr. *Ihenacho* was

2   doing exactly that.  He was selling drugs that weren't

3   prescribed, and he's the same as a drug dealer, and he got

4   convicted on ten counts of it.

5          So I think the case has almost no application at all.

6   It's an entirely different world, and it would have been

7   shocking if Judge Stearns had done anything else but include

8   the whole loss amount.  It would have been -- you know, counsel

9   there, David Apfel abandoned the entire argument about loss

12:11 10   amount.

11          Lastly, *Ihenacho* says that it didn't reach the issue

12   of whether Application Note 3(F)(v), I believe it's section

13   III, applies, Roman III or II, because they didn't get there

14   and they didn't need to perhaps, but the government argued that

15   it applied.  It argued it on appeal.  I dug into the *Ihenacho*

16   case, as the government complains, but I had to.

17          And one of the things about that is the government is

18   saying that these are 3(F)(v) cases.  I looked at the cases

19   that are cited there.  There's a section.  I quote the whole

12:12 20   thing.  I looked at those cases, and they don't, the precursor

21   to 3(F)(v) would have been under 2(F)(i).  The guidelines have

22   changed as Your Honor knows better than I.  But I don't find

23   the equivalent -- references in the decisions to the equivalent

24   note, but the government maintains that they're 3(F)(v) cases.

25          And if there's anything that's regulated and approved

1   by government agencies, it's drugs.  The DEA gives every

2   physician a prescription number.  The physician who is licensed

3   by the Board of Registration in Medicine gives out drugs based

4   on certain guidelines and tries to avoid harm like addiction or

5   death.

6          It could go on and on.  These are regulated, too, but

7   it's not about their being regulated in this case.  3(F)(v)

8   being a limited circumstance that doesn't include this case,

9   but in other words, the 3(F)(v) is not -- it deals with either

12:13 10   licensed professionals or certain goods.  And it's an issue,

11   there's no offset, and that's an issue throughout the

12   commentary.

13          I think the problem is that the government -- you

14   know, this is one of the big challenges, always, is that

15   there's a smart government lawyer arguing, a very able lawyer

16   arguing for a creative application of a guideline, and the

17   language isn't in the guidelines.  There's a lot of talk in the

18   government's memoranda about the benefit of the bargain, and

19   that does come up in many cases, but it's not the law.  It's a

12:14 20   descriptive phrase used.  I mean, we had this benefit of the

21   bargain argument in the *Cadden* case.  I'm drifting off from

22   *Ihenacho*.

23          THE COURT:  Actually, we can talk about *Cadden,* too.

24   We won't talk about *Cadden* right now.  But your last brief was

25   especially helpful, as I recall, but it focused in on language.

1       And part of the argument was there's no -- loss requires

2       pecuniary harm, which is harm that can be measured by money.

3       And to me, the relevance of 3(F)(v) is that it shows that the

4       guidelines treat services provided by some unlicensed

5       professionals as a form of pecuniary harm and therefore loss

6       and should be valued at zero.  Then I go to the cases.

7              And I did think, although the government focused on

8       *Ihenacho,* I thought *Gonzalez-Alvarez* was actually a more

9       analogous case, though not the only analogous case.

12:15 10             MR. BARRON:  I can address that I think.  First of

11      all, the guidelines, I'm arguing for structure because as soon

12      as we abandon the structure of the guidelines, they lose their

13      meaning.  We can argue these other cases or these other issues

14      at a variance argument perhaps or perhaps even as an issue for

15      an enhancement.  But when we're establishing the basic loss

16      amount, then I think we have to hew closely to them.  We can go

17      outside of them later, but not at this phase, is my point.  And

18      I think that --

19             THE COURT:  Let me see if this is a fair

12:16 20    understanding, formulation of the argument you're making; that

21      3(F)(v) describes certain categories of services which generate

22      loss.

23             MR. BARRON:  Correct.

24             THE COURT:  And Uber drivers don't fit in any of those

25      categories, and therefore the guidelines don't permit a finding

1    that services provided by unauthorized Uber drivers are a form

2    of loss.

3              MR. BARRON:  Yes, I agree with that statement.

4              THE COURT:  I'm just trying to understand the

5    argument.

6              MR. BARRON:  But I go even further to say, this is

7    where the government argued Uber drivers by unregulated drivers

8    had no value.  And Uber is the best proof or the rideshare

9    companies are the best proof that that's not true.

12:17 10          I think there's a case that Your Honor probably ought

11   to know about.  I didn't mention it in my brief.  Mr. Halpern

12   and I were talking last night, which is where I think he got

13   many of his arguments, but the case is *Anoush*.

14             THE COURT:  How do you spell it?

15             MR. BARRON:  That was a case brought by the taxi and

16   livery companies against Uber.

17             THE COURT:  How do you spell it?

18             MR. BARRON:  But the important thing is --

19             THE COURT:  How do you spell it?  Did you cite this

12:17 20   case?

21             MR. BARRON:  No, I didn't.  If Your Honor doesn't want

22   me to --

23             THE COURT:  I do want you to.  I just want you to tell

24   me how to spell the case and what the citation is, and then

25   I'll ask that it get printed out.

1          MR. BARRON:  A-n-o-u-s-h, *Anoush Cab v. Uber Techs*, 8

2    F.4th 1, 2021, First Circuit case.

3          THE COURT:  Go ahead.

4          MR. BARRON:  I'd hand you a copy.  I didn't print it

5    out this morning.

6          THE COURT:  That's okay.  Go ahead.

7          MR. BARRON:  This is a case in which Uber was deemed

8    by a removed state 93A case not to have violated Section 1983.

9    But the important part for this case involves what was really

12:19 10   happening.  Uber was operating between 2013 and 2016, the time

11   of enactment of Chapter 159A and a half, regulated for taxi or

12   for transportation network companies.  Uber was operating

13   against what the State Police were doing in Boston Logan

14   Airport.  The State Police issued anywhere from $500 to $20,000

15   worth of citations every day.

16         And the government is now arguing, well, this is

17   valueless, unlawful rides are valueless.  This is at a time

18   when Uber did nothing more than its own very cursory

19   verification system, which was easy to defeat, and they brought

12:19 20   people to the airport and they were ticketed.  And Uber kept

21   sending them to the airport through its system, right?  You

22   could get a ride to the airport on Uber.  Uber took your money,

23   and the driver got his fare, and they were taken to the

24   airport, even though Uber knew very well at the time the State

25   Police were ticketing.  So those rides had value and Uber made

1   money on it.

2        If we don't follow and hew closely to the guidelines,

3   my point was that there's sort of a danger that the guidelines

4   become meaningless and that we start taking in cases that don't

5   particularly -- that are way outside the guidelines because

6   we're offering something, we're reasoning about the benefit of

7   the bargain.  I mean, the *Alvarez* milk case, I wanted to

8   address that, too.  And perhaps -- may I be allowed?

9        THE COURT:  Go ahead.

12:20 10      MR. BARRON:  I won't take much longer.  The *Alvarez*

11  milk case doesn't seem to jibe with what's going on here.

12  *Alvarez* milk was a product.  It wasn't a service.  When a

13  service is done, it's over.  The person has been delivered.

14  And whether or not certain regulatory matters are complied with

15  or not is very different from being saddled with the product.

16       THE COURT:  Well, as I said, that's in (F)(v).  That

17  provision applies to goods and services.  It doesn't make a

18  distinction.

19       MR. BARRON:  Well, only part one, which I read as

12:21 20  lawyers and doctors, licensed professionals, maybe

21  psychologists, clinical psychologists, but those are licensed

22  professionals, not taxi drivers.

23       THE COURT:  But it puts them both in the same

24  guideline application note, and the application notes, I'll

25  have to find it, there's a First Circuit case that says they're

38

1    not gospel.  I mean, I can't ignore them.

2              MR. BARRON:  Right.  No.

3              THE COURT:  But they're not gospel.  And that's part

4    of the reason, you know, we're eventually going to do this in

5    your individual sentencing hearings, and that's why I wanted to

6    make it clear and put you on fair notice that if I'm persuaded

7    there's no loss, I'm inclined to upward depart, as I did in, I

8    think in the Meredith Varsity Blues case, or I may have.

9    Anyway, keep going.  This is helpful.

12:22 10         MR. BARRON:  The government's argument takes us to the

11   result in this case where the victim or purported victim,

12   according to the government, depending on how Your Honor looks

13   at it, is making millions of dollars and still getting a loss,

14   and that's way outside what the guidelines do.

15             THE COURT:  Well, this is why I said so far, as I've

16   delved into this, and I'll have to continue to delve into it,

17   so far I viewed the riders primarily as the victims and

18   essentially as the victims.

19             MR. BARRON:  That's why we pled guilty.  I agree with

12:23 20   Your Honor.  But are they really victims becomes the question.

21   And I think that, you know, they may be putative victims

22   because the riders used the aggravated identity theft as a

23   means to sign up, but it's impossible to say that where the

24   companies made their money, the drivers got their fares and the

25   riders got to their place that there's a pecuniary harm.

```
 1          So I think the argument does have to shift to either
 2    variance or perhaps departure, but I don't think we can do
 3    this, what the government is asking us to do, which is to get
 4    into loss where there are profits and where there's no evidence
 5    that somebody was harmed by the drivers.
 6               THE COURT:  All right.
 7               MR. HALPERN:  Can I chip in for a sec?
 8               THE COURT:  Yes.
 9               MR. HALPERN:  In the milk case --
10               THE COURT:  Which case?
11               MR. HALPERN:  The milk case.
12               THE COURT:  Gonzalez-Alvarez.
13               MR. HALPERN:  Right.  100 percent of the time that
14    product is valueless.  The bad thing that might happen
15    happened, right?  Similarly, in the drug cases --
16               THE COURT:  See, but this is -- keep going, keep
17    going.
18               MR. HALPERN:  So contrast that with what you mentioned
19    with respect to somebody delivering --
20               THE COURT:  Let's say the drug case though, Ihenacho,
21    there -- do I remember the facts right?  The customers were
22    actually getting real FDA-approved drugs.  The problem was they
23    were getting it without a prescription.
24               MR. HALPERN:  The customers were part of the scam.
25    They knew --
```

12:24 (line 10)
12:25 (line 20)

1          THE COURT:  Answer the question first.

2          MR. HALPERN:  Yes, that's correct.

3          THE COURT:  So they were getting the real FDA approved

4    drug.  The problem was that they didn't have valid

5    prescriptions, so it seems to me that that undermines the

6    argument that there's a difference between this and milk.

7          MR. HALPERN:  In *Ihenacho*, as in the milk case, the

8    product is inherently dangerous all the time, right?  It's a

9    bad product, right?  The mislabeled or unlabeled drug, the drug

12:26 10   that comes without an appropriate prescription is bad and it's

11   always bad.

12          THE COURT:  It's not if it's --

13          MR. HALPERN:  The First Circuit makes it very clear.

14   I'm not talking about "bad" in terms of is it a fraudulent

15   product.  I'm talking about does it create a harm, right?  Is

16   the harm real?  And what the First Circuit says is, in any

17   circumstance where you've got a drug, even if it's a real drug,

18   when it's being provided in this fraudulent manner, it is

19   inherently dangerous and harmful.

12:27 20          So compare that to the example you gave where, you

21   know, your wife is concerned that the guy delivering the food

22   could be a bad guy.  But the reality is in this case there's no

23   evidence that anybody ever was a bad guy.

24          Out of all of these drivers and all of the millions of

25   dollars that these companies made, there was no evidence, none,

1    of a single instance of any complaint, of any ticket, of any

2    violation of anybody -- and it's particularly -- Uber has quit

3    markets, for example, in Austin, Texas.  They abandoned that

4    market because the City of Austin enacted a regulation

5    requiring Uber and other companies to do fingerprint,

6    background checks.  Uber didn't want to do it, and they quit

7    the market.

