United States District Court
District of Massachusetts

| | |
|---|---|
| United States of America ) | |
| ) | Case No. 1:21-CR 10158 MLW |
| V. ) | |
| ) | |
| (7) Thiago De Souza Prado ) | 08 / 18 /2023 |
| Defendant, ) | |

# DEFENDANT'S RESPONSE TO GOVERNMENT'S OPPOSITION DOC # 1094 TO MOTION TO DISMISS THIRD SUPERSEDING INDICTMENT FOR FAILURE TO STATE AN OFFENSE AND LACK OF JURISDICTION.

The charged defendant Thiago De Souza Prado respectfully file this response to the Government's opposition to Motion to dismiss the third superseding indictment for failure to state a federal offense and lack of jurisdiction, in light of Supreme Court *Ciminelli, Percoco*, and First Circuit Precedent decisions *United States v. Abdelaziz, 68 F.4th 1 (1st Cir. 2023); United States v. Berroa, 856 F.3d 141 (1st Cir. 2017)*. Pursuant to *Fed. R. Crim. P. 12(b)*.

## *Scheme to Obtain Money or Property from Victims*

To prevail on a charge of wire fraud, the Government must prove: (1) a scheme to defraud; (2) the use of a wire, radio, or television to further the scheme; and (3) a specific intent to defraud. *United States v. Lindsey, 850 F.3d at 1013.9*. On a motion under Federal Rule of Criminal Procedure 12, the failure to allege facts that, if proven, would satisfy the intent element of the offense is a fatal defect requiring dismissal of the indictment. See *United States v. Mitchell, 867 F.2d 1232, 1233 (9th Cir. 1989)* *("To charge a scheme to defraud under section 1341, McNally requires an allegation that Mitchell intended to deprive the city of money or property. The indictment in this case is devoid of any such allegation." (Citations omitted))."* For purposes of the mail and wire fraud statutes, the thing obtained must be property in the hands of the victim." *Cleveland v. United States, 531 U.S. 12, 15, 121 S. Ct. 365, 148 L. Ed. 2D 221 (2000); see also Carpenter v. United States, 484 U.S. 19, 25 n.6, 108 S. Ct. 316, 98 L. Ed. 2D 275 (1987)* *("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here.")*. The specific intent element of wire fraud, thus, "must be [the intent] to obtain money or property from the one who is deceived." *United States v. Lew, 875 F.2d 219, 221 (9th Cir. 1989); see also United States v. Ali, 620 F.3d 1062, 1071 (9th*

1

*Cir. 2010) ("under Lew, Microsoft must be the victim from whom property was taken."); **Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Emps. & Rest. Emps. Union**, 215 F.3d 923, 927 (9th Cir. 2000) ("The purpose of the mail fraud and wire fraud proscriptions is to punish wrongful transfers of property from the victim to the wrongdoer, not to salve wounded feelings."). See;* **United States v. Holmes**, *2020 U.S. Dist. LEXIS 24551 (9th Cir. 2020).*

## *Reasons to grant motion to dismiss*

The defendant states that the Government opposition *(Doc# 1094)* is in complete harmony with the issue that Supreme Court concerns in **Ciminelli** about expanding jurisdiction of the statute. And that the Government effort to circumvent the *(mens rea)* "Lack of specific intent to deprive someone" of "money or property", stating at that Mr. Prado is charged with stealing money from ride-share companies in complete unsupported by the TSI.

Mr. Prado state that he did not requested the court to decide *both* "money" or "property", the defendant states that was most rational to think that the Government was based on "property" since is not any specific intent to deprive of money in the TSI whatsoever. Now that the Government is banking its case on "money", it does not change the fact that the TSI in insufficient of *(mens rea)* requirement specific intent to deprive someone of "money", in order to qualify as a federal wire fraud statute.

Mr. Prado asserts that the government theory now saying that the scheme "**involve**" money is unfairly and erroneous, also "lack of a sufficiently direct causal nexus" supported by **United States v. Berroa**, and by saying that money is involved without the intent to deprive the victim the Government will be expanding the jurisdiction of the statute, Supreme Court made very clear in **Ciminelli** clarifying that a person only violate the statute *§ 1343* if the fraud intentions is to deprive someone for his money or property rights. Therefore the indictment lacks the essential element of specific intent to obtain money or property from the one who is deceived.

In the First Circuit precedent case **United States v. Berroa**, *856 F.3d 141, 149-52 (1st Cir. 2017) (reversing mail fraud convictions for "lack of a sufficiently direct causal nexus" where the government alleged that defendants used their fraudulent medical licenses to obtain payment for medical services).* The government charged a scheme to "deprive unsuspecting consumers of health care services, health care benefit programs and health care providers, of property and money through the defendant[s'] knowing[] use of [their] fraudulently obtained medical license[s]." More specifically, the defendants allegedly used their fraudulent licenses to obtain payment for medical services and issue prescriptions. They continued to write prescriptions at least until about two to three years after receiving their licenses. And the Court rejected that argument and reverse those frauds convictions. *See;* **Berroa, Supra.**

2

Mr. Prado states that company A never had been deprived of his "money" rights, actually all the facts of this case supports that company A made money in every single ride or delivery that the drivers made, even the courts recognized this at Mr. Prado's co-defendant (Wemerson Dutra Aguiar) sentence hearing.

