1

2                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS

3

4                                    )
      UNITED STATES OF AMERICA,       )
5                                    )
              Plaintiff,              )
6                                    )   Criminal Action
      v.                             )   No. 1:21-cr-10158-MLW-7
7                                    )   Pages 1 to 83
      THIAGO DE SOUZA PRADO,          )
8                                    )
              Defendant.             )
9                                    )

10

11

12              BEFORE THE HONORABLE MARK L. WOLF
                  UNITED STATES DISTRICT JUDGE

13

14                         JURY TRIAL
                             Day 4

15

16                      September 14, 2023
                           9:00 a.m.

17

18          John J. Moakley United States Courthouse
                       Courtroom No. 2
19                    One Courthouse Way
                 Boston, Massachusetts 02210

20

21

22

23              Jessica M. Leonard, CSR, FCRR
                   Official Court Reporter
24          John J. Moakley United States Courthouse
                      One Courthouse Way
25              Boston, Massachusetts 02210
                JessicaMichaelLeonard@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: Kriss Basil
4         1 Courthouse Way
          Suite 9200
5         Boston, MA 02210
          617-748-3387
6         Kriss.basil@usdoj.gov

7
     On Behalf of the Government:
8
          UNITED STATES ATTORNEY'S OFFICE
9         By: David M. Holcomb
          1 Courthouse Way
10        Suite 9200
          Boston, MA 02210
11        (617) 756-9043
          David.Holcomb@usdoj.gov

12

13   On Behalf of the Defendant:

14        Law Office of John F. Palmer, P.C.
          By: John F. Palmer
15        18 Main Street Extension
          Suite 201B
16        Plymouth, MA 02360
          617-943-2602
17        Jpalmer@socialaw.com

18

19

20

21

22

23

24

25                  Proceedings reported and produced
                    by computer-aided stenography.

```
                           I N D E X
```

```
EXAMINATIONS                                    PAGE
  CONTINUED DIRECT EXAMINATION                    18
  BY MR. HOLCOMB
  CROSS-EXAMINATION                               51
  BY MR. PALMER
  REDIRECT EXAMINATION                            69
  BY MR. HOLCOMB
```

1                    P R O C E E D I N G S

2          THE CLERK:  Your Honor, this is the matter of the

3  *United States v. Thiago de Souza Prado* criminal case number

4  1:21-cr-10158.

5          THE COURT:  Would the clerk please administer the oath

6  to the interpreters?

7          (The interpreters were sworn.)

8          MS. AZOFF:  Good morning, Your Honor.  Claudia Azoff,

9  Portuguese interpreter.

10         THE COURT:  Good morning.

11         MS. HALL:  Alcione Hall, certified Portuguese

12  interpreter.  Good morning, Your Honor; good morning,

13  Mr. Clerk.

14         THE COURT:  Thank you both.  Would counsel please

15  identify themselves for the record?

16         MR. HOLCOMB:  Good morning, Your Honor.  David Holcomb

17  and Kriss Basil for the United States.

18         MR. PALMER:  Good morning, Your Honor.  John F. Palmer

19  for Mr. Prado.

20         THE COURT:  Mr. Prado is present.  I understand -- I

21  apologize for coming in late, but I've been focusing on the

22  filing that the Government made at 5:59 last night.  I

23  understand the Government's been talking to IT about the

24  question it raised as to how we would put the certain exhibits,

25  spreadsheets, I think, on the evidence presenter in the jury

1    room?

2              MR. BASIL:  Yes, Your Honor.  We did speak to IT about

3    that.

4              THE COURT:  Is that resolved?

5              MR. BASIL:  It is -- it's not resolved but I have a

6    solution for it.

7              THE COURT:  Well, fine.  You'll talk to IT and we're

8    not going to discuss the solution right now.

9              MR. BASIL:  Okay.

10             THE COURT:  Because we have other issues to discuss.

11   All right.  What's the proposed solution?

12             MR. BASIL:  The proposed solution is that as in

13   numerous other cases, not before Your Honor, that have happened

14   in this courthouse this year, including before Judge Burroughs

15   and Judge Saris, when there are file types that cannot be

16   loaded onto JERS, there is a blank laptop that has the Excel

17   that goes back and the jury is able to look at it.  That's

18   what's happened in multiple other cases.  It's not something

19   that the JERS system can accommodate, an Excel file, but that

20   is what has been done.

21             THE COURT:  And it's just one computer for all 12

22   jurors?

23             MR. BASIL:  Yes, Your Honor.  It's a big screen

24   laptop, but yes.

25             THE COURT:  Do you have any concern about that,

1   Mr. Palmer?

2           MR. PALMER:  I don't, Your Honor.

3           THE COURT:  All right.  We'll do it that way.  IT's

4   got a lot of other stuff to do.  Thank you very much.  I had

5   some issues that I was hoping to discuss in some detail, but I

6   won't now, although I'm going to alert you to two of them.  The

7   Government made its filing last evening concerning the

8   testimony of Special Agent Jorde; it's Docket 1139.  Have you

9   read it, Mr. Palmer?

10          MR. PALMER:  No, I haven't seen it, Your Honor.

11          THE COURT:  You haven't seen it?

12          MR. PALMER:  No.

13          THE COURT:  Mr. Palmer, I think, drives in here from

14  Plymouth and I was here until after 6:00 yesterday, but I

15  didn't see it until this morning.  And I've worked on it, but

16  Mr. Palmer, just listen to this and we'll see where we go,

17  because you'll get a chance to read it, if necessary, before I

18  make any rulings.

19          But as I understand it, the memo relates to what you

20  would like Mr. Jorde to say when he's explaining his charts

21  about what WhatsApp is and how he navigates it or how he

22  identifies the speakers, and then also say what he knows --

23  what an IP address is, because on his charts are IP addresses

24  that he's taken from the underlying records of Uber and Lyft.

25  But what is it that the Government proposes Mr. Jorde be

1    allowed to say - --

2           MR. BASIL:  Your Honor, so I was -- we're proposing

3    that he simply be allowed to describe what's in the WhatsApp

4    chat in terms of what the column headings are, that he's able

5    to recognize them in a particular way.

6           THE COURT:  What's in the WhatsApp chats or in the

7    summaries?

8           MR. BASIL:  So there are two things that we're talking

9    about here.  Let me start with chats.  That's the context of

10   the reading of the defendant's statement.  So those are in an

11   Excel format and the underlying chat is -- comes from WhatsApp.

12   He's not going to opine about how WhatsApp works or anything

13   like that other than that it's a messaging system.

14          THE COURT:  And you're going to ask Mr. Da Silva

15   what's WhatsApp, as I suggested yesterday.

16          MR. BASIL:  Yes.  And what Mr. Jorde would say -- and

17   there's a First Circuit case about this just last year --

18   that's the from, and I can tell who it's from in this manner.

19          THE COURT:  What's the case from last year?  *Belanger*?

20          MR. BASIL:  It's *United States v. Montijo-Maisonet.*

21   Pardon me, it is 2020, I misspoke on that.  The last year is

22   *Agramonte-Quezada* 974 F.3d, 34.

23          THE COURT:  At what page?

24          MR. BASIL:  Your Honor I can't find the page number

25   that I referenced.  I was writing quickly.  I apologize for

1    that.  I will find it for you.

2            THE COURT:  What's that?

3            MR. BASIL:  I cannot find the page number.

4            THE COURT:  What does it say?

5            MR. BASIL:  In that case, the issue was whether an

6    agent could look at an extraction from a phone, and under Rule

7    701 just say "to/from, this is how it works."  And so in this

8    case Mr. Jorde would also say "in this cell an image is sent

9    from this person to that person."  It's just narrating what

10   happens.  And then up would come the image and that's that.

11   That's all we're asking for.  Just to make it --

12           THE COURT:  So he would say, "This message came from

13   Mr. Prado and this message came from Mr. Da Silva"?

14           MR. BASIL:  Yes.

15           THE COURT:  Based on his experience and knowledge.

16           MR. BASIL:  Yes.  And his experience and knowledge,

17   Your Honor -- and we can establish it -- is based on non-law

18   enforcement knowledge.  It's knowledge from being in the world.

19   And that's all we're asking.

20           THE COURT:  Okay.  I'm not ruling on this, but so far

21   that sounds okay.  And what about the IP addresses?

22           MR. BASIL:  The IP address, again, this is -- from the

23   Government's point of view this is a commonly known thing.  The

24   defendant actually knows what it is and admitted what it was in

25   a chat, that it's an internet -- it's a computer linking

1    address that is common across accounts.

2           THE COURT:  What do you mean common across accounts?

3           MR. BASIL:  I'm using his language there, Your Honor.

4    That an IP address is one of the ways that the various accounts

5    could be linked.  That's what he said in a chat.

6           THE COURT:  Various accounts could be linked?

7           MR. BASIL:  Yes, the different fraudulent accounts in

8    this case were created from or accessed from the same IP

9    address, and that's in the Uber records.

10          THE COURT:  Yes, I looked at one of the charts, I'll

11   tell you the exhibit in a moment, and maybe Ms. Lewis actually

12   can pull it up.  I'll give you a little tip.  In the future,

13   don't put all 100 exhibits in one book, because you can't open

14   it.

15          MR. BASIL:  Your Honor, we've also put it on the

16   screen.

17          THE COURT:  What exhibit is this?  107.  Okay.  Blow

18   that up a bit, please.  So it says, Rideshare company, first

19   name, Robert Baker.  Signup date, 10/4/2020.  Signup IP,

20   73.123.253.111.  And then the next one is also Uber, Thiago

21   Barcellos, 2014, 2019, signup IP same address.  So that

22   information comes from the Uber records, right?

23          MR. BASIL:  Yes, and the next one is Lyft, Your Honor.

24          THE COURT:  Okay, I don't need to get to the next one

25   for this purpose.  All right.  So when it says "signup IP,"

1   presumably he'll say that's -- so, what's he going to say about

2   this?  What's he going to say an IP address is?

3          MR. BASIL:  He's going to say an IP, based on his

4   personal knowledge, is an internet protocol address that's

5   assigned to a computer or internet connection.

6          THE COURT:  Is assigned to one computer?

7          MR. BASIL:  Or internet connection.  For example, a

8   router.  And we had testimony, Your Honor, from Uber that they

9   track this because they're trying to see what computer has

10   accessed their system.

11          THE COURT:  That's -- Mr. Sauerwein testified

12   essentially to that.

13          MR. BASIL:  And so then what the agent did is he went

14   through, and from a very large spreadsheet that had lots of

15   data, extracted this piece and combined it with Lyft.

16          THE COURT:  What he could -- and I at the moment think

17   he should -- say is that this is the IP address shown in the

18   Uber records as the address from the device from which this

19   particular account was set up.

20          MR. BASIL:  Yes.

21          THE COURT:  That's what's shown in the records.

22          MR. BASIL:  Yes.

23          THE COURT:  And that's all you want him to say?  You

24   don't want him to say that an IP address is unique to one

25   device?

1          MR. BASIL:  With respect to this chart, that's all

2    he's going to say.  And then there's separate evidence -- for

3    example, the Comcast account for Mr. Prado -- that shows that

4    that's his address as well as lots of other accounts that shows

5    he's using that IP address.  And that's the link to him.

6          THE COURT:  But that's in records.

7          MR. BASIL:  It is in records, there's no opinion being

8    offered or interpretation.