8            THE COURT:  I believe Massachusetts requires criminal

9    history checks.  Maybe not fingerprints.

12:28 10            MR. HALPERN:  They don't require fingerprints.

11            THE COURT:  All right.  A lot of this -- go ahead.

12            MR. HALPERN:  Going back to the larger point, you're

13    comparing a situation where the thing, the product that has

14    been deemed valueless is inherently bad.  There's something

15    wrong with it, right?  Versus a situation where there is this

16    theoretical possibility that maybe your driver, the guy

17    delivering your food is a bad guy.  And those seem to me so far

18    at odds.

19            THE COURT:  Okay.  I will consider this, and we'll do

12:29 20    this more in the future at least, but let me give Mr. Holcomb a

21    chance to respond.  We've got a number of issues to go over

22    today.  I've got to give the interpreter a break pretty soon,

23    probably the court reporter, and send you off for lunch.  Is

24    there something you want to briefly say?

25            MR. HALPERN:  There's just one point I want to make,

         1    given your focus on the customers.  The companies knew who the

         2    customers were.  If you have Uber downloaded on your phone, you

         3    can pull up your account information and you can see every

         4    driver who has given you a ride for the past ten years.  Uber

         5    and Lyft, they all could do that, right?

         6            So these poor victimized customers that Uber is

         7    complaining about, they didn't refund them a dime.  Uber kept

         8    all the money, even though they knew who these people were,

         9    they claimed these rides are worthless and the customers --

12:30   10            THE COURT:  I'm not familiar with Uber making any

        11    claims.  There may be restitution issues in this case that may

        12    be impossible.

        13            MR. HALPERN:  Well, in their victim impact statement,

        14    it's filled with concerns over how their customers were misled

        15    and abused, right?

        16            THE COURT:  But that actually is not part of my

        17    analysis for present -- it's not part of my analysis for

        18    calculating the guidelines because the guidelines say that

        19    pecuniary harm does not include harm to reputation, for

12:30   20    example.  So I haven't seen any victim.

        21            MR. HALPERN:  I just want to make the point they kept

        22    the money.

        23            THE COURT:  Okay.  Mr. Holcomb, do you want to respond

        24    to some of this?

        25            MR. HOLCOMB:  I'll try to be brief, Your Honor.

1          THE COURT:  You're succinct, I think.  I'll tell you

2     if it becomes too much.

3          MR. HOLCOMB:  Yes, Your Honor.  First, on the issue of

4     harm and whether these rides were dangerous, the defendants

5     don't get to decide whether the people that they're selling or

6     renting accounts to are or aren't potentially dangerous.  The

7     Massachusetts Department of Public Utilities made that

8     decision.  They have decided this is a dangerous or potentially

9     dangerous service and that there are certain vetting

12:31 10   requirements that they're going to require the companies to

11    comply with and implement themselves in order to protect public

12    safety.

13         On the distinction of goods versus services and

14    whether there is any distinction, sure, a trip is completed

15    when it's completed, but adulterated milk is gone once it's

16    been consumed.  And the First Circuit did not find a loss

17    because customers got sick or didn't get sick.  They found a

18    loss because customers were sold adulterated milk.

19         Similarly here, Your Honor does not need to see

12:31 20   evidence that any harm has befallen a single rideshare customer

21    as a result of any of these fraudulent accounts.  They were

22    unauthorized; they therefore have no value.

23         On the Application Note 3(F)(v), which I had not

24    previously addressed today, but I did just want to point out

25    that the government did address that application note on page

1    12 of its initial memorandum, it's footnote 11, we didn't hang

2    our hat on that application note because I don't think that,

3    you know, just by its very text it clearly applies here.  But I

4    think Your Honor is correct in viewing it as helpful, first for

5    its I guess lumping together of goods and services but also

6    just based on it's a clear recognition that in certain

7    regulated contexts there's no offset that applies.  And this is

8    where the government's False Claims Act analogy came in.  The

9    government is not going to reimburse a fake chiropractor --

12:32  10          INTERPRETER:  Sorry, Your Honor.  The interpreter

11    cannot follow.  My apologies.

12          THE COURT:  Yes.  Why don't you go back to the podium,

13    please.

14          INTERPRETER:  My apologies.

15          THE COURT:  That's okay.

16          MR. HOLCOMB:  I believe I was talking about the False

17    Claims Act analogy.  The government does not reimburse a fake

18    chiropractor for perfectly performed services or services where

19    a purported patient has zero complaints.  Where somebody is

12:33  20    operating in that capacity without a proper license, there is

21    no reimbursement.

22          Then just the last point I wanted to make related to

23    the application note is that this is just an application note.

24    We don't contend that it applies perfectly here.  We think the

25    spirit of the note actually is helpful here.  But regarding the

1   concern that we're somehow expanding the guidelines, I don't
2   believe that any of those, you know, the adulterated milk case
3   or *Ihenacho* were 3(F)(v) cases.  They were cases interpreting
4   the guidelines, and they're binding First Circuit precedent
5   which is arguably, or inarguably I would say, a higher
6   authority than the application note.  So they are directly on
7   point here.  And those two cases and related cases did not rely
8   on an application note of special rules.

9       THE COURT:  Okay.  Thank you.  Let's see if we can in
12:34 10   about the next 20 minutes do the following.  We may need to
11   wait a bit.  I'm not going to hear argument right now.  We can
12   come back to it.

13       As I said, I think if I'm persuaded that -- and the
14   government has to persuade me there's loss, pecuniary harm.  If
15   I'm persuaded that there's no loss, if I decide there's no
16   loss -- I'll try to be more precise in the way I speak.  If I
17   decide there's no loss -- you can think about this over
18   lunch -- then I would go to Application Note 21 and say, well,
19   the guideline range wasn't calculated based on any loss, zero
12:36 20   loss, but that understates the seriousness of the offense.

21       I'll give you two cases under the predecessor, 2(F) I
22   think that have some relevance to this.  One is *Bobowick*, 113
23   F.3d 1302, 1304, and *Ravich*, 128 F.3d 865, 870.  They're
24   actually mortgage fraud cases.  But I don't think -- I think
25   you understand -- well, I could reiterate what I said before.

1    I think if there's no loss I would go to Application Note 21

2    and determine whether the guideline range understates the

3    seriousness of the offense.  I at the moment would be inclined

4    to find that it does.

5         And then I would have to determine what's a reasonable

6    upward departure or variance.  And I would take into

7    consideration, in my current conception, the parties haven't

8    addressed it, what the guideline range would have been if the

9    amount of money involved is loss.  Just think about that maybe

12:37 10   for later today but certainly for the sentencing hearings.

11        Then I think I want to make sure I understand the

12   government's arguments with regard to loss.  So just a minute.

13   Did you all receive the PSRs in the last day or two?

14        MR. BARRON:  Day before yesterday.

15        MR. HOLCOMB:  Yes, Your Honor.

16        THE COURT:  All right.  So I haven't focused on them,

17   the individual PSRs.  But here is my general understanding of

18   Probation's position and the government's.  And it's possible

19   that I misunderstand the government's position, and then I'll

12:39 20   have to hear what the defendant's position is.

21        But the government has the burden of proving the

22   amount of loss.  The court need only make a reasonable estimate

23   of the loss, not a precise calculation, based on the evidence

24   presented.  That's Section 2B1.1, note 3(c).  I may consider

25   all losses from all relevant conduct under 1B1.3(a)(1)(B) in

1    the First Circuit decision in *Curran*, 525 F.3d 78.  I believe

2    that Probation views the loss as the total amount of deposits

3    from the companies, the rideshare companies or delivery service

4    companies to the defendants.

5         And I think the defendants -- well, I'm not sure what

6    the defendants argue.  Maybe that some of those deposits were

7    paid to drivers who are not defendants, although if my

8    tentative view with regard to loss continues, those drivers

9    were also not vetted as required by law and provided worthless

12:40 10   services.  And those would have been losses that the defendants

11   intended and caused.  But I will have to do an individualized

12   determination to see how much of the total loss is attributable

13   to each defendant.

14        With regard to the Zelle payments, I'd like the

15   government to explain to me, some are from unauthorized drivers

16   who are not defendants, as I understand it, people who, they

17   make payments for licenses, they might be payments for BOTs,

18   they might be payments -- we'll for say for licenses and BOTs.

19   They're not payments that were sharing funds received from the

12:41 20   companies.  And I think the government wants to capture those,

21   and I think if that amount could be reasonably determined, it

22   would be includable in loss if there is loss.

23        But not all Zelle payments from non-defendant drivers

24   to the defendants are for rides provided.  As I said, they

25   might be for BOTs or licenses.  And those payments at the

1    moment seem to me they would be payments, they would be gain to

2    the defendants but not loss to the riders or to the ride

3    companies.  And then there may be some payments unrelated to

4    the conspiracy.

5          So let me ask the government this.  Do you think that

6    loss, if there is loss, should include at least the deposits

7    made from the companies to the defendants?

8          MR. HOLCOMB:  From the companies to the defendants,

9    yes, Your Honor.

12:43 10          THE COURT:  Okay.  And then here, just try to keep

11    your voice up.  Then what's your argument with regard to the

12    Zelle payments?

13          MR. HOLCOMB:  With respect to the Zelle payments, the

14    government's position is that there is sufficient information

15    for Your Honor to determine that it's more likely than not that

16    those Zelle payments represent further losses to customers in

17    the form of payments from the companies to other individuals

18    that were the result of the defendants' activity.

19          THE COURT:  Well, here -- I'm sorry.  Say that again,

12:43 20    please.

21          MR. HOLCOMB:  The fundamental example -- well, let me

22    say that again.  The Zelles represent further losses to

23    customers which were in the form of amounts paid out by the

24    companies to other individuals, the ones sending the Zelles to

25    the defendants.  And the reason that they're sending the Zelles

1    to the defendants is because the defendants rented them an

2    account, a fake account or sold them a fake account or sold

3    them a BOT to use and make additional money in connection with

4    fake accounts.

5         And so the government's position is that only looking

6    to the payments that the companies made to the defendants

7    leaves a lot of loss unaccounted for.

8         THE COURT:  I agree that it leaves a lot of loss, as I

9    understand the scheme, unaccounted for.  The question is do you

12:44 10   contend, for example, that payment for the license, for a

11   license or payment for a BOT that helps you jump the line or

12   exaggerate the length and cost of the trip caused -- actually,

13   I've got to separate those out.  Do you argue that payments for

14   the licenses harm the riders?

15        MR. HOLCOMB:  Yes, Your Honor, because the person

16   paying the defendant or sending a Zelle to the defendant for

17   the license takes that license, makes a fake account and either

18   drives under it and makes money from the companies that goes

19   into their bank accounts or then further rents or sells those

12:45 20   accounts.  So those payments for the identifiers result in

21   additional false rideshare or fraudulent rideshare activity.

22        THE COURT:  Are you able to tell, if I don't agree

23   with that, what payments to other drivers are sharing some of

24   the revenue from rides with the defendants from paying for

25   BOTs, paying for licenses?

1           MR. HOLCOMB:  In every instance, Your Honor, no.  The

2     Zelle records and how the Zelles show up on the bank records do

3     not provide sufficient information in every instance to

4     identify what the Zelle is for.

5           And so to meet a preponderance standard, what the

6     government would intend to show through chats and other records

7     and the bank transfers is that these defendants were in fact

8     receiving Zelles, sending their information to receive Zelles

9     to other individuals who were the renters or the purchasers.