The defendant contends that the Government theory that money is **"involve"** fails as a matter of law because the specific intent of the alleged scheme was to create company A accounts in order to obtain employment for drivers, and not to steal any "money" or property from Companies. The defendant's alleged intentions was to create accounts for drivers to work for company A, do a very good job to keep the accounts with 5 stars reviews in order to keep the accounts active for long as possible. Mr. Prado third superseding indictment lacks the essential element of specific intent to deprive company A of money or property of the scheme.

Mr. Prado asserts that if this Honorable District Court stay in the four corners of the third superseding indictment and accept all allegations as true this Court will conclude that the indictment also lacks the *(mens rea)* element specific intent to deprive the companies for "money" and property. Mr. Prado affirms that is not one single allegation on the indictment that alleged that Mr. Prado or any co-defendant in this case to intended to deprive companies of its money or property rights, or cause any type of pecuniary harm or loss to company A whatsoever. In *Boren, 278 F.3d at 914* ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment. See; *United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996); United States v. Caicedo, 47 F.3d 370, 371 (9th Cir. 1995); United States v. Buckley, 689 F.2d 893, 897 (9th Cir. 1982); United States v. Thordarson, 646 F.2d 1323, 1337 n. 25 (9th Cir. 1981)*. On a motion to dismiss an indictment for failure to state an offense, the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged. See; *Jensen, 93 F.3d at 669*. The indictment either states an offense or it doesn't.

Mr. Prado states that the TSI is clear as the day light that the objective of the alleged scheme was not money or property out of the companies' hands, but to open accounts to obtain employment for unqualified people to drive.

Mr. Prado states that the defendants alleged profits was a by-product of the scheme by renting, selling or sometimes donating those accounts to friends. (As bad as it sounds it does not qualify as a federal wire fraud).

The defendant also asserts that the relevant requirements under the Wire fraud statute are: a defendant must execute, or attempt to execute, a scheme or artifice, intended to victimize the companies by causing it an actual or potential loss of its own funds. Where the scheme involves the mere withdrawal of funds in the company's custody, the Government must show that the withdrawal exposed the company to some form of liability as a result of the fraud. There was none here. See; *United States v. Thomas, 315 F.3d 190 (3th Cir. 2002)*.

3

Mr. Prado asserts that this Honorable District court is very well familiar with the facts of this case because all the legal documents for example: FBI agent affidavit, criminal complaint, all three indictments, all rule 11 hearing and all defendant's sentence hearings, support the fact of the objective of the scheme was to create accounts for rent or sell to the drivers, not one single defendant in this case was accused or admitted to steal or intended to steal money or property from company A. Now the charged defendant Mr. Prado asserts that the Government want to change the theory of the case by saying that the objective was to obtain money from the companies, by saying that the scheme involve money. Mr. Prado states that is true that money was involved in the scheme but money is not the objective of the scheme, and by changing the theory of the case now is a major variance between his charges and his co-defendants charges.

Mr. Prado also state that the Government cannot ignore the fact that company A acted just as an agent for the Driver, the Company collect the money from its clients and pay the drivers for they work (service provided) without the companies cut which is between 25% to 40% as company's commission. See; **United States v Sullivan, 2022 U. S. Dist. Lexis 114187 (N. D. C. 2022);** that the Government points to Uber's contractual relationships with drivers in California as alleged in the Superseding Indictment. See; *Oppo. At 10:1-10.* Paragraph 7 states that Uber drivers were not considered "employees," nor were they promised a "traditional wage." *SI ¶ 7.* Drivers paid Uber service fees to use its Ride-sharing platform and Uber collected fares from its users, acting as drivers' agent. See; **United States v Sullivan, Supra.**

The Conspiracy and Aggravated Identity Theft charges raise no separate issues. None of the parties doubt that those charges stand or fall with those three substantive offenses (Counts 2, 3 and 4). If there was intent to defraud/deprive for "money" property fraud here, there was also conspiracy to commit it. But if no, not.

Because there is no proof of any kind that Mr. Prado intended to victimize the Companies or that the Companies suffered any type of loss, the Government's case as to Wire fraud fails as a matter of law.