9          THE COURT:  So within those limits, at the moment that

10   sounds admissible to me.  However, Mr. Palmer is going to have

11   a chance to read this, think about it.

12         MR. PALMER:  I can address the Court without reading

13   it first.  We had -- the Government and I had this discussion

14   before trial as to whether or not this witness could offer his

15   opinion as to what an IP address is.  I expressed my view is

16   that that's expert testimony because maybe the Court and maybe

17   Mr. Basil are more conversant with IP addresses than I am, but

18   the average person does not know, for example, that an IP

19   address --

20         THE COURT:  I think two things.  One, I don't hear --

21   I didn't understand Mr. Basil to be saying that he was going to

22   opine on what an IP address is.  I think he's just going to

23   testify the IP address associated with this Robert Baker

24   account was 75.123, et cetera.  Am I right?

25         MR. BASIL:  Yes, I would ask him, if the Court allows

1   me, if he can say what he knows that it stands for, but we

2   already had that from another witness.  Mr. Sauerwein said what

3   it was.

4          MR. PALMER:  It's for what it stands for.  What the

5   Court said --

6          THE COURT:  Okay.  So now I understand what the

7   dispute is.  I'm not ruling that he can give an opinion right

8   now.  One of the things that comes to my mind -- there is

9   testimony on this so you'll be able to argue it.  Remember

10  Mr. Sauerwein said an IP address -- and there wasn't any

11  objection to this.  There might have been, but there wasn't any

12  objection an IP address is the address from which the account

13  was opened and --

14         MR. PALMER:  You know, just -- if I can interrupt for

15  a moment, Your Honor.  I now understand -- I think Sauerwein

16  testified that the IP address, for example, is associated with

17  a particular device.  As I heard Mr. Basil, he said it could be

18  -- excuse me, I keep mispronouncing your name and I apologize.

19  What I understand now is that the agent would testify it's

20  associated with either a device or a network.  A router

21  network.

22         THE COURT:  According -- and we have a draft of the

23  transcript.  According to the draft transcript, I believe

24  Mr. Sauerwein testifies that IP stands for "internet protocol"

25  and belongs to the device that an Uber driver uses when he

1    signs up for that platform.

2           MR. BASIL:  Your Honor, if I may.  There is separately

3    admissible evidence that he has not objected to that shows that

4    the IP address is assigned to Mr. Prado.

5           THE COURT:  No, that can come in.

6           MR. BASIL:  So this is not --

7           THE COURT:  It may be that I need to see -- it doesn't

8    seem problematic to me.  There's another record that shows that

9    that IP address is assigned to Mr. Prado.  Is that a Comcast

10   record, I think?

11          MR. BASIL:  It is, Your Honor.  And there are multiple

12   other records that show him using that IP address.

13          THE COURT:  That's fine.  If he says, "I made a

14   spreadsheet and this comes from Comcast records and it shows

15   that 73.123 et cetera is assigned to Mr. Prado.  And here's

16   another spreadsheet, it shows that IP address was used to open

17   these 15 Uber accounts."  That's summary evidence.

18          MR. BASIL:  Your Honor, my thought on that is I'm

19   going to show the underlying record.  I'll show -- there's

20   money transfer, there's Google, there's Comcast.  He's using it

21   all over the place.  There's not an opinion here, Your Honor.

22   This is just fact.

23          THE COURT:  That sounds fine.  And with regard to the

24   chats, he's going to say, you know, "I can tell that the White

25   chats are the speaker and the yellow -- " "The White boxes are

1    the speaker, or the person who initiated the thread of chats on

2    WhatsApp, and the yellow ones are the respondent."

3              MR. BASIL:  Yes.  And he'll say as well -- and this is

4    obvious if we click on it -- a jpg is a picture -- which we can

5    also just demonstrate -- an opus is an audio file.

6              THE COURT:  That's fine.  Look, I was going to

7    discuss, before we got the jury, some jury instruction matters,

8    including my present views on the issues you've identified in

9    dispute.  But I'm not going to take the time to do that.  But

10   I'm going to tell you about two others so you can start

11   thinking about them.

12             One is, the Third Superseding Indictment using terms

13   like "victim --" like in the counts of conviction.  Victim A,

14   Victim B, Victim C.  I think it should be revised to put in the

15   names of the actual alleged victims.  And similarly -- because

16   otherwise it's going to be unintelligible to the jury.

17             MR. BASIL:  I agree.

18             THE COURT:  Mr. Palmer, do you have or anticipate

19   having any objection to that?

20             MR. PALMER:  I'd like to think about it, Your Honor.

21             THE COURT:  All right.  Well, I'll tell you, I don't

22   think it's any -- This whole case has proceeded -- like when

23   the defendant was arraigned -- and all the others have -- with

24   the understanding that the defendant knew who the alleged

25   victims were, it just wasn't going to be part of the public

1    record.  But the Government might in the future think about

2    this issue.  Because otherwise, you're going to have a file a

3    memo on why this is a variance, which I don't think it is.  If

4    the defendant has always been on notice that rideshare --

5    what's Rideshare Company A?

6              MR. BASIL:  Uber.

7              THE COURT:  Uber.  I mean, if he's known that from the

8    beginning of the case, I don't see what the prejudice would be.

9              Second, more substantive, you've each given me

10   conspiracy instructions.  The Government's instructions don't,

11   I think, address the issue of multiple -- possible multiple

12   conspiracies at all.  The defendant has a proposed instruction

13   on multiple conspiracies, but it's pretty sparse.  I'm inclined

14   to give a more detailed instruction with some principles that

15   should be very familiar to Mr. Holcomb because I recited them

16   in the 12 sentencings that I've done in this case.  They're

17   rooted in *Kotteakos*, 328 US 750 at 755.  My decision in

18   *Pappathanasi*, 383 F. Supp. 289 at 296, *Portela*, which is quoted

19   in *Pappathanasi* 167 F.3d at 695, a First Circuit case.  Wilson,

20   116 F.3d 1066 at 1076.

21             Basically, it's an amplification of the principal that

22   it's the conspiracy charged in the indictment and not some

23   other conspiracy that has to be proven.  Part of what I've been

24   saying at the sentencings is -- which is an excerpt in my

25   decision on *Pappathanasi* based on *Kotteakos* -- is:

1            Among other things, a single conspiracy requires

2    interdependence among participants.  *Portela* 167 F.3d at 695.

3    To be interdependent, "activities of one aspect of the scheme

4    must be necessary or advantageous to the success of another

5    aspect of the scheme.  Each individual must think the aspects

6    of the venture interdependent, and each defendant's state of

7    mind, and not his mere participation in some branch of the

8    venture, is key."  It comes from *Portela*.

9            I'm not saying I would essentially use that, but

10   having heard some of Mr. Da Silva's testimony, not all of it,

11   it sounds to me, particularly at the beginning, maybe he wasn't

12   in a conspiracy with Mr. Prado. They were committing the same

13   crime independently.  And then I've heard some testimony about,

14   you know, Mr. Prado buying, I think, driver's license numbers

15   or social security numbers from -- da Silva buying social

16   security numbers from Prado.  That could be part of one

17   conspiracy.  But whatever it is, I think that I want to fashion

18   an instruction appropriate to this case about it being that you

19   have to prove the conspiracy charged in the indictment, not

20   some other conspiracy.

21        MR. BASIL:  Your Honor, I -- we understand that,

22   that's why the Third Superseding Indictment was created that

23   way.  I simply ask -- this is also part of the standard

24   conspiracy instruction, that standard instruction that not

25   every conspirator needs to know every other conspirator.

1         THE COURT:  Look, we're not going to discuss it now.

2    That particular observation is irrelevant to this case.  One

3    thing's clear; they knew each other.  The question is whether

4    they were conspiring with each other.  I'm just putting this on

5    your radar screen.

6         MR. BASIL:  I understand.

7         THE COURT:  Okay.  Now, when we get the jury, Mr. Da

8    Silva is going to be back on the stand.  I understand that the

9    equipment is working now.  But on the other hand, the way

10   things were going yesterday seemed to be fine.  If I start with

11   Ms. Azoff again and continue and we'll take a break and maybe

12   you can switch off, or maybe we'll switch to the equipment, but

13   I'm sort of in the "if it's not broke don't fix it" category,

14   frame of mind, at the moment.  Ms. Azoff, can you start with

15   Mr. Da Silva the way we were proceeding yesterday without it

16   being too arduous?  Do the parties have any concern about that?

17        MR. HOLCOMB:  No, Your Honor.

18        MR. PALMER:  No, Your Honor.

19        THE COURT:  Let's get the jurors.

20        MR. BASIL:  Your Honor, although she's not a witness,

21   the reader I had leave the room.

22        THE COURT:  Sorry, I can't hear you.

23        MR. BASIL:  Although she's not a witness, we had the

24   reader we've arranged leave the room.

25        THE COURT:  She's in the courtroom?

1          MR. BASIL:  She was for pretrial but I just had her

2     leave just now.

3          THE COURT:  Yeah, we'll have to talk about the

4     mechanics of that.  Maybe one can stand and one can sit.

5     There's probably room for two seats in the jury box -- in the

6     witness box.

7          (The jury entered the courtroom at 9:46.)

8          You may be seated.  Ladies and gentlemen, I'm sorry to

9     have kept you waiting.  An issue came up last night and we've

10    been working on it, as well as a couple others.  So we're now

11    ready to resume with the testimony of Mr. Da Silva.  I told you

12    we would leave by -- I would let you go by 12:15 today.  I

13    might even let you go earlier.  We'll see how we're

14    progressing.  Mr. Da Silva, do you understand that you're still

15    under oath?

16         THE WITNESS:  Yes.

17         THE COURT:  Mr. Holcomb, you may proceed.

18         MR. HOLCOMB:  Thank you, Your Honor.

19                   CONTINUED DIRECT EXAMINATION

20    BY MR. HOLCOMB:

21    Q.   Good morning, sir.

22    A.   Good morning.

23    Q.   Sir, yesterday you looked at and listened to WhatsApp

24    messages.  Do you remember that?

25    A.   Yes.

1   Q.   Could you explain for us what WhatsApp is?

2   A.   WhatsApp, it's an app so we can have a conversation.

3   Q.   And how would you typically use WhatsApp?

4   A.   I use daily, I just -- I do conversations, I do phone

5   calls.

6   Q.   Phone calls, and then do you use WhatsApp for text

7   messages as well like we saw yesterday?

8   A.   Yes.

9   Q.   You also told us yesterday about Luiz Neto; is that

10   correct?

11   A.   Yes.

12   Q.   You said that he was also driving under other -- with

13   accounts under other people's names, right?

14   A.   Yes.

15   Q.   Why was he doing that?

16   A.   Because he was doing the same conspiracy with us to open

17   accounts --

18          MR. PALMER:  Move to strike, Your Honor.  I object.  I

19   object.

20          THE COURT:  To the word "conspiracy"?

21          MR. PALMER:  I object to the word.

22          THE COURT:  One of the issues the jury is going to

23   have to decide in this case is whether there was a conspiracy,

24   an agreement, to commit a crime, between Mr. Prado and at least

25   one other person.  Two of the people that could be, depending

1    on the evidence, is Mr. Da Silva and Mr. Neto.  The fact that

2    this witness used the word "conspiracy," I think you should

3    not -- you'll have to listen to my instructions on what is a

4    conspiracy.