12:46 10    It stands to reason that the renter or the purchaser is at

11    least most of the time making more money than they're paying to

12    rent or purchase the account in order to make it worthwhile by

13    using that account.

14          THE COURT:  So you would rely on evidence other than

15    the Zelle records, such as texts, chats, to prove by a

16    preponderance that certain payments were for rides, sharing

17    revenue from rides?

18          MR. HOLCOMB:  That's correct, Your Honor.  The volume

19    of those payments means that we would not and could not do that

12:47 20    in every instance to establish that all of the Zelles that the

21    defendant received were for rents or purchases.  The

22    government's position is that in order to find that those

23    Zelles more likely than not derived from this activity, though,

24    the government does not believe that Your Honor needs to do a

25    line by line accounting of those Zelle payments.

```
 1              And the reason that the government takes that -- part
 2       of the reason the government takes that position is because
 3       this is already a conservative estimate.  I've already
 4       explained why we're undercounting loss to the customers by
 5       looking at only what the companies pay out.  Here we're looking
 6       only at what the defendants received in terms of a rent
 7       payment.  We're missing everything else that the renters made
 8       in excess of that rent payment from the companies.  And so it's
 9       already a conservative estimate.
12:48 10              I understand that the records are insufficiently
 11       detailed for us to be able to look and see that, no, that was
 12       actually a payment from a roommate or for the weekly groceries
 13       or something.  But what we do know from chats is that they
 14       negotiated, the defendants negotiated rent rates or purchase
 15       prices.  They tended to be in round figures.  Rental payments
 16       for weekly rentals of rideshare accounts tended to be, ranged,
 17       depending on the timing and the market, from somewhere between
 18       $100 and $400 and that there were certain other going rates
 19       that varied --
12:49 20              THE COURT:  Have you --
 21              MR. HOLCOMB:  Yes, Your Honor?
 22              THE COURT:  Have you provided all these records to
 23       Probation that you're relying on?
 24              MR. HOLCOMB:  No, because the records that the
 25       government is relying on are just examples.  We don't have and
```

1    we did not and could not have gone out and obtained all of the

2    bank records of all of the renters.

3            THE COURT:  Well, whatever you're relying on have you

4    provided to Probation?

5            MR. HOLCOMB:  I don't know that Probation has their

6    bank records, no.  I think Probation's view is determined based

7    on the government's description of what the Zelles represent.

8            THE COURT:  Well, but the point is, first of all, all

9    of this needs to be in the Presentence Report.  So the

12:50 10   Presentence Reports are done.  This is, by Probation's

11   calculation, without the Zelles, the total loss is, I'm told,

12   $2,074,182.  With the Zelles, it's $5,707,259.  If it's the

13   lower number, you add 16 levels.  If it's the higher number,

14   you add 18 levels.  So this is a two-level issue.

15           And whatever -- I'll do and I always do what's

16   required by *Gall*.  I'll correctly calculate the guideline range

17   as I see it, and then I'll essentially, after hearing

18   everything, decide what sentence is sufficient and no more than

19   necessary.

12:51 20           So you can -- you're going to file sentencing memos.

21   They haven't been filed yet to my knowledge.  You're going to

22   have to lay all this out.  You're going to have to provide

23   additional evidence.  And I would encourage you to think about

24   whether it's worth it.  Because you're going to get an appeal

25   anyway, so you're not going to -- I expect, if I'm persuaded

1    that there's loss, if I find there's loss, and, you know, maybe

2    another issue doesn't matter.

3         But there's an opportunity cost to all of this because

4    while you're spending all this time in the sentencing of these

5    people, which you need to do, there are other people out there

6    that you're not conducting grand jury investigations on, and at

7    some point you need to consider what the marginal value of

8    pressing an issue is.

9         MR. HOLCOMB:  Yes, Your Honor.  And I can appreciate

12:52 10   the concern about the practicality of that, this particular

11   issue.  I think why the government thinks the Zelles are of

12   particular importance is, A, ignoring them leaves a lot of loss

13   unaccounted for, which I've already said, and B, based on each

14   individual's breakdown of how much of his or her activity

15   resulted in payments directly from the companies versus how

16   much resulted in payments to others, it could result in

17   disparate sentencing if Your Honor ignores the Zelles.

18        THE COURT:  But see, one of the -- and I'm not saying

19   I'm going to depart upward.  I'm not finding anything now.  But

12:52 20   you should keep in mind Application Note 21.  If you want to

21   say, you know, with regard to Defendant X, he did just as much

22   as Defendant Y.  And whatever it is, there's other ways

23   conceivably to deal with disparity.  I guess I think I'm

24   getting a better understanding of it but maybe not -- this is

25   helpful.  Let me put it this way.

         1              MR. HOLCOMB:  If I may, Your Honor, just speaking

         2    again to those practical concerns, the government provided the

         3    top line Zelle figures to Probation for everybody based on our

         4    analyst's review of the records.  And the government's

         5    understanding was that if that amount was -- if Your Honor

         6    determines that that amount could represent part of the loss

         7    figure, then at sentencing we would be prepared to present the

         8    records to the extent needed either in summary form or line by

         9    line and point to them and establish that --

12:54   10              THE COURT:  Well, you're going to have to present them

        11    well in advance so the defendants have a fair chance to -- I

        12    mean, you can't just show up in court and say, "Here are the

        13    records."

        14              MR. HOLCOMB:  Yes, Your Honor.  They have their bank

        15    records, though.

        16              THE COURT:  But you have to tell them.  I mean,

        17    Probation doesn't have the analysts that you have.  And

        18    anything you're relying on you should provide promptly to

        19    Probation and the defendants, and then you're going to have to

12:54   20    give it to me in advance of the hearing.

        21              MR. HOLCOMB:  Your Honor, that's the practical concern

        22    because these are voluminous bank records for many defendants.

        23              THE COURT:  Well, how is Probation supposed to know or

        24    the defendants know if you're right if they don't know what

        25    you're relying on?  But I'm not telling you it isn't a

```
 1    practical problem, and I'm not telling you that I want to go
 2    through all those records.  I've got to sentence 14 people in
 3    this case.  It's not the only case I've got.
 4         All right.  This is helpful.  But just, as far as I
 5    know, this is a fight over -- this is an issue that involves
 6    two levels under the guidelines.  Maybe you've got a different
 7    view.
 8         MR. HOLCOMB:  I do have a different view, Your Honor,
 9    because I think our relevant conduct analysis has proceeded
12:55 10    under the assumption that each defendant's individual conduct
11    was not necessarily in every instance reasonably foreseeable to
12    other co-conspirators that they weren't --
13         INTERPRETER:  Your Honor, the interpreter cannot hear
14    well.
15         THE COURT:  All right.  Then just stop interpreting.
16    Go ahead.  Stop interpreting.
17         INTERPRETER:  Sorry.
18         MR. HOLCOMB:  Under the relevant conduct analysis the
19    government has not assumed that each co-conspirator's or each
12:55 20    co-defendant's losses are necessarily reasonably foreseeable to
21    all other co-defendants.  So the government has been taking an
22    individualized approach looking at who did this individual
23    defendant work with and coordinate with and then looking at
24    their losses, not coming up with a total loss.
25         THE COURT:  You attribute -- well, this I anticipated.
```

1    But do you attribute any relevant conduct to any defendant?

2         MR. HOLCOMB:  Yes, Your Honor, we do.  But not all --

3    you know, say for instance we have 14 going to sentencing next

4    week.  Not all of the 13s -- for this one, right, for this one

5    we looked more narrowly to who were you aware of their activity

6    and who were you working with.

7         THE COURT:  Right.  And I think that's -- this is

8    something I was going to get at.  If you look at *Kodiakis* and

9    my decision in *Papathanasi*, the only time in almost 38 years I

12:56 10    granted a Rule 29 -- actually, I hate to say this -- well, it's

11   not all reasonably foreseeable.  I'm not saying there's more

12   than one conspiracy here in my view.  That's the right

13   approach.

14        But then I don't understand yet, I mean, it's not that

15   I don't understand the argument that you're making with regard

16   to the Zelles, that a lot of these payments, it's reasonable to

17   assume that the bulk of these payments were for -- is this your

18   argument:  It's reasonable to find, not assume, based on the

19   record that the bulk of the Zelle payments from the defendants

12:57 20    to each other were for rides or deliveries.  And while that

21   total number may include some Zelle payments for rent of

22   apartments that they shared, it's not going to inflate the

23   amount of the loss because the way you're calculating loss is

24   so conservative that this would only be a fraction of the real

25   total loss.  Is that --

1          MR. HOLCOMB:  Yes, Your Honor.

2          THE COURT:  All right.  Do the defendants want to say

3     something briefly on this?  Because I want to send you out for

4     lunch.

5          MR. HALPERN:  I do.  In my memo, I provided a page

6     from my client's Zelle record.  You had mentioned to the

7     government, you know, do you think we should include in the

8     loss the amounts that some drivers paid for things like

9     licenses or the BOTs.  You couldn't do it even if you wanted to

12:59 10   because the government has no idea which payments are for those

11    things.  They don't know which payments came from drivers.

12    There are, you know, I showed you in my --

13         THE COURT:  They don't know which payments came from

14    the defendants?

15         MR. HALPERN:  The payments didn't come from

16    defendants.  That was a misstatement.  I don't know whether it

17    was intentional or not.  The Zelle payments aren't coming from

18    other defendants.  They're coming from drivers who are not

19    defendants.  So what's going on here is that the companies are

12:59 20   paying drivers, not defendants.  The drivers are kicking back

21    to the defendants the rent that they owe those drivers.

22         Nobody's denying that somewhere in those Zelle records

23    there is gain to the defendants coming to them from the

24    drivers.  The problem is the government has no idea where that

25    is.  There are transactions all over the place in these Zelle

1    records that don't fit the government's allegations about how

2    much was being charged.  For example, there's nothing that the

3    government has alleged that should cost under $100.  There's

4    thousands of Zelle transfers for under $100.  The government

5    has no idea what those are.  And that's the problem.  There's

6    no way -- I mean, admittedly, somewhere buried in these Zelle

7    records there are payments for rent, but the government doesn't

8    know where they are.

9            THE COURT:  All right.  And I hope I wasn't

01:01 10    misspeaking because I think I do understand that the Zelle

11    payments at issue are payments that come from non-defendants.

12            MR. HALPERN:  Correct, from drivers.

13            THE COURT:  From drivers who are not defendants.

14            MR. HALPERN:  Correct.

15            THE COURT:  Okay.  So that I think I understand, and

16    that's what I was trying to get at.  I think Probation, as I

17    understand it, also understands that if my tentative analysis

18    holds, to the extent those payments come from compensation for

19    rides, that would be a form of loss to the riders.  But it's

01:01 20    not feasible to figure out how much.  That I think is

21    Probation's view.  Let me ask Ms. Victoria if I've captured it.

22            U.S. PROBATION:  Yes.  Good afternoon, Your Honor.

23    Martha Victoria from Probation.  That is correct, Your Honor.

24            THE COURT:  Okay.

25            MR. HALPERN:  The other point, I'm not sure if this

1   was a misstatement or not.  It's not that all of these

2   transfers to the defendants somehow are related to the

3   conspiracy.  Some of them involve rent, some of them involve

4   buying BOTs.  There's thousands of transactions in these Zelle

5   records that have nothing to do with this case, and the

6   government doesn't know which ones they are.

7          THE COURT:  All right.  So one of the things you need

8   to brief, if the government maintains this position, what's a

9   reasonable estimate?  And what's the case law in how you

01:02  10   determine what's a reasonable estimate?  Because, as you know,

11   I tend to delve deeply into things but there's a limit.

12          All right.  It's five minutes after 1:00.  I'm going

13   to excuse you until 2:30 so everybody can get something to eat.