### United States v. Holmes, 2020 U.S. Dist. LEXIS 24551 (9th Cir. 2020).

An indirect connection between the victim of the fraud and funds obtained by the fraudster is acceptable . . . ."). But, even in "indirect connection" cases, the victim must still *{2020 U.S. Dist. LEXIS 52}* be deprived of their property or money. See, *e.g., Bonallo, 858 F.2d at 1434 n.9 (noting that indirect victim, the bank, still was deprived of money).*

The Government's reliance on **United States v. Crawford** is misplaced. Crawford holds that a fraud conviction does not require the government to prove the identity of the fraud victim. *239 F.3d 1086, 1092 (9th Cir. 2001).* There, the defendant sold a painting that did not belong to her. *Id. at 1089.* The defendant argued on appeal that because ownership of the painting had not yet been established, there was no identifiable victim and the government could not prove she

4

had the specific intent to defraud someone. *Id. at 1092*. The court disagreed and held that because she knew she did not own *{2020 U.S. Dist. LEXIS 53}* the painting, she intended to deprive the owner, whoever that may be, of its use. *Id. at 1093*.

Crawford does not eradicate the requirement that a defendant's "intent must be to obtain money or property from the one who is deceived." *Lew, 875 F.2d at 221*. The Superseding Indictment alleges that Defendants intended to defraud two types of patients-ones who paid and ones whose insurance paid for the blood tests. Indeed, comparative to *Crawford*, where there was only one possible owner of the painting, here, there are two sources of money. Thus, even if the Government need not prove specific patients' identities, it still must prove that Defendants intended to deprive the class of victims of their money or property. A contrary finding would make the wire fraud statue limitless; any vague recitation of a class of persons would satisfy the statute. But this would contravene *McNally and Lew* because it would allow distinct sets of victims to be clumped into one group, which would erode any type of convergence requirement.

There are four types of possible victims in the doctor/patient scheme: paying patients, non-paying patients, doctors, and insurance companies. The Superseding Indictment does not allege insurance companies were defrauded. It does, however, allege *{2020 U.S. Dist. LEXIS 54}* that insured patients were defrauded. But it fails to connect a specific intent to defraud to such patients because it does not show Defendants intended to deprive them of money. Rather, the Superseding Indictment indicates that the money flowed from the insurance company. Hence, the Superseding Indictment does not show that Defendants intended to obtain money from the non-paying patient-victims, i.e., the one who was allegedly deceived. See id.

For these reasons, the Court **GRANTS** Defendants' motion to dismiss counts two and nine through eleven to the extent they depend on insured and non-paying patient-victims.

## *United States v. Palma, 2020 U.S. Dist. Lexis 214675 (E. D. Mich. 2020)*

Under 18 U.S.C. § 1343, it is a crime to effect with the use of wires "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The Supreme Court has held that under this statute, the government must show not only that the defendant engaged in deception but also that an object of that deception was money or property. See *Kelly v. United States, 140 S. Ct. 1565, 1571, 206 L. Ed. 2d 882 (2020) (citations omitted)*.

Counts 8-11 charge Defendant Palma with wire fraud and a portion of Count 1 charges him with conspiracy to commit wire fraud. These charges are based on four emails involving communications between Defendant and his colleagues at VM Motori, FCA, and FCA's outside counsel. Defendant argues these counts should be dismissed because the indictment fails to allege a cognizable property interest as the object of the purported scheme to defraud and three of the four counts fail to allege a communication "in furtherance" of the alleged scheme.

First, Defendant argues that to the extent the indictment alleges the purpose of the scheme was to obtain regulatory *{2020 U.S. Dist. LEXIS 10}* approval to sell the Subject Vehicles, this cannot be the basis for the wire fraud counts. See; *Kelly, 140 S. Ct. at 1573 (reaffirming that the "exercise of regulatory power cannot count as the taking of property" for purposes of the property fraud statutes).* The government does not dispute this point but argues that while fraudulently obtaining regulatory approval was a component of the overall scheme, 2 the wire fraud scheme also had the goal of fraudulently obtaining money from potential purchasers of FCA's diesel vehicles. Defendant responds by arguing that this is simply a repackaging of the deficient "wire fraud on government regulators" theory. Defendant notes that he is an engineer whose job was to calibrate diesel engines for the supplier and that he was not responsible for selling cars to FCA's customers. He also asserts that the indictment does not allege that he had any control over how subject vehicles were marketed, does not indicate how he sought to obtain customers' money, and none of the charged wires were communications with customers.

During oral argument, the government cited *United States v. Seidling, 737 F.3d 1155, 1160 (7th Cir. 2013)*, to argue that it does not have to prove that the fraud involved deception of the same person or entity whose money *{2020 U.S. Dist. LEXIS 11}* is the ultimate object of the scheme. In that case, however, the court noted that the defendant, through misrepresentations directed towards the Wisconsin small claims court, "undoubtedly intended for the money or property lost by the victims to ultimately end up in his possession." *Id. at 1161*. And in fact, there is a circuit split regarding whether the property fraud statutes require "convergence"-that the party deprived of money or property be the same party who is actually deceived. Compare *United States v. Blumeyer, 114 F.3d 758, 767-68 (8th Cir. 1997) (a defendant may be convicted of property fraud for making false representations to parties other than the intended victims of the scheme)* with *United States v. Lew, 875 F.2d 219, 221 (9th Cir. 1989) (a defendant must have the intent to obtain money or property from the victim of the deceit)*. In *United States v. Frost, 125 F.3d 346, 360 (6th Cir. 1997)*, the Sixth Circuit recognized but declined to resolve this split, noting that "even the cases which have held that convictions may rest upon deceit of a person other than the ultimate victim contemplated that the deception was causally related to the scheme to obtain money or property from the victim." The Fifth Circuit has framed the relevant issue as "whether the victims' property rights were affected by the misrepresentations." See *United States v. McMillan, 600 F.3d 434, 449 (5th Cir. 2010)*.