5            But it might be prudent to ask him if Mr. Neto --

6    we'll see if Mr. Palmer has an objection -- was working with

7    him and who was embraced by the "us."  He hasn't specified

8    that.  You could also ask whether what they were doing is

9    something they agreed to do together.  But the use of the word

10   "conspiracy" by the witness is potentially confusing.  But I

11   think with that explanation, it doesn't need to be struck.

12   BY MR. HOLCOMB:

13   Q.   Sir, the question was:  Why was Luiz Neto using other

14   people's names to drive?

15           MR. PALMER:  Objection, Your Honor.

16           THE COURT:  Overruled.  Well, actually, hold on just a

17   second.  You can ask him if Mr. Neto told him why he was using

18   other people's --

19           MR. PALMER:  The foundation was my objection.

20           THE COURT:  Okay.  Right.  Lay a foundation for that,

21   please.

22   BY MR. HOLCOMB:

23   Q.   Sir, do you know why Luiz Neto was using other people's

24   names to drive for Uber and Lyft?

25           THE COURT:  You have to say yes or no.

1            THE WITNESS:  Yes.

2    BY MR. HOLCOMB:

3    Q.   Why was that?

4            MR. PALMER:  Objection.

5            THE COURT:  How do you know?  Ask him, "How do you

6    know?"

7            THE WITNESS:  When I met him, he was renting accounts

8    from Ricardo.  And I met him at the airport with Thiago Prado

9    at that time.  So at that time, when I was managing Ricardo's

10   account that they were paying me via Zelle, we got to the point

11   that we were just tired of renting accounts from other people.

12           MR. PALMER:  Your Honor, I'm going to object at this

13   point.

14           THE COURT:  All right.  You can ask him if Mr. Neto

15   said why he was renting accounts rather than driving in his own

16   name or said anything that communicated that.

17   BY MR. HOLCOMB:

18   Q.   Did Mr. Neto ever tell you why he was -- he couldn't drive

19   under his own name or if he could not drive under his own name?

20   A.   He did not --

21           MR. PALMER:  Your Honor, I object.  It calls for a yes

22   or no answer.  Did he ever tell him?  Yes or no.

23           THE COURT:  Did he ever tell you or somehow

24   communicate to you why he was driving under other people's

25   names?  Yes or no.

1              THE WITNESS:  Yes.

2              THE COURT:  And what did he say to you or communicate

3    to you about that?

4              THE WITNESS:  He drove because he didn't have any

5    social security number and he had to use a fake number.

6    BY MR. HOLCOMB:

7    Q.   You said yesterday and just now that you started creating

8    accounts after managing accounts for Ricardo, right?

9    A.   Yes, yes.

10   Q.   Who were you creating accounts with?

11   A.   With whom?

12   Q.   That's right.  After you managed accounts for Ricardo, who

13   did you create accounts with?

14   A.   Thiago, Luiz Nascimento.  There were more than 30.  I do

15   not recall all of them.

16   Q.   Yesterday you described getting social security numbers

17   from Wemerson Aguiar; is that right?

18   A.   Yes.

19   Q.   And you said that Prado then was able to get social

20   security numbers, right?

21   A.   Yes.

22   Q.   Could you remind us how he got the ability to get social

23   security numbers?

24   A.   At the beginning, we used to get the social from Dutra

25   Aguiar.  At one time Thiago Prado, he could get -- he bought

1    the system, so he could get in the system.  He bought from Caio

2    for $5,000.  So everything became easier for us.  It was

3    cheaper and faster.

4    Q.   When you say "the system," what did the system give him

5    access to?

6    A.   Dark web.

7    Q.   And can you please remind the jury what the dark web is?

8    A.   It's a dark website that all the hackers, they go into,

9    they get everything that is illegal.

10   Q.   What did Prado do after he got access to the dark web?

11           MR. PALMER:  Objection, Your Honor.

12           THE COURT:  Based on your knowledge.  Put it that way.

13   BY MR. HOLCOMB:

14   Q.   What is your understanding of what Prado did when he got

15   access to the dark web?

16           MR. PALMER:  I object, Your Honor.  No foundation.

17   BY MR. HOLCOMB:

18   Q.   Sir, do you know what Mr. Prado did when he got access to

19   the dark web?

20   A.   Yes.

21   Q.   How do you know that?

22   A.   Because he told me.

23   Q.   And what was it that he did?

24   A.   He was getting social and just reselling.

25   Q.   Do you know what he did -- do you know who he resold

1    socials to?

2    A.    Yes.

3    Q.    Who?

4    A.    For me, Luiz Neto, he sold to Dutra Aguiar.

5    Q.    How much did he charge you for socials?

6    A.    For me it was $50.

7    Q.    Do you know how much he charged other people?

8    A.    $200, $250.

9    Q.    How is it that you know that?

10   A.    Because he was telling me.

11   Q.    When you bought social security numbers from him, how did

12   you pay him?

13   A.    Through Zelle.

14   Q.    What is Zelle?

15   A.    It's an app that we can transfer money from bank to bank.

16   Q.    And did you have an account that was hooked up to Zelle?

17   A.    Yes.

18   Q.    What kind of account was that?

19   A.    Bank of America.

20   Q.    Do you know if Mr. Prado had an account linked up to

21   Zelle?

22   A.    Yes.

23   Q.    How do you know that?

24   A.    Because I could only transfer from Bank of America to Bank

25   of America.

1   Q.   And did he have an account set up to Zelle?

2   A.   Yes.

3   Q.   Do you know how other people paid Mr. Prado for social

4   security numbers?

5   A.   Through Zelle, transfer.

6   Q.   How do you know that?

7   A.   Because he was telling me.

8   Q.   How often did you get social security numbers from Prado?

9   A.   Always.

10  Q.   About how many numbers did you get from him?

11  A.   One week I got, like, a hundred in one week.  And then it

12  was like little by little.

13  Q.   What did you do with those social security numbers?

14  A.   Then I applied for the Uber account, Lyft, Instacart.

15  Q.   And whose names were those accounts in?

16  A.   All the driver's license names.

17  Q.   Driver's licenses of whom?

18  A.   From American people.  From all over the state.

19  Q.   You said yesterday that for some of the accounts you and

20  Prado created, you and Prado would drive under them, is that

21  right?

22          MR. PALMER:  Objection, Your Honor.  Form of the

23  question.

24          THE COURT:  What's that?

25          MR. PALMER:  I object to the form of the question.

1          THE COURT:  Sustained.

2    BY MR. HOLCOMB:

3    Q.   Could you remind us how you used the accounts that you

4    created?

5    A.   I used to do -- create an e-mail, use a phone number --

6    Q.   Sir, I'll ask you about how you set them up in a minute.

7    But when you had them, how did you use the accounts?

8    A.   I was using my own cell phone so I could work.

9    Q.   Did you drive under the accounts?

10   A.   Yes.

11   Q.   Did other people drive under those accounts?

12   A.   Yes.

13   Q.   When Mr. Prado created accounts, do you know if he drove

14   under accounts that he created?

15   A.   Yes.

16   Q.   How do you know that?

17   A.   Because he used to show me.

18   Q.   And did he drive under his accounts?

19   A.   No.

20   Q.   What did he do with his accounts?

21   A.   I used my accounts to drive so I could make money.

22   Q.   I'm talking about Mr. Prado's accounts now.

23   A.   Okay.

24   Q.   Did he drive under his accounts?

25   A.   Oh, yes.

 1   Q.   Did other people drive under his accounts?

 2   A.   Yes.

 3   Q.   How do you know that?

 4   A.   Because he told me.

 5   Q.   And whose names were on those accounts?

 6   A.   He used names from American people.  He used names on the

 7   driver's license.

 8   Q.   When you drove with your accounts, how did you get paid?

 9   A.   When I was driving, I was getting paid by the company.

10   They would pay me a percentage.

11   Q.   And which companies were those?

12   A.   Lyft, Uber.

13   Q.   Where did that money go?  How did you receive the money,

14   that is.

15   A.   There was a -- on the app you just, like, touch a button

16   there, the money would transfer to my account.  It would come

17   to my account instantly.

18   Q.   When you say your account, which account are you talking

19   about?

20   A.   Bank of America.  My personal account.

21   Q.   Do you know how Prado got paid when he drove under his

22   accounts?

23   A.   Same way.

24   Q.   How do you know that?

25   A.   Because I was always with him so we talk.

1    Q.    Do you know what kind of accounts he used to receive

2    money?

3    A.    Bank of America.

4    Q.    When you rented out accounts to other people, who were you

5    renting accounts to?

6    A.    I used to rent to illegals, Brazilian illegals.

7    Q.    Where are these Brazilian individuals located?

8    A.    Boston, New Jersey, California.

9    Q.    Now, where were you physically located when you were

10   creating accounts?

11   A.    Boston.

12   Q.    Do you know where Prado was physically located when he

13   created accounts?

14   A.    Boston.

15   Q.    How do you know that?

16   A.    He was my neighbor.

17   Q.    Do you know how Prado -- do you know who Prado rented

18   accounts to?

19   A.    Same people:  All the immigrants, Brazilian undocumented.

20   Q.    How did you find people to rent to?

21   A.    We had groups at the WhatsApp, Facebook.

22   Q.    Could you describe these groups for us?

23   A.    Yeah.  I rented one account to one person and this person

24   opened in a group and say, you know, such and such, he's

25   renting some accounts, so you guys can work.  So that's how we

1   created a group.

2   Q.   And when you say "groups," what was the purpose of this

3   group?

4   A.   To rent accounts.   To sell accounts.

5   Q.   Do you know how Prado found people to rent to?

6   A.   Same way.

7   Q.   How do you know that?

8   A.   Because he was in the same group as I was.

9   Q.   Did you and Prado ever find people to rent each other's

10  accounts?

11  A.   Yes.

12  Q.   How did that typically work?

13  A.   Well, we used to meet people and you just explain how the

14  account was created.   They would send a picture to us and we

15  would just create the account.

16  Q.   The people renting accounts from you, why were they

17  renting accounts from you?

18  A.   Because not many people would create an account and we

19  were the few that would do that.

20  Q.   Could those people drive under their own names?

21  A.   No.

22  Q.   Why not?

23  A.   Because they were undocumented.

24  Q.   Now, I want to ask you about the process of setting up

25  these accounts.   What kind of contact info were you required to

1  provide Uber or Lyft when setting up an account?

2  A.    E-mail, phone number, car registration, the insurance

3  policy, like a picture of the person, driver's license, and

4  social security number.  And a car inspection -- the sticker.

5  Q.    With respect to the e-mails, what e-mail addresses did you

6  use when applying for accounts?

7  A.    I was creating e-mail in Google, Yahoo.

8  Q.    And why were you creating e-mails there?

9  A.    Because it was free.  They would let us create, like,

10  seven e-mails a day.

11  Q.    Did you use different e-mails to set up different

12  accounts?

13  A.    Oh, yes.  For each name I was creating one e-mail.

14  Q.    Why did you do that?

15  A.    Because if I didn't, I wouldn't be able to activate the

16  account, they would block it.

17  Q.    Why would they block it?

18  A.    Well, the system, first of all, it wouldn't let you

19  create -- they would say that was a fraud, so they wouldn't let

20  you create one account with the same -- two accounts with one

21  e-mail.

22  Q.    How did you know how to use different e-mail accounts to

23  create different accounts?

24  A.    Well, I tested before and it didn't work.

25  Q.    Now, do you know what e-mail addresses Prado was using to

1   set up accounts?