14   And I want to look again at the two remaining issues,

15   sophisticated means or substantially outside the United States

16   and authentication.  We'll take those up after lunch.

17          MR. BARRON:  May I correct the record here before we

18   close it for now?  I said earlier that I viewed the riders as

19   the victims.  I don't mean that.  In the heat of this, I said

01:03  20   it.

21          THE COURT:  Yes, you said it.  I made a note of it.

22   You said that's why the defendants pled guilty.

23          MR. BARRON:  Yes.  The reason that this defendant pled

24   guilty is the Real ID Act victims.

25          THE COURT:  Realize what?

1           MR. BARRON:  Real ID victims' names stolen and taken

2    and used in this commercial arrangement.  I just want to make

3    that clear.

4           THE COURT:  Thank you for that clarification.  All

5    right.  Court will be in recess until 2:30.

6           (Recess taken 1:03 p.m. - 2:28 p.m.)

7           THE COURT:  Good afternoon.  I apologize for the delay

8    in getting back, but I was doing more reading.

9           The next issue is whether the Section 2B1.1(b)(10)(B)

02:40 10    and (C) two-point enhancement applies for substantial part of

11    the fraudulent scheme being committed outside of the U.S.

12    and/or the offense otherwise involved sophisticated means and

13    the defendant intentionally engaged in or caused the conduct

14    constituting sophisticated means.

15           Again, I need to decide individually for each

16    defendant.  Hypothetically some defendants might get the

17    enhancement; some might not.  The defendants who pled guilty

18    stipulated that this enhancement applies to them.

19           With regard to whether a substantial part of the

02:41 20    conduct was committed outside of the United States, with regard

21    to the defendants who are present here today, Aguiar's

22    Presentence Report in paragraph 36 says that the defendant

23    purchased or traded driver's licenses and social security

24    numbers from an unindicted co-conspirator, Marcos Bastos, who I

25    understand was outside of the United States in Brazil, and

others, including co-defendants Prado and Sousa Correa who were

in the United States.

I actually have to talk to the government briefly ex

parte about a related matter.  But it's not clear to me what

the evidence will be once I get to look at the presentence

reports of what was done outside of the United States.  And in

*Bagby*, 550 Federal Appendix 364, a Ninth Circuit case which the

government cited, the court said "substantial" has numerous

meanings, like important, material, or ample.

It seems to me that if the government proves there was

substantial activity outside of the United States, Section

1B1.3 relevant conduct principles would apply.  The defendant

would get the enhancement if he directly or she directly dealt

with one or more unindicted co-conspirators outside of the U.S.

or if such conduct was in the scope of his conspiracy in

furtherance of it and reasonably foreseeable to him.  The

Eleventh Circuit applied this principle in *Chukwu*, 842 Federal

Appendix 314.

So again, the burden is on the government.  Do you

want to speak to this, please?

MR. HOLCOMB:  Yes, Your Honor.  And based on that

latter point, the relevant conduct analysis, I think that it's

fair to conclude that the sourcing of identifiers from others

outside of the United States was done by certain people,

including Priscila Barbosa, who is one of the more prolific --

```
 1              THE COURT:  Including?

 2              MR. HOLCOMB:  Co-defendant Priscila Barbosa, who was

 3      one of the more prolific account creators.  Her PSR indicates

 4      that -- Your Honor mentioned another uncharged co-conspirator.

 5              THE COURT:  Well, this is what I was alluding to I

 6      thought we might do ex parte because that's in her PSR.  The

 7      defendants don't have access to it.  So they'd have to be -- I

 8      mean, this is one of the things I was just reading, paragraph

 9      37.

02:45 10              MR. HOLCOMB:  Your Honor, if I may.

11              THE COURT:  Does Probation have any concern about

12      paragraph 37 of Barbosa's PSR being read into the record right

13      here?  I mean, I do think it's relevant and the defendants need

14      to know about it if the government is relying on it.

15              U.S. PROBATION:  Let me pull that up, Your Honor.

16              MR. HOLCOMB:  If I may, Your Honor, I think that

17      there's also, if the final is consistent with the draft, I

18      think there is also a paragraph --

19              THE COURT:  Here.  Look, I think I'm going to have you

02:45 20      go to the podium because I know the interpreter is going to be

21      having difficulty hearing you.  I am, too.

22              MR. HOLCOMB:  I will, Your Honor.  Apologies.  I hear

23      it on me, but I guess the speakers just aren't pointed, so I'll

24      go there.

25              Your Honor, I was just trying to point out that there
```

```
 1   is another paragraph related to Ms. Barbosa's contacts,
 2   assuming it made its way into the final PSR, that's in
 3   everybody's PSR in the common conduct.
 4            THE COURT:  What paragraph?
 5            MR. HOLCOMB:  I don't have the final in front of me,
 6   so I'm afraid I can't direct Your Honor to the correct
 7   paragraph.  Maybe Ms. Victoria can help me.
 8            THE COURT:  I'm sorry, where is it in the PSR if you
 9   don't have the paragraph?
10            MR. HOLCOMB:  There's the global offense conduct
11   section before the specific offense conduct.
12            THE COURT:  I see.  Ms. Victoria, can you find it?
13            U.S. PROBATION:  I'm looking to see what is --
14            THE COURT:  What's that?
15            U.S. PROBATION:  I'm looking to see what he's
16   referring to.
17            THE COURT:  I think Mr. Holcomb is referring to
18   paragraph 16.  Look, I think these things have to be read.
19            MR. HOLCOMB:  I don't have a concern with that, Your
20   Honor.
21            THE COURT:  I was asking Probation if they did.
22            U.S. PROBATION:  I think if it has to do with
23   Barbosa's conduct, and it's relevant in this connection, just
24   globally her interactions with the unindicted co-conspirators
25   in Brazil, I think that's okay to mention in court.
```

1           THE COURT:  Paragraph 16 of Barbosa's Presentence

2   Report says that, "In addition to each other, the defendants

3   coordinated with other Brazilian nationals both in and outside

4   the United States.  For example, several of the defendants

5   coordinated with Ricardo Martins and Marcos Bastos, unindicted

6   co-conspirators labeled CC-1 and CC-2 in the indictment, both

7   of whom resided at times in Massachusetts and Florida but

8   returned to Brazil before the defendants were charged in May

9   2021."

02:48 10           MR. BARRON:  That's in the Aguiar --

11           THE COURT:  What's that?

12           MR. BARRON:  It's in the Aguiar PSR as well, word for

13   word, at paragraph 60.  There's no issue.

14           THE COURT:  So that's in all of them.  And what the

15   defendants I think don't have is the pertinent part of

16   paragraph 37.  "In other cases Barbosa used a photograph or a

17   stock image of a driver's license and used software to edit the

18   image to show an identity theft victim's real driver's license

19   information with the photograph of Barbosa or another user.

02:49 20   Barbosa asked other co-conspirators in the United States and

21   Brazil to edit licenses as well for some accounts that she

22   created.  Other co-conspirators, such as co-defendant Edvaldo

23   Rocha Cabral, discussed further below, obtained driver's

24   license images from the dark net.

25           In many other cases Barbosa purchased driver's

```
 1    licenses from co-conspirators who took photographs of driver's
 2    licenses while completing alcohol deliveries for one or more
 3    companies, including from co-defendant Bruno Abreu and Oliver
 4    Felipe Gomes De Oliviera and at least five other individuals."
 5    Actually, I don't see Bastos' name mentioned here.  I thought
 6    it was.
 7              MR. BARRON:  Bastos is more associated with Aguiar.
 8              THE COURT:  I guess I read Bastos in the Aguiar PSR.
 9    You're right.  Thank you.  That's right.  Bastos is referenced
02:51 10   in paragraph 36 of the Aguiar PSR.  So actually, it's probably
11    sufficient to look at the Aguiar PSR anyway.
12              U.S. PROBATION:  Actually, Your Honor, as I think that
13    that's correct, that Aguiar was more associated with Bastos and
14    Barbosa was more associated with the other co-conspirator in
15    Brazil, Ricardo Martins.
16              THE COURT:  Is that written here somewhere?
17              U.S. PROBATION:  Paragraph 39 of the Barbosa PSR, in
18    the first sentence.
19              THE COURT:  In Aguiar's, okay.  Are you talking about
02:52 20   paragraph 39 of Barbosa?
21              U.S. PROBATION:  Paragraph 39 of Barbosa in the first
22    sentence.
23              THE COURT:  "As part of the conspiracy, Barbosa
24    coordinated with co-defendants Cabral and De Silveira and
25    co-conspirators Ricardo Martins to create and manage accounts."
```

1          PROBATION:  Ricardo Martins is one of the two

2     unindicted Brazilian co-conspirators.  It's Marcos Bastos and

3     Ricardo Martins are the two that at least are named unindicted

4     Brazilian co-conspirators.  There might be more.

5          THE COURT:  All right.  Go ahead.

6          MR. HOLCOMB:  So Your Honor, I think based on that

7     alone and similar contacts with respect to Mr. Aguiar as

8     referenced in his PSR --

9          THE COURT:  It appears that they bought, you know,

02:53 10     there was some activity in Brazil outside of the United States.

11     What's the basis for finding it was substantial?

12          MR. HOLCOMB:  I think the nature of that activity is

13     what makes it substantial.  Not necessarily that a majority

14     of -- you know, the government's not alleging that a majority

15     of the identifiers were sourced from Brazil, but if you look at

16     any given fraudulent account, one of the essential and

17     important parts of the creation of that account was the

18     obtaining of a driver's license image and/or a social security

19     number.  So the government's contention is that that piece of

02:54 20     the creation of a fraudulent account, if that is created, if

21     that is done or committed in Brazil, if that comes from Brazil,

22     that is substantial enough.

23          THE COURT:  But it didn't come exclusively from

24     Brazil, did it?

25          MR. HOLCOMB:  That's correct, Your Honor, but if we

1    were to -- if we had charged the case based on one fraudulent

2    account alone and that had come from -- that identifier had

3    come from Brazil, I think that our position would be that that

4    was a substantial part.  I don't know that that changes simply

5    because there were many other sources of identifiers for the

6    other fraudulent accounts.  I don't know that it's -- you know,

7    that there's a certain threshold of a fraction of the activity

8    that needed to have occurred in Brazil as opposed to the nature

9    of the activity itself being --

02:55 10    THE COURT:  I think this is something you're going to

11    have to brief more in your sentencing memos because

12    "substantial" means something.  I think if there was just one

13    transaction that involved activity outside of the U.S. and 999

14    that didn't, I don't think that would be substantial.

15    MR. HOLCOMB:  Respectfully, Your Honor, I'm going back

16    to the definition from *Bagby*.

17    THE COURT:  Which I don't find very helpful.  It says

18    "ample."  It's kind of conclusory.  I mean, I do agree that

19    something can be substantial, and it's not most of the

02:55 20    activity.  It could be substantial activity in several

21    jurisdictions but "substantial" must mean something.

22    MR. HOLCOMB:  Your Honor, I agree.  I think, though,

23    that this enhancement shouldn't not apply simply because the

24    conspiracy charged is so broad that it's diluted by all of the

25    activity that occurred in the United States.  I don't know that

1    it's --

2          THE COURT:  Okay.  There are alternative ways to get

3    the enhancement.  And I think the second way at the moment,

4    "sophisticated means" appears to me to be more promising for

5    the government.