The government *{2020 U.S. Dist. LEXIS 12}* argues that the allegations in the indictment are sufficient to set forth a scheme to defraud victims of money. More specifically, the government avers that regulatory approval was a means to a financial end, and thus the alleged wire fraud scheme also had an object of obtaining money from potential purchasers of FCA's vehicles. Setting aside the lack of convergence under this theory, the Court finds the causal connection between Defendant's alleged deceit and FCA's customers' loss of money tenuous at best. Because the fraud statutes are "limited in scope to the protection of property rights," the loss to the victim cannot be "only an incidental byproduct of the scheme." *Kelly, 140 S. Ct. at 1571, 1573*; see *United States v. Berroa, 856 F.3d 141, 149-52 (1st Cir. 2017) (reversing mail fraud*

6

*convictions for "lack of a sufficiently direct causal nexus" where the government alleged that defendants used their fraudulent medical licenses to obtain payment for medical services).*

**"Thus, the scheme to defraud alleged in this case, even if proven, is not sufficient to establish that Defendant committed wire fraud." See; United States v. Palma, 2020 U.S. Dist. Lexis 214675 (E. D. Mich. 2020)**

### United States v. Berroa, 856 F.3d 141 (1st Cir. 2017)

Berroa, Julio Castro, and Geraldo Castro appeal their convictions for mail fraud in violation of 18 U.S.C. § 1341. This provision proscribes use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." Because we find insufficient evidence to support the conclusion that the defendants obtained money or property "by means of" their alleged fraud, we reverse these convictions.

The Supreme Court has squarely held that the mail fraud statute is "limited in scope to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360, 107 S. Ct. 2875, 97 L. Ed. 2d 292 (1987). Before this ruling, the statute had been used to prosecute "various forms of corruption that deprived victims of 'intangible rights' unrelated to money or property." *Cleveland v. United States*, 531 U.S. 12, 18, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000). *McNally* expressly curtailed this use of § 1341. Congress later passed a new statute, 18 U.S.C. § 1346, designed to cover one of the intangible rights recognized in the *pre-McNally* case law, namely, "the intangible right of honest services." *Cleveland*, 531 U.S. at 19-20 {856 F.3d 149} (quoting 18 U.S.C. § 1346). Here, the relevant counts of the indictment allege a scheme to deprive the victims of money or property. Accordingly, we restrict our inquiry to § 1341 for the time being.

The Supreme Court has broadly and unequivocally instructed {2017 U.S. App. LEXIS 6} that "state and municipal licenses" generally "do not rank as 'property,'" sufficient to support a conviction under § 1341. *Id. at 15.* In *Cleveland*, the defendants were alleged to have made false statements in applications for state gaming licenses. The Court began its analysis by explaining that any interest the state had in the licenses was "regulatory," as opposed to proprietary, in nature. *Id. at 20*. It noted the government's concession that many other state licenses, including "medical licenses," are "purely regulatory." *Id. at 22*. But the Court did not rest solely on the fact that the government's theory of prosecution "stray[ed] from traditional concepts of property." *Id. at 24*. Rather, it went on to note that the government's preferred reading of the statute would result in "a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." Id. Indeed, "[e]quating issuance of licenses . . . with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities." Id. In short, Cleveland squarely precluded the government from seeking

mail fraud convictions on the theory that the defendants defrauded the Board out of some {2017 U.S. App. LEXIS 7} property interest in the medical licenses.

Presumably cognizant of this restriction, the government charged a scheme to "depriv[e] unsuspecting consumers of health care services, health care benefit programs and health care providers, of property and money through the defendant[s'] knowing[] use of [their] fraudulently obtained medical license[s]." More specifically, the defendants allegedly used their fraudulent licenses to obtain payment for medical services and issue prescriptions. They continued to write prescriptions at least until about two to three years after receiving their licenses.