2   A.   Gmail, Yahoo.

3   Q.   How do you know that?

4   A.   Because he told me.

5   Q.   Did there come a time when you started using e-mail

6   addresses other than Gmail and American service providers?

7   A.   Yes.

8   Q.   When was that?

9   A.   When?

10  Q.   That's right.

11  A.   I'm lost.  If you don't mind --

12  Q.   When did you start using other e-mail addresses other than

13  Gmail or Yahoo?

14  A.   I got to the point they were blocking the e-mails that I

15  was creating so I had to buy some kind of dominion -- domain.

16  Domain.  I bought that in Brazil and I could create, like, a

17  thousand e-mails.

18  Q.   And how did you use that domain?

19  A.   Well, Thiago started using it and then he gave it to me.

20  He told me how to use it.

21  Q.   Do you know how Prado was using that domain?

22  A.   Yeah, it's a website in Brazil.

23  Q.   How did Prado use the domain?

24  A.   Same way I did.

25  Q.   Please tell us what you mean by same way you did.

1   A.   You're creating the e-mail and then you're creating the

2   accounts.

3   Q.   You used the e-mails you created on the accounts with Uber

4   and Lyft you created?  Is that your testimony?

5   A.   Yes.

6   Q.   Now, when you created e-mail accounts, who had control

7   over those e-mail accounts?

8   A.   I did.

9   Q.   But this was for accounts you created for other people to

10  use, right?

11  A.   Yes.

12  Q.   Why did you keep control over the e-mail account?

13  A.   Because if the people didn't pay me, I would just take the

14  account away from them.

15  Q.   Do you know if Prado did the same thing with the accounts

16  he used?

17  A.   Same way.

18  Q.   With respect to the phone numbers that you used, which

19  phone numbers did you put on application for Uber and Lyft

20  accounts?

21  A.   It was by this app and I used to just -- they give me a

22  phone number for free, this app TextNow.

23  Q.   And did you use a different phone number for each account

24  application?

25  A.   The same e-mail that I was using.  So I used to use the

1    TextNow, they would give me a phone number for each e-mail.

2    Q.   But then for the Uber and Lyft accounts that you applied

3    for, did you use a different phone number for each of those?

4    A.   No, I could use the same number.

5    Q.   When you rented accounts out to other people, did you

6    charge them?

7    A.   Yes.

8    Q.   How much did you charge them?

9    A.   Well, $100, $200, $300.  $250.

10   Q.   Was that a one-time payment or a recurring payment?

11   A.   It was weekly.

12   Q.   And how long would you receive those payments for?

13   A.   Until they had the account.  But if they lost the account

14   I would create a new account and they would continue paying me.

15   Q.   But for any one account, you would receive rental payments

16   for as long as that account was opened; is that right?

17   A.   Yes.  Some accounts it took like a year.

18   Q.   Do you know if Prado was charging people to rent accounts?

19   A.   Yes.

20   Q.   How do you know that?

21   A.   Because we spoke everyday about that.

22   Q.   What did you talk about that with respect to those rent

23   payments?

24   A.   We just tried to establish, like, one rate so he wouldn't

25   charge more or I wouldn't charge more so we would be equal.

1   Q.    So you generally knew what he was charging?

2   A.    Yes.

3   Q.    How much was he charging?

4   A.    $100, $250, $300.  Depends on the account.

5   Q.    When people paid you those rental payments, how did you

6   receive the money?

7   A.    Zelle.

8   Q.    Do you know how Prado received money from people he rented

9   accounts to?

10  A.    Sometimes cash or Zelle.

11  Q.    Do you know why Prado would receive money in cash?

12  A.    Well, some people they just would prefer to pay cash so

13  they wouldn't have anything to do with us, that's why they

14  would pay cash.

15  Q.    Did Prado ever tell you why he preferred to receive money

16  in cash?

17  A.    Well, because he was declaring tax and he said the last --

18  you know, if you're getting cash, you wouldn't have to pay tax

19  on it.

20  Q.    Were there any other reasons that he preferred to receive

21  money in cash?

22  A.    He also had a -- he didn't want to show that he had a lot

23  of money in his account because he was -- he had some -- like

24  a -- child support so he didn't want to show a lot of money in

25  his account.

1    Q.   How do you know that?

2    A.   Because he told me.

3    Q.   Now, the people who rented accounts from you, how did they

4    make money?

5    A.   Working with this account.

6    Q.   And when you say "working with the account," specifically

7    what do you mean?

8    A.   Driving with their picture with somebody else's

9    information.

10   Q.   Do you know how they got paid?

11   A.   Through the app.  The same thing.  The client would pay

12   the app and the company would pay them and the money would go

13   to their account.

14   Q.   And you used the word "client."  Do you mean people who

15   rented accounts from you?

16   A.   Yes.

17   Q.   How frequently would the client get paid by Uber or Lyft?

18   A.   Everyday.

19   Q.   Are you familiar with the term "cashout"?

20   A.   Yes.

21   Q.   What did that mean?

22   A.   Yeah.  It's like a button.  Press, you get the money.  For

23   whatever you worked on that day, you received on that day.

24   Q.   For how long would a client rent an account from you?

25   A.   Some three months, six months, one year.

1   Q.   And how long did Prado's clients rent accounts from him?

2   A.   About the same, until they had the account.

3   Q.   When you say "until they had the account," what do you

4   mean?  Was there a time when they didn't have the account?

5   A.   Because the account would last for a certain period, they

6   would just be deactivated, so we would have to create a

7   different account.

8   Q.   What would cause an account to be deactivated?

9   A.   Because it got to the point that the money, when they

10  would deposit the money to the account, they would find out it

11  was a different name.

12  Q.   And then what would the company do?

13  A.   Cancel the account.

14  Q.   Do you know how the companies detected which account

15  should be deactivated?

16  A.   Yes.

17  Q.   How?

18  A.   Well, Uber and Lyft, they have a system that when you

19  create an account with your face, it stays there in a system

20  forever so if you create another account and you try to use the

21  same face, it just -- the system, they will know.

22  Q.   Did you ever discuss account deactivations with Prado?

23  A.   Yes.

24  Q.   What did you discuss with him about deactivations?

25  A.   We talk everyday about how to figure out a way that the

1   account wouldn't be deactivated.

2   Q.   Did he ever tell you ways that accounts wouldn't be

3   deactivated?

4   A.   No, just trying to do, like, tests.  Try to do different

5   things to, you know, make sure that the accounts were still

6   activated.

7   Q.   What kind of things would you do to keep accounts active?

8   A.   Oh, we changed pictures, we changed cars, telephone

9   numbers, e-mail, IP.

10   Q.   You said you were trying things out.  Who were you trying

11   things out with?

12   A.   Thiago and Luiz Neto.

13   Q.   Sir, are you familiar with what an IP address is?

14   A.   Yes.

15   Q.   How are you familiar with that?

16   A.   Because I used to use an app.  I was using a VPN.

17   Q.   What is an IP address?

18   A.   That's the number for the internet and my computer.

19   Q.   Did Uber and Lyft track IP addresses to your knowledge?

20   Did Uber and Lyft track IP addresses, to your knowledge?

21   A.   Oh, absolutely.

22   Q.   What, if anything, did you do with respect to your IP

23   address?

24   A.   Yes.

25   Q.   When you were applying for Uber and Lyft, did you do

1   anything special with respect to your IP address?

2   A.   Yes.  I would put an app that would not show my IP

3   address.

4   Q.   How did that app work?

5   A.   It's the VPN.  It's a paid system that you can use and you

6   can access the internet from other states and other parts and

7   other countries.

8   Q.   How did you know how to do that?

9   A.   Before, I didn't use that, but after some time I started

10  using because Thiago referred it to me because he used that to

11  access the dark web.

12  Q.   Was it important to you to keep accounts active?

13  A.   Yes.

14  Q.   Why?

15  A.   Because that was the money that I was getting to pay my

16  bills and to keep my family.

17  Q.   Do you know whether Prado was also trying to keep accounts

18  active?

19  A.   Yes.

20  Q.   Do you know why he was trying to keep his accounts active?

21  A.   To pay his bills.

22  Q.   How do you know that?

23  A.   Because I was always with him, always.

24  Q.   Mr. Da Silva, you've described making money through the

25  app through rides?

1    A.    Yes.

2    Q.    Are you familiar with other payments like bonuses that

3    Uber or Lyft offered?

4    A.    Yes.

5    Q.    Could you give us an example?

6    A.    I didn't understand exactly what type of payment you want.

7    Q.    Are you familiar with a bonus or referral reward?

8            THE COURT:   Sorry.   The interpreter didn't interpret

9    the answer.

10           MS. HALL:   The answer was yes, Your Honor.

11           THE COURT:   Hold on, now there's no question.   Go

12   ahead.

13   BY MR. HOLCOMB:

14   Q.    Could you describe that referral bonus for us, please?

15   A.    Yes.   When you refer a person to drive, depending on the

16   month or the state, they give you a bonus for referral.   It

17   depends on -- for 200 rides it can be from $1,500 to $2,000.

18   Q.    Who does the bonus get paid to?

19   A.    For the person who referred the other driver.

20   Q.    Do you know if Prado ever made referral bonuses?

21   A.    Yes.

22   Q.    How do you know that?

23   A.    Because he used to tell me.

24   Q.    What would he do to get referral bonuses?

25   A.    He would refer using his wife's account, because his wife

1   had a social security number, driver's license, and an Uber

2   account.  For you to be able to refer somebody to get the

3   bonus, you have to have a real account because otherwise the

4   account will drop.

5   Q.   When you say the account will drop, what does that mean?

6   A.   Be deactivated.

7   Q.   Why would a fake account be deactivated based on referral

8   bonuses?

9   A.   Because Uber would detect this fraud.  Uber does not want

10   to pay such a high bonus if the account is not real.  They

11   check the accounts.

12   Q.   And so the accounts that were the referred accounts, the

13   people being referred to the platform, were those real or fake

14   accounts?

15   A.   Fake.

16   Q.   Did you ever make referral bonuses?

17   A.   Yes.

18   Q.   How would you do it?

19   A.   The same way, but I didn't have social security number and

20   I didn't have documents so I tried to earn that bonus with the

21   fake accounts but they would drop.

22   Q.   Sir, are you familiar with something called "the drone"?

23   A.   Yes.

24   Q.   What was the drone?

25   A.   This drone is an app that allows you to deceive the Uber

1    system or Lyft or any other app.

2    Q.    How did it work?

3    A.    For example, I'll pick up a passenger at the airport and

4    I'm bringing the passenger to Connecticut.  I drop him off at

5    his house, right?  So instead of doing the dropoff, I set the

6    car up to return by itself to Boston so the ride will cost

7    more.  Another example, when there was a Patriots game in

8    Foxborough, for example, they would give us a very high bonus.

9    For example, $50 per ride.  So I would be at the airport but I

10   would set up the app to have my car in Foxborough, and then my

11   car would come with the ride as if it was, like, flying.  So

12   the next passenger I would pick up at the airport would be

13   paying for a ride and I would get the $50 bonus from

14   Foxborough.

15   Q.    Would the drone allow you to fake your location then?

16   A.    Exactly.

17   Q.    And would the drone allow you to make a trip look longer

18   than it really was?