6          But what do the defendants have to say about

7    substantial activity outside of the U.S.?  Now they're both

8    going to jump into ring at once.  Mr. Halpern is also up, and

9    Mr. Barron.  Have you decided --

02:56 10          MR. HALPERN:  I briefed this one.  The government and

11    Probation are not quite on the same page.  The government's

12    position is that there were some defendants, Barbosa, for

13    example, who were involved with people in Brazil and all of the

14    defendants should be held accountable because it's part of the

15    overall conspiracy and they knew about it.

16          Probation's position, at least based on my PSR, is

17    much more limited, and it's looking at whether or not the

18    individual defendant actually had personal involvement with

19    somebody in Brazil.

02:57 20          THE COURT:  Just to help you, my view, because that's

21    consistent with what I understood coming in, is that neither of

22    those is quite right, that it does have to be individual.  It's

23    not sufficient -- well, there has to be substantial activity

24    outside of the United States, and then the usual relevant

25    conduct principles would apply.

1          So I'd have to look at the scope of a particular

2     defendant's conspiracy and then whether, either he knew what --

3     if there was substantial activity, he knew of it or he

4     reasonably should have foreseen it.

5          MR. HALPERN:  I agree.  I believe that both the

6     government and Probation are way overbroad, and to exemplify

7     it, I'm going to talk about my client and Mr. Barron's client.

8          With respect to Mr. Ponciano, the allegation which

9     Probation put forward as a legitimate basis for this

02:58 10    enhancement is that his initial involvement was that he drove a

11    car for Lyft and he told the government in a proffer interview

12    that when they asked him, "How did you start with this," he

13    said, "I started by driving with Lyft, and I purchased the

14    account information from Bastos," who was an unindicted

15    co-conspirator.

16         There's no evidence that this happened during the

17    period of the conspiracy.  There's no evidence of exactly when

18    it happened.  There's no evidence that Bastos was in Brazil

19    when it happened.  The government has alleged that Bastos

02:59 20    traveled back and forth between the United States and Brazil.

21    But there's no evidence in my case that Bastos was actually in

22    Brazil when anything happened, let alone that it is

23    substantial.  This was a minimal part of his involvement.  And

24    in fact, the government didn't even know about it but for the

25    proffer.  Probation ultimately reversed their position on it

1    because of the fact that there was no other evidence of it

2    other than his proffer.

3         THE COURT:  Well, just to pause.  I assume the

4    government is not relying in whole or in part on something that

5    was said in a proffer and that there's other evidence.  Is that

6    right?

7         MR. HALPERN:  Well, Probation concluded that they were

8    relying on the proffer and reversed their position.

9         THE COURT:  I wonder if that's permissible.

03:00 10        MR. HALPERN:  That's an argument I'm going to be

11   making in my case, and I've objected to the government's

12   reliance on anything that they obtained in the proffer.

13        THE COURT:  Is the government relying on information

14   that was proffered?

15        MR. HOLCOMB:  The government has independent evidence

16   of the contacts with Brazil.  I apologize, Your Honor.  I

17   approached today's hearing as if it was a hearing on legal

18   issues.  I thought the evidentiary issues would be decided --

19        THE COURT:  Well, I'm trying to give you some

03:00 20   guidance, though.  This is somewhat of a -- I'm not going to be

21   able to decide this issue because it is heavily factual.  But

22   I've given you a framework, and now I'm telling you some of the

23   questions you should be prepared to address in your sentencing

24   memo and at sentencing.

25        MR. HOLCOMB:  I don't think it's quite accurate at all

1   to say that there is no evidence of anything beyond just the

2   cherry-picked examples of interactions with one co-conspirator

3   when we've produced entire iCloud accounts full of chats

4   between two of the main co-defendants speaking with numerous

5   co-conspirators who are located in Brazil.  The government will

6   present that when the right time for that is.

7          THE COURT:  See, this is helpful.  I knew I wanted to

8   have this because I just thought it would be fair.  So I didn't

9   decide how I'm going to calculate loss in the first case and

03:01 10   then very likely doing the same throughout.  But this is

11   helpful because, you know, if you have all of that evidence,

12   then it sounds like you'll be able to prove by a preponderance

13   of the evidence that a substantial amount of the activity

14   occurred outside of the United States, and then I'll have to

15   decide individually, is the particular defendant responsible

16   for that for the purposes of the enhancement; did that person

17   deal directly with people outside of the United States, or did

18   he know about it.  And if he didn't know about it, was it

19   reasonably foreseeable.  That's shorthand.  Okay?

03:02 20          MR. HOLCOMB:  Yes, Your Honor.

21          MR. HALPERN:  There are other defendants, including

22   Mr. Barron's client, who, similar to Ponciano, the basis of

23   Probation's finding foreign involvement was contact with

24   Bastos.  And just like Ponciano's case, there's no evidence

25   that Bastos was in Brazil when he had these communications.

1    It's simply an allegation that Bastos went back and forth.  But

2    in response to Mr. Barron asking the government, "What

3    information do you have about Bastos actually being in Brazil,"

4    the government replied that Bastos was in the United States

5    based on their immigration information from April of 2018 to

6    December of 2020.  So almost for the entire conspiracy, Bastos

7    was in the United States.  And the fact that he happened to

8    occasionally go back and forth to Brazil doesn't create a link

9    with Brazil with substantial events happening in Brazil.

03:03 10          The other issue I want to raise with respect to

11   substantiality, Bastos, for example, is using a computer to

12   access information about people in the United States.  He could

13   have done that from anywhere, right?  So is the relationship

14   with Brazil substantial just based on the happenstance that

15   Bastos happened to be in Brazil when he did that?

16          THE COURT:  Well, I think the focus is on the

17   activity.  So if he was doing it in Brazil, it would be part of

18   the calculus as to whether it was substantial activity.  This

19   is helpful.

03:04 20          MR. HALPERN:  But I think the question is, if his

21   being in -- his being in Brazil has nothing to do with

22   furthering the plot.  He just happens to be there, and he could

23   have just as easily been anywhere else.  And Brazil isn't being

24   used to launder money or hide bank accounts or do anything.

25   It's just that his computer happens to be there and he's there.

```
 1    I'm not sure that's substantial.  But more to the point,

 2    there's no evidence that he was there.

 3              THE COURT:  Okay.  That's good.

 4              MR. HOLCOMB:  May I respond to one point, Your Honor?

 5    There is an independent importance to somebody being in Brazil,

 6    especially if they're living in Brazil, we can't get them if

 7    they're involved in the scheme.  Brazil doesn't extradite.  So

 8    if it's somebody not like Mr. Bastos traveling back and

 9    forth -- and by the way, he's back in Brazil, so we can't get

10    him.  So if there are others who we have evidence of having

11    operated from Brazil, there is importance to them having been

12    in Brazil.

13              THE COURT:  Thank you.  Why don't we move on.

14              MR. HALPERN:  All right.  Another issue where I think

15    the government is lacking --

16              THE COURT:  No.  I meant move on to the next prong of

17    the enhancement.  The interpreter is doing a great job.

18              INTERPRETER:  Thank you, Judge.

19              THE COURT:  But this is hard, and it's getting late in

20    the afternoon, so I want to go on.

21              You've got my present thoughts, and I'm going to take

22    a break later and give you another, a more formal expression of

23    my tentative thinking.  But then the question is whether there

24    were sophisticated means.  Application Note 9(N) says,

25    "Sophisticated means or something especially complex or
```

1    especially intricate."  And it uses as one example the use of

2    shell companies as an example of sophisticated means.

3          In *Pacheco-Martinez*, 791 F.3d 171 at 179, the First

4    Circuit says, "The list in Application Note 8(B)" -- is it 8(B)

5    or 9(B) -- "is not exhaustive," and that you should look to see

6    if the offense as a whole shows a greater level of planning or

7    concealment than a typical fraud of its kind.  It cites *Foley*,

8    783 F.3d 7, 25 -26.  And *Foley* also, as the First Circuit is

9    saying, the application note examples are not exhaustive.  The

03:06 10   enhancement properly applies to conduct less sophisticated than

11   the examples.  And importantly, I think it says, "The scheme

12   may be sophisticated even if individual elements alone are

13   not."

14         In *Foley*, the enhancement applied in a scheme where

15   the defendant used fictitious checks and fictitious payments to

16   make the scheme more effective and difficult to thwart.  And in

17   *Pacheco-Martinez*, the enhancement applied where the defendant

18   set up multiple companies to facilitate the scheme and hide his

19   ill-gotten gains from a bankruptcy proceeding.

03:07 20        It appears to me in this case that sophisticated means

21   were used.  Some of the defendants used the dark web to find

22   identifiers, like dates of birth and social security numbers to

23   obtain driver's licenses.  The scheme also involved altering

24   licenses, which appears to me to involve more than

25   photoshopping.  They had counterfeit authentication features.

1       The scheme involved using BOTs to jump lines and exaggerate the

2       length of trips to get more money.  And taken as a whole, it

3       appears to me that sophisticated means were involved.

4               It doesn't take much sophistication to set up a shell

5       company.  You can go on the internet and fill out a form.  This

6       seems to me more sophisticated as a whole than the others --

7       well, than setting up a shell company.

8               However, for the enhancement to apply, a defendant

9       must have intentionally used or cause to be used sophisticated

03:08 10       means.  The guideline itself says the government must -- well,

11       it indicates the government must show the defendant's

12       intentional involvement with the sophisticated means, Section

13       2B1.10(c).

14              The 2015 amendments to the guidelines regarding

15       sophisticated means says that they only apply to a defendant's

16       own intentional conduct, not on the basis of the sophistication

17       of the overall scheme, which communicates to me that the

18       relevant conduct analysis shouldn't be done here.

19              And I'm going to have to decide individually what the

03:09 20       evidence proves by a preponderance each defendant did.  But for

21       some of them the sophisticated means or one or more of the

22       sophisticated means enhancement would apply and moot the issue

23       of whether there was substantial activity outside of the United

24       States.

25              Do you want to speak to that, Mr. Holcomb?

1          MR. HOLCOMB:  Just that I share Your Honor's

2    understanding of that, and I think, based on the latter part,

3    the individualized assessment, it's going to be an

4    individualized determination.  But overall I think that if you

5    look at what they were doing, which was circumventing

6    companies' antifraud detection systems, if it was easy to do

7    and if everybody could do it, you wouldn't see defendants

8    creating many accounts and then renting them out.  You'd just

9    see the people, the endusers doing it themselves, setting aside

03:10 10   the issue of obtaining the identifiers.

11          But I think the fact that they are trying to get

12   things past background checks by photoshopping, they're getting

13   information on the dark net, I understand that lots of people

14   can get on the dark net.  But it's not indexed.  You need to

15   know where you're going.  And the evidence includes a lot of

16   messages between defendants about how to do just that.

17          And so I think that the many different parts of this

18   individually and then certainly taken together satisfy the

19   requisite level of sophistication for the enhancement.

03:11 20        MR. HALPERN:  Your Honor, there are a number of

21   documents, I think five that I provided.

22          THE COURT:  Let me have all five.

23          MR. HALPERN:  I'm going to introduce those.  They use

24   their own bank accounts.  They use their own Zelle accounts.

25          THE COURT:  Hold on just one second.

1           MR. HALPERN:  I'll go through them.

2           THE COURT:  Anyway, go ahead.

3           MR. HALPERN:  They didn't do anything to try to hide

4    the money.  They didn't do anything sophisticated to avoid

5    getting caught.  And getting caught involved nothing more than

6    somebody who got a 1099 asking why.

7           The BOTs or apps that Probation certainly in my case

8    and others argues represents sophistication, if you do a search

9    in any -- for example, Google Play store which is the largest

03:12 10   collection of apps in the world, you can find hundreds of fake

11   GPS products that can be purchased online.  This is the first

12   exhibit.