In its effort to circumvent Cleveland, the government runs headlong into another Supreme Court precedent. *Loughrin v. United States, 134 S. Ct. 2384, 189 L. Ed. 2d 411 (2014)*, involved a prosecution under the bank fraud statute, which prohibits schemes to obtain bank property "by means of false or fraudulent pretenses." 18 U.S.C. § 1344(2). The Court described the statute's "by means of" language, also present in § 1341, as a "textual limitation" on its scope. *Loughrin, 134 S. Ct. at 2393*. This limitation assuaged federalism concerns about infringing on state criminal jurisdiction. *Id. at 2392-93*. The Court explained that "by means of" "typically indicates that the given result (the 'end') is achieved, at least in part, through the specified action, {2017 U.S. App. LEXIS 8} instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental." *Id. at 2393 (citing Webster's Third New International Dictionary 1399 (2002); 9 Oxford English Dictionary 516 (2d ed. 1989))*. Accordingly, "not every but-for cause will do." Id. Rather, the "by means of" language requires that the defendant's fraud be "the mechanism naturally inducing a bank . . . to part with money."4 Id. Here, the defendants' {856 F.3d 150} alleged fraud in obtaining their medical licenses cannot be said to have "naturally induc[ed]" healthcare consumers to part with their money years later.

The government correctly points out that Loughrin interpreted the bank fraud statute, while this case involves the separate prohibition on mail fraud. But, for aught that appears, this is a distinction without a difference. To be sure, these two provisions are not identical. See *id. at 2391* (holding that the bank fraud statute, unlike the mail fraud statute, may be violated in two distinct ways). The government, however, offers no explanation at all for why the same "by means of" language should be read differently in these two contexts. See *Smith v. City of Jackson, 544 U.S. 228, 233, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005)* ("[W]hen Congress uses the same{2017 U.S. App. LEXIS 9} language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). In fact, to the contrary, the very same federalism concerns underlying this "textual limitation" in the bank fraud statute are equally applicable to mail fraud. See *Cleveland, 531 U.S. at 24 (noting resistance to reading which would effect "a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress")*. Indeed, the issuance of licenses and permits is "traditionally regulated by state and local authorities." Id. And medical licenses, much like the gaming licenses at issue in *Cleveland*, almost invariably are sought and obtained in an effort to realize some monetary profit. Accordingly, under the government's theory, virtually any false

8

statement in an application for a medical license could constitute a federal crime. Such a broad reading of the statute would impermissibly infringe on the states' "distinctively sovereign authority to impose criminal penalties for violations of" licensing schemes, "including making false statements in a license application." *Id. at 23*. Just as in Loughrin, the phrase "by means of" serves *{2017 U.S. App. LEXIS 10}* as a textual limitation preventing such a usurpation of state criminal jurisdiction.

Our dissenting colleague disagrees, suggesting that *Loughrin's* reading of "by means of" in the context of the bank fraud statute should not inform our interpretation of the identical language in § 1341. But, as the dissent readily concedes, the bank fraud statute was expressly "modeled on" the pre-existing prohibition on mail fraud. S. Rep. No. 98-225, at 378 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3519. Both provisions "proscribe the conduct of executing or attempting to execute 'a scheme or artifice to defraud' or to take the property of another 'by means of false or fraudulent pretenses, representations, or promises.'" Id. (emphasis added). Perhaps unsurprisingly in light of this legislative history, other circuits have consistently applied precedents construing § 1341 to the bank fraud statute. See, e.g., *United States v. Saks, 964 F.2d 1514, 1520 (5th Cir. 1992)* ("It is well settled that Congress modeled § 1344 on the mail and wire {856 F.3d 151} fraud statutes, and that the usual practice is to look to precedents under those statutes to determine its scope and proper interpretation."); *United States v. Young, 952 F.2d 1252, 1255 (10th Cir. 1991) (noting that the two statutes contain "virtually the same language")*; *United States v. Mason, 902 F.2d 1434, 1441 (9th Cir. 1990) ("[T]he bank fraud statute{2017 U.S. App. LEXIS 11} directly tracks or is parallel to the mail and wire fraud statutes."), abrogated on other grounds by Dixon v. United States, 548 U.S. 1, 126 S. Ct. 2437, 165 L. Ed. 2d 299 (2006)*.

The dissent rejects this longstanding consensus, reasoning that, while the mail fraud and bank fraud statutes employ "equivalent language," the lack of "contemporaneous drafting" undermines any presumption that Congress intended the phrase "by means of" to have a similar meaning in both contexts. But we have never imposed any requirement of "contemporaneous drafting" to give rise to a presumption of similar meaning where two statutes employ identical language and one is expressly modeled on the other. We have, for example, held that the wire fraud statute should be construed according to our mail fraud precedents. See *United States v. Fermin Castillo, 829 F.2d 1194, 1198 (1st Cir. 1987)*. We reached this result despite recognizing that the mail fraud statute was significantly "older" than its wire fraud counterpart. Id. Indeed, the substance of the federal prohibition on mail fraud has been in place since 1909. See Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1088, 1130-31; see also Jed S. Rakoff, The Federal Mail Fraud Statute (Part I), 18 Duq. L. Rev. 771, 821 n.225 (1980) (characterizing post-1909 amendments as "chiefly designed to remove 'surplus' language from the statute"). The wire fraud statute was not enacted *{2017 U.S. App. LEXIS 12}* until more than four decades later. See Communications Act Amendments, 1952, ch. 879, § 18(a), 66 Stat. 711, 722. In *Fermin Castillo*, rather than treating chronology as dispositive, we noted that the wire fraud statute "tracks" the language of § 1341. *829 F.2d at 1198*. We also cited legislative history indicating that the former provision was "patterned on" the latter. Id. Each of these considerations applies equally to the bank fraud