19   A.    Correct.

20   Q.    What was the purpose for doing either of those things?

21   A.    Make more money.

22   Q.    How did you learn about the drone?

23   A.    When we drove at the airport, we would see -- and by we I

24   mean myself, Thiago, Luiz -- a lot of people just sitting there

25   at the airport.  And then we would go have our rides, come back

1    to the airport, and they were still sitting there.  So we would

2    ask ourselves, they must be doing something wrong.  So that's

3    when Thiago had this idea and he tried to find out what it was

4    and then he found out that it was this.  So he bought the

5    system from a guy, then Luiz Neto copied the system so all of

6    us started using it and then we started selling it.

7    Q.   Who sold the drone?  You said, "we started selling it."

8    A.   So, Thiago was the owner of the drone.  So he would ask me

9    to offer it to people to sell for about $800, $1,000 dollars.

10   So if I sold, I would have profit.

11   Q.   When you sold the drone to people for Thiago, did he also

12   make money?

13   A.   Yes.

14   Q.   How much did Thiago sell the drone for?

15   A.   A thousand dollars.

16   Q.   When somebody bought the drone, what were they buying?

17   A.   This app to make money.

18   Q.   Did you personally use the drone?

19   A.   Yes.

20   Q.   Do you know if Thiago personally used the drone?

21   A.   Yes.

22   Q.   How do you know that?

23   A.   Because we talked everyday.  Sometimes we wouldn't even

24   leave the house and we were working just using the drone.

25   Q.   How would you be able to use the drone without leaving the

1  house?

2  A.   Because I was home but I was online, so my car was

3  actually at the airport.  I would place it at the airport and I

4  would get fake rides and do these rides, they were called ghost

5  rides.  So I was making money like that.

6  Q.   When you put your car at the airport, do you mean you made

7  it look like your car was at the airport?

8  A.   Physically I was at home but my car was at the airport.

9  Q.   Your car physically was at the airport?

10 A.   No, I was home, my car -- not physically, virtually -- was

11 at the airport.

12 Q.   Were there any risks to using the drone?

13 A.   Yes.

14 Q.   What were those risks?

15 A.   The account could be deleted.

16 Q.   Mr. Da Silva, overall, do you know how many accounts Prado

17 had at any given time?

18 A.   Yes.

19 Q.   How do you know that?

20 A.   Because he used to tell me.

21 Q.   How many accounts would he have active at any given time?

22 A.   One time he told me that he and Luiz Neto had 50 active

23 accounts.

24 Q.   And do you know how much money Prado was making from these

25 accounts?

1   A.   Yes.

2   Q.   How do you know that?

3   A.   Because he used to tell me.

4   Q.   How much money was he making from accounts?

5   A.   Weekly him and Luiz Neto, each one of them $8,000 a week.

6   Q.   Sir, when you were doing all of this, did you believe you

7   were committing a crime?

8   A.   Yes.

9   Q.   Did you and Prado ever discuss that you were committing a

10  crime?

11  A.   Yes.

12  Q.   What, if anything, did Prado say about it?

13  A.   He said that it was a silly crime, that all we had to do

14  was pay $10,000, post bail, and then we would be set free.

15  Q.   Were you eventually arrested?

16  A.   Yes.

17  Q.   Approximately when was that?

18  A.   2021.

19  Q.   Did you speak with Prado after you were arrested?

20  A.   Yes.

21  Q.   I'll come back to that.  Now, before you were arrested,

22  did you ever interact with Wemerson Aguiar at Prado's house?

23  A.   Yes.

24  Q.   Approximately when was that?

25  A.   January, 2021.

1   Q.   Could you tell us what they were doing at Prado's house?

2   A.   I had gone to Prado's house to make Japanese food.  When I

3   got there, they were creating driver's license, like printing

4   photos and putting -- getting the licenses to try to create

5   accounts.

6   Q.   What were they using to print driver's licenses?

7   A.   A printer.

8   Q.   And then what were they doing with the printed licenses?

9   A.   They would take the photos and apply it to Uber, Lyft, any

10   account they created.

11   Q.   Now, you just mentioned that you were arrested in 2021; is

12   that correct?

13   A.   May 7, 2021.

14   Q.   Did you speak with Prado after you were arrested?

15   A.   Yes, on the same day.

16   Q.   How did you speak to each other?

17   A.   When I got to the jail, first of all I called my wife.

18   And I asked for his phone number and his wife's phone number.

19   Q.   When you say "his phone number," who do you mean?

20   A.   Thiago Prado and Amarilda.  And later on I called my

21   attorney.  And then I called Thiago Prado.

22   Q.   What did you and Prado discuss?

23   A.   I told him that I had gotten arrested and I needed his

24   support.  I said that my wife may need some money and if she

25   needed money for him to lend her some money and also to pay for

1    an attorney for me.

2    Q.    What if anything did he say in response?

3    A.    He said he had already researched it and that a federal

4    attorney was very expensive and he asked me if he was going to

5    be arrested.

6    Q.    Did he tell you what you should do?

7    A.    Yes.

8    Q.    What did he tell you?

9    A.    To try to delete all my electronic devices.

10    Q.    Did he say why you should do that?

11    A.    Because there was proof, like evidence, against me and him

12    and everything that we did.

13    Q.    Did he tell you what he was going to do?

14    A.    He said he was going to do that:  Delete everything and

15    hide everything he had.

16    Q.    What was your understanding of why he was going to do

17    that?

18            MR. PALMER:  Well, I object to that, Your Honor.

19            THE COURT:  The objection is sustained.  He's

20    testified somewhat to what Mr. Prado said.  You can pursue that

21    discussion.  Maybe you don't have all of it.

22    BY MR. HOLCOMB:

23    Q.    You just said he told you he was going to destroy his

24    devices; is that correct?

25    A.    I told him that he was better off doing that, too, because

1   he was going to be arrested.

2   Q.   But, sir, just yes or no, do you know why he was going to

3   destroy his devices?

4            MR. PALMER:  Objection.

5            THE COURT:  Well, he can answer that yes or no.

6            THE WITNESS:  Yes.

7   BY MR. HOLCOMB:

8   Q.   Before you answer, how do you know that?

9   A.   Because it was proof, evidence --

10            THE COURT:  No, did he tell you that?  What did he

11   say?

12            THE WITNESS:  No, I'm speaking for myself.  But he did

13   say that that could incriminate him.

14   BY MR. HOLCOMB:

15   Q.   Sir, you testified yesterday that you pled guilty to wire

16   fraud conspiracy and aggravated identity theft; is that

17   correct?

18   A.   Yes.

19   Q.   In connection with your guilty plea, did you enter into

20   any agreements with the Government?

21   A.   Yes.

22            MR. HOLCOMB:  Ms. Lewis, may I have Exhibit 116 in

23   evidence, please?

24   BY MR. HOLCOMB:

25   Q.   Sir, do you see this document?

1   A.   Yes.

2   Q.   What is this document?

3   A.   This is the guilty plea agreement that I did.

4        MR. HOLCOMB:  Ms. Lewis, may I have the last page,

5   please?

6   BY MR. HOLCOMB:

7   Q.   Do you see where it says "acknowledgment of plea

8   agreement"?

9   A.   Yes.

10  Q.   And do you see the top signature?

11  A.   Yes.

12  Q.   Is that your signature?

13  A.   Yes.

14       MR. HOLCOMB:  And Ms. Lewis, may I have Exhibit 115 in

15  evidence, please?

16  BY MR. HOLCOMB:

17  Q.   Do you recognize this document?

18  A.   Yes.

19  Q.   What is this document?

20  A.   It's a document that shows cooperation.

21  Q.   And above where it says, "Dear Ms. Griffin," do you see

22  where it says "Cooperation Agreement"?

23  A.   Yes.

24  Q.   Is that the kind of document you just told us?

25  A.   Yes.

1              MR. HOLCOMB:  May I have the last page, please?

2    BY MR. HOLCOMB:

3    Q.   Under "Acknowledgment of Cooperation Agreement," do you

4    see the top signature?

5    A.   Yes.

6    Q.   Is that your signature?

7    A.   Yes.

8              MR. HOLCOMB:  And Ms. Lewis, can I just have the first

9    page again, please?

10   BY MR. HOLCOMB:

11   Q.   Sir, what is your understanding of what you have agreed to

12   do under this cooperation agreement?

13   A.   To tell the truth, just the truth about everything I know.

14   Q.   And what is it that you were hoping that the Government

15   will do if you comply with this cooperation agreement?

16   A.   Nothing was promised to me.  I don't know what can happen.

17   Q.   Are you hoping for a lower sentence as a result of your

18   cooperation?

19   A.   Yes.

20   Q.   Who ultimately decides what sentence you receive?

21   A.   The judge.

22             MR. HOLCOMB:  May I have a moment, Your Honor?

23   Nothing further.

24             THE COURT:  Well, I think at this point I should give

25   the limiting instruction I reviewed with you yesterday.  Ladies

1   and gentlemen, I want to tell you something about the testimony

2   you just heard concerning the Exhibits 115 and 116, Mr. Da

3   Silva's what we call Plea Agreement and Cooperation Agreement.

4   While Mr. Da Silva pled guilty to conspiring with others to

5   defraud rideshare companies, neither Mr. Prado nor any other

6   person was named as an alleged co-conspirator.  Mr. Prado has a

7   right to have the decision concerning whether he has been

8   proven guilty determined by the evidence presented here in

9   court.

10        Mr. Da Silva's plea agreement and the fact that he

11   pled guilty to conspiring with someone to commit wire fraud is

12   not evidence or proof that Mr. Prado is guilty of the charge

13   against him in this case.  You may consider Mr. Da Silva's plea

14   agreement and guilty plea only in judging the credibility, the

15   believability, of his testimony here in court.  Okay?

16        It's now 10:50.  I think before we go to the

17   cross-examination we'll take an abbreviated break, ten minutes.

18   And we'll come back -- come back at 11:05 and we'll see where

19   we are at noontime, but probably have to stop by then.  Okay?

20   Court is in recess.

21        (The hearing recessed from 10:50 to 11:09.)

22        THE COURT:  Mr. Palmer, I assume you took some rest,

23   maybe gave some thought to your cross-examination, so we'll

24   talk about Mr. Jorde more either later today or tomorrow

25   morning, but is there anything before we get the jury?

1          MR. PALMER:  No, Your Honor.

2          THE COURT:  Okay, we'll do that.  Do you have some

3     idea of how long your cross is likely to be?

4          MR. PALMER:  Maybe half an hour, Your Honor, no more.

5          MR. BASIL:  Your Honor, if the cross is just half an

6     hour and the redirect is also short, we have a single witness

7     who's about a five-minute witness.

8          THE COURT:  Well, I'm stopping by 12:00 so we'll see

9     where we are.  You may have some redirect.

10          MR. BASIL:  Yes.

11          THE COURT:  Who's the single witness?

12          MR. BASIL:  Her name is Sharon Valerio, she's the

13     Social Security Administration witness who will just say those

14     are the real SSNs.

15          (The jury entered at 11:10.)

16          THE COURT:  Mr. Palmer, you may cross-examine.

17          MR. PALMER:  Thank you, Your Honor.

18                         CROSS-EXAMINATION

19     BY MR. PALMER:

20     Q.   Mr. Da Silva, yesterday you indicated that you came from

21     Brazil in 2017/2018?

22     A.   Sorry, I didn't understand your question.

23     Q.   Did you come from Brazil in 2018 to the United States?

24     A.   The second time, yes, I came in 2018.

25     Q.   When did you come the first time?

1    A.    2017.

2    Q.    Then you went back to Brazil and returned to the United

3    States in 2018?

4    A.    Correct.

5    Q.    And you had a visa at that time?

6    A.    Yes.

7    Q.    And did your wife come with you with a visa?

8    A.    Yes.

9    Q.    Is your wife a Brazilian national?

10   A.    Yes.

11   Q.    All right.  So how soon after you arrived in 2018 did you

12   start making up fake drivers' accounts for both yourself and

13   for your wife?