13          THE COURT:  Okay.  This is the document we previously

14   marked as Exhibit 1, correct?

15          MR. HALPERN:  Correct.  And all this is is a search in

16   Google Play for fake GPS products.  And there are dozens and

17   dozens of them, most of them for free.  These are used widely.

18          The second document I have is an article about

19   thousands of delivery drivers in Indonesia using these apps to

03:13 20   create --

21          THE COURT:  I'll make this document you've got up on

22   the screen Exhibit 2.  It's a Motherboard article.

23          MR. HOLCOMB:  I think this would be Exhibit 2 because

24   we've already got Exhibit 1.

25          THE COURT:  I'm sorry.  This would be 2?

1           MR. HALPERN:  This would be 3.

2           THE COURT:  So this one is 2.  That was 2.  This is 3.

3           MR. HALPERN:  So the way these worked was that the

4    driver would receive a notification of where a customer was

5    located, and if they were able to use a BOT to make it appear

6    that they were located closer to the customer than they

7    actually were, then the company would direct them to get the

8    business.  There are literally millions of these that have been

9    sold.  If you look at this listing, ten million downloads of

03:14 10   this one particular product, fake GPS, ten million.

11          So to argue that the use of some BOT -- and that's

12   just one of them, one of dozens that millions of people have

13   purchased.  And you also have to assume that of those millions

14   of people, a whole lot of them are driving for these companies

15   because it's an obvious use.

16          With respect to my client, Probation says that

17   sophistication was established because after Mr. Ponciano

18   bought one of these apps, he contacted co-defendant Barbosa to

19   ask for help in how to install it.  I mean, I was on the phone

03:15 20   yesterday with Pitney Bowes for a half hour trying to figure

21   out how to download new rates into my machine.  The notion that

22   sophistication is based on his needing to ask for help on how

23   to download something that tens of millions of people have

24   purchased and downloaded I just think is baseless.

25          The dark web, I've never had a case involving the dark

         1    web, so I was kind of curious, so I Googled.  This is the next
         2    exhibit, How to Use the Dark Web.
         3              THE COURT:  Hold on.  Okay.  Google.  This one, what
         4    number is the next one?
         5              THE CLERK:  4.
         6              THE COURT:  So this is number 4.
         7              MR. HALPERN:  Right.  So I Googled, "How do I use the
         8    dark web?"  And what I got was the easiest way to get on the
         9    dark web is to download the TOR browser.  So I went to -- this
03:16   10    is the next document.
        11              THE COURT:  All right.  Go ahead.
        12              MR. HALPERN:  I went to the website for the TOR
        13    browser.  And all you do is -- it's really complicated.  You
        14    have to tell it whether you're using a Windows system or an
        15    Apple system and you click "Install."  And now you've got a
        16    browser that is capable of accessing the dark web.  And the
        17    next article is about the dark web, which has two and a half
        18    million --
        19              THE COURT:  Wait a minute.  That's not the next
03:17   20    article in my pile.  That's one that says, "How many people
        21    used the dark web in 2023."  Okay.  I've got it.  Make that
        22    Exhibit 5.
        23              MR. HALPERN:  Two and a half million a day.  And for
        24    the government to say, well, there's no index, there's no
        25    index, when I use Google, this is simply, this is the same as

1    Google, except that you are able to buy things that you can't

2    buy legally on Google.  But the fact that it's illegal and that

3    you can do illegal things on it doesn't make it sophisticated.

4    There's nothing to it.  You download a browser and you search

5    for whatever you want.  You type in, "I want to find fake IDs,"

6    and there you go.

7         There's another argument that they make that VPNs are

8    sophisticated.  So this is a device that would allow you to

9    hide your actual computer identity.  So the next article --

03:18 10        THE COURT:  We'll make that Exhibit 6.  "How to set up

11   and use a VPN."

12        MR. HALPERN:  Right.  So this is from PC Magazine.

13   "There's a thriving market with VPNs with slick apps at

14   affordable prices that require no network know-how to use."

15   Then I did a Google search again on Google Play for VPNs.  This

16   is the last exhibit.  There's hundreds of them.

17        THE COURT:  Hold on just one minute, one second.  Let

18   me find that.  Secure VPN.  I don't see that.

19        MR. HALPERN:  I think this is the last or close to the

03:19 20   last.

21        THE COURT:  I don't think we have it.  You'll give us

22   a copy later.  Go ahead.  It will be Exhibit 7.

23        MR. HALPERN:  I'm pretty sure it's up there.  This is

24   just a search that I did in Google Play for VPNs.  I got 11

25   pages of results.  If you just look the first one, it says

1       "Secure VPN chosen by 100 million users."  That's just one out

2       of 11 pages.

3              I mean, I think the argument that using a VPN is

4       sophisticated is just baseless, so I can't speak for every

5       defendant.  I don't know what every defendant did.  I know that

6       with respect to Mr. Ponciano, the manner in which the phony

7       licenses are created is that he obtains a photograph of the

8       person who wants to buy a driver account.  He sends a copy of

9       the photograph to a co-conspirator.  The co-conspirator has

03:20 10   loaded into a computer a license form, and all they do is put

11      the picture into the license form.  They just photo-shop the

12      picture.

13             THE COURT:  They don't add any authentication

14      features, like a watermark or a hologram?

15             MR. HALPERN:  There's no actual driver's license

16      that's ever created, right?  So to the extent you have to make

17      an image of a watermark or hologram, it's done in a photograph.

18      Because what happens here is he sends a photograph of the

19      person's face to a co-defendant.  The co-defendant imbeds that

03:21 20   picture into a form picture of a license plate -- I'm sorry --

21      driver's license and emails him back a picture of the driver's

22      license.  That's it.

23             THE COURT:  Does it have a picture of a watermark?

24             MR. HALPERN:  I assume it may have a picture of a

25      watermark because the form itself may have a picture of a

1    watermark.  I don't think that makes it sophisticated.

2         In other words, you don't have to create an actual

3    watermark, right?  You just have to create a photograph of

4    something that looks like it's a watermark.  They send it back

5    to him, just send him a picture of a driver's license with this

6    photograph embedded in it, and when the application is

7    submitted to the company, he sends them the photograph.  That's

8    it.  Right?

9         So when you say there's nothing really more

03:22 10   complicated here than photo-shop, I don't think there is.

11   You've got a pre-created form of a driver's license.  The

12   picture, the only alteration that occurs is that the photograph

13   that he provides them is photoshopped into the stock image of

14   the same driver's license, right?  They changed the name, they

15   changed the picture, and they send it back to him, and he sends

16   a photograph to the company.  He doesn't send a driver's

17   license to the company.  Nobody's marketing driver's licenses

18   that have to look like real driver's licenses.  This isn't like

19   *Jones* where you had to create an actual driver's license.

03:23 20        THE COURT:  You don't create a driver's license to

21   send the company?

22        MR. HALPERN:  Pardon?

23        THE COURT:  They didn't send --

24        MR. HALPERN:  They sent them photographs.

25        THE COURT:  Yes, a photograph of a driver's license.

1        MR. HALPERN:  They sent them photographs of a

2    photograph.

3        THE COURT:  A photograph that appeared to be a

4    photograph of a driver's license.

5        MR. HALPERN:  Exactly.  But nobody ever actually had

6    to have a driver's license.  So the level of sophistication

7    that's necessary to create a driver's license that's going to

8    be inspected is different than creating a photograph of a

9    driver's license, right?

03:23 10        THE COURT:  Okay.  I understand the argument.  To

11    prepare for the argument, the rulings on objections with regard

12    to your client, you don't need to do it right now, but you need

13    to think about how you're going to address the cases that I

14    just brought to your attention, the First Circuit cases.

15        The whole can be more than the sum of the parts.  You

16    might argue that zero plus zero plus zero is zero, but if there

17    are a number of elements and they get put together, it could be

18    that that's sophisticated means, even if one of the elements

19    alone would be insufficient.

03:24 20        You don't have to address it now.  This is what this

21    argument is intended to do.  But based on what I know now, and

22    this is all tentative, I continue to be open-minded, I would

23    find the sophisticated means enhancement applies.  And then the

24    last one is the authentication features.

25        So the question is whether there's another two-point

1   enhancement under Section 2B1.1(b)(11)(A) and (B) and

2   Application Note 10(A) applies.  It says, in effect, if there's

3   a means of identification -- and my understanding is a driver's

4   license, or picture of a driver's license is a means of

5   identification -- my understanding is the driver's license is a

6   means of identification and a fraudulent hologram, watermark or

7   other feature used by the issuing authority would be an

8   authentication feature.

9           So I hadn't thought up until you just made the

03:25 10   argument about whether there's a distinction between a picture

11   of a driver's license or a driver's license for this purpose.

12   But where, as here, the defendants pled guilty to aggravated

13   identity theft, merely possessing or transferring a fraudulent

14   means of identification would not be sufficient.  That's

15   Section 2B1.6 Note 2.  The enhancement can only be applied if

16   the defendant was involved in the production of a fraudulent

17   means of identification.

18           This is the case that I brought to your attention

19   yesterday.  *Jones,* 551 F.3d 19, 25-26, First Circuit case.  In

03:26 20   that case, removing air bubbles was found to be producing an

21   authentication feature.  And I think with regard to this

22   enhancement, the Section 1B1.3, relevant conduct principles

23   would apply.  So that's the framework.

24           What's the government's argument as to why it should

25   be applied and why should it apply even if it's only -- here --

 1    also, among other things, why would it apply if it's only a

 2    photograph of a driver's license, not a counterfeit driver's

 3    license?

 4         MR. HOLCOMB:  Well, Your Honor, to that question,

 5    first, none of that is new information.  I think it's right in

 6    the charging documents that in some cases there were

 7    photographs of actual driver's licenses, and in other cases the

 8    defendants used forms.  But even those forms used real driver's

 9    license information, and so it's the driver's license number

03:27 10    and all of the corresponding information of a real driver's

11    license, so I think that based on --

12         THE COURT:  Are those authentication features?

13         MR. HOLCOMB:  No.  I think that goes more to means of

14    identification.

15         THE COURT:  Okay.  So it's means of identification.

16         MR. HOLCOMB:  Yes.

17         THE COURT:  I was more focused on whether there are

18    authentication features.

19         MR. HOLCOMB:  Your Honor, as I understand

03:28 20    "authentication features" based on the statutory definition, I

21    think they're defined in a way that makes it clear that we're

22    talking about the security features -- with respect to a

23    driver's license, we're talking about the security features on

24    it.  So that's where you get the watermark example, the

25    hologram, in some cases the state will have the larger in-color

1        photograph of the driver and a miniature black and white

2        photograph, the same photograph but in miniature in black and

3        white in a corner.  That's another security feature.

4            There's evidence from the WhatsApp chats that were

5        produced that show videos of one of the defendants, I believe

6        it's Barbosa, physically replacing both the colored driver's

7        license in the big square and then doing the same with the

8        black and white photo of the face in the bottom corner.

9            And so what I'm getting at here is that our position

03:29 10   all along, notwithstanding *Jones*, is that access devices,

11       authentication features, means of identification, they're all

12       distinct concepts with distinct statutory definitions.  And so

13       I think there's still a question as to how Jones would apply as

14       to authentication features, and it's not just in my mind a

15       textual argument.

16           There's an independent significance to the

17       authentication features in this case because we're not talking

18       about a case like in *Jones* where the importance of having the

19       means of identification is just to pass yourself off as

03:30 20   somebody else at the bank and to get a set of human eyes to

21       accept that you are who you say you are.