9

statute. {856 F.3d 152} The dissent next takes the position that the federalism concerns underlying *Loughrin* are not transferrable to the mail fraud context. We disagree. Of course, the mail fraud and bank fraud statutes are predicated on different jurisdictional bases, but that does not mean that the scope of the former provision is unlimited. Indeed, the Supreme Court has expressly recognized that § 1341 "does not purport to reach all frauds." ***Schmuck v. United States, 489 U.S. 705, 710, 109 S. Ct. 1443, 103 L. Ed. 2d 734 (1989) (citation omitted). Rather, it targets "only those limited instances in which the use of the mails is a part of the execution of the fraud." Id. (citation omitted). The mail fraud statute also requires that the fraudulent scheme seek to obtain money or property. See Cleveland, 531 U.S. at 18; McNally, 483 U.S. at 360.***

Adoption of the dissent's preferred construction of "by means of" {2017 U.S. App. LEXIS 13} would work "a sweeping expansion of federal criminal jurisdiction." ***Loughrin, 134 S. Ct. at 2392 (quoting Cleveland, 531 U.S. at 24).*** The present appeals provide a case in point. The government's mail fraud allegations are entirely predicated upon the falsification of test scores. With these falsified scores in hand, and after completing certain other requirements, the defendants received medical licenses. The Board mailed letters indicating that the licenses were ready for pick-up. Under ***Cleveland***, the defendants had not yet committed mail fraud. The government, however, contends that the mail fraud charges are salvaged by evidence that, in the ensuing years after becoming licensed, the defendants practiced medicine for profit. The government points to no additional instances of fraudulent conduct, instead falling back on the defendants' "use of [their] fraudulently obtained medical license[s]." Endorsing such a prosecution theory would extend the scope of federal jurisdiction to cover cases where the underlying fraudulent scheme, and the mailing in furtherance thereof, is far removed from any money or property. The ***Loughrin*** Court's citation to Cleveland in discussing these federalism concerns makes clear that they remain relevant in the mail {2017 U.S. App. LEXIS 14} fraud context.

The dissent relies in large part on a string of cases refusing to read a so-called "convergence" requirement into the mail fraud statute. But this is a distinct issue from the causal nexus required under ***Loughrin***. Our decision in ***United States v. Christopher, 142 F.3d 46 (1st Cir. 1998)***, illustrates the point. In that case, the defendant argued that, in order to constitute wire fraud, the alleged scheme had to "deceive the same person whom it deprive[d] of money or property." *Id. at 52-53.* We rejected this reading of the statute in ***Christopher***, and we impose no such requirement in these appeals. Rather, our reversal of the money or property mail fraud convictions is based on the lack of a sufficiently direct causal nexus to satisfy ***Loughrin***. In ***Christopher***, after disposing of the convergence argument, we proceeded to address the separate issue of causation. See id. at 54; see also ***United States v. Frost, 125 F.3d 346, 360 (6th Cir. 1997)*** ("[E]ven the cases which have held that convictions may rest upon the deceit of a person other than the ultimate victim contemplated that the deception was causally related to the scheme to obtain property from the victim."). In that case, we found "the causal connection between the deception and the loss of property" to be "obvious." ***Christopher, 142 F.3d at 54.*** This characterization was justified by the *facts {2017 U.S. App. LEXIS 15}* of the case at hand, which

were very different from those at issue here. The defendant {856 F.3d 153} was convicted for making misrepresentations to insurance regulators in connection with his acquisition of two companies. More specifically, he assured regulators "that the collateral liens would be paid off by the time of closing, and that assets of the acquired companies would not be used for the purchase." *Id. at 49*. But, after closing, the acquired companies "loaned" money to satisfy the liens. Id. Similarly, cash belonging to one company was used to pay its purchaser. Id. The wire fraud charges were predicated on these two categories of payments. *See id. at 50-51*. Thus, the transfers through which the defendant realized the required monetary benefit directly contradicted his prior statements to regulators. In the parlance of Loughrin, the defendant's lies "naturally induc[ed]" the resulting benefit. *134 S. Ct. at 2393*. As discussed above, the causal connection is much more attenuated in the present case. The other precedents cited by the dissent on this point, like Christopher, deal primarily with the convergence issue, not the required causal connection between the fraud and the obtainment of money or property. In any event, to the extent {2017 U.S. App. LEXIS 16} that these out-of-circuit decisions could be read to be inconsistent with Loughrin, we are bound to follow the standard imposed by the Supreme Court.