14   A.    I started making those fake accounts in 2019.

15   Q.    And you made -- and your wife was driving on a fake

16   account for Uber?

17   A.    Yes.  My wife did drive, yes.

18   Q.    And was she driving on a fake account for Lyft?

19   A.    Yes.

20   Q.    And you yourself were driving on fake accounts for Uber

21   and Lyft, correct?

22   A.    Yes, yes.

23   Q.    And this was all before you ever met Thiago Prado,

24   correct?

25   A.    Yes.

1   Q.   And you know how many rides or -- strike that.  Do you

2   know how many rides that your wife took for Uber and Lyft

3   during that period of time?

4   A.   I believe, like, 400.  I don't know.  Maybe 400 or 500.

5   Depends.

6   Q.   What about you?  How many rides were you riding illegally

7   for Uber or Lyft?

8   A.   About 500 or 600 rides.

9   Q.   And again, this is all before you ever met Mr. Prado; is

10  that correct?

11  A.   Yes.

12  Q.   Now, was your wife ever prosecuted for that?

13  A.   No.

14  Q.   Were you ever prosecuted for that?

15  A.   I am here because of this.

16  Q.   I'm talking about before -- you're here because of

17  Mr. Prado.  I'm talking about before you ever met Prado.  You

18  said you had 400 or 500 drives illegally for Uber or Lyft,

19  right?

20  A.   Before that I do not have any problems with the justice.

21  Q.   So you were never prosecuted for the crimes you committed

22  before you met Mr. Prado; is that correct?

23  A.   No.

24  Q.   Now, before you ever met Mr. Prado, you were engaged in

25  business with a gentleman by the name of Martin; is that right?

```
 1   A.   What's the name?

 2   Q.   Ricardo Martins.  Do you recall that name?

 3   A.   Yes, Ricardo, yes.

 4   Q.   And Ricardo was from Brazil?

 5   A.   Yes.

 6   Q.   And after -- how soon after you got to the United States

 7   in 2018 do you start doing business with Mr. Martins?

 8   A.   As soon as my account dropped, I started renting an

 9   account from Ricardo.

10   Q.   I'm sorry, could you repeat that?

11   A.   As soon as my account dropped, I started renting an

12   account from Ricardo.

13   Q.   And then when did that happen?  Was that in 2018 or was

14   that in 2019?

15   A.   July/August, 2019.

16   Q.   And then you started doing some more business with

17   Mr. Martins, did you not?

18   A.   You are talking about Ricardo Martins, right?

19   Q.   Yes, I am.

20   A.   But I didn't understand your question.  Repeat, please.

21   Q.   When did you start doing business with Ricardo Martins?

22   A.   July/August, 2019.

23   Q.   And at first you started renting accounts from him; is

24   that correct?

25   A.   I worked with an account that he created with my face.
```

1   Q.   Okay.  So how many accounts were created with your face by

2   Ricardo Martins?

3   A.   I believe about ten.

4   Q.   And you were using those accounts to continue driving with

5   Uber or Lyft?

6   A.   Yes.

7   Q.   And how many rides or drives did you make under those ten

8   accounts during 2019?

9   A.   Approximately 500 or 600.

10  Q.   So -- and, again, this is all before you ever met

11  Mr. Prado, right?

12  A.   Yes.  This is like July or August, 2019, I met Thiago at

13  the airport.  Around that time.

14  Q.   So did Mr. Martins also create accounts for your wife to

15  continue driving?

16  A.   No.

17  Q.   So she stopped her illegal activity; is that correct?

18  A.   Yes.

19  Q.   Now, after you started renting these accounts from

20  Mr. Martins, you and Mr. Martins reached some sort of

21  arrangements, we'll call it, for business dealings?

22  A.   At that time, Thiago Prado --

23  Q.   Excuse me, it was a yes-or-no question.  Did you start a

24  business relationship with Mr. Martins?

25  A.   Yes.

1    Q.   And you, in fact, went into business with Mr. Martins; is

2    that correct?

3    A.   Yes.

4    Q.   And Martin, his first name was Ricardo, correct?

5    A.   Yes.

6    Q.   So where was Martins residing at this time?

7    A.   I would talk to him just through WhatsApp.  He probably

8    was in Brazil.  I never saw him in person.

9    Q.   The question was where was he residing at the time --

10        THE COURT:  You should ask him if he knows where he

11   was residing.

12   BY MR. PALMER:

13   Q.   Do you know where he was residing?

14   A.   No.

15   Q.   But all your communications with Ricardo were through

16   WhatsApp.  Is that what your testimony is?

17   A.   Yes.

18   Q.   And Mr. Martins -- you don't know where he resided -- he

19   had many of these so-called accounts in the United States; is

20   that correct?

21   A.   Yes.

22   Q.   Do you know how many accounts he had?

23   A.   About 40, 50 accounts.

24   Q.   And isn't it a fact that he then hired you as the manager

25   of his accounts in the United States?

1   A.   Yes, yes.

2   Q.   And so how many of Mr. Martins' accounts were you managing

3   during this time frame in 2019?

4   A.   20 to 30 accounts.

5   Q.   And you were making about $4,000 a week; is that correct?

6   A.   No.  You mean $4,000 me personally or $4,000 with Ricardo?

7   Q.   Well, let me ask you this:  Was $4,000 coming into your

8   bank account every week during this period of time when you and

9   Martins were working together?

10  A.   Yes.

11  Q.   Now, you said that -- well, let me ask you this:  After

12  you arrived in the United States on a visa in 2018, how long

13  was that visa for?

14  A.   My visa was good for five years, but I could stay in the

15  US only six months legally.

16  Q.   So are you legally in the United States today or illegally

17  in the United States today?

18  A.   Illegally now.

19  Q.   But you're living at home; is that correct?

20  A.   Yes.

21  Q.   Has the immigration service taken any steps to deport you?

22  A.   No.

23  Q.   You were arrested, you said, in May of 2021?

24  A.   May 7, 2021.

25  Q.   And at that time when you were arrested, were you detained

1    in prison?

2    A.    Yes.

3    Q.    And you remained in prison until June of 2022; is that

4    correct?

5    A.    Yes.

6    Q.    So you first decided that you wanted to cooperate with the

7    Government in July of 2021?

8    A.    I had talked to my attorney.  She had given me this option

9    and I said yes.

10   Q.    Okay.  That was in July of 2021; is that correct?

11   A.    Yes.

12   Q.    And so you sat down with the agents and the Assistant US

13   Attorney and your lawyer and you had a meeting; is that

14   correct?

15   A.    Yes, yes.

16   Q.    And during that meeting, you were asked about the case,

17   correct?

18   A.    Yes.

19   Q.    And this was in preparation for whether or not the

20   Government, based on what you were telling them, was willing to

21   enter into a cooperation agreement with you; is that correct?

22   A.    Yes, that I told the truth and everything.

23   Q.    And when you were asked back in July of -- strike that.

24   You were asked back in either June or July what your

25   relationship was with Mr. Prado.  Do you remember what you told

1   the agents at that time?

2   A.   I said I was his friend.

3   Q.   You said you were his friend?

4   A.   We were friends.  We would, like, hang out with each

5   other, or go to each other's house and do the work that we did.

6   Q.   Well, do you remember telling the agents and the Assistant

7   US Attorney at that time that you declined a partnership offer

8   from Prado and Neto?

9   A.   Yes.

10   Q.   And do you remember telling them that you worked mostly by

11   yourself?

12   A.   Yes, yes.

13   Q.   Was that true when you told them that?

14   A.   Yes, yes.

15   Q.   And do you remember telling the agents and the Assistant

16   US Attorney at the time that you didn't want to join Prado and

17   Neto because you were trying to do the right thing?

18   A.   Yes.

19   Q.   So what was your relationship with Aguiar?

20   A.   Zero.

21   Q.   Zero?

22   A.   The one who had --

23   Q.   There's no question now.  There's no question -- no, no,

24   there's no question --

25          THE COURT:  I'm sorry.  You said zero.  It might have

1   been a question or it might have been a reiteration of his

2   answer.  Okay.  What's the next question?

3   BY MR. PALMER:

4   Q.   The next question is, you described or you testified to,

5   one meeting you had with Aguiar.  Did you meet with him on any

6   other occasions?

7   A.   No.  The first time I met him was at Thiago Prado's house

8   in 2021 -- no, 2020.  Sorry, 2021.

9   Q.   Was that the only time you met Aguiar?

10  A.   In person, yes.

11  Q.   Now, after -- so you had been, just to get the chronology

12  in this case, you indicated and testified -- it was testified

13  to yesterday that you pled guilty to a so-called superseding

14  information.  Do you recall that?

15  A.   I don't remember.  I don't know exactly the question

16  you're asking.

17  Q.   Did you plead guilty to a superseding information in this

18  case?

19  A.   Yes, I'm guilty of identity theft and conspiracy with

20  other people.

21  Q.   The question was:  Do you remember pleading guilty to that

22  information?

23  A.   I don't remember.

24  Q.   Do you remember signing those agreements that the

25  prosecutor showed up on the screen?

1   A.   Yes.  Yes, guilty.

2   Q.   Now, prior to that, you were charged with a different

3   indictment.  Do you remember that?

4   A.   Which indictment?

5   Q.   The so-called Second Superseding Indictment.  Do you

6   remember that?

7   A.   I may have signed, but I do not remember.  What I signed

8   was those two papers.

9   Q.   I'm not asking you what you signed.  I'm asking you do you

10  remember before the superseding information was brought against

11  you, there was another charge, there was an indictment that

12  charged you with conspiracy with 17 other people.  Do you

13  remember that?

14          MR. HOLCOMB:  Objection.

15          THE COURT:  Is it because of the number?  Is that the

16  objection?

17          MR. HOLCOMB:  That and he has said he doesn't remember

18  it.

19          THE COURT:  I'm not sure that's what he said.  He said

20  he didn't remember pleading guilty, I believe.  The objection

21  is overruled.

22          MR. PALMER:  Thank you.

23          THE COURT:  But I think there were a total of 18

24  defendants, so 17 others.

25          MR. PALMER:  Eighteen including this one.

 1            THE COURT:  Correct.

 2            MR. PALMER:  Seventeen others.  That's right.

 3            THE COURT:  Go ahead.

 4   BY MR. PALMER:

 5   Q.   So do you remember before the information to which you

 6   pleaded guilty was issued, you were charged in a Second

 7   Superseding Indictment involving 17 other co-defendants.  Do

 8   you remember that?

 9   A.   I do.

10   Q.   So you remember as part of the understanding between your

11   lawyer and the Government, that indictment was going to be

12   dismissed in this case; is that correct?

13            MR. HOLCOMB:  Objection.

14            THE COURT:  I'll see counsel at sidebar.

15            (A discussion was held at sidebar.)

16            What's the objection?

17            MR. HOLCOMB:  To the fact that he's asking essentially

18   what the attorneys were doing.  It's attorney/client

19   information.  He's asking him to talk for the attorney.

20            THE COURT:  He said as a result of the Plea Agreement

21   the second superseding information was to be dismissed.