22           Here, they were uploading the driver's license images

23       to computer systems, the company's platforms and their

24       applications.  And many of them were being rejected because

25       they didn't look right because they didn't conform to what a

1    real license would or should look like according to those

2    programs.  And they certainly did not pass the test if the

3    authentication features did not match what a real license would

4    look like, any halograms, watermarks, things like that.

5         And the chats are replete with the defendants

6    discussing the company's applications starting to reject

7    accounts and rejecting photographs of licenses.  That's all in

8    the chats.

9         Turning to *Jones*, I recognize at least with respect to

03:31 10   the term "access devices," there's really no discussion in

11   *Jones* about whether access devices are the same thing or

12   distinct from means of identification, but it does appear that

13   the First Circuit treated them the same way.

14        The court determined that the access device was the

15   driver's license that had the bubbles that the defendant poked

16   or directed somebody else to poke out of the lamination.  And

17   so, you know, I recognize that at least with respect to the

18   *Jones* case, in those concepts, *Jones*, yes, found that driver's

19   license was both the means of identification for the purposes

03:31 20   of 1028A, the 1028A guideline that is, and the access device

21   with respect to the enhancement we're talking about here.

22        But I do think that it's an open question as to

23   whether the driver's license here, the means of identification

24   can also be considered the authentication features, which is

25   the statutory term that we're focused on and that I believe

1    Probation has determined, in Probation's view -- I don't want

2    to overstate it -- thinks applies.

3         So that's I guess our argument with respect to the

4    concept of authentication features.

5         THE COURT:  So what is the authentication feature if

6    there's a photograph of the driver's license?

7         MR. HOLCOMB:  It would be either a holograph or a

8    watermark or whatever the feature may be, if it's a miniature

9    photograph, it's whatever -- usually the state has decided that

03:33 10   as a security feature it's going to prove that a license is a

11   real license by, you know, all licenses will have this thing

12   that's difficult to replicate.

13        In our view, that's distinct from the actual license

14   itself.  That's an additional component of this, that was

15   duplicated and reproduced every time that a driver's license or

16   a fake driver's license image was created in this case.

17        So, yes, our first argument is that it's unclear that

18   *Jones* even applies to the trafficking of authentication

19   features as opposed to the trafficking of access devices or an

03:33 20   access device that is itself the means of identification as was

21   the case with the driver's license in *Jones*.

22        But assuming that *Jones* does apply in this case then

23   and we're confined to arguing that the enhancement applies

24   based on the production rather than the trafficking in

25   authentication features, *Jones* held that the enhancement can

1    still apply for production.  And the circuit looked to the

2    guidelines commentary on the definition of production in *Jones*,

3    which included manufacture, design, alteration, authentication,

4    duplication, assembly.

5        And so at least with respect to defendants who created

6    the driver's license images or fake driver's license images,

7    those defendants unquestionably altered driver's licenses that

8    they used and uploaded.  And I think that with respect to any

9    individual defendant's responsibility or the enhancement to any

03:34 10   individual defendant there's strong argument that the

11   enhancement applies if the license, the fake license with the

12   authentication features, has been produced at that defendant's

13   direction.

14       In *Jones*, I think the court commented that it wasn't

15   clear whether the defendant herself was the one to alter the

16   license or somebody else did it at her direction.  But the

17   court found it sufficient, even if it was the latter case, that

18   somebody had altered the license at her direction.

19       THE COURT:  Thank you.  All right.  Who would like to

03:35 20   address this for the defendants, if anybody?

21       MR. HOLCOMB:  They're not jumping up because it's such

22   dry material, Your Honor.

23       MR. BARRON:  It's rather dense material.  I was more

24   prepared on the other issue.

25       I'm not sure what it is I'm addressing, whether we're

1    talking about the *Jones* case, the difference between

2    production --

3          THE COURT:  Well, we're talking about whether the

4    enhancement relating to an authentication feature should apply.

5          MR. BARRON:  I'm hearing different things from the

6    government and Probation on one side and then the court's

7    reference to the *Jones* case on the other.

8          THE COURT:  If I'm confused, if I shouldn't have drawn

9    *Jones* to your attention, and I wondered if it was applicable,

03:36 10  why at least one of the 13 of you didn't cite it.  You can

11   explain to me why it's not.  Mr. Halpern did to some degree.

12   But the question is, there's a two-level enhancement for the

13   production or trafficking of an authentication feature.

14         MR. BARRON:  Right.  It seems that *Jones* says that if

15   you traffic, you can get the enhancement, but you can also get

16   it additionally, I guess -- well, in other words, in spite of

17   the 1028A conviction, you can get the enhancement under *Jones*

18   if you did more than just traffic.

19         THE COURT:  Exactly.  As I understand it, all of the

03:37 20  defendants -- well, I know all the defendants pled guilty to

21   aggravated identity theft.  So I read *Jones* to be saying that

22   there couldn't be an enhancement in those circumstances

23   relating to authentication features merely for possessing or

24   transferring, say, a phony driver's license; that the

25   enhancement could only apply in a case where the defendants

1  pled guilty to aggravated identity theft if the defendant --

2           MR. BARRON:  Also produced.

3           THE COURT:  -- yes, fraudulently produced the phony

4  driver's license with an authentication feature like a hologram

5  or a watermark.

6           MR. BARRON:  One of the problems of course is the

7  authentication feature exists in any image of a driver's

8  license.  So if somebody is making the driver's license and

9  violating 1028A, how are we going to produce it twice?  Because

03:38 10  essentially what we're saying is twice because the first

11  trafficking, right, is taken care of by 2B1.6.  But now we're

12  going to go back to 2B1.6 because there's an authentication

13  feature.  No driver's license, as Mr. Halpern pointed out, is

14  without an authentication feature.  It seems to be a kind of

15  check-box application of the guidelines that doesn't make much

16  sense.

17           If Your Honor finds, however, *Jones* is *Jones*, I don't

18  have to agree with it.  I have to deal with it.  *Jones* is a

19  case in which somebody actually produced, she sat down and she

03:39 20  said this won't do, I'm going to fix this, I'm going to create

21  essentially or help create this authentication feature, being a

22  driver's license -- excuse me -- this means of identification

23  called a driver's license.

24           And I don't think we have that here.  What we have

25  here is a single license, in each one of these instances, a

1    single license being produced.  None of these defendants have

2    gone back.  In other words, they farmed it out, right?  The

3    defendant said, "I need these driver's licenses.  Here are the

4    pictures."  Just like happened in *Jones*.  The same thing in

5    *Jones*.  They sent pictures to New York, and the license came

6    back.

7         That's essentially what's going on here, is that the

8    defendants are saying, "Okay, here is somebody who wants to

9    drive.  Here is his picture.  Put him on a Massachusetts

03:40 10   driver's license."  And the Massachusetts driver's license

11   comes back.  They haven't changed what they got back.  And I

12   think that puts an end to I think *Jones* is --

13        THE COURT:  What they got back from whom?  They got it

14   back from a co-conspirator, and the co-conspirator produced it,

15   and it could be relevant conduct to the person who didn't

16   produce it.

17        MR. BARRON:  I don't know if the co-conspirator

18   actually produced or if the co-conspirator knew somebody who

19   could produce.

03:40 20        THE COURT:  Well, if the co-conspirator got somebody

21   else to produce, I think that person is an unindicted

22   co-conspirator.

23        MR. BARRON:  Possibly, if they knew they were part of

24   this conspiracy and not some other.  I mean, we would have to

25   show that they're an unindicted co-conspirator.

1           THE COURT:  I think they would be an unindicted

2    co-conspirator in some conspiracy.  Then it would be a question

3    whether it's this conspiracy or some other conspiracy.

4           MR. BARRON:  A variance from this conspiracy.  I think

5    that's too remote, too remote an area to go.

6           If this defendant is sending out something to get

7    back, he's doing the same thing that the defendant in *Jones*

8    did.  It's exactly the same.  And we're not introducing an

9    enhancement of production on top of somebody just for sending

03:41 10  it out and bringing it back.  That's what *Jones* seems to do.

11          Now, I understand Your Honor's question there, but it

12   goes out, comes back just like in *Jones*, except, unlike *Jones*,

13   there's no pinprick.  There's no redevelopment of this license

14   to make it better, which perhaps would be substantial.

15          Now, *Jones*, how it reads a disjunctive list as to

16   offer two opportunities, I don't know, but that's what is done,

17   and that is the case I have to deal with.  As I say, they

18   haven't altered what they got back, so they're aren't involved

19   in the production.  Sophisticated means -- should I go on or

03:42 20  not?

21          THE COURT:  Okay.  You want to address sophisticated

22   means, too?

23          MR. BARRON:  Sorry.  That's right.  Mr. Halpern did

24   that.  We're done I guess on that.

25          THE COURT:  I think that's enough for now.  Thank you.

1          MR. BARRON:  All right.

2          MR. HALPERN:  Can I clarify one point on *Jones*?

3          THE COURT:  Yes.

4          MR. HALPERN:  The person who was involved in creating

5    the phony licenses in *Jones* was a co-conspirator.  It's the

6    same as it is here.  What *Jones* requires is more than knowing

7    that a co-conspirator is going to do something.  The individual

8    defendant has to do it.  That's why they were focusing on

9    whether *Jones* herself made the pinprick or told somebody to do

03:43 10  it, but merely sending identification information to a

11   co-conspirator isn't enough because that's what happened in

12   *Jones*.

13         THE COURT:  Okay.  This is what I was hoping to get

14   because I put in there -- this is helpful; let me put it that

15   way.  There may not be relevant conduct analysis if the person

16   has to have done it himself or herself.  I'll look at *Jones*

17   more closely.

18         At the moment, you can consider me agnostic, uncertain

19   as to whether the identification feature enhancement would

03:43 20  apply.  Let me tell you in a little more perhaps organized way

21   or reiterate what my thinking at the moment is on loss, which I

22   think is the major issue perhaps.  And then I'm going to take a

23   break, and we're going to have to have some discussion about

24   how we proceed, because one thing I'm persuaded of, these

25   sentencings are going to take longer than I thought when I

1    scheduled them for three a day for five days in a row.  So

2    we'll see where we're going.

3          But here is my present and still tentative view on

4    loss.  At the moment, I continue to think that it's most

5    appropriately calculated -- well, first, I think there was

6    loss.  It's most appropriately calculated by using payments

7    from the rideshare and delivery companies to the defendants,

8    so-called deposits.

9          At the moment -- and this I just need more factual

03:45 10   information on, but at the moment I don't think -- based on

11   what I know now, I doubt I would include the Zelle payments,

12   which may be gain rather than loss.  I do recognize that this

13   approach doesn't capture the amounts riders paid to other

14   fraudulent drivers who haven't been indicted and paid by them

15   to the defendants.

16         As I said earlier, according to Probation's

17   calculations, this is an issue that involves two levels in the

18   guidelines.  Is there roughly a $2 million loss or is there a

19   $5,700,000 loss?  It's a question of whether there would be an

03:46 20   increase of 16 levels or 18 levels.

21         If there's no loss, I would depart upward at the

22   moment under Application Note 21 because a total offense level

23   would substantially understate the seriousness of the offense.

24   My reasoning as of now is as follows:  Application Note 3

25   applies to the determination of loss.  Note 3(A)(1) says actual

loss means reasonably foreseeable pecuniary gain.  Note
3(A)(iii) says that pecuniary -- sorry -- pecuniary harm.
Application Note 3(A)(iii) says pecuniary harm means harm
that's monetary or that is otherwise measurable by money.
Application Note 3(F)(v) does not apply but it has relevance.
It provides that in certain specified circumstances,
misrepresentation of services or goods causes a loss as the
term is used in the guideline, meaning conduct that causes
pecuniary harm.