Contrary to the dissent's suggestion, Loughrin's interpretation of "by means of" did not impose a convergence requirement like the one we rejected in *Christopher*. Indeed, the Court expressly recognized the possibility of bank fraud convictions in cases where the fraud never actually reaches a bank. It explained that "the clause covers property 'owned by' the bank but in someone else's custody and control . . . ; thus, a person violates § 1344(2)'s plain text by deceiving a non-bank custodian into giving up bank property that it holds." *Loughrin, 134 S. Ct. at 2389*. To be sure, the Loughrin Court ultimately held that, in the specific context of bank fraud, "by means of" requires a "false statement [that] will naturally reach [a federally insured] bank (or a custodian of the bank's property)." *Id. at 2394 n.8*. But, in contending that our application of Loughrin to § 1341 imposes a convergence requirement, the dissent overlooks its own warning that "what relationships count as close enough to satisfy the phrase 'by means of' will depend almost entirely on {2017 U.S. App. LEXIS 17} context." Id. Generally speaking, "by means of" requires "an inquiry into the directness of the relationship between means and ends." Id. In its initial discussion of the phrase, the *Loughrin* Court relied upon dictionary definitions. After citing these generally applicable sources of meaning, the Court concluded that, in order to satisfy the bank fraud statute, the false statement must be "the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control." *Id. at 2393*. It is the specification that the fraud target bank property, not the widely applicable "naturally inducing" standard that makes context relevant. The Court's rejection of the "Little Bobby" hypothetical posited by Justice Scalia illustrates the point. In the hypothetical, "Bobbly falsely tells his mother that he got an A on his weekly spelling test and so deserves an extra cookie after dinner." *Id. at 2396 (Scalia, J., concurring)*. Bobby's mother, who will not be home for dinner, leaves a note for Bobby's {856 F.3d 154} father indicating that Bobby should get an extra cookie. According to Justice Scalia, when Bobby receives his cookie, he has done so "by means of the fib to his mother." Id. We agree that, in these {2017 U.S. App. LEXIS 18} circumstances, Bobby's false statement "naturally induce" his

11

father to give him an extra cookie. And the Loughrin majority did not dispute the point. Rather, it responded by citing the importance of context and concluded that, in the bank fraud statute, "by means of" is "best read" to include only those frauds in which the false statement will reach a bank, either directly or indirectly. *Id. at 2394 n.8.* Of course, this specific application could not possibly apply to all uses of the phrase "by means of."

In light of the above analysis, there was insufficient evidence to support the defendants' convictions for money or property mail fraud. Because we find the government's theory legally deficient, we must reverse these convictions.

## *United States v. Thomas, 315 F.3d 190 (3th Cir. 2002)*

Because there is no proof that Thomas intended to victimize the banks or that the banks suffered a loss, the Government's case as to bank fraud fails as a matter of law on Count I. Also in *United States v. Bass, 404 U.S. 336, 349, 30 L. Ed. 2d 488, 92 S. Ct. 515 (1971)*, the Supreme Court held that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." We are disinclined to read a statute in a manner which permits it to trench on the domain of traditional state criminal law, circumscribed only by the exercise of prosecutorial discretion. The extension proposed here by the Government offends *{2002 U.S. App. LEXIS 20}* the balance of federal and state jurisdiction and our principles of comity by imposing federal law where the federal interest is remote and attenuated. We hold, therefore, that conduct, reprehensible as it may be, does not fall within the ambit of the bank fraud statute when the intention of the wrongdoer is not to defraud or expose the bank to any loss but solely to defraud the bank's customer. Our holding today is consonant, not only with Congressional intent but also with our federal criminal law jurisprudence.

Our holding that the statute is to be read conjunctively does not end this matter. We must still decide the thorny question of what is meant by the subsection (1) requirement that the defendant intends to defraud the bank. The Government's *{315 F.3d 200}* position is that the banks were exposed "to the real threat of civil liability for having succumbed to Thomas's conduct and the loss of the use of the money that was withdrawn." The Government, however, cites no authority for this proposition, one that is highly speculative. We see no evidence that there was civil liability or that Thomas intended to expose the bank to a loss. The Government also suggests that mere "deceptive *{2002 U.S. App. LEXIS 21}* conduct" toward the bank establishes intent to defraud. *We disagree. See, e.g., State v. Weigel, 194 N.J. Super. 451, 477 A.2d 372, 462 (N.J. Super. 1984)("In common parlance, the word 'defraud' means to cheat or wrongfully deprive another of his property by deception or artifice.")* Congress sought to proscribe conduct that "victimized" banks, which suggests that the bank must be deliberately harmed before the statute is violated. We believe that, given the legislative intent, harm or loss to the bank must be contemplated by the wrongdoer to make out a crime of bank fraud. See *United States v. Brandon,*