22            MR. HOLCOMB:  I think part of the objection, Your

23   Honor, was he asked what his attorney's understanding was.

24            THE COURT:  I don't think he asked about his

25   attorneys.

1          MR. HOLCOMB:  I apologize if I misheard that.

2          THE COURT:  I think he asked about the witness's

3    understanding.  Actually, I don't know where that is in the

4    plea agreement.  I'm looking at 116.

5          MR. PALMER:  It's one of those wink and a nod we'll

6    dismiss the indictment and we'll have an information.  I've

7    represented cooperating witnesses in the past.

8          MR. HOLCOMB:  To the extent that's not a plea

9    agreement, though, I don't know how he can testify about that.

10         THE COURT:  Well, he can testify what his

11   understanding was, and basically he doesn't have to say his

12   attorney told him that, he can just ask -- he can testify to

13   his understanding.  In fact, he could ask him, "Did you speak

14   to your attorney and what was your understanding afterwards as

15   to what would happen to the Second Superseding Indictment?"

16   That doesn't invade the attorney/client privilege.

17              (The sidebar discussion ended.)

18         THE COURT:  May I see the interpreters at the sidebar?

19              (The interpreters were seen at sidebar.)

20         I was taking notes and didn't notice that you might

21   not be feeling well.  You don't have to stay.  You can go.

22   She's doing a good job and we'll stop at 12:00 anyway.

23         THE INTERPRETER:  I have low blood pressure.  I'm

24   seeing flashes.

25         THE COURT:  Too much tension.  You can go now.

 1                (The discussion with the interpreters ended.)

 2                All right.   The objection is overruled.   Why don't you

 3     put the question again?

 4                MR. PALMER:   Thank you, Your Honor.   Mr. Da Silva, we

 5     were talking about the Second Superseding Indictment in which

 6     you were charged, along with 17 other people, with conspiracy.

 7     Do you recall that?

 8     A.   Yes.

 9     Q.   And was it your understanding after consultation with your

10     lawyer that that second indictment would be dismissed by the

11     Government if you pled guilty to a new information?

12     A.   No.

13     Q.   But, in fact, that was dismissed after you pled guilty,

14     right?

15     A.   I do not remember.

16     Q.   Is it your understanding, sir, that the Second Superseding

17     Indictment is still a charge against you and 17 other people?

18     The Second Superseding Indictment?

19     A.   I don't understand.   Can you repeat?

20     Q.   You remember you were charged -- before you pled guilty

21     and before you agreed to cooperate with the Government, you

22     were charged in an indictment of conspiracy to commit wire

23     fraud and aggravated identity theft along with 17 other

24     co-defendants.   Do you remember that?

25     A.   Yes.

1   Q.   What is your understanding of what happened to that

2   indictment?

3   A.   That I'm guilty with all of them.

4   Q.   You're guilty with all 17 people?

5   A.   I mean the whole conspiracy as a total.  But the people

6   that I conspired the most was Thiago, Wemerson Aguiar, and Luiz

7   Neto Nascimento.

8   Q.   So what you told the agents and the assistant US Attorney

9   back in June of 2021 was not correct.  Is that what you're

10  saying?

11  A.   I do not understand your question.

12        THE COURT:  Incorrect with regard to what, would be

13  the --

14  BY MR. PALMER:

15  Q.   Well, you indicated back in June when you first talked to

16  the Government about this case that you weren't in partnership

17  with Prado.  Do you remember that?

18  A.   I had a partnership with him, but each one made their own

19  money.  We exchanged information.

20  Q.   Didn't you tell the agents and the Government attorneys

21  back in June of 2021 that you did not have a partnership with

22  Prado, you worked by yourself?  Do you remember telling them

23  that?

24  A.   I worked for myself --

25  Q.   No, the question called for a yes-or-no answer -- whether

1    he said that to the agents and the Government.

2        THE COURT:  Say it again.  Said what?

3    BY MR. PALMER:

4    Q.   You told the agents and the Government in this case of

5    June of 2021 that you did not have a partnership with Prado and

6    that you worked mostly by yourself.  Was that true at that

7    time?

8        THE COURT:  I'm sorry, I thought you were going to ask

9    him if that's what he said.

10   BY MR. PALMER:

11   Q.   Is that what you said?

12   A.   Yes.

13   Q.   Now, after -- so you entered into this agreement with the

14   Government in December of 2021; is that correct?

15   A.   Yes.

16   Q.   And then at the time that you entered into the agreement

17   with the Government, you were still in jail; is that right?

18   A.   Yes.

19   Q.   And then in June, with the Government's assent, you were

20   released from jail; is that correct?

21   A.   I was let out of the jail because there was a reason --

22   Q.   It's a yes-or-no question.  Were you let out of jail in

23   June of 2021?

24   A.   Yes.

25   Q.   And you've been living at some residence on your own since

1   then; is that correct?

2   A.   Yes.

3        THE COURT:  I'm sorry.  Let's just correct this or

4   clarify this.  When were you let out of jail?

5        THE WITNESS:  June, 2022.

6   BY MR. PALMER:

7   Q.   But then you indicated in the agreement -- or in your

8   testimony that no specific promises had been made to you?

9   A.   No promises.

10  Q.   Now, the plea agreement you signed indicates that the

11  Government's going to ask for 51 months in jail.

12  A.   Yes.

13  Q.   Do you understand that?

14  A.   Yes.

15  Q.   But on the basis of your cooperation here, you understood

16  you're not going to be doing 51 months in jail, right?

17  A.   The one who decides is the judge.  I do not know.

18  Q.   Who told you that?

19  A.   My lawyer.

20       THE COURT:  And I'll say -- lest there be any

21  confusion on the jury's part -- that's correct.  I'll decide --

22  if he's found guilty, if Mr. Prado is found guilty.

23       MR. PALMER:  I'm talking about the witness.

24       THE COURT:  I'll decide the sentence for Mr. Da Silva

25  at the appropriate time.

1   BY MR. PALMER:

2   Q.   You understand that the prosecutor's recommendation

3   carries great weight with the Court?

4        THE COURT:  You want to ask him, "Is it your

5   understanding?"  Or, "Do you believe"?

6        THE WITNESS:  I believe so.

7   BY MR. PALMER:

8   Q.   Otherwise you wouldn't have entered into the agreement,

9   right?

10  A.   I accepted the agreement based on the fact that I may have

11  a reduced sentence, but nothing was promised to me.

12  Q.   Was this something that you and your lawyer in coaching

13  your testimony talked about --

14       THE COURT:  Excuse me.  This may -- I think his lawyer

15  is here.  It's possible by answering the last question or the

16  earlier question he waived it, but why don't you try to do it

17  in a way that doesn't call a ruling on whether the

18  communication was privileged.

19       MR. PALMER:  I'll ask him another question.

20       THE COURT:  Because I'll tell the jury what we're

21  talking about.  Confidential communications between a client

22  and a lawyer are what's called privileged.  The witness doesn't

23  have to say what he and his lawyer discussed unless they'd

24  already -- unless the witness had already told it to some third

25  party so it was no longer confidential.

1    BY MR. PALMER:

2    Q.   Let me ask another question, a different question.  Is it

3    your expectation, sir, that you will be allowed not to do any

4    prison time in this case?

5    A.   Yes.

6    Q.   And is it your expectation that you will be continued to

7    be allowed to live in the United States after this case is

8    over?

9    A.   No.

10   Q.   Have you tried to get some assistance from the Government

11   in allowing you to stay in the United States?

12   A.   Not yet.

13   Q.   Not yet.

14            MR. PALMER:  No further questions, Your Honor.

15            THE COURT:  Is there redirect?

16            MR. HOLCOMB:  Yes, Your Honor.

17            THE COURT:  Go ahead.  But we are going to have to

18   stop at noon and, if necessary, we'll resume with Mr. Da Silva

19   tomorrow.

20            MR. HOLCOMB:  Yes, Your Honor.

21                        REDIRECT EXAMINATION

22   BY MR. HOLCOMB:

23   Q.   Mr. Da Silva, you were just asked about meeting with

24   Aguiar and you said you had only met with him once; is that

25   correct?

1   A.   Yes.

2   Q.   You also testified yesterday that you had received social

3   security numbers from Aguiar, though.  Is that correct?

4   A.   Yes.

5   Q.   Did you know that those social security numbers were

6   coming from Aguiar?

7   A.   In the beginning, before Thiago had the system, they would

8   all come from Aguiar.

9   Q.   And you knew that those social security numbers were

10  coming from Aguiar?

11  A.   Yes.

12  Q.   Did you need to meet with Aguiar in order to get social

13  security numbers from him?

14  A.   No.  Thiago would resend them to me.

15  Q.   You were also asked about a partnership between Prado and

16  Neto just now.

17  A.   Yes.

18  Q.   How did Prado's relationship with Neto differ from your

19  relationship with Prado?

20  A.   Prado --

21          THE INTERPRETER:  One minute.

22          THE WITNESS:  Prado used to live on the second floor;

23  Neto lived on the first floor, so it was 30 seconds between the

24  two of them so they would meet and do these accounts all the

25  time.

1    BY MR. HOLCOMB:

2    Q.   And did they share accounts?

3    A.   Yes.

4    Q.   Did you share accounts with them?

5    A.   Yes.

6    Q.   Did they share the profits from accounts?

7    A.   Between them, yes.

8    Q.   Did you share profits with them?

9    A.   Sometimes yes, of some accounts.

10   Q.   And generally were you all working together on fake

11   accounts?

12            MR. PALMER:  Objection, Your Honor.

13            THE COURT:  Overruled.  Well, on those accounts.  You

14   mean on the accounts that they shared profits on?

15            MR. HOLCOMB:  That's correct, Your Honor.

16            THE WITNESS:  Yes.

17   BY MR. HOLCOMB:

18   Q.   You were asked about a Second Superseding Indictment

19   charging you with 17 other people just now.

20   A.   Yes.

21   Q.   Was Thiago Prado one of those 17 other people?

22   A.   Yes.

23   Q.   And did that indictment charge you with anything you

24   didn't plead guilty to?

25   A.   I didn't understand.

1    Q.   The charges in that indictment, were they the same as the

2    ones you pled guilty to?

3            THE COURT:  I'm sorry, you better clarify that.  Do

4    you mean -- you better clarify that, because -- I can explain

5    at sidebar if necessary, but what do you mean by "the charges"?

6    BY MR. HOLCOMB:

7    Q.   Sir do you recall the specific charges in that Second

8    Superseding Indictment?

9    A.   Yes.

10   Q.   And what were those?

11   A.   Aggravated identity theft, conspiracy, tax evasion.  All

12   that.

13   Q.   And, sir, you pled guilty to a superseding information?

14   A.   Yes, I believe so.

15   Q.   And which charges did you plead guilty to under that

16   document?

17           MR. PALMER:  Your Honor, I object to this.

18           THE COURT:  Overruled.

19           THE WITNESS:  Aggravated theft of identity,

20   conspiracy, fraud against people.

21   BY MR. HOLCOMB:

22   Q.   Mr. Da Silva, you also just testified that you had been

23   detained after your arrest.  But at some point you were

24   released; is that correct?

25   A.   Yes.

1    Q.    Do you know why you were released?

2    A.    Yes.

3    Q.    Why were you released?

4              MR. PALMER:  Objection.

5              THE COURT:  You want to know what his understanding is

6    of why he was released?