03:47        For example, a scheme in which services were
fraudulently provided by a person falsely posing as a licensed
professional causes, according to that Application Note, loss.
And the (F)(v) further says that, "In such cases, the loss
includes the amount paid for the services with no credit for
any value the services may have had."  And the application note
also treats goods and services equally.  So the defendants
don't fit into any of the 3(F)(v) categories.

        However, the most relevant case law indicates that the
defendants' fraudulent conduct caused loss in the full amount
03:48 paid to the defendants for rides or deliveries by the
defendants should be included in the calculation of loss.

        *Alvarez-Gonzalez,* 277 F.3d 73, 78 involved adulterated
milk.  The law prohibited its distribution in interstate
commerce.  The First Circuit held that there was both actual
and intended loss, and because the product could not be

1    lawfully sold, its value is zero for the purpose of calculating

2    loss.

3          With regard to riders, and actually I think the people

4    who ordered for delivery companies, this case is analogous to

5    *Gonzalez-Alvarez*.  The rideshare industry is heavily regulated.

6    Drivers are required to have background checks to establish,

7    among other things, that they are licensed to drive and are not

8    sex offenders and do not have a disqualifying criminal history.

9          More specifically, the conduct in this case took place

03:50 10   largely in Massachusetts and California.  So, for example, in

11   Massachusetts, to be able to lawfully provide services for a

12   transportation network company, which Uber and Lyft, for

13   example, would be, each driver must successfully complete a

14   two-part background check.  That's 220 Mass. Reg. Section

15   274.06.

16          First, the Transportation Network Company must

17   complete a nationwide background check for the driver that

18   reviews criminal history, sex offender status, and driving

19   history.  Second, the Commonwealth performs its own background

03:51 20   check to ensure that a driver meets the suitability standard in

21   Section 274.21, which establishes age and license requirements

22   and bars drivers with certain criminal and driving histories.

23          To facilitate the Commonwealth's background check, the

24   Transportation Network Company must submit its driver roster to

25   the transportation network company division.  The roster must

1    include, among other things, the driver's name, license

2    information, and the last six digits of the driver's social

3    security number.  Failure to comply with these requirements can

4    result in a company being penalized, including monetary

5    penalties under Section 274.14.

6         Similarly, in California, a company must have a

7    criminal background check completed for each driver.  That's

8    California Public Utilities Regulation, Section 5445.2.  And if

9    the company doesn't comply, it's also subject to monetary

03:52 10   penalties of $1,000 to $5,000 for each offense.

11        So this is a regulated industry.  It is regulated to

12   try to assure the safety of people who are being driven and by

13   people who are letting strangers come to or opening their doors

14   to if there's a delivery.

15        Here the defendants who drove and many others involved

16   in the scheme could not have passed the background check.

17   That's why they needed the fraudulent identities and licenses.

18   Therefore I find this is analogous to the adulterated milk in

19   *Gonzalez-Alvarez*, that the loss amount should not be diminished

03:53 20   by any credit for the value of the ride.  It should be deemed

21   zero.

22        If it's necessary, and I'm not sure it is, I would at

23   this point find that if riders knew that particular drivers

24   were not vetted as required by the law and the companies had

25   not done the necessary vetting, they would not have taken and

1    paid for the Uber or Lyft rides or used Uber or Lyft.  With

2    regards to rides, they would have taken a taxi, a subway,

3    driven, or walked instead.

4         The case that is consistent with this analysis and

5    conclusion are *Ihenacho*, 716 F.3d 266, 277-78, First Circuit

6    case involving medication without a valid prescription.  And

7    the medications were real, but there was no required valid

8    prescription.  *Bhutani*, 266 F.3d 661, 668-70, there the

9    medications being sold were not FDA approved.  And *Marcus*, 82

03:55 10   F.3d 661, 668-70 where the medications were not FDA approved

11   and the gross amount of the sale was the measure of loss.

12        I also find that *Cadden*, 965 F.3d 1, 32, another First

13   Circuit case, is, in its pertinent part, analogous part

14   consistent with the analysis I've just done because in *Cadden*

15   the drugs sold based on the fraudulent representation they were

16   properly compounded were included in the loss.

17        In addition, if I'm incorrect in the view that there

18   was loss and no value should be attributed to the services

19   provided because the riders did not get the benefit they

03:56 20   bargained for, that is, vetted qualified drivers, I at the

21   moment would depart under Application Note 21 because the

22   offense level would substantially understate the seriousness of

23   the offense.

24        Application Note 21, by its terms, provides a

25   non-exhaustive list of examples.  In this case, even if no

1    rider was harmed by being with an unqualified driver, the

2    riders were at risk and the companies were, too, for potential

3    liability, traffic accidents, if it turned out, if they had

4    been negligent, for example, I assume, in vetting the drivers.

5         Therefore, the absence of pecuniary harm would not

6    fully or fairly reflect the seriousness of the crime.  And the

7    predecessor to Application Note 21 was applied to upwardly

8    depart in *Bobwick*, 113 F.3d 1302, 1304 and *Ravich*, 128 F.3d

9    865, 870, I believe a mortgage fraud case.

03:58 10    If I departed, I would use the payments made to the

11   defendants by the companies to determine the reasonable range

12   for the departure which would result in essentially using the

13   same guideline range as if there had been loss.  I would

14   attribute no value to the services provided.

15        With regard to calculating loss, as I said, at the

16   moment I would use the deposits from the companies to the

17   defendants but not the Zelle payments.  When I say "use," the

18   total amount of deposits from the company to the defendants for

19   defendants' own activities but not the Zelle payments with

03:59 20   regard to non-defendants.

21        The loss would be the total amount of the deposits

22   from the companies to the defendants for the rides or

23   deliveries they did.  Actually, the total loss is actually the

24   deposits from the companies to the defendants.  The defendants

25   argue that some of the deposits paid were paid to drivers who

1    were not defendants.  However, those drivers, if they got

2    fraudulent licenses and accounts, also caused loss because they

3    weren't vetted as required by law and provided worthless

4    services.  The defendants intended and caused this loss.

5         At sentencing I will have to analyze based on the

6    facts, including the stipulated facts, the amount of the loss

7    attributable to each defendant and apply the relevant conduct

8    principles in 1B1.3, including reasonable foreseeability.

9         With regard to the Zelle payments, some are from

04:00 10   unauthorized drivers who are not defendants, it appears at this

11   point.  If the amount could be reasonably estimated, it would

12   be includable loss, but not all Zelle payments from drivers who

13   were not defendants to the defendants are for rides provided.

14   They could have been for rent, for example, if they were

15   roommates.  And some evidently were payments for BOTs.  And

16   these payments, say for the BOTs or for the licenses, would be

17   gain to the defendant but not loss to the victims, either the

18   riders or recipients of deliveries or the company.

19        So if the government can satisfy the requirement of

04:01 20   making a reasonable estimate of how much of the Zelle payments

21   fit my description of loss, it would be included.  But so far

22   Probation at least thinks that's not feasible.

23        It's now five after four.  We're going to resume at

24   4:15, not for too long I hope, but I want to talk to you about

25   the sentencing hearings because the schedule is going to have

```
 1    to be somewhat altered.  So court is in recess for ten minutes.
 2              (Recess taken 4:02 p.m. - 4:24 p.m.)
 3              THE COURT:  All right.  As I mentioned, for a
 4    combination of reasons, the dates for the defendants'
 5    sentencings that I included in the January 24 order need to be
 6    adjusted.  I don't think it's realistic to do three a day, and
 7    my availability the week of March 13 has become more limited,
 8    particularly later in the week.  I think there may be certain
 9    value to doing the defendants who don't have plea agreements
04:23 10   first to have robust argument on some of the issues, additional
11    robust argument.
12              So here is my present thinking, but this isn't etched
13    in granite.  Looking at my schedule, I'm inclined to schedule
14    Aguiar and Ponciano for March 13, let Mr. Halperns and
15    Mr. Barron continue their tag-team match.  Da Fonseca and
16    Cabral on the 14th.  No additional sentencings that week.  I've
17    just had a trial become a guilty plea, a trial I was going to
18    start on April 10, so I would do basically two a day starting
19    April 11.  I think Correa, Guimaraes Neto, Alves Neto Pereirra,
04:24 20   Barbosa, Da Silveira and Braga.
21              Does anybody anticipate a problem with that scheduling
22    and order?  And if turns out that somebody has a serious
23    conflict, a date could be adjusted.  Are there any immediate
24    thoughts?
25              MR. HOLCOMB:  That would work for the government, Your
```

1  Honor.

2          MR. BARRON:  Fine for Mr. Aguiar, but we do have a

3  motion requesting additional time to file our memorandum.

4          THE COURT:  I haven't seen that.

5          MR. BARRON:  I filed --

6          THE COURT:  What's that?

7          MR. BARRON:  I filed it while we were here.

8          THE COURT:  Well, additional time, when would it be

9  due and when do you propose to --

04:25 10        MR. BARRON:  I was suggesting another week.

11          THE COURT:  Well, I don't know at the moment when it's

12  due.

13          MR. BARRON:  The current due date is Monday.

14          THE COURT:  So you want another week that would take

15  you --

16          MR. BARRON:  To the 6th, Your Honor.

17          THE COURT:  But the problem is I built in time for

18  replies and there wouldn't be any time.  See, I have to read

19  this stuff.

04:25 20        MR. BARRON:  Yeah.

21          THE COURT:  What about Wednesday?

22          MR. BARRON:  Better than nothing.  Friday would be

23  better.

24          THE COURT:  Well, the government needs to respond to

25  it.

```
 1            MR. BARRON:  The government and I, I thought, were
 2   supposed to do it at the same time.
 3            THE COURT:  You do.  But look, I gave you a date.  I
 4   thought you were going to do simultaneous briefing for this
 5   hearing.  And then 12 days after the due date, you filed a
 6   reply.  And then the government had to hustle to file a very
 7   good sur-reply.  But the memos have to be submitted because I
 8   read them.
 9            MR. BARRON:  Yes, of course.
```
04:26 10            THE COURT:  That's the purpose.  So look, you've done
```
11   a lot of work already.  I'll give you until Wednesday, which is
12   what, March 1 maybe?
13            MR. BARRON:  March 1, yeah.
14            THE COURT:  And the government will reply -- the
15   government should do further briefing on the same schedule, if
16   you want to do further briefing.
17            MR. HOLCOMB:  I agree, Your Honor.  I would just ask
18   that we also have ours extended to Wednesday and then we can
19   have the same days simultaneous --
```
04:27 20            THE COURT:  Yes, Wednesday, and if there are any
```
21   replies the following Monday, which is March --
22            MR. BARRON:  6.
23            THE COURT:  March 6.  Okay.  And look, you can make
24   this laser-focused.  You have unusual maybe unprecedented
25   knowledge of what my state of mind is, although I haven't read
```

1    the Presentence Reports yet.  Okay?

2         Look, you've all done a very good job and we're

3    working hard to keep up.  I want to thank the interpreter for

4    operating in difficult circumstances all by herself all day,

5    thank you very much, and of course the court reporter,

6    probation officers, my staff, the marshals, everybody.

7         Is there anything further in this matter for today?

8         MR. HOLCOMB:  No, thank you, Your Honor.

9         MR. BARRON:  No, Your Honor.

04:28 10      THE COURT:  We will be in recess.

11        Excuse me, one more thing.  I'm directing, ordering

12   that you order the transcript of today's proceeding.  It may

13   take a while to prepare, but I expect you'll have it before the

14   sentencings.  Okay?

15             (Adjourned, 4:27 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 6th day of March, 2023.

10

11              /s/ Kelly Mortellite

12              _____

13              Kelly Mortellite, RMR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25