*298 F.3d 307, 312 (4th Cir. 2002); **United States v. Sprick**, 233 F.3d 845, 852 (5th Cir. 2000); **United States v. Blackmon**, 839 F.2d at 905-06; **United States v. Moede**, 48 F.3d 238, 242 (7th Cir. 1995).*

The legislative history shows that Congress sought to allay crimes that undermined public confidence in banking institutions. See ***Blackmon**, 839 F.2d at 906. ("Where the victim is not a bank and the fraud does not threaten the financial integrity of a federally controlled or insured bank, there seems to be no basis in the legislative history for finding coverage under [subsection (2)].")* The deception of a bank as an incidental part of a scheme primarily intended to bilk a bank customer does not undermine the integrity of banking. Our reading of the Congressional intent is also supported by the Court of Appeals of the Seventh Circuit. Writing for that court, Judge Posner stated that "the purpose [of the bank fraud statute] is not to protect people who write checks to con artists but to protect the federal government's interest as an insurer of financial institutions." ***Davis**, 989 F.2d at 247*. In that case, facially valid checks, issued by the IRS as a tax refund to a person who, in fact, was owed no tax refund, were deposited at a bank. The bank was, of course, deceived as to the entitlement of the payee to the money, whether by affirmative deception or *{2002 U.S. App. LEXIS 23}* passive, material omission. Yet, according to Judge Posner, only when the Government proves the existence of civil liability is the bank truly endangered by the fraud. Cashing facially valid checks, even where the bank is deceived as to their legitimacy, does not expose the bank to liability and, therefore, there is no bank fraud.

The Court of Appeals for the Second Circuit also holds, and we agree, that a defendant must intend to cause a bank a loss or potential liability, whether by way of "statutory law, common law, or business practice." ***United States v. Laljie**, 184 F.3d 180, 191 (2d Cir. 1999)*. We believe that this holding is effective *{2002 U.S. App. LEXIS 24}* shorthand for the legislative intent that the statute would proscribe conduct which undermines the integrity of federally insured institutions. See *S. Rep. No. 98-225, at 377 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3517 (noting that the statute was intended to protect the "financial integrity" of banks)*. The reputation and integrity of banking are harmed when a bank is victimized in a way that exposes it to liability. Conduct which exposes a bank to liability casts the institution of banking into doubt by adversely affecting its image with the public. It implicates the federal interest in maintaining the integrity and esteem of our federally insured banks. *Laljie* illustrates the kind of distinction we make between schemes which victimize banks by exposing them to liability or loss, and schemes in which banks, despite being the target of deception, are mere "unwitting instrumentalities" to the fraud. *184 F.3d at 190*. *Laljie* addressed two distinct accusations of bank fraud. The first involved an employee's presentation of altered employer checks to the bank. The defendant's actions were directed at deceiving the bank and exposed the bank to civil liability for honoring *{2002 U.S. App. LEXIS 25}* the checks under New York law, under which a bank may be held liable for paying conspicuously forged or altered checks. Although he deceived the bank, he did not expose it to any loss. His conduct solely victimized the maker of the check, and not the bank, which incurred no loss. The bank merely served as "the unwitting instrumentality of the fraud."

Moreover, even were there a colorable case for civil liability set forth here, it must also be *{2002 U.S. App. LEXIS 29}* shown that Thomas intended to victimize the bank. Even a scheme

13

which does expose a bank to a loss must be so intended. "[A] scheme to pass bad checks [to merchants] is not bank fraud," because, even though the bank might honor the checks and be civilly liable, the defendant did not anticipate that the bank, rather than the merchant, would bear the loss. **United States v. Jacobs, 117 F.3d 82, 93 (2d Cir. 1997).** In **United States v. Barrett, 178 F.3d 643, 648 (2d Cir. 1999)** the court held that one must look to the "entire circumstances of defendant's conduct as an indication of the requisite criminal intent." Thomas's actions, in fact, demonstrate that she never intended to victimize the banks. Her only victim was Weygandt.

In summary, we hold that the relevant requirements under the bank fraud statute are: a defendant must execute, or attempt to execute, a scheme or artifice, intended to victimize a federal bank or federally insured bank by causing it an actual or potential loss of its own funds. Where the scheme involves the mere withdrawal of funds in the bank's custody, the Government must show that the withdrawal exposed the bank to some form of liability as a result of the fraud. There was none here.

Accordingly, because there is no proof that Thomas intended to victimize the banks or that the banks suffered a loss, the Government's case as to bank fraud fails as a matter of law on Count I.

## Conclusion

Based on above legal arguments and Supreme Court Authority, the charged Defendant Mr. Prado requests this Honorable District Court to use its supervisory powers to dismiss his third superseding indictment for failing to state a valid offense and lack of jurisdiction to avoid a further miscarriage of justice.

Respectfully Submitted
Thiago De Souza Prado

Signed by Thiago Prado