7              MR. HOLCOMB:  I do, Your Honor.

8              MR. PALMER:  It's not relevant.

9              THE COURT:  I think it is in view of your questioning,

10   but I'll have to see you at sidebar because there may be a Rule

11   403 issue.  And, in fact, since it's 11:55 and I'm going to

12   have to explain my concern -- which is what I think is going to

13   be Mr. Palmer's concern -- I'm going to excuse the jury.

14             So, ladies and gentlemen please come back by 9:00

15   tomorrow.  Hopefully I won't find more surprises overnight, but

16   I might.  Continue to keep an open mind.  Don't discuss the

17   case among yourselves or with anybody else.  Don't communicate

18   on social media about it, and tomorrow I'll give you a sense of

19   the rest of the schedule.

20             We won't finish tomorrow.  We won't have closing

21   arguments and instructions.  You won't need to be here tomorrow

22   afternoon.  You might or might not need to be here on Monday

23   afternoon, I'll see where we are tomorrow.  Okay?  Court is in

24   recess.

25             (The jury exited at 11:55.)

1          THE COURT:  The witness is also excused.  No,

2     actually, you better stay there.  I'll see counsel at sidebar.

3               (A discussion was held at sidebar.)

4          The question was:  Do you have an understanding of why

5     you were let out of jail.  I think it's a relevant question

6     because the suggestion is the Government wanted him -- to give

7     him a benefit because he was cooperating.  But having read the

8     Jencks, I think I recall that there was some concern that he

9     was being -- Prado was talking to him about -- talking to

10    people about him being a cooperator which was putting him in

11    danger.  So what was the basis of your objection?

12         MR. PALMER:  Well, you've highlighted my concern.

13    I've gotten two different versions of what opens a can of

14    worms.  There was no threat from Prado to this witness,

15    whatever his understanding or his lawyer's understandings were.

16    So as I understand it, initially he got out because they said

17    that Prado had been telling other people that he was a

18    cooperator.  The most recent Jencks I got, one of the recent

19    Jencks, doesn't really corroborate what happened.

20         THE COURT:  What is the most recent -- I've read the

21    Jencks.

22         MR. PALMER:  Well, it says something vague like

23    concerning that somebody had learned that he was a cooperator

24    and he was concerned that he might be threatened, or something

25    vague.

1          THE COURT:  All right.  So what's the question you

2     want to ask him?

3          MR. HOLCOMB:  What his understanding is of why he was

4     released, and he could testify as to what his understanding

5     was.  You know, what led to his release is the concerns --

6          THE COURT:  Let's do this with the interpreter.  Come

7     over here with Mr. Da Silva, please.  You too.

8          DA SILVA ATTORNEY:  May I come up while he's being

9     questioned?  I do represent Mr. Da Silva.

10         MR. PALMER:  And Mr. Prado.

11         THE COURT:  All right.  Mr. Prado, you can come, too.

12         You're going to have to translate this for him.

13    Mr. Da Silva, I'm being asked to decide if I should let you

14    answer the question of what your understanding is of why you

15    were let out of jail in June of 2022.  If I let you answer that

16    question before the jury, when the jury is here, what would you

17    say?

18         THE WITNESS:  The truth.

19         THE COURT:  But tell me.  What is your understanding

20    of why you were let out of jail in June, 2022?

21         THE WITNESS:  My understanding is that when I was in

22    jail, Thiago Prado realized that I was cooperating, he started

23    spreading throughout the jail that I was working with the

24    Government, cooperating with the Government.  Then they started

25    trying to kick me out of the jail.

1          THE COURT:  Who tried to -- keep going.

2          THE WITNESS:  So I talked to my attorney and I

3    explained everything to her.  I was a hard worker.  I was in

4    the block of the workers.  So the hairdressers, all the gossip

5    goes through the hairdressers.  So Thiago would go get a

6    haircut and told them that I was a Government agent.  And I was

7    getting -- I was in risk for my life when I was taking showers

8    and stuff like that.  So I told my attorney and she demanded

9    that the Government would let me go, set me free, and wait for

10   my sentence at home.

11         THE COURT:  So it was your understanding that

12   Mr. Prado was telling some people that you were cooperating

13   with the Government; Is that right?

14         THE WITNESS:  They told me personally that.

15         THE COURT:  Who told you?

16         THE WITNESS:  The hairdressers.

17         THE COURT:  All right.  And then you said something

18   about somebody was trying to get you -- kick you out of jail.

19   Who was trying to kick you out of jail?

20         THE WITNESS:  If it were true, that I couldn't be in

21   that block, that I would have to leave that block.  They do not

22   accept people that cooperate inside the same cell block.  So

23   any block I went to, any cell I went to, if they knew that I

24   was cooperating, I couldn't be there.

25         THE COURT:  And you would have to go where?  To

1    another jail?

2              THE WITNESS:  Probably.

3              THE COURT:  And when you heard -- rightly or

4    wrongly -- that Mr. Prado was telling the hairdressers that you

5    were a cooperator, were you concerned for your safety?

6              THE WITNESS:  Yes, yes.

7              THE COURT:  And did -- without telling me what you

8    said, did you speak to your lawyer?

9              THE WITNESS:  Yes.

10             THE COURT:  And were you later let out of jail?

11             THE WITNESS:  Yes.

12             THE COURT:  All right.  So I think this is what the --

13             THE INTERPRETER:  Your Honor, should I continue to

14   interpret?

15             THE COURT:  Yes.  So I think this is -- well,

16   actually --

17             MR. PALMER:  Could I ask him a few questions, Your

18   Honor?

19             THE COURT:  Go ahead.

20             MR. PALMER:  Mr. Da Silva, what, if anything, did

21   Mr. Prado say to you about your being a cooperator?

22             THE WITNESS:  He told the hairdresser on the block

23   where I was that I was cooperating.

24             THE COURT:  Did Mr. Prado say anything to you directly

25   about cooperating?

1          THE WITNESS:  No, because we didn't see each other.

2   We wouldn't see each other.

3          THE COURT:  Well, still --

4          MR. PALMER:  By the way --

5          THE COURT:  Your objection is what?  You want to -- if

6   the question is, "what was your understanding" and a lot of

7   this wouldn't come in, some of it would.

8          MR. PALMER:  But his understanding is informed -- a

9   lot of the questions are being asked of various witnesses,

10  there's no foundation.  It has to come from a direct source.

11  It can't be gossip.

12         THE COURT:  Well, no.  That's not necessarily true.

13         MR. PALMER:  Well, that's not necessarily true --

14         THE COURT:  If --

15         MR. PALMER:  But do the 403 analysis that -- even if,

16  even if his understanding -- such and such -- is coming from a

17  gossiping source, it's not coming from my client.  And my

18  client hasn't done anything.

19         THE COURT:  Well, this is the --

20         MR. PALMER:  And the risk that the jury is going to

21  say, Oh, he's threatening a Government witness --

22         THE COURT:  Well, that's why I sent the jury home.

23  This is what I perceive the issue to be.  So, a, I think it's

24  not irrelevant, even if it's wrong.  The Government might have

25  believed it or shared the concern and helped him get out, but I

1   think it's a 403 balancing is the probative value with

2   regarding credibility substantially outweighed.  And the answer

3   to that may be yes, because the jury's already heard and

4   although he believes I'm going to decide the sentence, he

5   expects that the Government is going to recommend no time and

6   that I'm not going to sentence him to serve any more time in

7   custody.  So that's a significant benefit.

8           MR. PALMER:  It also is a collateral -- it opens up

9   collateral, because the marshals have other places for

10  corroborators in jail.  And so to --

11          THE COURT:  Here, let me ask this:  Did the Government

12  play a role in getting him out of jail?

13          MR. HOLCOMB:  Your Honor, we did.  We assented to a

14  release motion largely because of the safety concerns.

15          THE COURT:  Right.  So I think I am going to sustain

16  the objection.  Getting out of jail -- the Government helping

17  him get out of jail has been a benefit to him.  So -- and, you

18  know, you properly disclosed it.  And I think it's a 403

19  balancing point.  You know, you can bring out, Did he tell

20  you -- is it your understanding that the Government -- the

21  Government can bring this up:  Is it your understanding that

22  the Government played a role in getting you released from jail?

23  Yes.

24          MR. PALMER:  Your Honor, should the witness not be

25  present for this conversation?

 1          THE COURT:  All right.  You can go back on the witness

 2   stand.  You can stay.  Mr. Prado can stay.  So the Government

 3   can bring out what you're doing now on redirect.  The

 4   Government played a role -- is it your understanding the

 5   Government played a role in getting you released from jail?

 6   He'll say yes, we expect.  And then you can say, And have

 7   you -- something like, Did it promise you or ask you to do

 8   anything because it's going to help you get released from jail,

 9   you could get released from jail?  I assume he'll say no.

10   Something along those lines.

11          And then, you know, you can go back to his plea

12   agreement if you want and did he testify truthfully.  He'll say

13   yes.  I believe the immunity portion of the cooperation

14   agreement says he can be prosecuted for perjury if he makes any

15   false statements.  What do you understand can happen to you?

16   And this is a case that I referred you to yesterday.  That's

17   proper.  But I think the -- getting why he understands that he

18   was released -- although, you know, the fact that the

19   hairdresser said to him -- that would be hearsay.  So it

20   wouldn't get in but it affects his state of mind.

21          But I do think the probative value of that -- an

22   answer to that question is substantially outweighed by the risk

23   of unfair prejudice, particularly that the jury will think that

24   Mr. Prado is a dangerous man who was trying to get the witness

25   harmed while they were in jail, and he's not charged with that.

1          MR. HOLCOMB:  Your Honor, may I ask him whether it's

2    his understanding that his release was a result of his signing

3    of the Cooperation Agreement?  My concern is that, as things

4    stand now, the suggestion that was -- has been left with the

5    jury on cross is that his release was a direct reward for

6    entering into a cooperation agreement.  And I understand the

7    concerns about the facts of the safety concerns coming in, but

8    I do think that there is a state of play right now that

9    needs -- that merits some answer.

10          THE COURT:  Do you object to that?

11          MR. PALMER:  The reality is, it was a benefit from his

12    cooperation.  Because I've had clients who have been threatened

13    and they put them in another facility.  So when the

14    Government -- and I'll go into this on recross if the Court

15    allows me to.  It just opens up a can of worms.

16          THE COURT:  He signed the plea agreement --

17    cooperation agreement when, December?  Is that his testimony.

18          MR. HOLCOMB:  It is, yes.

19          THE COURT:  And he was let out six months later.  So

20    if he asks, Was it a result of signing the agreement that you

21    got let out six months later?  We'll see what he says.  And

22    then you can say, Did you think that contributed to it?  Do you

23    think they would have let you out if you hadn't cooperated?

24    That you can do, and we'll see it in the transcript and I'll

25    look in the morning and refresh it, but I really have to go.

1             So the objection's sustained.  I'm saying to the

2    public -- turn off the white noise.  The objection is sustained

3    and we'll resume with this witness at 9:00 tomorrow morning.

4    Court is in recess.

5             (Whereupon the hearing was adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Jessica Leonard, Certified Shorthand Reporter

4    for the United States District Court for the District of

5    Massachusetts, do hereby certify that the foregoing transcript

6    is a true and correct transcript of the stenographically

7    reported proceedings held in the above-entitled matter, to the

8    best of my skill and ability.

9           Dated this 15th day of December, 2023.

10

11

12           /s/ Jessica M. Leonard

13           Jessica M. Leonard, CSR, FCRR

14           Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25